# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
### MIAMI DIVISION

| | | |
|---|---|---|
| ELOY ROJAS MAMANI, ETELVINA RAMOS MAMANI, SONIA ESPEJO VILLALOBOS, HERNÁN APAZA CUTIPA, JUAN PATRICIO QUISPE MAMANI, TEÓFILO BALTAZAR CERRO, JUANA VALENCIA DE CARVAJAL, HERMÓGENES BERNABÉ CALLIZAYA, GONZALO MAMANI AGUILAR, AND FELICIDAD ROSA HUANCA QUISPE | ) ) ) ) ) ) ) ) ) ) | **Case No. 08-21063-Civ-(JORDAN)** <br><br> **CORRECTED AMENDED CONSOLIDATED COMPLAINT FOR EXTRAJUDICIAL KILLING; CRIMES AGAINST HUMANITY; VIOLATION** |
| Plaintiffs, | ) ) | **OF THE RIGHTS TO LIFE, LIBERTY, AND SECURITY OF PERSON AND FREEDOM OF** |
| v. | ) ) | **ASSEMBLY AND ASSOCIATION; WRONGFUL DEATH; INTENTIONAL INFLICTION OF** |
| GONZALO DANIEL SÁNCHEZ DE LOZADA SÁNCHEZ BUSTAMANTE, | ) ) ) | **EMOTIONAL DISTRESS; NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS; AND NEGLIGENCE** |
| Defendant. | ) ) | **JURY TRIAL DEMANDED** |
| | ) ) | |
| ELOY ROJAS MAMANI, ETELVINA RAMOS MAMANI, SONIA ESPEJO VILLALOBOS, HERNÁN APAZA CUTIPA, JUAN PATRICIO QUISPE MAMANI, TEÓFILO BALTAZAR CERRO, JUANA VALENCIA DE CARVAJAL, HERMÓGENES BERNABÉ CALLIZAYA, GONZALO MAMANI AGUILAR, AND FELICIDAD ROSA HUANCA QUISPE | ) ) ) ) ) ) ) ) ) ) ) | **Case No. 07-22459-Civ-(JORDAN/MCALILEY)** |
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| JOSÉ CARLOS SÁNCHEZ BERZAÍN, | ) ) | |
| Defendant. | ) ) ) | |

**PRELIMINARY STATEMENT**

1.      This is a civil action for compensatory and punitive damages against the ex-President of Bolivia, Gonzalo Daniel Sánchez de Lozada Sánchez Bustamante ("Defendant Lozada" or "Lozada"), and ex-Minister of Defense of Bolivia, José Carlos Sánchez Berzaín ("Defendant Sánchez Berzaín" or "Sánchez Berzaín"), (collectively "Defendants"), for their role in the massacre of Bolivian civilians in September and October 2003.  During that period, many Bolivians engaged in protests against unpopular policies of the Bolivian government.  The Defendants' response to the protests of September and October 2003 was to order Bolivian security forces, including military sharpshooters armed with high-powered rifles and soldiers and police wielding machine guns, to attack and kill scores of unarmed civilians, many of whom -- including the victims on whose behalf Plaintiffs are suing -- were not involved in the protests at all, and who were not even in the vicinity of the protests.  In all, security forces under the direction of Defendants intentionally killed 67 and injured over 400, primarily members of Bolivia's indigenous Aymara communities.

**JURISDICTION AND VENUE**

2.       This Court has jurisdiction over this action based on 28 U.S.C. § 1350; 28 U.S.C. § 1331; and 28 U.S.C. § 1332.

3.      This Court also has Supplemental Jurisdiction over Plaintiffs' state law claims based on 28 U.S.C. § 1367.

4.      This Court has personal jurisdiction over Defendant Lozada pursuant to the April 15, 2008 Order of the United States District Court for the District of Maryland.  This Court has personal jurisdiction over Defendant Sánchez Berzaín, as he is a resident of this District.

## PARTIES

5.      On information and belief, Defendant Lozada is a Bolivian citizen and, since he fled Bolivia in October 2003, he has been a resident of the United States, currently residing in Chevy Chase, Maryland.  From August 1993 to August 1997 and again from August 2002 to October 2003, Defendant Lozada served as President of the Republic of Bolivia.

6.      On information and belief, Defendant Sánchez Berzaín is a Bolivian citizen and, since he fled Bolivia in October 2003, he has been a resident of the United States.  On information and belief, he currently resides in Key Biscayne, Florida.

7.      At all relevant times in September and October 2003, Defendant Lozada, as President and Captain General of the Armed Forces, and Defendant Sánchez Berzaín, as Minister of Defense of the Republic of Bolivia, possessed and exercised command and control over the Armed Forces of the country, which includes the permanent forces of the Army, Navy and Air Force, as well as reserve or auxiliary forces (including, among others, the police).

8.      Plaintiffs Eloy Rojas Mamani and Etelvina Ramos Mamani, husband and wife, are natives and citizens of Bolivia, who reside in Warisata, Bolivia.  They bring this action in their individual capacities and on behalf of their eight-year-old daughter, Marlene Nancy Rojas Ramos, who was killed on September 20, 2003 in the family home in Warisata by the Bolivian Armed Forces or persons or groups acting in coordination with the Armed Forces or under their control.

9.      Plaintiff Sonia Espejo Villalobos is a native and citizen of Bolivia, who resides in El Alto, Bolivia.  She brings this action in her individual capacity and on behalf of her husband, Lucio Santos Gandarillas Ayala, who was killed on October 12, 2003 in the Senkata zone of El

Alto by the Bolivian Armed Forces or persons or groups acting in coordination with the Armed Forces or under their control.

10.     Plaintiff Hernán Apaza Cutipa is a native and citizen of Bolivia, who resides in El Alto, Bolivia.  He brings this action in his individual capacity and on behalf of his sister, Roxana Apaza Cutipa, who was killed on October 12, 2003 in her home in the Los Andes zone of El Alto by the Bolivian Armed Forces or persons or groups acting in coordination with the Armed Forces or under their control.

11.     Plaintiff Juan Patricio Quispe Mamani is a native and citizen of Bolivia, who resides in El Alto, Bolivia.  He brings this action in his individual capacity and on behalf of his brother, Constantino Quispe Mamani, who was killed on October 12, 2003 in the Rio Seco region of El Alto by the Bolivian Armed Forces or persons or groups acting in coordination with the Armed Forces or under their control.

12.     Plaintiff Teófilo Baltazar Cerro is a native and citizen of Bolivia, who resides in El Alto, Bolivia.  He brings this action in his individual capacity and on behalf of his wife, Teodosia Morales Mamani, who was killed on October 12, 2003 in Teodosia's sister's home in the Rio Seco zone of El Alto by the Bolivian Armed Forces or persons or groups acting in coordination with the Armed Forces or under their control.  At the time of the shooting, decedent was five months pregnant.

13.     Plaintiff Juana Valencia de Carvajal is a native and citizen of Bolivia, who resides in El Alto, Bolivia.  She brings this action in her individual capacity and on behalf of her husband, Marcelino Carvajal Lucero, who was killed on October 12, 2003 in the Tunari zone of El Alto by the Bolivian Armed Forces or persons or groups acting in coordination with the Armed Forces or under their control.

14.    Plaintiff Hermógenes Bernabé Callizaya is a native and citizen of Bolivia, who resides in Apaña, Bolivia.  He brings this action in his individual capacity and on behalf of his father, Jacinto Bernabé Roque, who was killed on October 13, 2003 in the Animas area near Apaña by the Bolivian Armed Forces.

15.    Plaintiff Gonzalo Mamani Aguilar is a native and citizen of Bolivia, who resides in Apaña, Bolivia.  He brings this action in his individual capacity and on behalf of his father, Arturo Mamani Mamani, who was killed on October 13, 2003 in the Animas area near Apaña by the Bolivian Armed Forces.

16.    Plaintiff Felicidad Rosa Huanca Quispe is a native and citizen of Bolivia, who resides in Ovejuyo, Bolivia.  She brings this action in her individual capacity and on behalf of her father, Raúl Ramón Huanca Márquez, who was killed on October 13, 2003 in Ovejuyo by the Bolivian Armed Forces.

17.    All Plaintiffs' Decedents were Aymara natives of Bolivia.


## STATEMENT OF FACTS

18.    Defendant Lozada was President of Bolivia from August 1993 to August 1997 and from August 2002 to October 2003.

19.    Defendant Sánchez Berzaín was Minister of the Interior during Defendant Lozada's first term as President, and Minister of Defense at all relevant times in September and October 2003.

20.    During his first term, Defendant Lozada oversaw the sale of state industries, provoking widespread domestic criticism based on allegations that these sales were corrupt and were made to companies with which he had close personal ties.

21.     Violent suppression of those who criticized the government marked Defendant Lozada's first term as President.  In response to protests, his administration reacted brutally, inflicting hundreds of civilian casualties.  Defendant Sánchez Berzaín served as Minister of the Interior during this administration, and was widely believed to have been closely involved with the violence.

22.     During his second term as President of Bolivia, from August 2002 to October 2003, Defendant Lozada's administration again employed violence to quell widespread popular criticism of his policies, specifically his economic programs.

23.     Defendant Lozada's administration used military force to silence opposition and intimidate the civilian population, particularly poor and indigenous people.

a)  In two separate incidents in January 2003, the government responded violently to protests, killing demonstrators.

b)  Less than a month later, on February 12, 2003, Defendant Lozada ordered the Armed Forces to suppress a strike organized by police against a recently implemented controversial income tax, again killing demonstrators.  The following day, massive popular protests began in response to the killings by the government, and the soldiers sent by Defendant Lozada attempted to impose control with further violence.

c)  In the first two months of 2003, government security forces were responsible for at least 38 deaths and 182 injuries.  Although the government later provided some compensation to victims, it failed to investigate or to punish those responsible.

24.     Incidents of military violence against the civilian population continued over the next several months.

25.     By September 2003, Defendant Sánchez Berzaín was serving as Minister of Defense in the Lozada government.

26.     In early September 2003, thousands of rural villagers began to congregate in and around El Alto to protest government policies.  On September 8, 2003, these villagers and Aymara community members from El Alto and surrounding areas, up to 15,000 in all, marched toward the neighboring city of La Paz.  Their list of complaints included a new local tax and the detention of a community leader.

27.     In the ensuing days and weeks, communities beyond the El Alto area joined the protests.  The protests increasingly focused on recent policy changes involving the sale of Bolivia's natural gas, which protesters believed to be corrupt.

28.     On September 15, 2003, unions and community groups began widespread street protests and a general civil strike to oppose the natural gas sales.  Aymara community groups blocked major highways, halting automobile traffic on some routes into La Paz.

29.     Around this time, travelers in Sorata, a rural highland village north of La Paz, were unable to return to the city because of the closed roads.

30.     On September 19, 2003, Defendants, along with Minister of the Interior Yerko Kukoc, ordered the mobilization of a joint police and military operation that they asserted was intended to "rescue" the group of travelers in Sorata.  Late on September 19, 2003, security forces left for Sorata.

**The Events of September 20, 2003**

31.     On September 20, 2003, at 5:30 a.m., the military arrived in Warisata, where a small group was demonstrating on the road.  Warisata is a small village between Sorata and La Paz.

32.     The military shot tear gas and bullets upon their arrival.  That day, villagers went into hiding in their homes and in the surrounding hills.

33.     An elderly man, Alejandro Apaza Huallpa, heard the sound of gunfire and villagers shouting, and saw the military convoy's flashing lights.  He and his wife came out of their house, located a few hundred feet from the road.  Soldiers came off the road, and two of them took Mr. Apaza into custody, putting him in a truck.  Later, at a deserted area, the security forces assaulted him with kicks, punches and rifle butts.  After a day, they released him in La Paz.  It took him three days to return home to his wife.

34.     The military and police convoy arrived in Sorata around 8:00 a.m.  Defendant Sánchez Berzaín was present in Sorata directing military personnel.  Protesting local villagers forced Defendant Sánchez Berzaín out of town.  The convoy left Sorata for La Paz around 9:20 a.m. with the travelers.

35.     Outside Sorata, local villagers blocked the road with rocks.  The military chased the unarmed villagers along the ridge overlooking the road for approximately thirty minutes.  Military personnel shot and killed an elderly man, Demetrio Coraca Castro, who was among those being chased by the military.

36.     That afternoon, Defendant Lozada ordered the Bolivian Army, Air Force, and Navy to form a task force and authorized the use of "necessary force" to reestablish public order,

a determination codified in Directive 27/03.  Defendant Sánchez Berzaín, as Minister of Defense, was responsible for the implementation of this Directive.

37.     By early afternoon, the townspeople of Warisata received notice that the military was returning from Sorata.  Villagers from the area came to Warisata to protest the military's use of deadly force in Sorata, news of which had spread among local communities.  The security forces approached Warisata from the direction of Sorata as well as from La Paz.

38.     While security forces were on the ground, Defendant Sánchez Berzaín engaged in the military operation from a helicopter in the area of Warisata at the time of these events.  Shots were fired from a helicopter at the villagers below, and military planes were also spotted in the area.

39.     The military used sharpshooters and machine guns in its attacks on civilians in Warisata.  In Bolivia, only officers—and not conscripted soldiers—are trained as sharpshooters.  Additionally, it is generally officers, and not soldiers, who carry machine guns.

40.     That afternoon, eight-year-old Marlene Nancy Rojas Ramos ("Marlene") was at home in Warisata with her mother, Plaintiff Etelvina Ramos Mamani, who had just given birth.  Marlene was on the second floor of their house, which is a significant distance from the site where villagers had demonstrated that morning in Warisata.  Moments after going to look out a window from inside her home, she was shot by the military.  On information and belief, a sharpshooter fired the shot from at least several hundred yards; no other shots hit the house either before or after the shooting of Marlene.  The single bullet passed through Marlene's chest and pierced the wall behind her.  She fell onto the bed where her mother was lying with the baby.  Marlene died seconds later in her mother's arms.  Marlene's mother clutched her dead child's body for nearly half an hour until a relative pried Marlene from her arms.  Marlene's father,

Plaintiff Eloy Rojas Mamani ("Mr. Rojas"), heard that his daughter had been shot and came down from the hills where he had fled to avoid the military.  He was fired upon continuously as he crawled back to his home.  When he arrived back at his family home and confirmed that his daughter had been killed, he experienced extreme emotional and physical distress.

41.     That day in Warisata, in addition to Marlene, two other civilians were killed by the military, and one soldier was killed by gunfire from an unknown source.  The entry and exit wounds that killed one of the civilians suggest that he was shot from above, possibly from a helicopter or military aircraft seen flying over the area.

**The Events of Early October 2003**

42.     On and after September 20, 2003, Bolivian media provided extensive coverage and criticism of the government's excessive use of force in Sorata and Warisata, as well as of the decisions made by Defendant Sánchez Berzaín, Defendant Lozada, and others in the administration to use the military to address the situation.

43.     On October 1, 2003, Aymara villagers blocked roads again to protest the events in Warisata and Sorata.  Strikes spread throughout the highlands and countryside.

44.     A week later, on October 8, 2003, with the issue of the corrupt sale of gas still unresolved, community organizations called for an indefinite general strike.

45.     On the evening of October 9, 2003, Father Modesto Chino Mamani ("Father Chino"), a Catholic priest in the El Alto area, was returning from tending to a sick parishioner when a group of street protesters approached him.  He saw police grabbing people, beating and humiliating them.  People asked him to help halt the security forces' violence toward civilians in El Alto and to inform the media about the abuses.  Father Chino contacted the media and put on

his priestly vestments so that he could safely approach the security forces.  Father Chino then walked up to a police formation and tried to speak with them.  Instead, they fired rubber bullets directly at him, injuring his leg.

46.     On October 9, 2003, two more civilians were killed and more than twenty were injured, increasing popular outrage toward Defendants and toward the Lozada government.  Three more civilians were injured the next day.  On October 11, 2003, the security forces killed three more civilians, including a five-year-old boy, who was shot on the terrace of his home, far from where the demonstrations took place.  On information and belief, the boy was targeted by a sharpshooter.

47.     On October 11, 2003, Defendants authorized Executive Decree (*Decreto Supremo*) 27209.  The Executive Decree established a state of emergency in the country, declaring the transport of gas to La Paz a national priority.

48.     Anticipating that the government forces would use deadly force and indiscriminate violence, a clause in the Executive Decree offered indemnification for damages to persons and property resulting from the government's actions.

49.     Executive Decree 27209 falsely states that there was a meeting of the full Council of Ministers on October 11, 2003.  In fact, a meeting of the full Council did not occur on that date.  The Decree also falsely states that all of the ministers had signed the Decree on October 11, 2003.  In fact, some signatures were not obtained until October 13, 2003.

50.     In addition, Executive Decree 27209 was not published in the Official Gazette of Bolivia (*Gaceta Oficial de Bolivia*) until October 17, 2003.  It is a well-established legal principle and accepted practice in Bolivia that such decrees do not go into effect until they are published in the Gazette.

**The Events of October 12, 2003**

51.     On October 12, 2003, the military and police killed 30 civilians and injured more than 100 in and around the city of El Alto.

52.     As with the earlier incidents in September 2003, a helicopter flew over the area in El Alto during the attacks on civilians by the military.

53.     Near the Senkata gas plant in El Alto, a tractor emerged onto the main road. Military officers came out of the tractor, unaccompanied by soldiers, and fired shots into the air. Protesters fled in two directions; many ran down a street perpendicular to the main road.

54.     Approximately five military officers then took up firing positions at the intersection of the main road and the side street and began shooting directly at civilians in the road with rifles and machine guns from at least one block away.  The officers first shot and killed Eduardo Baltazar Hino, a thirty-five-year-old man, when he looked out from his hiding place behind a kiosk.  An officer also shot Plaintiff Sonia Espejo Villalobos' husband, Lucio Santos Gandarillas Ayala ("Mr. Gandarillas").  Shortly thereafter, he was taken into a small store, where he was unable to leave to seek treatment for his injuries until the military left.  Plaintiff, his wife, received a call from her sister-in-law informing her that Mr. Gandarillas was in the hospital, where Plaintiff found him still alive but losing blood quickly.  She then accompanied him in an ambulance to a different hospital.  Mr. Gandarillas was bleeding and screaming in pain during the entire trip, and later died in the hospital from his injuries.

55.     Nineteen-year-old Roxana Apaza Cutipa ("Ms. Apaza"), the sister of Plaintiff Hernán Apaza Cutipa ("Mr. Apaza"), was in her house away from the protests when the military stormed El Alto.  Ms. Apaza, along with two younger siblings and her niece, went to the fourth floor terrace around 6:00 p.m. on October 12, 2003.  They heard shots in the distance; there were

11

neither military nor protesters congregated in front of or near her home.  As soon as she peeked

over the ledge of the terrace, the military shot her.  The bullet passed through her head into the

opposite wall.  On information and belief, she was shot by a sharpshooter.  Mr. Apaza found his

sister dead on the terrace several minutes later, after his younger brother told him that she had

been shot.  The death of Ms. Apaza, the oldest female sibling, was devastating for the family, as

the six children had been orphaned several years earlier.  Her younger siblings depended heavily

on Ms. Apaza.

56.     On October 12, 2003, forty-two-year-old Constantino Quispe Mamani ("Mr.

Constantino Quispe"), the brother of Plaintiff Juan Patricio Quispe Mamani ("Mr. Juan Patricio

Quispe"), went out to check on his property in El Alto, which he believed might have been

damaged that day.  He was found badly wounded later that evening.  He had been shot in the

lower back by a bullet that passed through his abdomen.  Mr. Juan Patricio Quispe was informed

in the early evening that his brother had been badly wounded, and went to the hospital, where he

found his brother on a stretcher.  Mr. Constantino Quispe died from his wounds three days later

in the hospital.  Since that death, Mr. Juan Patricio Quispe has been responsible for raising and

providing for Decedent's son, Ronald Quispe de la Oliva.

57.     Teodosia Morales Mamani ("Ms. Morales"), a thirty-nine-year-old pregnant

mother with seven children, was visiting family in El Alto on October 12, 2003.  At that time,

she was not engaged in any protests against the government.  A bullet, fired by the military,

blasted through the wall of the house she was in, hitting Ms. Morales' abdomen and exiting

through her chest.  A relative told her common-law husband and father of her children, Plaintiff

Teófilo Baltazar Cerro ("Mr. Baltazar"), that Ms. Morales had been injured.  Mr. Baltazar took

her to a hospital in La Paz where she arrived around 11:30 p.m. on October 12, 2003.  Their

unborn child died that night.  Ms. Morales died in the early hours of October 14, 2003 without ever leaving the hospital.  Plaintiff is now the sole supporter of their seven children.

58.    Fifty-nine-year-old Marcelino Carvajal Lucero was in his house in El Alto with his wife, Plaintiff Juana Valencia de Carvajal ("Mrs. Carvajal"), in the early evening of October 12, 2003.  When he went to close a window, military personnel shot him in the chest.  The bullet passed through his body and entered the wall behind him.  Mrs. Carvajal came to her husband's aid as he lay on the floor, bleeding.  Despite his wife's efforts to stop the bleeding, he died before he could receive any medical attention.  Mrs. Carvajal would not take her deceased husband to the morgue because she feared the government would disappear the body, and instead took it to the parish where a wake was held.


**The Events of October 13, 2003**

59.    In a nationally-televised address on October 13, 2003, Defendant Lozada did not order an end to the violence; instead, he used the occasion to accuse protesters of being traitors and subversives and of attempting a coup funded by international financiers.

60.    On the morning of October 13, 2003, then Vice President Carlos Mesa appeared on television to distance himself from Defendant Lozada's government and stated, "Neither as a citizen nor a man of principles can I accept that, faced with popular pressure, the response should be death."

61.    Nonetheless, violence by security forces against civilians, including killings, continued.

62.    By October 13, 2003, military units were encamped near Lake Animas on the road between the villages of Apaña and Uni, on the outskirts of La Paz.

63.     On the morning of October 13, 2003, a group of approximately 400 villagers from Ovejuyo and surrounding villages walked toward Lake Animas.  At a guardhouse near the lake, they were confronted by a company of approximately 90 soldiers who were spread out over the road.  The military opened fire with rifles and machine guns, and the villagers fled in different directions.  The military continued to fire on the fleeing villagers, who sought refuge in hills and ditches nearby.

64.     Over the course of the next several hours, the military killed seven civilians and, on information and belief, one conscripted soldier.  Three of the dead were killed by a single shot to the head, including the soldier.  On information and belief, military sharpshooters fired these and other shots.

65.     The first person shot and killed in the area was Germán Carvajal Valencia ("Mr. Carvajal"), a thirty-five-year-old man.  After the military opened fire, Mr. Carvajal hid in the hills.  When he peeked out from behind a rock, military personnel shot him in the forehead from a distance of several hundred yards.

66.     Also killed by a single shot to the head—a bullet piercing the cheek and exiting the back of the head—was Marcelo Hugo Cusi Vargas, a twenty-one-year-old man.

67.     The third victim shot in this fashion was Edgar Lecoña Amaru, a nineteen-year-old soldier, killed with a single shot through his eye.  The nature of the injury suggests that he was killed by a sharpshooter.  Mr. Lecoña was killed mid-morning near Lake Animas.  The autopsy on his cadaver was performed in La Paz at 1:30 p.m. that same day.  Military conscripts in Mr. Lecoña's regiment later told his family that an officer had shot Mr. Lecoña.

68.     Only military officers in the Bolivian Armed Forces receive sharpshooter training.

14

69.     After about an hour of constant firing on the ground, a helicopter arrived on the scene, firing as it flew overhead.  The helicopter carried Defendant Sánchez Berzaín, who was directing military personnel in the helicopter where to fire their weapons.  The helicopter flew over the area, circling twice and firing at civilians on the ground before landing in Uni.  Soldiers unloaded munitions from the helicopter and delivered them to other military personnel, who were dispersed throughout the hills in the area.  Thereafter the shooting intensified again as the military encircled the Animas area.

70.     Plaintiff Hermógenes Bernabé Callizaya's father, Jacinto Bernabé Roque ("Mr. Bernabé"), a sixty-one-year-old man, left Apaña headed for another son's home in Uni on October 13, 2003.  He intended to walk through the hills so that he could retrieve his crop of lettuce and carry it back to Apaña.  While Mr. Bernabé was walking through the hills, the military shot and killed him.

71.     On October 13, 2003, after the military began shooting, Domingo Mamani Mamani ("Mr. Domingo Mamani"), a thirty-two-year-old man, was hiding in the hills.  As he reached the crest of a hill, the military shot and killed him.  His nephew, Plaintiff Gonzalo Mamani Aguilar ("Mr. Gonzalo Mamani"), a teenager at the time, witnessed the killing.

72.     That morning, Arturo Mamani Mamani ("Mr. Arturo Mamani"), a forty-two-year-old man, was tending his family's small potato field with his son, Mr. Gonzalo Mamani.  The field was in the hills hundreds of meters above the road, and out of view of the military personnel below.  After military personnel began firing, Mr. Arturo Mamani and his son climbed higher up into the hills to see what was happening below.  While his son hid in a crevice a short distance away, Mr. Arturo Mamani watched the scene unfold below, and saw his brother Mr. Domingo Mamani shot by military personnel.  A short while later, military personnel shot Mr.

15

Arturo Mamani at about 11:00 a.m. from a significant distance, through the leg.  His son carried

his father, Mr. Arturo Mamani, down the hill, eventually obtaining assistance.  His father was

carried to a hospital, where he died.

73.     After several hours, the military departed Apaña and Uni and headed toward La

Paz.  As they passed through the village of Ovejuyo near Apaña, personnel in military transports

fired at civilians.  They fired at a drunken man who feigned death.  They also shot and killed the

father of Plaintiff Felicidad Rosa Huanca Quispe, Raúl Ramón Huanca Márquez, from a

significant distance as he crawled along the ground to avoid gunfire.

74.     On October 15 and 16, 2003, military personnel killed three additional civilians.

On October 17, 2003, the U.S. Embassy issued a public statement withdrawing support for

Defendant Lozada and his government.  On that same day, Defendant Lozada resigned the

presidency.  Both Defendants, immediately fled to the United States.

75.     In November 2004, one year after Defendants left Bolivia, the Trial of

Responsibilities (*Juicio de Responsabilidades*) commenced in Bolivia to determine the criminal

liability of Defendant Lozada, Defendant Sánchez Berzaín, and other ministers for the 67 deaths

and over 400 injuries during September and October 2003.

76.     While twelve ministers have testified, Defendant Sánchez Berzaín and Defendant

Lozada have refused to return to Bolivia to face trial.  On June 22, 2005, the Bolivian

government formally requested that the U.S. State Department serve Defendants in connection

with the criminal investigation in Bolivia.  On information and belief, the U.S. State Department

has not forwarded this request to either Defendant Lozada or Defendant Sánchez Berzaín.

77.     In January 2007, the Supreme Court of Bolivia issued pre-indictments against Defendant Lozada and Defendant Sánchez Berzaín, advancing the criminal process against the two men and others.

## GENERAL ALLEGATIONS

78.     The acts described herein were carried out under actual or apparent authority or color of law of the government of Bolivia.  The acts of extrajudicial killing against Plaintiffs' Decedents were part of a pattern and practice of systematic or widespread attacks and human rights violations committed against the civilian population in Bolivia from September to October 2003, for which Defendants bear responsibility.

79.     At all relevant times in September and October 2003, Defendant Lozada, as President, was Captain General of the Armed Forces of Bolivia, as designated by Article 97 of the Bolivian Constitution, and Defendant Sánchez Berzaín was Minister of Defense of the Republic of Bolivia.  As such, Defendants possessed and exercised command and control over the Armed Forces of Bolivia, which includes the Army, Navy and Air Force and, as a reserve or auxiliary force, the police.  Defendants' command over such forces included the authority and responsibility to give orders to, set policy for, and manage the affairs of these forces, and to appoint, remove and discipline the personnel of such forces.  They also acquiesced in and permitted persons or groups acting in coordination with the Police and Armed Forces or under their control to commit human rights abuses and widespread attacks against civilians.

80.     At all relevant times in September and October 2003, Defendant Lozada and Defendant Sánchez Berzaín had the actual authority and practical ability to exert control over subordinates in the security forces.

81.     At all relevant times in September and October 2003, Defendant Lozada and Defendant Sánchez Berzaín met with military leaders, other ministers in the Lozada government to plan widespread attacks involving the use of high-caliber weapons against protesters.

82.     At all relevant times in September and October 2003, Defendant Lozada and Defendant Sánchez Berzaín had a duty under customary international law and Bolivian law to ensure the protection of civilians, to prevent violations of international and Bolivian law by government forces, and to ensure that all persons under their command were trained in, and complied with, the laws of war, as well as international and Bolivian law, including the prohibitions against extrajudicial killings and crimes against humanity.

83.     At all relevant times in September and October 2003, Defendant Lozada and Defendant Sánchez Berzaín were under a duty to investigate, prevent and punish violations of international and Bolivian law committed by members of the Armed Forces under his command.

84.     The extrajudicial killings described above were part of a pattern and practice of widespread, systematic attacks against the civilian population of Bolivia.

85.     At all relevant times, Defendant Lozada and Defendant Sánchez Berzaín knew or reasonably should have known of the pattern and practice of widespread, systematic attacks against the civilian population by subordinates under their command, including the abuses committed against Plaintiffs and Plaintiffs' Decedents.

86.     Defendant Lozada and Defendant Sánchez Berzaín knew or should have known that government forces had employed targeted, deadly force against Bolivia's civilian population prior to September and October 2003.

87.     During the events of September and October 2003, images of violence perpetrated by the government forces were repeatedly shown on the major Bolivian television stations and in

the major newspapers.  Furthermore, community and human rights leaders met with Defendant

Sánchez Berzaín, Defendant Lozada, and other members of the government to discuss the

violence that was taking place.  Nevertheless, rather than taking necessary steps to prevent

additional violence, Defendants and the government escalated the attacks against the civilian

population.

88.     Defendant Lozada and Defendant Sánchez Berzaín failed or refused to take all

necessary measures to investigate and prevent these abuses, or to punish personnel under their

command for committing such abuses.

89.     At all times relevant hereto, Defendant Lozada and Defendant Sánchez Berzaín

exercised command responsibility over, conspired with, ratified, and/or aided and abetted

subordinates in the Armed Forces or persons or groups acting in coordination with the Armed

Forces or under their control to commit acts of extrajudicial killing, crimes against humanity, and

the other wrongful acts alleged herein, and to cover up these abuses.

90.     At all times relevant hereto, Defendant Lozada's and Defendant Sánchez

Berzaín's acts and omissions described above, and the acts committed by their subordinates

against the Plaintiffs and Plaintiffs' Decedents, were committed under actual or apparent

authority, or color of law, of the government of Bolivia.

91.     At all times relevant hereto, the Armed Forces or persons or groups acting in

coordination with the Armed Forces or under their control were acting as agents of Defendant

Lozada and Defendant Sánchez Berzaín.

## FIRST CLAIM FOR RELIEF
*(Extrajudicial Killing)*

92.     Plaintiffs Eloy Rojas Mamani, Etelvina Ramos Mamani, Sonia Espejo Villalobos, Hernán Apaza Cutipa, Juan Patricio Quispe Mamani, Teófilo Baltazar Cerro, Juana Valencia de Carvajal, Hermógenes Bernabé Callizaya, Gonzalo Mamani Aguilar, and Felicidad Rosa Huanca Quispe re-allege and incorporate by reference the allegations set forth in paragraphs 1 through 91 as if fully set forth herein.

93.     The murders of Plaintiffs' Decedents Marlene Nancy Rojas Ramos, Lucio Santos Gandarillas Ayala, Roxana Apaza Cutipa, Constantino Quispe Mamani, Teodosia Morales Mamani and her unborn child, Marcelino Carvajal Lucero, Jacinto Bernabé Roque, Arturo Mamani Mamani and Raúl Ramón Huanca Márquez constitute extrajudicial killings under customary international law and as defined by the Torture Victim Protection Act, Pub. L. No. 102-256, 106 Stat. 73 (1992) (codified at 28 U.S.C. § 1350 note).

94.     Defendants are liable for the acts committed by their subordinates, caused the extrajudicial killings of said Decedents, and caused Plaintiffs Eloy Rojas Mamani, Etelvina Ramos Mamani, Sonia Espejo Villalobos, Hernán Apaza Cutipa, Juan Patricio Quispe Mamani, Teófilo Baltazar Cerro, Juana Valencia de Carvajal, Hermógenes Bernabé Callizaya, Gonzalo Mamani Aguilar, and Felicidad Rosa Huanca Quispe to experience severe mental pain and suffering.

95.     The conduct alleged is actionable under the Alien Tort Statute, 28 U.S.C. § 1350, and the Torture Victim Protection Act, Pub. L. No. 102-256, 106 Stat. 73 (1992) (codified at 28 U.S.C. § 1350 note).

**SECOND CLAIM FOR RELIEF**
*(Crimes Against Humanity)*

96.     Plaintiffs Eloy Rojas Mamani, Etelvina Ramos Mamani, Sonia Espejo Villalobos, Hernán Apaza Cutipa, Juan Patricio Quispe Mamani, Teófilo Baltazar Cerro, Juana Valencia de Carvajal, Hermógenes Bernabé Callizaya, Gonzalo Mamani Aguilar, and Felicidad Rosa Huanca Quispe re-allege and incorporate by reference the allegations set forth in paragraphs 1 through 91 as if fully set forth herein.

97.     The extrajudicial killings of Plaintiffs' Decedents Marlene Nancy Rojas Ramos, Lucio Santos Gandarillas Ayala, Roxana Apaza Cutipa, Constantino Quispe Mamani, Teodosia Morales Mamani and her unborn child, Marcelino Carvajal Lucero, Jacinto Bernabé Roque, Arturo Mamani Mamani and Raúl Ramón Huanca Márquez described herein were committed as part of a widespread or systematic attack against a civilian population.

98.     The attacks were intended to terrorize the indigenous Aymara population of the La Paz region.

99.     The conduct alleged violates the customary international law norm prohibiting crimes against humanity and is actionable under the Alien Tort Statute.

**THIRD CLAIM FOR RELIEF**
*(Violation of the Rights to Life, Liberty and Security of Person and Freedom of Assembly and Association)*

100.     Plaintiffs Eloy Rojas Mamani, Etelvina Ramos Mamani, Sonia Espejo Villalobos, Hernán Apaza Cutipa, Juan Patricio Quispe Mamani, Teófilo Baltazar Cerro, Juana Valencia de Carvajal, Hermógenes Bernabé Callizaya, Gonzalo Mamani Aguilar, and Felicidad Rosa Huanca Quispe allege and incorporate by reference the allegations set forth in paragraphs 1 through 91 as if fully set forth herein.

101.     The shootings of Plaintiffs' Decedents Marlene Nancy Rojas Ramos, Lucio

Santos Gandarillas Ayala, Roxana Apaza Cutipa, Constantino Quispe Mamani, Teodosia

Morales Mamani and her unborn child, Marcelino Carvajal Lucero, Jacinto Bernabé Roque,

Arturo Mamani Mamani and Raúl Ramón Huanca Márquez described herein were violations of

their rights to life, liberty and security of person, and their rights to association, for which

Defendants may be held liable.   In addition, the right of Lucio Santos Gandarillas Ayala to

assemble peacefully was violated.

102.     The wrongful acts described herein violated and deprived Plaintiffs' Decedents of

their rights to life, liberty and security of person, to association, and, in the case of Lucio Santos

Gandarillas Ayala, to peaceful assembly, in violation of customary international law.  This

conduct is actionable under the Alien Tort Statute.

103.     Defendants are liable for said conduct in that they requested, confirmed, ratified,

incited and/or conspired with the Bolivian Armed Forces and Police or persons or groups acting

in coordination with the Armed Forces or under their control to bring about these violations.

## FOURTH CLAIM FOR RELIEF
### *(Wrongful Death)*

104.     All Plaintiffs allege and incorporate by reference the allegations set forth in

paragraphs 1 through 91 as if fully set forth herein.

105.     Defendant Lozada and Defendant Sánchez Berzaín tortiously and intentionally

ordered military personnel to use deadly force against the unarmed decedents, who posed no

threat to Defendants, Bolivian military personnel or others.  Defendants' tortious conduct caused

the deaths of Marlene Nancy Rojas Ramos, Lucio Santos Gandarillas Ayala, Roxana Apaza

Cutipa, Constantino Quispe Mamani, Teodosia Morales Mamani and her unborn child,

Marcelino Carvajal Lucero, Jacinto Bernabé Roque, Arturo Mamani Mamani, and Raúl Ramón Huanca Márquez.

106.     Plaintiff Eloy Rojas Mamani is the father and personal representative of decedent Marlene Nancy Rojas Ramos, and Plaintiff Etelvina Ramos Mamani is the mother of decedent Marlene Nancy Rojas Ramos.  As a result of the death of their daughter, Mr. and Mrs. Rojas have suffered damages due to mental pain and anguish, medical and funeral expenses, and the loss of future support and services.

107.     Plaintiff Sonia Espejo Villalobos is the wife and personal representative of decedent Lucio Santos Gandarillas Ayala.  As a result of the death of her husband, Mrs. Espejo has suffered damages due to mental pain and anguish, medical and funeral expenses, and the loss of future support and services on which she is dependent.

108.     Plaintiff Hernán Apaza Cutipa is the brother and personal representative of decedent Roxana Apaza Cutipa.  As a result of the death of his sister, Mr. Apaza has suffered damages due to mental pain and anguish, medical and funeral expenses, and the loss of future support and services on which he and his family are dependent.

109.     Plaintiff Juan Patricio Quispe Mamani is the brother and personal representative of decedent Constantino Quispe Mamani.  As a result of the death of his brother, Mr. Juan Patricio Quispe has suffered damages due to mental pain and anguish, medical and funeral expenses, and the loss of future support and services on which he and his family are dependent.

110.     Plaintiff Teófilo Baltazar Cerro is the husband and personal representative of decedent Teodosia Morales Mamani.  At the time of the shooting, decedent was five months pregnant.  As such, Mr. Baltazar is also the father of his unborn child.  As a result of the death of

23

his wife and unborn child, Mr. Baltazar has suffered damages due to mental pain and anguish, medical and funeral expenses, and the loss of future support and services.

111.    Plaintiff Juana Valencia de Carvajal is the wife and personal representative of decedent Marcelino Carvajal Lucero.  As a result of the death of her husband, Mrs. Valencia de Carvajal has suffered damages due to mental pain and anguish, medical and funeral expenses, and the loss of future support and services on which she is dependent.

112.    Plaintiff Hermógenes Bernabé Callizaya is the son and personal representative of decedent Jacinto Bernabé Roque.  As a result of the death of his father, Mr. Bernabé Callizaya has suffered damages due to mental pain and anguish, medical and funeral expenses, and the loss of future support and services on which he and his family are dependent.

113.    Plaintiff Gonzalo Mamani Aguilar is the son and personal representative of decedent Arturo Mamani Mamani.  As a result of the death of his father, Mr. Mamani Aguilar has suffered damages due to mental pain and anguish, medical and funeral expenses, and the loss of future support and services on which he and his family are dependent.

114.    Plaintiff Felicidad Rosa Huanca Quispe is the daughter and personal representative of decedent Raúl Ramón Huanca Márquez.  As a result of the death of her father, Ms. Huanca Quispe has suffered damages due to mental pain and anguish, medical and funeral expenses, and the loss of future support and services on which she and her family are dependent.

## FIFTH CLAIM FOR RELIEF
*(Intentional Infliction of Emotional Distress)*

115.    Plaintiffs Eloy Rojas Mamani, Etelvina Ramos Mamani, Sonia Espejo Villalobos, Hernán Apaza Cutipa, Juan Patricio Quispe Mamani, Teófilo Baltazar Cerro, Juana Valencia de Carvajal, Hermógenes Bernabé Callizaya, Gonzalo Mamani Aguilar, and Felicidad Rosa Huanca

Quispe allege and incorporate by reference the allegations set forth in paragraphs 1 through 91 as if fully set forth herein.

116.    The acts described herein constitute outrageous conduct against the Decedents. These acts terrorized Decedents' families, including the Plaintiffs.

117.    Defendant Lozada and Defendant Sánchez Berzaín intended to cause Plaintiffs to suffer emotional distress, or, in the alternative, Defendants or their agents engaged in the conduct with reckless disregard of the high probability of causing Plaintiffs to suffer emotional distress.

118.    Plaintiffs suffered severe emotional distress and the outrageous conduct of Defendants was a cause of the emotional distress suffered by Plaintiffs.

119.    Defendant Lozada's and Defendant Sánchez Berzaín's or their agents' outrageous conduct constitutes intentional infliction of emotional distress and is actionable under the laws of the State of Florida.  Plaintiffs are entitled to compensatory and punitive damages in amounts to be ascertained at trial.

## SIXTH CLAIM FOR RELIEF
*(Negligent Infliction of Emotional Distress)*

120.    Plaintiffs Eloy Rojas Mamani and Etelvina Ramos Mamani allege and incorporate by reference the allegations set forth in paragraphs 1 through 91 as if fully set forth herein.

121.    At all relevant times, Defendant Lozada and Defendant Sánchez Berzaín owed these two Plaintiffs a duty to act with reasonable care, and/or the injury to the Plaintiffs was reasonably foreseeable.

122.    At all relevant times, Defendants had the power, ability, authority and duty to stop engaging in the conduct described herein and to intervene to prevent or prohibit such conduct.

123.    At all relevant times, Defendants knew, or reasonably should have known, that the conduct described herein would and did proximately result in Plaintiffs' physical and emotional distress.

124.    Despite said knowledge, power, and duty, Defendant Lozada and Defendant Sánchez Berzaín negligently failed to stop engaging in the conduct described herein or to prevent or to prohibit such conduct or otherwise to protect Plaintiffs, thereby breaching their duty to them.  To the extent that said negligent conduct was perpetrated by certain agents of the government, the Defendants confirmed and ratified said conduct with the knowledge that Plaintiffs' emotional and physical distress would thereby increase and with a wanton and reckless disregard for the deleterious consequences to Plaintiffs.

125.    Plaintiffs observed the circumstances of the extrajudicial killing of a family member.

126.    As a direct and legal result of Defendant Lozada's and Defendant Sánchez Berzaín's wrongful acts, Plaintiffs have suffered and will continue to suffer significant physical injury, pain and suffering and extreme and severe mental anguish and emotional distress.

127.    Defendant Lozada's and Defendant Sánchez Berzaín's conduct constitutes the negligent infliction of emotional distress and is actionable under the laws of the State of Florida. Plaintiffs are entitled to compensatory and punitive damages in amounts to be ascertained at trial.

**SEVENTH CLAIM FOR RELIEF**
*(Negligence)*

128.    All Plaintiffs allege and incorporate by reference the allegations set forth in paragraphs 1 through 91 as if fully set forth herein.

129.    Defendant Lozada and Defendant Sánchez Berzaín failed to use ordinary or reasonable care to avoid injury to Plaintiffs.  Defendants' negligence was a cause of injury, damage, loss or harm to Plaintiffs.

130.    As a result of these acts, Plaintiffs suffered harm including, but not limited to, physical injury, pain and suffering, and severe emotional distress.  Defendants' conduct constitutes negligence and is actionable under the laws of the State of Florida.  Plaintiffs are entitled to compensatory and punitive damages in amounts to be ascertained at trial.

## PRAYER FOR RELIEF

131.    WHEREFORE, Plaintiffs pray for judgment against Defendants as follows:

(a) For compensatory damages according to proof;

(b) For punitive and exemplary damages according to proof;

(c) For reasonable attorneys' fees and costs of suit, according to proof; and

(d) For such other and further relief as the court may deem just and proper.

132.    A jury trial is demanded on all issues.

Dated: May 16, 2008
        Miami, Florida

                              Respectfully submitted,

                              By:    _____/s/ Ira J. Kurzban_____

                              Ira J. Kurzban (Fla. Bar No. 225517)
                              KURZBAN, KURZBAN, WEINGER & TETZOLI,
                              P.A.
                              Plaza 2650
                              2650 SW 27th Avenue, 2nd Floor
                              Miami, FL  33133
                              Tel: (305) 443-4675
                              Fax: (305) 444-3503
                              E-mail: ira@kkwtlaw.com
                              *Attorneys for Plaintiffs*

*Attorneys for Plaintiffs*

Paul Hoffman
SCHONBRUN, DE SIMONE, SEPLOW,
HARRIS & HOFFMAN, LLP
723 Ocean Front Walk
Venice, CA 90201
Tel: (310) 396-0731
Fax: (310) 399-7040
E-mail: hoffpaul@aol.com

David Rudovsky (*pro hac vice*)
KAIRYS, RUDOVSKY, MESSING &
FEINBERG LLP
718 Arch Street, Suite 501 South
Philadelphia, PA 19016
Tel: (215) 925-4400
Fax: (215) 925-5365
E-mail: drudovsk@law.upenn.edu

James L. Cavallaro (*pro hac vice*)
Tyler R. Giannini (*pro hac vice*)
INTERNATIONAL HUMAN RIGHTS
CLINIC, Human Rights Program
Harvard Law School
Pound Hall 401, 1563 Massachusetts Avenue
Cambridge, MA 02138
Tel: (617) 495-9362
Fax: (617) 495-9393
E-mail: jcavalla@law.harvard.edu
E-mail: giannini@law.harvard.edu

Judith Brown Chomsky (*pro hac vice*)
CENTER FOR CONSTITUTIONAL RIGHTS
Post Office Box 29726
Elkins Park, PA  19027
Tel:  (215) 782-8367
Fax:  (215) 782-8368
E-mail: jchomsky@igc.org

Jennifer Green
CENTER FOR CONSTITUTIONAL RIGHTS
666 Broadway
Seventh Floor
New York, NY 10012
Tel:  (212) 614-6431
Fax:  (212) 614-6499
E-mail: jgreen@ccr-ny.org

Steven H. Schulman (*pro hac vice*)
John L. Van Sickle (*pro hac vice*)
Meredith L. Bentley (*pro hac vice*)
AKIN GUMP STRAUSS HAUER & FELD LLP
Robert S. Strauss Building
1333 New Hampshire Avenue NW
Washington, DC 20036
Tel:  (202) 887-4000
Fax: (202) 887-4288
E-mail: sschulman@akingump.com
E-mail: jvansickle@akingump.com
E-mail: mbentley@akingump.com

Michael D. Small (*pro hac vice*)
Jeremy F. Bollinger (*pro hac vice*)
AKIN GUMP STRAUSS HAUER & FELD LLP
2029 Century Park East, Suite 2400
Los Angeles, CA  90067
Tel:  (310) 229-1000
Fax: (310) 229-1043
E-mail: msmall@akingump.com
E-mail: jbollinger@akingump.com

**CERTIFICATE OF SERVICE**

I hereby certify that that on May 16, 2008, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.  I also certify that the foregoing document is being served this day on all counsel of record or pro se parties identified on the attached Service List in the manner specified, either via transmission of Notice of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

                                  _____/s/ Geoffrey Hoffman_____
                                  Geoffrey Hoffman

**SERVICE LIST**

Mark P. Schnapp, Esq.
Eliot Pedrosa, Esq.
Andres N. Rubinoff, Esq.
GREENBERG TRAURIG, P.A.
1221 Brickell Avenue
Miami, FL 33131
(305) 579-0743
schnappm@gtlaw.com
pedrosac@gtlaw.com
rubinoffa@gtlaw.com

Gregory B. Craig
Howard W. Gutman
Ana C. Reyes
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, DC 20005
(202) 434-5000
gcraig@wc.com
hgutman@wc.com
areyes@wc.com

Alan M. Dershowitz
Jack Landman Goldsmith III
1563 Massachusetts Avenue
Cambridge, MA 02138
(617) 495-4617 (Dershowitz)
(617) 495-9170 (Goldsmith)
dersh@law.harvard.edu
jgoldsmith@law.harvard.edu