**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF FLORIDA**
**(Miami Division)**
**Case Nos. 07-22459 & 08-21063 (COHN/SELTZER)**

| | |
|---|---|
| ELOY ROJAS MAMANI, *et al.*, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) |
| | ) |
| GONZALO SÁNCHEZ DE LOZADA | ) |
| SÁNCHEZ BUSTAMANTE, | ) |
| | ) |
| Defendant, | ) |
| | ) |
| JOSÉ CARLOS SÁNCHEZ BERZAÍN, | ) |
| | ) |
| Defendant. | ) |
| | ) |

## DEFENDANTS' REPLY IN SUPPORT OF JOINT MOTION TO DISMISS

Mark P. Schnapp (Fla. Bar No. 501689)
Eliot Pedrosa (Fla. Bar No. 182443)
GREENBERG TRAURIG, P.A.
333 Avenue of the Americas
Miami, FL  33131
(305) 579-0500
(305) 579-0717 (facsimile)
    schnappm@gtlaw.com
    pedrosae@gtlaw.com

Glenn E. Goldstein (Fla. Bar No. 435260)
GREENBERG TRAURIG, P.A.
401 East Las Olas Boulevard
Fort Lauderdale, FL  33301
(954) 765-0500
(954) 765-1477 (facsimile)
    goldsteing@gtlaw.com

Kannon K. Shanmugam (*pro hac vice*)
Ana C. Reyes (*pro hac vice*)
Kristin A. Shapiro (*pro hac vice*)
Greg S. Hillson (*pro hac vice*)
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, DC  20005
(202) 434-5000
(202) 434-5029 (facsimile)
    kshanmugam@wc.com
    areyes@wc.com
    kshapiro@wc.com
    ghillson@wc.com

Dated:  January 27, 2014

*Counsel for Defendants*

## <u>TABLE OF CONTENTS</u>

INTRODUCTION....................................................................................................................1

ARGUMENT.........................................................................................................................2

I.     THE COURT SHOULD DISMISS PLAINTIFFS' ATS CLAIMS UNDER
*KIOBEL v. ROYAL DUTCH PETROLEUM* ........................................................2

II.    THE COURT SHOULD DISMISS PLAINTIFFS' TVPA CLAIM IN LIGHT OF
THE ACT'S EXHAUSTION REQUIREMENT ....................................................7

     A.    Plaintiffs Have Received Compensation For Their Alleged Injuries ....................7

     B.    Plaintiffs Have Failed To Exhaust All Avenues For Relief Under
Bolivian Law..................................................................................................11

III.   THE AMENDED COMPLAINT SUFFERS FROM THE SAME INFIRMITIES
IDENTIFIED BY THE ELEVENTH CIRCUIT AND THEREFORE FAILS TO
STATE A VALID CLAIM .................................................................................14

     A.    The Amendments To Plaintiffs' Extrajudicial-Killing Claims Fail To Address
The Deficiencies Identified By The Eleventh Circuit...........................................14

          1.    Plaintiffs Concede They Have Made No New Allegations Concerning
The Circumstances Of Decedents' Deaths .................................................14

          2.    Plaintiffs' New Allegations Are Contradicted By The Documents On
Which They Rely ......................................................................................15

     B.    Even If Plaintiffs Had Alleged A Valid Extrajudicial-Killing Claim, Plaintiffs
Fail To Allege A Basis For Holding Defendants Liable.......................................17

          1.    Plaintiffs Fail To Plead Command Responsibility....................................17

          2.    Plaintiffs Fail To Plead Conspiracy .........................................................20

          3.    Plaintiffs Fail To Plead Agency................................................................21

     C.    The Amendments To Plaintiffs' Crimes-Against-Humanity Claim Also Fail
To Address The Deficiencies Identified By The Eleventh Circuit ........................23

IV.   THE COURT SHOULD DECLINE TO EXERCISE JURISDICTION OVER
PLAINTIFFS' STATE-LAW CLAIM.................................................................25

CONCLUSION .................................................................................................................26

## TABLE OF AUTHORITIES

### FEDERAL CASES

*Accurate Grading Quality Assurance, Inc. v. Thorpe*, Civ. No. 12-1343, 2013 WL 1234836 (S.D.N.Y. March 26, 2013)........................................................................17

*Ahmed v. Magan*, Civ. No. 10-342, 2013 WL 4479077 (S.D. Ohio Aug. 20, 2013) ....................5

*Ahmed v. Magan*, Civ. No. 10-342, 2013 WL 5493032 (S.D. Ohio Oct. 2, 2013).......................5

*Ahmed-Al-Khalifa v. Al-Assad*, Civ. No. 13-48, 2013 WL 4401831 (N.D. Fla. Aug. 13, 2013) .............................................................................................................4

*Ahmed-Al-Khalifa v. Obama*, Civ. No. 13-49, 2013 WL 3797287 (N.D. Fla. July 19, 2013).............................................................................................................4

*Ahmed-Al-Khalifa v. Queen Elizabeth II*, Civ. No. 13-103, 2013 WL 2242459 (N.D. Fla. May 21, 2013).................................................................................4

*Al Shimari v. CACI Int'l, Inc.*, Civ. No. 08-827, ___ F. Supp. 2d ___, 2013 WL 3229720 (E.D. Va. June 25, 2013) .........................................................7

*Aldana v. Del Monte Fresh Produce, N.A., Inc.*, 416 F.3d 1242 (11th Cir. 2005) .....................21

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) .......................................................................15, 16, 20

*Balintulo v. Daimler AG*, 727 F.3d 174 (2d Cir. 2013) ....................................................2, 3, 4, 6

*Battle v. Central State Hosp.*, 898 F.2d 126 (11th Cir. 1990) ........................................15

*Belhas v. Ya'alon*, 515 F.3d 1279 (D.C. Cir. 2008)........................................................19

*Ben-Haim v. Neeman*, No. 13-1522, 2013 WL 5878913 (3d Cir. Nov. 4, 2013) ..........................3

*Bowoto v. Chevron Corp.*, Civ. No. 99-2506, 2007 WL 2349343 (N.D. Cal. Aug. 14, 2007) .............................................................................................................23

*Cabello v. Fernandez-Larios*, 402 F.3d 1148 (11th Cir. 2005) ........................................19, 21, 24

*Chiquita Brands Int'l, Inc. Alien Tort Statute & S'holder Derivative Litig., In re*, 792 F. Supp. 2d 1301 (S.D. Fla. 2011), *appeal pending*, No. 12-90020 (11th Cir.)................................................................................................20, 21, 22, 25

*Dacer v. Estrada*, Civ. No. 10-4165, 2013 WL 5978101 (N.D. Cal. Nov. 8, 2013).......................5

*Doe v. Drummond Co.*, Civ. No. 09-1041, 2010 WL 9450019 (N.D. Ala. Apr. 30, 2010) .............................................................................................................24

*Doe v. Qi*, 349 F. Supp. 2d 1258 (N.D. Cal. 2004)....................................................................20

*Doe v. Rafael Saravia*, 348 F. Supp. 2d 1112 (E.D. Cal. 2004) ...............................................13, 24

*Ford ex rel. Estate of Ford v. Garcia*, 289 F.3d 1283 (11th Cir. 2002) ...................................19

*Filartiga v. Pena-Irala*, 630 F.2d 876 (2d Cir. 1980)..............................................................6

*Flores v. Southern Peru Copper Corp.*, 414 F.3d 233 (2d Cir. 2003).......................................22

*Giraldo v. Drummond Co.*, Civ. No. 09-1041, 2013 WL 3873960 (N.D. Ala.
  July 25, 2013)..........................................................................................................4, 21

*Giraldo v. Drummond Co.*, Civ. No. 09-1041, 2013 WL 5934645 (N.D. Ala.
  Nov. 5, 2013) ...........................................................................................................4

*Griffin Indus., Inc. v. Irvin*, 496 F.3d 1189 (11th Cir. 2007) ...................................................15

*Hilao v. Estate of Marcos*, 103 F.3d 767 (9th Cir. 1996) .......................................................19

*Hua Chen v. Honghui Shi*, Civ. No. 09-8920, 2013 WL 3963735 (S.D.N.Y.
  Aug. 1, 2013) ...........................................................................................................3

*Kiobel v. Royal Dutch Petroleum Co.*, 133 S. Ct. 1659 (2013) ....................................... *passim*

*Korber v. Bundesrepublik Deutschland*, No. 12-3269, ___ F.3d ___,
  2014 WL 68142 (7th Cir. Jan. 9, 2014) ..................................................................3

*Lamie v. U.S. Trustee*, 540 U.S. 526 (2004) .......................................................................8

*Lobo v. Celebrity Cruises, Inc.*, 704 F.3d 882 (11th Cir. 2013), *cert denied*,
  134 S. Ct. 61 (2013)..................................................................................................6

*Mamani v. Berzain*, 636 F. Supp. 2d 1326 (S.D. Fla. 2009)................................................8, 9

*Mamani v. Berzain*, 654 F.3d 1148 (11th Cir. 2011) ................................................... *passim*

*Mohamad v. Palestinian Authority*, 132 S. Ct. 1702 (2012)..............................................9, 16

*Morrison v. National Australia Bank Ltd.*, 130 S. Ct. 2869 (2010).........................................3

*Mujica v. Occidental Petroleum Corp.*, 381 F. Supp. 2d 1164 (C.D. Cal. 2005)........................13

*Mwangi v. Bush*, Civ. No. 05-373, 2013 WL 3155018 (E.D. Ky. June 18, 2013) .......................4

*Nationmotor Club Inc. v. Stonebridge Cas. Ins. Co.*, Civ. No. 10-81157,
  2013 WL 6729664 (S.D. Fla. Oct. 29, 2013)...........................................................22

*Parratt v. Taylor*, 451 U.S. 527 (1981)..........................................................................10, 11

iii

*Sexual Minorities Uganda v. Lively*, Civ. No. 12-30051, ___ F. Supp. 2d ___,
  2013 WL 4130756 (D. Mass. Aug. 14, 2013) ...................................................4, 5

*Sinaltrainal v. Coca-Cola Co.*, 256 F. Supp. 2d 1345 (S.D. Fla. 2003) ......................13

*Sinaltrainal v. Coca-Cola Co.*, 578 F.3d 1252 (11th Cir. 2009), *abrogated for
  other reasons*, *Mohamad v. Palestinian Authority*, 132 S. Ct. 1702 (2012)...........16

*Xuncax v. Gramajo*, 886 F. Supp. 162 (D. Mass. 1995)...................................13, 19, 20

*Yamashita v. Styer*, 327 U.S. 1 (1946) ........................................................................19

## FEDERAL STATUTORY AUTHORITIES

28 U.S.C. § 1350 note................................................................................... *passim*

28 U.S.C. § 1367(c)(1).........................................................................................25

28 U.S.C. § 1367(c)(3).........................................................................................25

134 Cong. Rec. 28,611 (Oct. 5, 1988) ................................................................9

134 Cong. Rec. H964 (daily ed. Oct. 5, 1988)................................................10

S. Rep. No. 102-249 (1991)............................................................................9, 10

H.R. Rep. No. 102-367(I) (1991)........................................................................9

Statement by President George Bush Upon Signing H.R. 2092, 28 Weekly Comp.
  of Pres. Doc. 465 (Mar. 12, 1992) ...............................................................10

Fed. R. Civ. P. 8 ...............................................................................................20

## OTHER MATERIALS

13B Charles Alan Wright, et al., *Federal Practice and Procedure* § 3533.2.1 (3d
  ed. 2013) ...........................................................................................................12

C.A. Br. of Appellees, *Mamani v. Berzain*, Nos. 09-16246 & 10-13071, 23, 28,
  34, 44, 47-55 (Dec. 16, 2010) ........................................................................19

## INTRODUCTION

Attempting to circumvent the Eleventh Circuit's dismissal of their prior complaint, Plaintiffs contend that their amended complaint "contains copious new factual allegations."  Opposition ("Opp.") 2.  But those allegations do not remedy the fundamental *legal* deficiencies in Plaintiffs' ATS and TVPA claims.  As to the ATS claims, *Kiobel v. Royal Dutch Petroleum Co.*, 133 S. Ct. 1659 (2013), squarely holds that Congress did not intend the statute to "appl[y] to torts committed abroad" and thus it does not confer jurisdiction over claims in which "all the relevant conduct took place outside the United States."  *Id.* at 1665, 1669.  As to the TVPA claim, Plaintiffs concede that they have received substantial compensation for their injuries; they protest only that they have not received it specifically from Defendants.  That argument, however, relies on a non-existent limitation to the TVPA's exhaustion requirement—*viz.*, that the requirement applies only to remedies *received from defendants*.  That limitation does not appear in the text of the TVPA and is inconsistent with its legislative history and the Court's prior decision in this case.

Plaintiffs are accordingly precluded from bringing claims under the ATS or TVPA and the Court need not reach Defendants' motion to dismiss for failure to state a claim.  Should the Court reach that issue, however, it should find that Plaintiffs fail to state a claim under either statute.  Plaintiffs' new factual allegations simply do not address the pleading deficiencies identified by the Eleventh Circuit:  namely, that "each of the plaintiffs' decedents' deaths could plausibly have been the result of precipitate shootings during an ongoing civil uprising," and that "high-level decisions on military tactics and strategy during a modern military operation have [never] been held to constitute . . . extrajudicial killing under international law." *Mamani v. Berzain*, 654 F.3d 1148, 1155 (11th Cir. 2011) (internal quotation marks omitted).

Plaintiffs' amended complaint, like their initial complaint, should be dismissed.

1

**ARGUMENT**

I.      **THE COURT SHOULD DISMISS PLAINTIFFS' ATS CLAIMS UNDER *KIOBEL v. ROYAL DUTCH PETROLEUM***

The Supreme Court's recent decision in *Kiobel* readily disposes of Plaintiffs' ATS claims.  Plaintiffs do not dispute that their claims involve conduct that occurred entirely outside the United States.  *See* Opp. 18–19.  In *Kiobel*, the Supreme Court held that the ATS does not provide jurisdiction for such claims.  *See* 133 S. Ct. at 1669.  In arguing to the contrary, Plaintiffs ignore not only the Court's reasoning in *Kiobel* but the growing body of post-*Kiobel* case law refusing to extend ATS jurisdiction to extraterritorial conduct.

*First*, Plaintiffs contend that *Kiobel* did not create a "categorical bar to all ATS claims arising from conduct outside of the United States."  Opp. 18.  That contention, however, cannot be squared with the core of the reasoning in the Court's opinion, which stated time and again that the ATS does not extend jurisdiction to extraterritorial conduct.  *Kiobel*, 133 S. Ct. at 1664–65; *see also, e.g.*, *id.* at 1666, 1668–69.  The Court affirmed the dismissal of the claims in *Kiobel* precisely because "all the relevant conduct took place outside the United States."  *Id.* at 1669.[1]

Plaintiffs instead rely on a single sentence in the Court's opinion:  "And even where the claims touch and concern the territory of the United States, they must do so with sufficient force to displace the presumption against extraterritorial application."  *Kiobel*, 133 S. Ct. at 1669.  But that sentence does not aid Plaintiffs here, because it simply stands for the straightforward propo-

---

[1] Plaintiffs incorrectly contend that Defendants are advocating "the standard urged by the concurring opinion of Justice Alito."  Opp. 18.  In that opinion, Justice Alito wrote that an ATS claim should be barred "unless the domestic conduct is sufficient to violate an international law norm."  *Kiobel*, 133 S. Ct. at 1670.  Put differently, according to Justice Alito, there must be sufficient conduct *in the United States* to satisfy all elements of an ATS claim.  Defendants, by contrast, are contending only that at least some of the "relevant conduct" must "touch and concern" the United States—not that the domestic conduct must be sufficient to state an independent claim.  *See Balintulo v. Daimler AG*, 727 F.3d 174, 190–91 (2d Cir. 2013).

2

sition that, in some cases, sufficient relevant *conduct* might occur within the United States, with the result that the claim is not impermissibly extraterritorial. *See Morrison v. National Australia Bank Ltd.*, 130 S. Ct. 2869, 2884 (2010). The foregoing interpretation is confirmed by the Second Circuit's post-*Kiobel* decision in *Balintulo v. Daimler AG*, 727 F.3d 174 (2d Cir. 2013)—a case discussed at length by Defendants, yet all but ignored by Plaintiffs. *Compare* Motion to Dismiss ("Mot.") 20–22 & n.8 *with* Opp. 20 n.25. In that case, the Second Circuit explained that the "touch and concern" sentence sets out the standard for "how courts should proceed when *some* of the relevant conduct occurs in the United States." *Balintulo*, 727 F.3d at 191. But where, as here, "*all* the relevant conduct . . . occur[s] outside the United States," there is "no reason to explore, much less explain" the exact meaning of that standard. *Id.*[2]

*Second*, Plaintiffs suggest that "Defendants' long-term U.S. residence displaces the presumption" against extraterritoriality. Opp. 20. Defendants' current location, however, has no bearing on where the conduct underlying the claims occurred—alleged conduct that occurred well before Defendants left Bolivia. By its terms, the "touch and concern" sentence focuses on the plaintiffs' "claims," not on the defendants' present location. *See Kiobel*, 133 S. Ct. at 1669 (stating that, "even where the *claims* touch and concern the territory of the United States, they must do so with sufficient force to displace the presumption against extraterritorial application" (emphasis added)). Where defendants are presently located goes to the question of *personal* jurisdiction, not the distinct question of subject-matter jurisdiction. *See Hua Chen v. Honghui Shi*, Civ. No. 09-8920, 2013 WL 3963735, at *6 (S.D.N.Y. Aug. 1, 2013) (holding that, "even if the Court had personal jurisdiction over Defendant, it would lack subject matter jurisdiction to de-

---

[2] Recent circuit-court decisions also support the proposition that *Kiobel* bars ATS claims in which all relevant conduct occurred abroad. *See also Ben-Haim v. Neeman*, No. 13-1522, 2013 WL 5878913, at *2 (3d Cir. Nov. 4, 2013) (per curiam); *Korber v. Bundesrepublik Deutschland*, No. 12-3269, ___ F.3d ___, 2014 WL 68142, at *3 (7th Cir. Jan. 9, 2014).

cide the majority of Plaintiffs' claims" under *Kiobel*).   As the Second Circuit explained in *Balintulo*, "the [Supreme] Court did not suggest that a defendant's citizenship has any relevance to the presumption against extraterritoriality, and it instead stated over and over that the ATS bars suits where the relevant *conduct* occurs abroad."  727 F.3d at 190 n.24.

Plaintiffs attempt to make something of the unremarkable fact that Defendants are individuals, whereas the defendants in *Kiobel* and *Balintulo* were corporations.  Opp. 20 & n.25.  But it is hard to see why the location of an *individual* should matter to the "touch and concern" analysis if the location of a *corporate* defendant does not.  Nothing in the statute's history indicates that Congress made the fine distinction that the ATS should extend to extraterritorial conduct by individuals but not by corporations.  Unsurprisingly, post-*Kiobel* courts have dismissed claims against individuals located in the United States because the alleged conduct occurred abroad.[3]

Plaintiffs cite two supposedly "similar" cases in which the "presumption against extraterritoriality did not bar litigation of the claim."  Opp. 20 & n.24.  But those cases do not aid Plaintiffs.  The first case, *Sexual Minorities Uganda v. Lively*, Civ. No. 12-30051, ___ F. Supp. 2d ___, 2013 WL 4130756 (D. Mass. Aug. 14, 2013), in fact supports Defendants' reading of *Kiobel*, not Plaintiffs'.  There, the district court refused to dismiss the claims at issue because "[t]he Amended Complaint adequately *sets out actionable conduct undertaken by Defendant in the United States* to provide assistance in the campaign of persecution in Uganda."  *Id.* at *15

---

[3] *See Giraldo v. Drummond Co.*, Civ. No. 09-1041, 2013 WL 5934645, at *4 (N.D. Ala. Nov. 5, 2013); *Ahmed-Al-Khalifa v. Al-Assad*, Civ. No. 13-48, 2013 WL 4401831, at *2 (N.D. Fla. Aug. 13, 2013); *Giraldo v. Drummond Co.*, Civ. No. 09-1041, 2013 WL 3873960, at *8 (N.D. Ala. July 25, 2013); *Ahmed-Al-Khalifa v. Obama*, Civ. No. 13-49, 2013 WL 3797287, at *2 (N.D. Fla. July 19, 2013); *Mwangi v. Bush*, Civ. No. 05-373, 2013 WL 3155018, at *4 (E.D. Ky. June 18, 2013); *Ahmed-Al-Khalifa v. Queen Elizabeth II*, Civ. No. 13-103, 2013 WL 2242459, at *1 (N.D. Fla. May 21, 2013).

(emphasis added).   Indeed, the defendant helped "craft tactics" from his home in the United States to persecute sexual minorities in Uganda.  *Id.*

The second case, *Ahmed v. Magan*, Civ. No. 10-342, 2013 WL 4479077 (S.D. Ohio Aug. 20, 2013), is also unhelpful to Plaintiffs.  In that case, the defendant had not defended the lawsuit for nearly two years.  *Id.* at *1.  Because the defendant did not file a motion to dismiss, the magistrate judge held that he had "waived any merits argument he may have raised based on the *Kiobel* decision."  *Id.* at *2.  To be sure, the magistrate judge then proceeded to determine, without elaboration, that "as a permanent resident of the United States, the presumption . . . against extraterritoriality has been overcome in this case."  *Id.*  The defendant did not object to the report, with the result that the district court adopted it in a summary order.  *Ahmed v. Magan*, Civ. No. 10-342, 2013 WL 5493032, at *1 (S.D. Ohio Oct. 2, 2013).  Nor did the defendant appeal.  It is therefore impossible to attach any meaningful weight to the magistrate judge's opinion, which made no effort to come to grips with the relevant language in *Kiobel* (much less the post-*Kiobel* case law rejecting claims against individuals in the United States).

*Third*, Plaintiffs argue that "[h]istory . . . helps inform application of the 'touch and concern' standard to claims in cases that are not governed by the Court's application of the standard to the facts of *Kiobel*, including cases such as this involving individuals seeking to avoid facing trial by fleeing to the United States."  Opp. 22.  As stated above, however, the question under *Kiobel* is where the conduct occurred, not where the defendants reside at the time of litigation. The mere allegation that defendants "fled" the country where the conduct occurred does not alter the analysis.  *Dacer v. Estrada*, Civ. No. 10-4165, 2013 WL 5978101, at *2 (N.D. Cal. Nov. 8, 2013) (dismissing an ATS claim even though the defendant "fled the Philippines for the United States . . . to avoid prosecution in the Philippines").

Critically, in *Kiobel*, the Supreme Court rejected the very history upon which Plaintiffs now rely. As to Attorney General Bradford's opinion, the Court explained that it "defies a definitive reading" and "hardly suffices to counter the weighty concerns underlying the presumption against extraterritoriality." *Kiobel*, 133 S. Ct. at 1668. As to *Filartiga v. Pena-Irala*, 630 F.2d 876 (2d Cir. 1980), Justice Breyer's separate opinion does invoke that case in support of his argument that jurisdiction "was deemed proper because . . . the suit vindicated our Nation's interest in not providing a safe harbor, free of damages claims, for those defendants who commit such conduct." *Kiobel*, 133 S. Ct. at 1675. But the Court itself was unmoved, concluding that "[n]othing about this historical context suggests that Congress also intended federal common law under the ATS to provide a cause of action for conduct occurring in the territory of another sovereign." *Id.* at 1668–69.

*Fourth*, Plaintiffs argue that dismissing their claims "would run contrary to the very international comity concerns that the *Kiobel* majority sought to address." Opp. 23. *Kiobel*, however, in no way suggests that courts are free to disregard its holding simply because they conclude there would be no negative foreign policy-implications from adjudicating extraterritorial violations of the law of nations.[4] And Plaintiffs' "case-specific policy arguments miss the mark." *Balintulo*, 727 F.3d at 191; *see also Lobo v. Celebrity Cruises, Inc.*, 704 F.3d 882, 889 (11th Cir. 2013), *cert denied*, 134 S. Ct. 61 (2013) ("A case-specific inquiry into the effect on international relations is not permitted."). The Supreme Court reached its holding in *Kiobel* partly because of "the danger of unwarranted judicial interference in the conduct of foreign policy." *Kiobel*, 133 S. Ct. at 1664. It decidedly did not encourage case-by-case judicial analysis as to

---

[4] While Plaintiffs repeatedly emphasize that President Evo Morales supports their case, *see* Opp. 16, 17–18, 23–25, 48, that is hardly surprising, since he is Defendants' long-time political opponent. There is no guarantee that future administrations will support it.

whether pursuing particular claims would affect foreign relations.  *Id; see also Al Shimari v. CACI Int'l, Inc.*, Civ. No. 08-827, ___ F. Supp. 2d ___, 2013 WL 3229720, at *10 (E.D. Va. June 25, 2013).  And in this regard, it bears emphasizing that the Executive Branch, which has expertise in this area, has not only refused to extradite Defendants but has granted one of them asylum.  *See* Compl. ¶ 15.  Because Plaintiffs do not identify *any* activity occurring in the United States in connection with the alleged violations, their claims are plainly barred under *Kiobel*.

## II.   THE COURT SHOULD DISMISS PLAINTIFFS' TVPA CLAIM IN LIGHT OF THE ACT'S EXHAUSTION REQUIREMENT

Plaintiffs' TVPA claim fares no better, both because Plaintiffs have already been compensated for their alleged injuries and because Plaintiffs have failed fully to exhaust their remedies under Bolivian law.  The TVPA claim, like the ATS claims, should therefore be dismissed.

### A.   Plaintiffs Have Received Compensation For Their Alleged Injuries

Plaintiffs do not dispute that they have each received compensation from the Bolivian government, in an average amount that is approximately 23 times the annual per capita income there.  They claim that an American court should nonetheless hear their extraterritorial claims because they have not obtained remedies directly from Defendants.  The TVPA does not support such a cramped view of its exhaustion requirement.  And Plaintiffs' argument cannot be reconciled with the Court's prior opinion in this case; with the text and legislative history of the TVPA; or with applicable preclusion principles.[5]

*First*, this Court has already rejected Plaintiffs' argument that payments must be received from Defendants themselves in order to be adequate.  In their opposition to Defendants' motion

---

[5] Understandably, Plaintiffs do not contend that a claimant could receive adequate remedies from a tortfeasor abroad then sue the same tortfeasor under the TVPA.  Thus, the question before the Court is whether a remedy must be obtained *from the alleged tortfeasor himself* before a TVPA claim can be barred on exhaustion grounds.

to dismiss their initial complaint, Plaintiffs argued, *inter alia*, that the grants they received under the 2003 Humanitarian Assistance Agreement were inadequate because "the payments given to them and accepted by them do not address the defendants' liability." *Mamani v. Berzain*, 636 F. Supp. 2d 1326, 1330 (S.D. Fla. 2009). The Court disagreed, concluding that "the defendants have the better of the argument with respect to the effect of the 2003 payments." *Id.* The Court explained that "[i]t is difficult for the plaintiffs to say that the 2003 payments did not constitute compensation (*albeit non-individualized compensation*) for their losses." *Id.* (emphasis added). The Court ultimately expressed no opinion on the preclusive effect of the 2003 payments, but only because it dismissed Plaintiffs' TVPA claim on the ground that Plaintiffs had not yet applied for compensation pursuant to the 2008 Law for the Victims of the Events of February, September, and October of 2003. *Id.* at 1331. If "non-individualized" remedies were irrelevant, the Court would hardly have required Plaintiffs to exhaust such remedies in the first instance.

*Second*, Plaintiffs claim that, in Section 2(a) of the TVPA, "Congress explicitly framed the statute to impose liability on the *individual* tortfeasor." Opp. 46. True enough. But at the same time, in Section 2(b), Congress explicitly provided an exhaustion defense, requiring claimants to exhaust all "adequate and available remedies in the place in which the conduct giving rise to the claim occurred." 28 U.S.C. § 1350 note. Plaintiffs seek to read language into the statute, requiring claimants to exhaust all "adequate and available remedies [*from defendants*] in the place in which the conduct giving rise to the claim occurred." That is not a permissible interpretation of the statute; it is an atextual limitation to the exhaustion requirement that the statute does not contain. *See, e.g.*, *Lamie v. U.S. Trustee*, 540 U.S. 526, 538 (2004).

Even assuming, *arguendo*, that the statutory language were ambiguous, it would be inconsistent with the TVPA's legislative history to deem remedies to be adequate only if they orig-

inate from the named defendants.  As this Court has already explained: "[o]ne of the early sup-porters of the proposed legislation . . . explained that the bill would permit victims of foreign tor-ture to undertake a civil action against their torturers in the United States *if they are unable to obtain redress in the country where the torture took place*."  *Mamani*, 636 F. Supp. 2d at 1331 n.9 (citing 134 Cong. Rec. 28,611, 28,614 (Oct. 5, 1988)).  In that respect, as in others, "Congress appeared well aware of the limited nature of the cause of action it established in the [TVPA]."  *Mohamad v. Palestinian Authority*, 132 S. Ct. 1702, 1710 (2012).

Relying on a single passage from the Senate Report, Plaintiffs contend that "[t]he con-gressional purpose of the statute is clear—to ensure that the United States is not a 'safe haven' for individuals who engage in extrajudicial killing or torture."  Opp. 46–47.  When the legislative history is considered as a whole, however, it is clear that the TVPA's overriding concern was to provide a "means of civil redress to victims of torture" in countries whose "governments still en-gage in or tolerate torture of their citizens," and are thus unwilling or unable to provide a means of redress.  H.R. Rep. No. 102-367(I), at 83 (1991); *see also, e.g.*, S. Rep. No. 102-249, at 3 (1991).  Consistent with that goal, and mindful of overburdening the judiciary, Congress includ-ed an exhaustion requirement to ensure that American courts become embroiled in politically sensitive disputes only where foreign governments are unwilling or unable to provide adequate local remedies.  *See* H.R. Rep. No. 102-367(I), at 4 (stating that, "[s]triking a balance between the desirability of providing redress for a victim and the fear of imposing additional burdens on

U.S. courts, the bill recognizes as a defense the existence of adequate remedies in the country where the violation allegedly occurred.").[6]

*Third*, Plaintiffs argue that dismissal of their claim would be inconsistent with "[b]asic principles of tort law and claim preclusion."  Opp. 47–48.  But Congress has already indicated that "basic principles" of preclusion do not require satisfaction from an individual defendant.  Specifically, the Senate Report states that the TVPA's exhaustion provision "is generally consistent with common-law principles of exhaustion as applied by courts in the United States," and that "[c]ourts in the United States are familiar with the operation of the exhaustion requirement," citing the Supreme Court's decision in *Parratt v. Taylor*, 451 U.S. 527 (1981).  S. Rep. No. 102-249, at 10 & n.20 (internal quotation marks omitted).[7]  *Parratt* concerned a prisoner in Nebraska who sued two prison employees, alleging that they had deprived him of certain items of property.  451 U.S. at 529–30.  The Supreme Court held that the suit was precluded because Nebraska had a state tort-claims process through which the prisoner might obtain relief.  *Id.* at 543–44.  Significantly, the plaintiff argued that the state process "d[id] not adequately protect [his] interests be-

---

[6] *See also* Statement by President George Bush Upon Signing H.R. 2092, 28 Weekly Comp. of Pres. Doc. 465, 466 (Mar. 12, 1992) (courts should employ a "sound construction of the statute and the wise application of relevant legal procedures and principles" to avoid becoming "embroiled in difficult and sensitive disputes in other countries"); 134 Cong. Rec. H9694 (daily ed. Oct. 5, 1988) (Rep. Broomfield) ("[A]s a last recourse to justice, [the TVPA] would then allow a person to turn to the Federal courts for help.").

[7] This Court previously questioned whether the preclusion principles of the United States or Bolivia apply.  As evidenced by the Senate Report, Congress plainly intended for courts to apply American exhaustion principles, and Plaintiffs cite no contrary authority.  Plaintiffs nevertheless suggest their claims are not precluded under Bolivian law.  *See* Opp. at 47.  But because Plaintiffs have been fully compensated for their alleged injuries, they lack standing to pursue further claims under Bolivian law.  Defendants in Bolivia are making this very argument before the court hearing a civil case in Sucre, Bolivia.  That court denied the motion as premature, but asked for further information concerning which plaintiffs had received payments.  *See* Ex. 21.  There is no dispute that Plaintiffs here have received payments.  If the Court finds Bolivian preclusion law applies, it should at a minimum stay the TVPA claim pending resolution of this issue in the Bolivian courts.

cause it provides only for an action against the State as opposed to its individual employees." *Id.* at 543.  The Court flatly rejected the argument, explaining that, "[a]lthough the state remedies may not provide [the plaintiff] with all the relief which may have been available if he could have proceeded under § 1983, that does not mean that the state remedies are not adequate to satisfy the requirements of due process."  *Id.* at 544.  "The remedies provided could have fully compensated the [plaintiff] for the property loss he suffered," and they were thus "sufficient" even though he would not receive compensation specifically from the individual employees.  *Id.*

Finally with regard to the TVPA, Plaintiffs again invoke general "principles of comity" to suggest that Defendants "would require this Court to act contrary to the clear statement of the Bolivian government that claims against these Defendants should proceed."  Opp. 48 (internal quotation marks omitted).  To state the obvious, however, the wishes of the Bolivian government do not trump American law, any more than they trump the State Department's right to reject ex-tradition requests (a right it exercised in rejecting the government of Bolivia's request to extra-dite the Defendants).  The fact that the current government of Evo Morales wishes this suit to proceed—to say nothing of what a future government may wish, *see* p. 6, n.4, *supra*—is irrele-vant to the interpretation and application of the TVPA's exhaustion requirement.

### B.   Plaintiffs Have Failed To Exhaust All Avenues For Relief Under Bolivian Law

Plaintiffs are also entitled to seek additional relief by pursuing civil claims in Bolivian court.  Mot. 27–29.  Because Plaintiffs have not exhausted those remedies, their TVPA claim must be dismissed even if the compensation they have already received does not preclude it.  *Id.*

To begin with, Plaintiffs conspicuously do not deny that they and other alleged victims have filed lawsuits against Defendants' alleged co-conspirators in Bolivia, or that those lawsuits are ongoing.  Instead, they argue that "Defendants' citations to media reports do not meet their

11

burden of showing that such a lawsuit has actually been filed." Opp. 48 n.45. But the reports only confirm what is widely known in Bolivia, and surely known by Plaintiffs—that numerous alleged victims, *and apparently some Plaintiffs*, have brought civil claims in Bolivia. If Plaintiffs have filed lawsuits in Bolivia, they should admit as much, rather than hiding behind a claim that Defendants have failed to prove that they have done so. And, presumably, they would not pursue such claims if there were no possibility of obtaining meaningful recovery.[8]

Plaintiffs additionally argue that relief in Bolivia would be inadequate because it does not constitute direct payment from Defendants. Opp. 48–49. As discussed above, however, that argument lacks merit. Just two additional points merit noting. *First*, Plaintiffs incorrectly contend that Defendants' position "is directly contradicted by hornbook tort law." Opp. 48. Plaintiffs note that, "where multiple parties are subject to liability for tortious conduct, the injured party can properly maintain a single action against one, some, or all of them." Opp. 49 (internal quotation marks omitted). But it is equally true that, if a co-defendant provides a plaintiff a full remedy, "appeals are mooted as between the plaintiff and any other defendant." 13B Charles Alan Wright, et al., *Federal Practice and Procedure* § 3533.2.1 (3d ed. 2013). And the TVPA requires Plaintiffs to pursue all available relief in Bolivia before bringing TVPA claims in an American court. Plaintiffs cannot seriously contend that relief from alleged co-conspirators in Bolivian court—relief that could *moot* Plaintiffs' claims in this action—is inadequate.

*Second*, Plaintiffs also incorrectly contend that "[c]ourts have consistently rejected exhaustion defenses to TVPA actions under similar circumstances." Opp. 49. The cases they cite

---

[8] If Plaintiffs prevail against the alleged co-conspirators in Bolivia, the Bolivian government is required to satisfy any judgment pursuant to Article 94 of the Bolivian Criminal Code. Plaintiffs note that Article 94 was repealed in 1999. Opp. 48 n.45. However, the annulment of Article 94 was not effective until May 12, 2004, and it therefore still applies to Plaintiffs' claims, which accrued before that date. *See* Ex. 22. In any event, Article 89 of the Bolivian Code similarly holds the Bolivian government liable for satisfying Plaintiffs' claims. *See* Mot., Ex. 15.

do not stand for that proposition. In *Mujica v. Occidental Petroleum Corp.*, 381 F. Supp. 2d 1164 (C.D. Cal. 2005), the court dismissed the plaintiffs' claims on alternative grounds and thus declined to address the defendants' exhaustion argument. *Id.* at 1171 n.2. In *Sinaltrainal v. Co-ca-Cola Co.*, 256 F. Supp. 2d 1345 (S.D. Fla. 2003), the court rejected an exhaustion argument because "[the defendants] . . . offered *no* evidence on the issue so the burden to prove the futility of remedies available in Colombia did not shift to the Plaintiff." *Id.* at 1358 (emphasis added). And in *Xuncax v. Gramajo*, 886 F. Supp. 162 (D. Mass. 1995), the court rejected an exhaustion argument because the plaintiff was unable to pursue a civil action in Guatemala. *Id.* at 178.

The only relevant case that Plaintiffs cite, *Doe v. Rafael Saravia*, 348 F. Supp. 2d 1112 (E.D. Cal. 2004), actually supports Defendants' position. In *Doe*, a plaintiff brought a TVPA claim against the former chief of security for an organizer of a Salvadoran paramilitary group relating to the assassination of Archbishop Oscar Romero. *Id.* at 1117–31. Saravia raised an exhaustion defense, which the court rejected. *Id.* at 1151. The court did not reject the defense, however, on the ground that potential civil claims against Saravia's co-conspirators in El Salvador were inadequate. Instead, the court explained that the "[p]laintiff cannot obtain a civil remedy against Saravia—*or any other person involved in Archbishop Romero's assassination*—unless a criminal prosecution first occurs." *Id.* (emphasis added). And "beyond the failed attempt to extradite Saravia, there have been no prosecutions brought by the Salvadoran government for the assassination of Archbishop Romero," and thus the plaintiff could not sue *anyone* responsible for the assassination in El Salvador. *Id.* The court concluded that, "[b]ecause there has never been a successful criminal prosecution against the killers of Archbishop Romero[,] . . . plaintiff has no judicial remedy in El Salvador." *Id.* at 1152. Here, Plaintiffs have not only already received substantial compensation from the Bolivian government, they may also bring—and are bring-

ing—civil claims in Bolivian court seeking further relief from Defendants' alleged co-conspirators.  The TVPA's exhaustion provision requires dismissal of Plaintiffs' claim.

## III.   THE AMENDED COMPLAINT SUFFERS FROM THE SAME INFIRMITIES IDENTIFIED BY THE ELEVENTH CIRCUIT AND THEREFORE FAILS TO STATE A VALID CLAIM

Should this Court agree with Defendants that Plaintiffs' federal claims fail as a matter of law—their ATS claims, because they allege only extraterritorial conduct, and their TVPA claim, because Plaintiffs have failed to satisfy the applicable exhaustion requirement—then it need not reach the issue of the sufficiency of Plaintiffs' allegations on each count.  Should the Court do so, however, it should conclude that Plaintiffs have failed to remedy the deficiencies identified by the Eleventh Circuit in its earlier opinion, and order dismissal of the ATS and TVPA claims on that independent and sufficient ground.

### A.   The Amendments To Plaintiffs' Extrajudicial-Killing Claims Fail To Address The Deficiencies Identified By The Eleventh Circuit

#### 1.   *Plaintiffs Concede They Have Made No New Allegations Concerning The Circumstances Of Decedents' Deaths*

In their opposition to the motion to dismiss, Plaintiffs disclose that at least one of their attorneys regularly attended a criminal trial spanning three years (from 2009 to 2011) in Bolivia concerning the events at issue.  *See* Becker Decl. ¶ 3.  If there were additional relevant facts to be alleged, Plaintiffs surely would have learned of them there.  Yet Plaintiffs concede that, in the most recent iteration of their complaint—filed after the criminal trial concluded, and nearly a decade after the events in question—they have not alleged *any* new facts regarding the circumstances of the decedents' deaths.  Opp. 29.  That concession should be dispositive in light of the Eleventh Circuit's decision.  The Eleventh Circuit focused on the circumstances of each decedent's death, and determined that the conclusory allegation of a general plan to kill innocents was insufficient absent a nexus to the individual deaths.  *Mamani*, 654 F.3d at 1155.

14

Plaintiffs allege that, in light of new allegations concerning the alleged plan to kill inno-

cents, "the alternative explanations suggested by the Eleventh Circuit are no longer equally like-

ly."  Opp. 29.  But whatever happened before the protests, the inescapable fact remains that the

decedents died "during an ongoing civil uprising." *Mamani*, 654 F.3d at 1155.  And without any

new allegations concerning the circumstances of the particular deaths—for example, which indi-

viduals shot the decedents, what orders the shooters were acting under (if any), whether the

shooters were even each government agents, and how the decedents were shot—it remains equal-

ly plausible that the deaths were "the result of precipitate shootings," or that decedents were

"mistakenly [targeted] as a person who did pose a threat to others." *Id.*  Put differently, even if

Plaintiffs have sufficiently alleged a plan to kill innocents (they have not), they still have not al-

leged facts sufficient to infer that their decedents were killed pursuant to such a plan.

### 2.   Plaintiffs' New Allegations Are Contradicted By The Documents On Which They Rely

In any event, the documents on which Plaintiffs rely to support their new allegations—

documents they misleadingly cite and fail to attach as exhibits—confirm that Defendants *did not*

intend for innocent civilians to be killed.  Instead of remedying the defects identified by the

Eleventh Circuit, the contradictions render Plaintiffs' claims implausible as a matter of law.

Even before *Iqbal*, complaints were dismissed when they alleged facts that refuted a

plaintiff's claims.  A court's "duty to accept the facts in the complaint as true does not require

[it] to ignore specific factual details of the pleading in favor of general or conclusory allegations.

Indeed, when the exhibits contradict the general and conclusory allegations of the pleading, the

exhibits govern." *Griffin Indus., Inc. v. Irvin*, 496 F.3d 1189, 1205–06 (11th Cir. 2007); *see also*

*Battle v. Central State Hosp.*, 898 F.2d 126, 130 n.3 (11th Cir. 1990) (per curiam) (explaining

that "allegations that are contradicted by other allegations in the complaint may also constitute

grounds for dismissal").  *Iqbal*, of course, has only heightened Plaintiffs' burden.  *See Sinaltrainal v. Coca-Cola Co.*, 578 F.3d 1252, 1268 (11th Cir. 2009), *abrogated for other reasons*, *Mohamad v. Palestinian Authority*, 132 S. Ct. 1702 (2012).  Thus, in dismissing Plaintiffs' initial complaint, the Eleventh Circuit rightly considered allegations that *undermined* Plaintiffs' claims, *e.g.*, that the military was responding to violent uprisings.  *See Mamani*, 654 F.3d at 1154–55.

In that regard, the current version of the complaint fares no better.  To support the notion that Defendants planned and intended for the military to kill innocent civilians, Plaintiffs rely on two government documents allegedly promulgated by Defendants:  the "Manual for the Use of Force" and the "Republic Plan."  Compl. ¶¶ 37–38; Opp. 6–7.  As detailed in Defendants' motion to dismiss, however, the Manual for the Use of Force not only does not support Plaintiffs' allegations, but directly contradicts them.  *See* Mot. 32–35.  Among other constraints on the use of the force, the Manual directed the military to respect and defend human rights; forbade the military from using firearms against unarmed people; and instructed the military to use lethal force only as a last resort.  *See* Mot. 9–10, 32–35; *id.*, Ex. 3, at 5, 10–14.  The two-page Republic Plan, meanwhile, says absolutely nothing about using force against unarmed civilians.  *See* Mot., Ex. 4.  Given that the military was specifically instructed not to kill innocent civilians, the critical deficiency identified by the Eleventh Circuit remains: "each of the [P]laintiffs' decedents' deaths could plausibly have been the result of precipitate shootings during an ongoing civil uprising," rather than the result of an unlawful extrajudicial killing.  *Mamani*, 654 F.3d at 1155.

Plaintiffs' amended complaint is based in part on these documents, yet their opposition all but ignores the resulting contradictions, addressing them only in a footnote.  Opp. 6 n.9.  In that footnote, Plaintiffs insist that the Manual supports their claim for extrajudicial killing simply

because it authorized the use of military force against civilians. *Id.* Plaintiffs ignore, however, that the use of military force against civilians is not a *per se* violation of international law. They also wholly ignore the substantial constraints on that authorization. And while Plaintiffs complain that the Manual authorized the use of military force in a domestic setting, they ignore that it contemplates the participation of "troops of Armed Forces . . . whenever *the Police* [*are*] *insufficient*" and when the "persuasive methods adopted by the National Police . . . *have been exhausted*." Mot., Ex. 3, at 5 (emphasis added). They also conspicuously fail to address the Standing Rules for the Use of Force in the United States, which permit the use of military force in similar circumstances. Mot. 34 n.19.

In short, Plaintiffs "cannot cherry-pick or favorably summarize statements[,] then avoid the consequences of those that directly contradict the allegations of the complaint." *Accurate Grading Quality Assurance, Inc. v. Thorpe*, Civ. No. 12-1343, 2013 WL 1234836, at *8 (S.D.N.Y. Mar. 26, 2013). Far from remedying the defects identified by the Eleventh Circuit, the documents on which Plaintiffs rely render their claims implausible as a matter of law.

**B.**     **Even If Plaintiffs Had Alleged A Valid Extrajudicial-Killing Claim, Plaintiffs Fail To Allege A Basis For Holding Defendants Liable**

Plaintiffs' extrajudicial-killing claims fail for an additional, and independent, reason. Even if Plaintiffs had sufficiently alleged that any extrajudicial killings took place—for the reasons stated above, they have not—they also fail sufficiently to allege any basis for holding the former President and Minister of Defense liable.

### 1.     *Plaintiffs Fail To Plead Command Responsibility*

Plaintiffs concede that the Eleventh Circuit held that their initial complaint failed to allege command responsibility because there were no facts linking Defendants to the acts of their subordinates. Opp. 40. Plaintiffs' initial complaint was also deficient because it failed to estab-

lish that Defendants knew or should have known of the acts allegedly committed by their subor-

dinates, and the law does not provide strict liability for national leaders at the top of a long chain

of command.  *See Mamani*, 654 F.3d at 1153–54.

Plaintiffs argue that their amended complaint "fills the gaps identified by the Eleventh

Circuit" because it alleges that Defendants "planned, ordered, and supervised the acts at issue"

and that the deaths were "widely reported in the press."  Opp. 39–40.  But Plaintiffs do not allege

that Defendants *ordered* the military to kill any innocent civilians or that they *supervised* the kill-

ing of anyone.  Indeed, Plaintiffs do *not* directly allege that Defendants ordered the military to

kill civilians; it is telling that they consistently use the passive voice in alleging that soldiers

"were ordered" to shoot and kill civilians.  Mot. 32 n.16.  And with respect to Defendants' al-

leged "plan," Plaintiffs alleged the same type of "plan" in their initial complaint, FACC ¶¶ 1, 21–

24, 42, 48, 59, 61, 82, 87, yet the Eleventh Circuit held such conclusory allegations to be insuffi-

cient, *see Mamani*, 654 F.3d at 1153–55 & n.8.

At most, Plaintiffs' latest allegations suggest that Defendants were on notice that some

civilians had been killed during a violent and chaotic civilian uprising, which simply does not

rise to the level of an extrajudicial killing.  But nowhere do Plaintiffs allege that Defendants were

on notice of facts indicating that the military had *committed extrajudicial killings* or other viola-

tions of international law, such as by targeting and deliberately killing innocent civilians.  In-

deed, Plaintiffs' command-responsibility theory would fail even if Plaintiffs had alleged that De-

fendants were aware of all the specific circumstances surrounding the decedents' deaths that are

outlined in the complaint.  *See* Mot., Ex. 19 (table outlining those allegations).  The Eleventh

Circuit held that even such detailed allegations—much less the vague allegations in media re-

ports that Defendants allegedly saw—would be insufficient to plausibly suggest to a reasonable person that the military had violated international law. *Mamani*, 654 F.3d at 1155.

In the prior appeal in this case, the Eleventh Circuit cited *Belhas v. Ya'alon*, 515 F.3d 1279 (D.C. Cir. 2008), for the proposition that "[Plaintiffs] point to no case where similar high-level decisions on military tactics and strategy during a modern military operation have been held to constitute . . . extrajudicial killing under international law." *Mamani*, 654 F.3d at 1155 (citing *Belhas*, 515 F.3d at 1293 (Williams, J., concurring)). Relying on the same cases they cited on appeal, Plaintiffs attempt to relitigate that point before this Court.[9] *Compare* Opp. 30–31 *with* C.A. Br. of Appellees, *Mamani v. Berzain*, Nos. 09-16246 & 10-13071, 23, 28, 34, 44, 47–55 (Dec. 16, 2010). The cited cases, however, are readily distinguishable. In *Ford ex rel. Estate of Ford v. Garcia*, 289 F.3d 1283 (2002), the Eleventh Circuit held only that the district court did not err in instructing the jury as to the legal elements of plaintiffs' TVPA claim. *Id.* at 1287–94. And in *Cabello v. Fernandez-Larios*, 402 F.3d 1148 (2005) (per curiam), the Eleventh Circuit held only that the ATS and TVPA "permit claims based on direct and indirect theories of liability," and that, because the defendant "actively participated" in the unlawful killings, the jury verdict was supported by substantial evidence, *id.* at 1158–60. Similarly, in *Hilao v. Estate of Marcos*, 103 F.3d 767 (1996), the Ninth Circuit held that the district court did not err in instructing the jury on the command-responsibility theory of liability; it did not shed light on what allegations satisfy this theory. *Id.* at 776–78. Finally, in *Xuncax v. Gramjo*, 886 F. Supp. 162 (D. Mass. 1995), the district court entered a default judgment against a defendant who was personal-

---

[9] The only new case Plaintiffs cite on remand is *Yamashita v. Styer*, 327 U.S. 1 (1946). Opp. 31. *Yamashita* held that a military commission was authorized to try a defendant for an alleged failure "to perform the duty imposed on him by the law of war." 327 U.S. at 17. While *Yamashita* laid the groundwork for the command-responsibility doctrine, it does address what allegations are sufficient to satisfy that doctrine.

19

ly responsible for ordering and directing the unlawful activities.  *Id.* at 169, 171.[10]  Because Plaintiffs have failed to fill the gaps identified by the Eleventh Circuit, they cannot proceed here on a command-responsibility theory.

### 2.   Plaintiffs Fail To Plead Conspiracy

Plaintiffs' attempt to implicate Defendants on a conspiracy theory is similarly unsuccessful.  Plaintiffs try to salvage that theory with a classic straw-man argument, insisting that they need not allege that Defendants agreed to murder *specific* victims.  Opp. 40–41.  Defendants, however, have never argued otherwise.  And Plaintiffs simply dodge the argument that Defendants actually have made:  namely, that, in order to state a conspiracy claim, Plaintiffs must allege facts indicating that Defendants *intended* that the military would commit an act within the purview of the ATS or TVPA.  *See, e.g., In re Chiquita Brands Int'l, Inc. Alien Tort Statute & S'holder Derivative Litig.*, 792 F. Supp. 2d 1301, 1351 (S.D. Fla. 2011) (noting that "[a] conspiracy claim under the ATS requires the same *mens rea* allegations as aiding and abetting claims, i.e., a showing of purpose or intent, not merely knowledge."), *appeal pending*, No. 12-90020 (11th Cir.).  Plaintiffs' conspiracy claim fails because they do not plausibly allege that Defendants entered into an agreement with the military with the intention of killing innocent civilians.  While intent may be "alleged generally," it must still be alleged in accordance with Rule 8—*i.e.*, a *plausible* claim for relief must be articulated.  *Ashcroft v. Iqbal*, 556 U.S. 662, 686 (2009).

---

[10] The cases cited by Plaintiffs are additionally distinguishable because they involved defendants who were aware not just that civilians had been killed, but that civilians had been killed *illegally*.  *See Doe v. Qi*, 349 F. Supp. 2d 1258, 1332 (N.D. Cal. 2004) (noting that the complaint alleged that "patterns of *repression and abuse* were . . . widely reported" (emphasis added)); *Xuncax*, 886 F. Supp. at 173 (noting that the defendant was "publicly confronted with the *murder of innocent civilians*" (emphasis added)).

Here, not only is the complaint devoid of non-conclusory allegations that Defendants entered into a plan or agreement with the *intent* to unlawfully kill civilians, but the complaint contains allegations that directly contradict that notion.  *See* pp. 15–17, *supra*.

### 3.      Plaintiffs Fail To Plead Agency

Plaintiffs also seek to hold Defendants liable under agency principles.  In order to hold a defendant liable for a violation of the ATS or TVPA under an agency theory, a plaintiff must demonstrate that agency principles are well accepted in customary *international law*.  *See Chiquita*, 792 F. Supp. 2d at 1352; *see also Giraldo v. Drummond Co.*, Civ. No. 09-1041, 2013 WL 3873965, at *6 (N.D. Ala. July 25, 2013).  Here, Defendants cannot be held liable under an agency theory because there is "no well-established international consensus for imposing secondary liability on entities whose agents violate international law."  *Chiquita*, 792 F. Supp. 2d at 1352–53 (rejecting the plaintiffs' agency-based ATS claims in part because agency theory is "not cognizable under international law"); *accord Giraldo*, 2013 WL 3873965, at *6–*7.

Plaintiffs do not dispute that *Chiquita* and *Giraldo* are directly on point, but instead argue that this Court should look to federal common law rather than international law to determine whether Defendants may be held liable under agency theory.  In support, Plaintiffs cite two Eleventh Circuit cases: *Cabello v. Fernandez-Larios*, 402 F.3d 1148 (2005), and *Aldana v. Del Monte Fresh Produce, N.A., In*c., 416 F.3d 1242 (2005) (per curiam).  Opp. 42–43.  Both cases, however, are inapposite.  As the *Chiquita* court noted, those cases involved accomplice and conspiracy liability, and neither permits plaintiffs to pursue an ATS case on an agency-liability theory.  *Chiquita*, 792 F. Supp. 2d at 1352 n.94.[11]

---

[11] The plaintiffs in *Giraldo* relied on *Aldana* in support of their agency-based claim under the TVPA, but the court rejected their argument as well.  *See* 2013 WL 3873965, at *6.

In the alternative, plaintiffs argue that, even if courts should look to international rather than domestic law, agency liability is available under international law.  First, Plaintiffs cite *Flores v. Southern Peru Copper Corp.*, 414 F.3d 233, 252 (2d Cir. 2003), for the proposition that principles of agency have become part of international law as " 'general principles of law recognized by civilized nations' as well as by 'judicial decisions.' "  Opp. 43–44.  *Flores* does not stand for that proposition.  In *Chiquita*, the court rejected a similar misinterpretation of *Flores*: "Plaintiffs' selective quotation from *Flores* [was] misplaced" because the "issue of agency liability is entirely absent . . . from the *Flores* opinion."  792 F. Supp. 2d at 1352 n.94.[12]

Even if agency liability were available under the ATS or the TVPA, Plaintiffs allege no facts suggesting that either President Lozada or Minister Berzaín ever ordered the military to kill unarmed civilians, or otherwise manifested a desire for the military to do so.  To the contrary, as discussed above, the Manual for the Use of Force on which Plaintiffs rely explicitly instructed the military *not* to kill innocent civilians, and to apply deadly force only as a last resort.[13]

---

[12] Plaintiffs cite domestic decisions from the United Kingdom, Canada, and India to support the notion that agency principles are well accepted in *international* law.  Opp. 44.  But as *Chiquita* makes clear, "[r]eliance on domestic laws, even those of the United States, cannot support recognition of an international norm under the ATS."  792 F. Supp. 2d at 1320 (collecting cases).

[13] Plaintiffs also argue that, even if individual soldiers acted beyond the scope of their agency, Defendants ratified the alleged unlawful killings because they had knowledge of the killings and tacitly approved them.  Opp. 42.  However, "[n]o rule of law is better settled than this:  That the ratification of the act of an agent previously unauthorized must, in order to bind the principal, be with full knowledge of all the material facts."  *Nationmotor Club Inc. v. Stonebridge Cas. Ins. Co.*, Civ. No. 10-81157, 2013 WL 6729664, at *15 (S.D. Fla. Oct. 29, 2013) (internal quotation marks omitted).  A principal is "generally not required to make inquiries as to the facts," as "[h]e has a right to presume that his agent has followed instructions, and has not exceeded his authority."  *Id.* (internal quotation marks omitted).

22

**C.**     **The Amendments To Plaintiffs' Crimes-Against-Humanity Claim Also Fail To Address The Deficiencies Identified By The Eleventh Circuit**

As with the extrajudicial-killing claims, the amended complaint fails to overcome the deficiencies in the crimes-against-humanity claim identified by the Eleventh Circuit.

Plaintiffs contend that they have sufficiently alleged a "widespread" and "systematic" attack by alleging that Defendants "devised and implemented a plan" to kill thousands of civilians, across "multiple regions" of Bolivia, to deter public opposition to their policies.   Opp. 33–36. Yet Plaintiffs' initial complaint made those very same factual allegations, *see* FACC ¶¶ 1, 21–24, 30, 36, 38–39, 42, 47–48, 52, 59, 69, 81, 87, 98, and the Eleventh Circuit still ordered dismissal of their crimes-against-humanity claim.   The Eleventh Circuit did so not because Plaintiffs' allegations were too conclusory, but rather because the circumstances described by Plaintiffs did not qualify as crimes against humanity.   The Court explained that this case involves "national leaders facing thousands of people taking to the streets in opposition," *Mamani*, 654 F.3d at 1156, which posed a "threat to the capital city and to public safety."   *Id*.   The Court reasoned that "[a]llowing [P]laintiffs' claims to go forward would substantially broaden . . . the kinds of *circumstances* from which claims may properly be brought under the ATS," *id.* (emphasis added), and that, "[i]n a case like this one, judicial restraint is demanded."   *Id*. at 1157.

Plaintiffs now rehash the same allegations—albeit with some cosmetic changes—in a renewed effort to broaden the offense of crimes against humanity beyond what is recognized under international law.   *First,* Plaintiffs now allege that, during September and October 2003, 58 civilians were killed and over 400 civilians were injured.   Compl. ¶ 6.   That is actually a smaller number of deaths than Plaintiffs alleged in their initial complaint—a number that the Eleventh Circuit held was insufficient to qualify as "widespread."   *See* FACC ¶ 1 (alleging 67 deaths and over 400 injuries during this time period); *see also Bowoto v. Chevron Corp.*, Civ. No. 99-02506,

2007 WL 2349343, at *10 (N.D. Cal. Aug. 14, 2007) (explaining that "the number of victims, in relation to the overall population, is a key inquiry for both the 'widespread' and the 'civilian population' requirements," and determining that hundreds of deaths and thousands of injuries among roughly 14 million inhabitants were insufficient to give rise to crimes against humanity).

*Second*, Plaintiffs' amended complaint alleges that Defendants "planned the attacks against the civilian population in advance and executed those plans in a systematic way, including personally supervising" the campaign.  Opp. 33.  But Plaintiffs disregard the fact that the casualties at issue here occurred during massive civil disturbances that threatened public safety and encompassed the nation's capital and at least two other major cities.  *See, e.g.,* Compl. ¶¶ 62, 70, 94, 129, 133, 152.  Presented with materially identical allegations, the Eleventh Circuit held that Plaintiffs failed to state a claim for crimes against humanity because "the pertinent international law is not already clear, definite, or universal enough to reach the alleged conduct." *Mamani*, 654 F.3d at 1157.  Plaintiffs cannot avoid dismissal now by repackaging allegations that the Eleventh Circuit has already held do not rise to the level of crimes against humanity.

Plaintiffs cite no case that comes close to presenting circumstances similar to those presented here.  Instead, Plaintiffs rely on cases more closely resembling notorious atrocities such as the Holocaust, the Rwandan genocide, and ethnic cleansing in the former Yugoslavia.  *See Cabello*, 402 F.3d at 1152; *Doe v. Drummond Co.*, Civ. No. 09-1041, 2010 WL 9450019, at *9 (N.D. Ala. Apr. 30, 2010); *Rafael Saravia*, 348 F. Supp. 2d at 1156.  Plaintiffs' claim for crimes against humanity, like their claims for extrajudicial killings, should therefore be dismissed.

## IV.   THE COURT SHOULD DECLINE TO EXERCISE JURISDICTION OVER PLAINTIFFS' STATE-LAW CLAIM

Should the Court dismiss the ATS and TVPA claims, it should decline to exercise supplemental jurisdiction over Plaintiffs' wrongful-death claim.  Plaintiffs do not dispute that declining to exercise supplemental jurisdiction would be appropriate because the Court will have "dismissed all claims over which it has original jurisdiction."  28 U.S.C. § 1367(c)(3); Opp. 50.  Plaintiffs seemingly contend only that, if any a federal claim were to survive, the Court should exercise supplemental jurisdiction over the wrongful-death claim because it does not raise a "novel or complex issue of State law."  28 U.S.C. § 1367(c)(1).  "Because this Court has already determined that the claims are governed by Bolivian law," Plaintiffs argue, "there is no basis for Defendants' assertion that the issues are 'novel or complex.'" Opp. 50.  Assuming, *arguendo*, that Bolivian law applies, the claim does raise numerous "novel or complex issues," such as whether government officials responding to a civil uprising may be held liable for actions of an individual member of the military.  *See Chiquita*, 792 F. Supp. 2d at 1356–57 (declining to exercise supplemental jurisdiction over Colombian-law claims).  In any event, because Plaintiffs concede that dismissal of the Bolivian-law claim is appropriate under 28 U.S.C. § 1367(c)(3) if the Court dismisses their federal-law claims, it is not necessary to decide whether Plaintiffs' claim is "novel or complex."  Accordingly, all of Plaintiffs' claims must be dismissed.

## CONCLUSION

The amended complaint should be dismissed in its entirety with prejudice.

Respectfully submitted,

By:    <u>/s/ Kannon K. Shanmugam</u>
Kannon K. Shanmugam (*pro hac vice*)
Ana C. Reyes (*pro hac vice*)
Kristin A. Shapiro (*pro hac vice*)
Greg S. Hillson (*pro hac vice*)
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, DC  20005
(202) 434-5000
(202) 434-5029 (facsimile)
    kshanmugam@wc.com
    areyes@wc.com
    kshapiro@wc.com
    ghillson@wc.com


Mark P. Schnapp (Fla. Bar No. 501689)
Eliot Pedrosa (Fla. Bar No. 182443)
GREENBERG TRAURIG, P.A.
333 Avenue of the Americas
Miami, FL  33131
(305) 579-0500
(305) 579-0717 (facsimile)
    schnappm@gtlaw.com
    pedrosae@gtlaw.com


Glenn E. Goldstein (Fla. Bar No. 435260)
GREENBERG TRAURIG, P.A.
401 East Las Olas Boulevard
Fort Lauderdale, FL  33301
(954) 765-0500
(954) 765-1477 (facsimile)
    goldsteing@gtlaw.com

Dated:  January 27, 2014        *Counsel for Defendants*

26

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that, on January 27, 2014, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.  I also certify that the foregoing document is being served on the counsel listed on the attached Service List by electronic mail (in PDF format).

_____/s/ Eliot Pedrosa_____

Eliot Pedrosa

## SERVICE LIST

Ira J. Kurzban (Fla. Bar No. 225517)
KURZBAN, KURZBAN, WEINGER & TETZOLI, P.A.
Plaza 2650
2650 SW 27th Avenue, 2nd Floor
Miami, FL 33133
Tel: (305) 443-4675
Fax: (305) 444-3503
E-mail: ira@kkwtlaw.com

Judith Brown Chomsky
CENTER FOR CONSTITUTIONAL RIGHTS
Post Office Box 29726
Elkins Park, PA 19027
Tel: (215) 782-8367
Fax: (215) 782-8368
E-mail: jchomsky@igc.org

Beth Stephens
CENTER FOR CONSTITUTIONAL RIGHTS
666 Broadway
Seventh Floor
New York, NY 10012
Tel: (212) 614-6431
Fax: (212) 614-6499
E-mail: jgreen@ccr-ny.org

David Rudovsky
KAIRYS, RUDOVSKY, MESSING &
FEINBERG LLP
718 Arch Street, Suite 501 South
Philadelphia, PA 19016
Tel: (215) 925-4400
Fax: (215) 925-5365
E-mail: drudovsk@law.upenn.edu

Tyler R. Giannini
Susan H. Farbstein
INTERNATIONAL HUMAN RIGHTS CLINIC
Harvard Law School
Pound Hall 401, 1563 Massachusetts Avenue
Cambridge, MA 02138
Tel: (617) 495-9362
Fax: (617) 495-9393
E-mail: giannini@law.harvard.edu

Paul Hoffman
SCHONBRUN, DE SIMONE, SEPLOW,
HARRIS & HOFFMAN, LLP
723 Ocean Front Walk
Venice, CA 90201
Tel: (310) 396-0731
Fax: (310) 399-7040
E-mail: hoffpaul@aol.com

Steven H. Schulman
AKIN GUMP STRAUSS HAUER & FELD LLP
Robert S. Strauss Building
1333 New Hampshire Avenue N.W.
Washington, DC 20036
Tel: (202) 887-4000
Fax: (202) 887-4288
E-mail: sschulman@akingump.com

Michael D. Small
Jeremy F. Bollinger
AKIN GUMP STRAUSS HAUER & FELD LLP
2029 Century Park East, Suite 2400
Los Angeles, CA 90067
Tel: (310) 229-1000
Fax: (310) 229-1043
E-mail: msmall@akingump.com
E-mail: jbollinger@akingump.com