FILED BY *HH*

Sep 14, 2016

STEVEN M. LARIMORE
CLERK U.S. DISTRICT CT.
S.D. OF FLA. MIAMI

# UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

ELBERT PARR TUTTLE COURT OF APPEALS BUILDING
56 Forsyth Street, N.W.
Atlanta, Georgia 30303

David J. Smith
Clerk of Court

For rules and forms visit
www.ca11.uscourts.gov

September 14, 2016

Steven M. Larimore
U.S. District Court
400 N MIAMI AVE
MIAMI, FL 33128-1810

Appeal Number:  14-15128-EE
Case Style: Eloy Mamani, et al v. Jose Berzain, et al
District Court Docket No: 1:07-cv-22459-JIC
Secondary Case Number: 1:08-cv-21063-JIC

A copy of this letter, and the judgment form if noted above, but not a copy of the court's decision, is also being forwarded to counsel and pro se parties. A copy of the court's decision was previously forwarded to counsel and pro se parties on the date it was issued.

The enclosed copy of the judgment is hereby issued as mandate of the court. The court's opinion was previously provided on the date of issuance.

Sincerely,

DAVID J. SMITH, Clerk of Court

Reply to:  Lois Tunstall
Phone #:  (404) 335-6191

Enclosure(s)

MDT-1 Letter Issuing Mandate

# UNITED STATES COURT OF APPEALS
## For the Eleventh Circuit

——————————

No. 14-15128

——————————

District Court Docket No.
1:07-cv-22459-JIC

ELOY ROYAS MAMANI,
ETELVINA RAMOS MAMANI,
SONIA ESPEJO VILLALOBOS,
HERNAN APAZA CUTIPA,
JUAN PATRICIO QUISPE MAMANI, et al.,

Plaintiffs - Appellees,

versus

JOSE CARLOS SANCHEZ BERZAIN,
GONZALO SANCHEZ DE LOZADA,

Defendants - Appellants.

———————————————————————

Appeal from the United States District Court for the
Southern District of Florida

———————————————————————

JUDGMENT

It is hereby ordered, adjudged, and decreed that the opinion issued on this date in this appeal is
entered as the judgment of this Court.

Entered: June 16, 2016
For the Court: DAVID J. SMITH, Clerk of Court
By: Jeff R. Patch

[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 14-15128

_____

D.C. Docket No. 1:07-cv-22459-JIC; 1:08-cv-21063-JIC

ELOY ROYAS MAMANI,
ETELVINA RAMOS MAMANI,
SONIA ESPEJO VILLALOBOS,
HERNAN APAZA CUTIPA,
JUAN PATRICIO QUISPE MAMANI, et al.,

                                                Plaintiffs-Appellees,

versus

JOSE CARLOS SANCHEZ BERZAIN,
GONZALO SANCHEZ DE LOZADA,

                                                Defendants-Appellants.

_____

Appeals from the United States District Court
for the Southern District of Florida

_____

(June 16, 2016)

Before ED CARNES, Chief Judge, TJOFLAT and SENTELLE,[*] Circuit Judges.

_____

[*] Honorable David Bryan Sentelle, United States Circuit Judge for the District of
Columbia, sitting by designation.

ED CARNES, Chief Judge:

The plaintiffs who brought this Torture Victim Protection Act (TVPA) lawsuit are heirs to eight civilians killed in 2003 by Bolivian troops acting under the direction of the President and Minister of Defense at the time.  The TVPA bars courts from hearing claims brought under it "if the claimant has not exhausted adequate and available remedies in the place in which the conduct giving rise to the claim occurred."  Pub. L. No. 102-256, 106 Stat. 73, § 2(b) (1992) (codified at 28 U.S.C. § 1350, historical and statutory notes).  These plaintiffs have exhausted all of their available Bolivian remedies.  They received some compensation through those remedies but not nearly as much as they claim is necessary to fully compensate them for their losses.  The defendants contend that the fact the plaintiffs received some compensation through the local remedy bars them from any compensation under the TVPA.  In other words, they would have us construe the TVPA so that when it comes to exhaustion, you're barred if you do and barred if you don't.  We won't.

## I.

Because this is an appeal from the denial of a Federal Rule of Civil Procedure 12(b)(6) motion, we take the facts as stated in the second amended complaint, accepting them as true and construing them in the light most favorable

to the plaintiffs.  See United States ex rel. Lesinski v. S. Fla. Water Mgmt. Dist.,

739 F.3d 598, 600 n.2 (11th Cir. 2014).

A.

Defendant Gonzalo Sánchez de Lozada Sánchez Bustamante (Lozada) was

twice elected President of Bolivia, serving from 1993 to 1997 and again from

August 2002 to October 2003.  Defendant José Carlos Sánchez Berzaín (Berzaín)

served as Minister of Defense of Bolivia from August 2002 to October 2003.  This

case arises from actions they took during Lozada's second term to quash

opposition to his administration.

Before they even took office, Lozada and Berzaín knew that certain

economic programs they planned to implement, particularly their plan to export

natural gas, would probably trigger political protests.  They agreed that if their

programs provoked widespread protest, they would use military force to kill as

many as 2,000 or 3,000 civilians in order to squelch the opposition.

In mid-September 2003, Lozada announced that the government was

finalizing a contract to sell natural gas to Mexico and the United States.  As he and

Berzaín anticipated, the announcement triggered widespread opposition and

protest.  The protestors, among other things, blocked roads by digging trenches in

them or covering the roads with rocks or other impediments.  One road they

blocked ran between La Paz and Sorata, which is a small town in the mountains

several hours from La Paz.  Hundreds of foreign tourists were trapped in Sorata by the roadblocks.  The Lozada government decided to use the foreign tourists as a justification for military force against the protestors blocking the roads.  On September 19 in a meeting of military officials chaired by Berzaín, plans were made to use military force to carry out Lozada's order to clear the road and rescue the tourists.  What followed was a series of operations in September and October 2003 designed to suppress opposition to the Lozada administration.  In those operations, troops killed 58 civilians and injured over 400.  Eight of those killed were relatives of the plaintiffs.

On October 17, 2003, the United States embassy issued a statement withdrawing support for Lozada and his administration.  He resigned the presidency that same day and fled, along with Berzaín, to the United States.  That night the commander of the army "issued a statement in which he acknowledged that members of the Armed Forces had successfully complied with the orders of their superiors."

In November 2003 the new Bolivian government passed a "Humanitarian Assistance Agreement" that provided "humanitarian assistance compensation" to the heirs of those killed by the Lozada government's use of military force.  The agreement provided payments of 55,000 bolivianos as general compensation and 5,000 bolivianos for funeral expenses.  The total amount provided, 60,000

bolivianos, was equivalent to about eight times the average annual income in

Bolivia.  See Mamani v. Berzain, 636 F. Supp. 2d 1326, 1329 (S.D. Fla. 2009)

("Mamani I").  All the plaintiffs have received the full amount of compensation

available under the agreement.

In 2007 the prosecutor for a specially convened Trial of Responsibilities

filed a formal indictment charging the defendants and 15 other high-ranking former

government officials with various crimes.  The ones who had not fled Bolivia were

all found "guilty of the crime of genocide through mass killings."  Lozada and

Berzaín had fled, the United States has refused to extradite them, and Bolivia does

not permit trials in absentia.  As a result, the two of them have not been tried.

Bolivia has declared them fugitives from justice.

## B.

The amended complaint sought relief under:  (1) the Alien Tort Statute

(ATS), 28 U.S.C. § 1350; (2) the Torture Victim Protection Act, Pub. L. No. 102-

256, 106 Stat. 73, § 2(b) (1992) (codified at 28 U.S.C. § 1350, historical and

statutory notes); and (3) state law.[1]  It alleged that in the military operations of

September and October 2003, Lozada and Berzaín caused disproportionate force to

be used against civilians in order to quell opposition to their administration, which

---

[1] The plaintiffs originally filed two suits, one against Berzaín in the Southern District of
Florida, and one against Lozada in the District of Maryland.  They later had their lawsuit against
Lozada transferred to the Southern District of Florida.  The district court consolidated the two
cases, and the plaintiffs filed an amended complaint, followed by a second amended complaint.

resulted in the extrajudicial killings of eight of the plaintiffs' relatives.  Plaintiffs

sought compensatory, punitive, and exemplary damages (in amounts to be

determined at trial), as well as costs and attorney's fees.  The defendants filed a

motion to dismiss the amended complaint, which the district court disposed of in

two separate orders.

The first order dismissed the plaintiffs' TVPA claims for failure to satisfy

the exhaustion requirement in § 2(b) of that act.  Mamani I, 636 F. Supp. 2d at

1332–33.  The court reasoned that the plaintiffs had failed to exhaust a newly

available local remedy created in 2008 by Bolivian Law No. 3955, which provided

further compensation to the heirs of those killed by the Lozada government, and

that they were required to exhaust that remedy before they could proceed with their

TVPA claims.  Id. at 1329–33.  The second order dismissed some of the plaintiffs'

ATS claims and one of their state-law claims but refused to dismiss others.

The district court granted the defendants' motion to certify an interlocutory

appeal of that second order involving the issue of whether the complaint failed to

state ATS claims, and we granted them permission to appeal that order.  See 28

U.S.C. § 1292(b).  On appeal, we held that the plaintiffs had not alleged sufficient

facts to make out claims for relief under the ATS, reversed the denial of the motion

to dismiss, and remanded with instructions to dismiss.  Mamani v. Berzain, 654

F.3d 1148, 1152–57 (11th Cir. 2011) ("Mamani II").  Which the district court did.

While their interlocutory appeal from the district court's second order was pending, the plaintiffs did what that court's first order on the motion to dismiss, which involved the TVPA claims, had required them to do.  They sought compensation under Bolivian Law No. 3955.  As heirs of the victims, they received the benefits they were entitled to under that law:  (1) a free public university education to obtain a bachelor's degree; and (2) a payment of about 145,000 bolivianos.  At the time, the 145,000 bolivianos, which equaled USD $19,905.56, was about 15 times the average annual income in Bolivia.  Mamani I, 636 F. Supp. 2d at 1329–30.  When the award under Bolivian Law No. 3955 was combined with the payment they had already received under the 2003 Humanitarian Assistance Agreement, each plaintiff received from their Bolivian remedies total compensation worth 205,000 bolivianos, which is about 23 times the average annual income in Bolivia.  That is the equivalent of USD $28,264.17 (based on the 2008 exchange rate), not counting the value of the free education, which is not disclosed in the record.  See id.

On remand from the interlocutory appeal of the second order, involving the ATS claims, the plaintiffs sought and received leave to amend their complaint again in light of this Court's decision in that appeal.  Their second amended complaint added close to one hundred paragraphs of allegations.  It once again sought relief under the ATS, the TVPA, and state law; the defendants once again

7

moved to dismiss; and the district court once again granted the motion to dismiss in part and denied it in part.  Mamani v. Berzaín, 21 F. Supp. 3d 1353, 1364, 1379 (S.D. Fla. 2014) ("Mamani III").  The district court dismissed the ATS claims on the ground that, under the Supreme Court's Kiobel decision, it lacked subject matter jurisdiction over them.  Id. at 1365–69 (applying Kiobel v. Royal Dutch Petroleum Co., 569 U.S. ___, 133 S. Ct. 1659 (2013)).

The district court, however, refused to dismiss the plaintiffs' TVPA and state-law claims.  Id. at 1378–80.  On the TVPA claims, the district court rejected the defendants' argument that the exhaustion requirement in § 2(b) of the TVPA barred those claims because the plaintiffs had already received substantial local remedies in Bolivia.  Id. at 1369–73.  The court also decided that the second amended complaint contained sufficient factual allegations to state plausible claims for relief under the TVPA based on the command-responsibility doctrine.  Id. at 1373–78; see generally Ford ex rel. Estate of Ford v. Garcia, 289 F.3d 1283, 1287–93 (11th Cir. 2002).

The defendants sought certification for an interlocutory appeal of the decision on two issues:  (1) whether the exhaustion requirement in § 2(b) of the TVPA bars the plaintiffs' claims, and (2) whether the plaintiffs have failed to state claims for relief under the TVPA.  After the district court certified both issues for appeal under 28 U.S.C. § 1292(b), the defendants filed in this Court a petition for

8

permission to appeal the rulings on those two issues.  A motions panel granted the

petition as to both issues.

Although the motion panel's order granting permission to appeal pointed to

the exhaustion issue as the reason for doing so, it also noted that interlocutory

jurisdiction under § 1292(b) "applies to the <u>order</u> certified to the court of appeals,

and is not tied to the particular question formulated by the district court."  <u>See</u>

<u>Yamaha Motor Corp., U.S.A. v. Calhoun</u>, 516 U.S. 199, 205, 116 S. Ct. 619, 623

(1996).  For that reason, the panel stated, "the parties may wish to address the other

certified issue in their briefs to this Court, but we leave to the merits panel whether

to address that issue on appeal."  The last clause of that statement is appropriate,

although not necessary.  <u>See</u> 11th Cir. R. 27-1(g) ("A ruling on a motion or other

interlocutory matter, whether entered by a single judge or a panel, is not binding

upon the panel to which the appeal is assigned on the merits, and the merits panel

may alter, amend, or vacate it."); <u>McFarlin v. Conseco Servs.</u>, 381 F.3d 1251,

1253 (11th Cir. 2004); <u>Jones v. United States</u>, 224 F.3d 1251, 1256 (11th Cir.

2000).

## II.

The defendants contend that the exhaustion requirement contained in § 2(b)

of the TVPA bars a plaintiff from bringing a claim under the TVPA after obtaining

some compensation through the remedies available in the foreign state where the

wrongful conduct occurred.  See Pub. L. No. 102-256, 106 Stat. 73, § 2(b) (1992)

(codified at 28 U.S.C. § 1350, historical and statutory notes).  No court of appeals

has addressed this issue.

     "In construing a statute we must begin, and often should end as well, with

the language of the statute itself."  United States v. Steele, 147 F.3d 1316, 1318

(11th Cir. 1998) (en banc) (quotation marks omitted); accord Hartford

Underwriters Ins. Co. v. Union Planters Bank, 530 U.S. 1, 6, 120 S. Ct. 1942, 1947

(2000) ("[W]hen the statute's language is plain, the sole function of the courts —

at least where the disposition required by the text is not absurd — is to enforce it

according to its terms.") (quotation marks omitted); Conn. Nat'l Bank v. Germain,

503 U.S. 249, 253–54, 112 S. Ct. 1146, 1149 (1992) ("[I]n interpreting a statute a

court should always turn first to one, cardinal canon before all others.  We have

stated time and again that courts must presume that a legislature says in a statute

what it means and means in a statute what it says there."); Harris v. Garner, 216

F.3d 970, 972 (11th Cir. 2000) (en banc) ("We begin our construction of [a

statutory provision] where courts should always begin the process of legislative

interpretation, and where they often should end it as well, which is with the words

of the statutory provision.").

     Subsection 2(b) of the TVPA plainly states:  "A court shall decline to hear a

claim under this section if the claimant has not exhausted adequate and available

remedies in the place in which the conduct giving rise to the claim occurred."

Pub. L. No. 102-256, 106 Stat. 73, § 2(b) (1992) (codified at 28 U.S.C. § 1350, historical and statutory notes).  As written, the provision provides a prerequisite a plaintiff must satisfy before the court will hear his TVPA claim.  The plaintiffs' failure to initially satisfy that prerequisite by exhausting their Bolivian remedies is why the district court dismissed the TVPA claims in the first amended complaint.

Since then the plaintiffs have exhausted all of their Bolivian remedies, so it can no longer be said of any of them that "the claimant has not exhausted adequate and available remedies in the place in which the conduct giving rise to the claim occurred."  Id.  Plainly each of the plaintiffs has fulfilled the exhaustion prerequisite. Plainly the § 2(b) bar no longer bars their claims.  Plainly the defendants' contention to the contrary is wrong.

The defendants would render the plain unplain by reading the statutory language to say what it does not say and mean what it does not mean.  They argue that we should read, interpret, and construe § 2(b) to say that a court must decline to hear a claim under the TVPA if the claimant has "sought and obtained adequate remedies" in the place where the conduct occurred and has received substantial compensation there.  Putting aside the vagueness problem with the term "substantial compensation," what the defendants would have us do is not actually read, interpret, or construe statutory language but amend, modify, or revise it.

To conform the statutory language to the defendants' liking we would have to strike the words "has not" before "exhausted" and write in their place the words "has successfully," and we would also have to write in a clause about the claimant having received "substantial compensation." We could do all of that without any problem — if only we were Congress. But unless and until the first and third branches of government swap duties and responsibilities, we cannot rewrite statutes. See Republic of Argentina v. Weltover, Inc., 504 U.S. 607, 618, 112 S. Ct. 2160, 2168 (1992) ("The question . . . is not what Congress 'would have wanted' but what Congress enacted in the [statute]."); see also Felix Frankfurter, Some Reflections on the Reading of Statutes, 47 Colum. L. Rev. 527, 533 (1947) ("A judge must not rewrite a statute, neither to enlarge nor to contract it. Whatever temptations the statesmanship of policy-making might wisely suggest, constructions must eschew interpolation and evisceration.").

Seeking to avoid the no-no of judicial revision of statutory language, the defendants argue that what they want § 2(b) to mean is nothing more than "the necessary import" of the language. Not so. The necessary import of "if plaintiffs don't do X, they lose" is not "if plaintiffs do X and get Y, they also lose." The import of statutory language is what it says, not what it ought to say. Lawyers frequently argue for an "interpretation" of plain statutory language that would be better — better for one policy end or another and, not coincidentally, better for

12

their clients as well.  The Supreme Court's observation last year describes the flaw

in that approach as "the one that inheres in most incorrect interpretations of

statutes:  It asks us to add words to the law to produce what is thought to be a

desirable result.  That is Congress's province.  We construe [the statute's] silence

as exactly that:  silence." EEOC v. Abercrombie & Fitch Stores, Inc., 575 U.S.

___, 135 S. Ct. 2028, 2033 (2015); see also Antonin Scalia & Bryan A. Garner,

Reading Law: The Interpretation of Legal Texts 93 (2012) ("The principle that a

matter not covered is not covered is so obvious that it seems absurd to recite it.").

And as we have said in similar situations before, the "absence of legislative

language restricts our interpretation, as we are not allowed to add or subtract words

from a statute.  Because our task is merely to apply statutory language, not to

rewrite it." Houston v. Marod Supermarkets, Inc., 733 F.3d 1323, 1334 (11th Cir.

2013) (citation and quotation marks omitted).  The text of § 2(b) speaks to the

necessity of exhausting local remedies, not to whether exhausting local remedies

and recoveries bars TVPA claims.  See Ebert v. Poston, 266 U.S. 548, 554, 45

S. Ct. 188, 190 (1925) ("The judicial function to be exercised in construing a

statute is limited to ascertaining the intention of the Legislature therein expressed.

A casus omissus does not justify judicial legislation.").

    Another way to look at it is that the defendants' reading of § 2(b) would

nullify two words in the provision:  "if" and "not." See Duncan v. Walker, 533

U.S. 167, 174, 121 S. Ct. 2120, 2125 (2001) ("[A] statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant.") (quotation marks omitted).  Subsection 2(b) states that it bars claims "if the claimant has not exhausted adequate and available remedies."  Pub. L. No. 102-256, 106 Stat. 73, § 2(b) (1992) (codified at 28 U.S.C. § 1350, historical and statutory notes) (emphases added).  The word "if" makes the clause a condition for applying the exhaustion bar, and the word "not" makes the condition a negative one.  So § 2(b)'s plain language makes the exhaustion bar applicable only where a claimant fails to pursue her remedies in the foreign state. In contrast, the defendants' interpretation of § 2(b) would extend the exhaustion bar to exactly the opposite situation, making it applicable where the claimant has (successfully) exhausted her remedies in the foreign state.  In effect, they would have us read § 2(b) to bar claims when there is a local remedy regardless of whether the plaintiff has exhausted it.  It is that interpretation which would render superfluous the words "if" and "not" in § 2(b).  Our duty to enforce the law as written by Congress prevents us from interpreting the TVPA in a manner that strikes out some of the words Congress wrote in.  See Duncan, 533 U.S. at 174, 121 S. Ct. at 2125.

The defendants attempt to avoid the straightforward language of § 2(b) by asserting the canon of imputed common-law meaning.  See, e.g., Sekhar v. United

States, 570 U.S. ___, 133 S. Ct. 2720, 2724 (2013) ("It is a settled principle of

interpretation that, absent other indication, Congress intends to incorporate the

well-settled meaning of the common-law terms it uses.") (quotation marks

omitted).  They urge us to presume that Congress intended the term "exhausted" to

import into § 2(b) the "common-law principles of exhaustion as applied by courts

in the United States."  Those common-law principles, according to the defendants,

include a well-settled rule that, "where plaintiffs have successfully obtained local

remedies, they are precluded from seeking further relief."  But that is not what

Congress said.

Putting aside the question of whether that is a well-settled rule, the canon of

imputed common-law meaning does not apply where the plain language of the

statute provides an "indication" that Congress did not intend to incorporate the

common-law meaning that the defendants advocate.  See Sekhar, 133 S. Ct. at

2724 (requiring the "absen[ce of] other indication" for the presumption to apply).

Because Congress used the words "if" and "not" to frame § 2(b)'s exhaustion bar

as a negative condition, the provision limits that bar to cases where the claimant

has not exhausted her remedies in the foreign state.  That is contrary to the

meaning defendants advocate.  See Gilbert v. United States, 370 U.S. 650, 655, 82

S. Ct. 1399, 1402 (1962) (stating that the canon applies only "in the absence of

anything to the contrary"). We will not presume that Congress intended to imply a meaning that undercuts the explicit words it chose to use.

For these reasons, we conclude that § 2(b)'s exhaustion requirement does not bar a TVPA suit by a claimant who has successfully exhausted her remedies in the foreign state. Because the plain language is decisive, we will not resort to the TVPA's legislative history. See Harris, 216 F.3d at 976–77. Nor will we entertain the defendants' attempts to use the legislative history to manufacture ambiguity in the text. See id. at 976 ("When the import of the words Congress has used is clear, as it is here, we need not resort to legislative history, and we certainly should not do so to undermine the plain meaning of the statutory language."). We are a nation governed by the rule of law — not by legislative committee reports. See Mitchell v. Great Works Milling & Mfg. Co., 17 F. Cas. 496, 498 (C.C.D. Me. 1843) (No. 9,662) (Story, J.) ("What passes in congress upon the discussion of a bill can hardly become a matter of strict judicial inquiry; and if it were, it could scarcely be affirmed, that the opinions of a few members . . . are to be considered as the judgment of the whole house . . . ."). A court therefore must "read the statute according to its text." Hui v. Castaneda, 559 U.S. 799, 812, 130 S. Ct. 1845, 1855 (2010). As Justice Holmes put it: "Only a day or two ago — when counsel talked

of the intention of a legislature, I was indiscreet enough to say I don't care what their intention was.  I only want to know what the words mean."[2]

Finally, we note the limited reach of our holding.  We do not decide whether the recoveries the plaintiffs received in Bolivia have any preclusive effect under principles of res judicata.  Neither claim preclusion nor issue preclusion was raised in this appeal.  And we don't decide whether the defendants are entitled to have deducted from any compensation that may be awarded to the plaintiffs in this lawsuit the amount of compensation they received in Bolivia.  What we do decide is that successful exhaustion of foreign remedies does not operate under § 2(b) to bar a TVPA claim.

## III.

The defendants also urge us to reverse on the ground that the second amended complaint fails to state claims for relief under the TVPA.  See Fed. R. Civ. P. 12(b)(6).  They argue that the factual allegations (1) do not establish two of the three elements of the command-responsibility doctrine, and (2) fail to show that the eight decedents' deaths were the result of extrajudicial killings.[3]  As the motions panel correctly noted, our jurisdiction under 28 U.S.C.

---

[2] See Frankfurter, supra, at 538 (quoting a letter from Oliver W. Holmes, Jr., to an unidentified recipient).

[3] To state a TVPA claim under the command-responsibility doctrine, a plaintiff must allege facts establishing that the defendant is culpable for the wrongdoing at issue and that the wrongdoing is the kind of action prohibited by the TVPA.  The Ford decision identified three

§ 1292(b) is discretionary, and we therefore are not obligated to consider this issue.

See McFarlin, 381 F.3d at 1253.  We have identified five conditions that generally

must be met before we will consider an issue on interlocutory appeal under

§ 1292(b).  Id. at 1264.  They are:  (1) the issue is a pure question of law, (2) the

issue is "controlling of at least a substantial part of the case," (3) the issue was

specified by the district court in its order, (4) "there are substantial grounds for

difference of opinion" on the issue, and (5) "resolution may well substantially

reduce the amount of litigation necessary on remand."  Id.

The defendants' Rule 12(b)(6) issue fails to meet the first condition.  To be a

pure question of law for purposes of § 1292(b), an issue must be "an abstract legal

issue" that "the court of appeals can decide quickly and cleanly."  Id. at 1258

(quotation marks omitted).  In McFarlin, which involved a proposed § 1292(b)

appeal from a partial summary judgment, we drew the following distinction:  A

pure question of law is an issue the court can resolve "without having to delve

beyond the surface of the record in order to determine the facts," as opposed to a

---

essential elements for culpability under the command-responsibility doctrine:  (1) "a superior-subordinate relationship" with the wrongdoer, (2) knowledge of the wrongdoing, and (3) a failure to prevent or punish the wrongdoing.  289 F.3d at 1288.  And the text of the TVPA requires that the wrongdoing for which the defendant is responsible qualify as "torture" or "extrajudicial killing" under the TVPA.  See Pub. L. No. 102-256, 106 Stat. 73, § 2(a) (1992) (codified at 28 U.S.C. § 1350, historical and statutory notes); cf. Mamani II, 654 F.3d at 1155 (stating, in the context of reviewing an ATS claim, that "the minimal requirement for extrajudicial killing [is] that [the] plaintiffs' decedents' deaths were 'deliberate' in the sense of being undertaken with studied consideration and purpose").

case-specific question of "whether there is a genuine issue of fact or whether the

district court properly applied settled law to the facts or evidence of a particular

case."  Id. at 1259.

Applying that distinction here in the Rule 12(b)(6) context, we conclude that

this issue falls into the group of case-specific questions.  While the issue of

whether a complaint states a claim for relief is a legal determination, see

Chudasama v. Mazda Motor Corp., 123 F.3d 1353, 1367 (11th Cir. 1997), the issue

raised here is not the kind of pure or abstract question of law contemplated in

McFarlin.  Instead of asking us to decide a pure or abstract question about the

TVPA itself, the defendants ask us to decide whether the specific facts alleged by

these particular plaintiffs state eight claims for relief under the TVPA.  That is the

Rule 12(b)(6) equivalent of deciding whether the district court properly applied

settled law to facts, the facts being those alleged in the complaint.  See McFarlin,

381 F.3d at 1259; see also 16 Charles Alan Wright et al., Federal Practice and

Procedure § 3931, 526–27 (3d ed. 2012) (explaining that appeals under § 1292(b)

are improper where they involve "a mere matter of properly pleading a claim

sought to be brought within a recognized and generally sufficient legal theory").

And we could not decide that question "quickly and cleanly."  McFarlin, 381 F.3d

at 1258.  The second amended complaint contains 224 paragraphs of allegations

spanning 55 pages.  To decide the Rule 12(b)(6) issue would require us not only to

scrutinize the scores of factual allegations that support all the plaintiffs' claims, but also to assess the clusters of allegations that support each of the plaintiffs' individual claims to relief against the two defendants.

Deciding these Rule 12(b)(6) issues would require us to say much about these particular plaintiffs' allegations and little about the TVPA's general standard for liability.[4]  For these reasons we exercise our discretion not to decide the second certified issue, which is actually a cluster of multiple issues involving the claims of multiple plaintiffs against the two defendants.

_____

[4] The defendants do at one point attempt to dress up their Rule 12(b)(6) issue as raising a pure question of law.  Though they dedicate the majority of their Rule 12(b)(6) argument to critiquing the factual allegations in the second amended complaint under Ford's standard, see supra note 3, the defendants do spend a couple of pages of their opening brief arguing that the district court should have applied a heightened knowledge standard.  They contend that Ford established the elements of a command-responsibility claim against military commanders, but not the elements of such a claim against civilian officials.  They argue that, instead of alleging facts establishing that the defendants "knew or should have known" of the extrajudicial killings, the plaintiffs had to allege facts establishing that the defendants "knew, or consciously disregarded information which clearly indicated, that the subordinates were committing or about to commit" the extrajudicial killings.  See Rome Statute of the International Criminal Court, art. 28, July 17, 1998, 2187 U.N.T.S. 90.

The defendants' briefs to the district court in support of their motion to dismiss never presented the issue of what knowledge element is required to hold civilian officials liable under the TVPA.  In fact, their briefs on the motion did not mention Ford or the knowledge element of the command-responsibility doctrine.  The first time they raised the issue was in their reply brief filed in the district court in support of their motion to certify an interlocutory appeal — which was after the court had denied their motion to dismiss.  Even assuming that this is an issue suitable for interlocutory appeal under § 1292(b), it would be inappropriate to permit review here given that it was raised at such a late hour in the district court.  Cf. Fils v. City of Aventura, 647 F.3d 1272, 1284 (11th Cir. 2011) ("To prevail on a particular theory of liability, a party must present that argument to the district court.").

We answer the first certified question in the negative and affirm the part of the district court's order denying the defendant's motion to dismiss the TVPA claims on exhaustion grounds.  We decline to answer the second certified question concerning the part of the district court's order denying the motion to dismiss the second amended complaint for failure to state a claim, vacate our previous order granting permission to appeal that part of the district court's order, and deny the petition for permission to appeal it.

Certified question no. 1 **ANSWERED**.

Certified question no. 2 **DECLINED**, order granting permission to appeal as to it **VACATED**, and petition for permission to appeal as to it **DENIED**.