**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**FORT LAUDERDALE DIVISION**

| | | |
|---|---|---|
| ELOY ROJAS MAMANI, *et al.*, | ) | **Case No. 08-21063-CV-COHN** |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| GONZALO DANIEL SÁNCHEZ DE | ) | |
| LOZADA SÁNCHEZ BUSTAMANTE, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |
| | ) | **Case No. 07-22459-CV-COHN** |
| ELOY ROJAS MAMANI, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| JOSÉ CARLOS SÁNCHEZ BERZAÍN, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

**PLAINTIFFS' OPPOSITION MOTION TO**
**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

**Page**

INTRODUCTION .................................................................................................1

I.  STATEMENT OF MATERIAL FACTS .......................................................2

II.  STANDARD OF REVIEW ..........................................................................10

III.  ARGUMENT ...............................................................................................10

   A.  The record contains evidence sufficient to support a finding that
      decedents' deaths constituted extrajudicial killings under the
      Torture Victim Protection Act. ..............................................................11

      1.  The record evidence supports a finding that each of the
         deaths was a deliberate killing. ..........................................11

      2.  The circumstances of each death show that each
         constituted an extrajudicial killing and was not the result
         of an accidental or negligent shooting. .................................16

         a.  September 20 .................................................16

         b.  October 12 ....................................................17

         c.  October 13 ....................................................20

      3.  Defendants have offered no admissible evidence to
         support a claim that the killings were lawful .......................21

   B.  The record contains evidence sufficient to support a finding that
      Defendants are liable for the deaths of Plaintiffs' family
      members. ...............................................................................................22

      1.  The record supports a finding that Defendants are liable
         under the doctrine of command responsibility. ....................22

         a.  The record supports a finding that Sánchez de Lozada is liable
            under the doctrine of command responsibility. .........................24

         b.  Sánchez Berzaín is liable under the doctrine of command
            responsibility. ..........................................................................27

      2.  The record supports a finding that Defendants are liable
         as conspirators. ....................................................................29

      3.  The record supports a finding that Defendants are liable
         as principals for the acts of their agents..............................30

   C.  The record contains evidence sufficient to support a finding that
      each of the killings constituted a wrongful death under Bolivian
      law, the law that the Florida courts would apply to Plaintiffs'
      state law claims. ....................................................................................32

      1.  Bolivian law recognizes indirect liability. ...........................33

      2.  Bolivian law does not preclude civil claims in this case. .....33

i

D.      None of the Plaintiffs' claims fail based on individual
        deficiencies. ..................................................................................34

        1.      Plaintiff Sonia Espejo is a proper plaintiff with regard to
                all claims. ............................................................................34

        2.      All Plaintiffs received the benefits intended for the heirs
                of deceased victims of the 2003 events and exhausted
                local remedies...........................................................................36

E.      Plaintiffs' common law claims are not preempted and are not
        barred by the foreign affairs doctrine............................................38

        1.      Congress has not demonstrated a "clear and manifest"
                intent to preempt wrongful death claims through the
                TVPA..................................................................................38

        2.      Plaintiffs' wrongful death claims are not barred by the
                foreign affairs doctrine.........................................................39

CONCLUSION.................................................................................................40

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Am. Ins. Ass'n v. Garamendi*,
   539 U.S. 396 (2003) ..................................................................................................41

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986) ..................................................................................................10

*Arias v. Dynacorp*,
   517 F. Supp. 2d 221 (D.D.C. 2007) ..........................................................................39

*Baloco v. Drummond Co.*,
   640 F.3d 1338 (11th Cir. 2011) ........................................................................... 13, 36

*Boyle v. United Techs. Corp.*,
   487 U.S. 500 (1988) ..................................................................................................40

*Cabello v. Fernandez-Larios*,
   402 F.3d 1148 (11th Cir. 2005) .......................................................................... 29, 40

*Celotex Corp. v. Catrett*,
   477 U.S. 317 ..............................................................................................................10

*Chavez v. Carranza*,
   559 F.3d 486 (6th Cir. 2009) .....................................................................................25

*In re Chiquita Brands Int'l Inc. Alien Tort Statute & S'holder Derivative Litig.*,
   792 F. Supp. 2d 1301 (S.D. Fla. 2011) .....................................................................15

*Clark v. Allen*,
   331 U.S. 503 (1947) ..................................................................................................40

*Clark v. Coats & Clark, Inc.*,
   929 F.2d 604 (11th Cir. 1991) ........................................................................... 10, 23

*Commodities Future Trading Comm'n v. Gibraltar Monetary Corp. Inc.*
   575 F.3d 1180 (11th Cir. 2009) .......................................................................... 30, 31

*Cox v. Adm'r United States Steel & Carnegie*,
   17 F.3d 1386 (11th Cir. 1994) ...................................................................................32

*Doe v. Drummond Co.*,
   782 F.3d 576 (11th Cir. 2015) ....................................................................... 13, 23, 30

*Doe v. Exxon Mobile Corp*,
  654 F.3d 11 (D.C. Cir. 2011), *vacated on other grounds*, 527 Fed. App'x 7
  (D.C. Cir. 2013) ............................................................................................................41

*Doe v. Qi*,
  349 F. Supp. 2d 1258 (N.D. Cal. 2004)..........................................................................28

*Ford ex rel. Estate of Ford v. Garcia*,
  289 F.3d 1283 (11th Cir. 2002)....................................................... 13, 23, 25, 28

*In re Estate of Marcos Human Rights Litig. (Hilao v. Marcos)*,
  25 F.3d 1467 (9th Cir. 1996) ..........................................................................................15

*Fitzpatrick v. City of Atlanta*,
  2 F.3d 1112 (11th Cir. 1993) ..........................................................................................10

*Flanagan v. Islamic Rep. of Iran*,
  190 F. Supp. 3d 138, 163 (D.D.C. 2016)................................................................ 12, 29

*Forti v. Suarez-Mason*,
  672 F. Supp. 1531 (1987) ................................................................................................15

*GDG Acquisitions LLC v. Gov't of Belize*,
  849 F.3d 1299 (11th Cir. 2017)........................................................................................31

*Gul v. Turkey*,
  App. No. 22676/93 ...........................................................................................................16

*Jara v. Nunez*,
  No. 6:13-cv-1426, 2015 WL 8659954 (M.D. Fla. Dec. 14, 2015) .........................................25

*Jaramillo v. Naranjo*,
  No. 10-21951, 2014 WL 4898210 (S.D. Fla. Sept. 30, 2014)........................................ 12, 25

*Jean v. Dorelien*,
  431 F.3d 776 (11th Cir. 2005) .........................................................................................13

*Johnson v. Lincoln Square Props., Inc.*,
  571 So. 2d 541 (Fla. 2d DCA 1990) ...............................................................................36

*Jones v. Rath Packing Co.*,
  430 U.S. 519 (1977) .........................................................................................................40

*Jovic v. L-3 Servs., Inc.*,
  69 F. Supp. 3d 750, 762 (N.D. Ill. 2014)........................................................................39

*Kadic v. Karadzic*,
  70 F.3d 232 (2d Cir. 1995) ..............................................................................................15

*Mamani v. Berzaín,*
654 F.3d 1148 (11th Cir. 2011)........................................................................ 11, 15, 23, 34

*Mamani v. Berzain,*
Nos. 07-22459-CIVet ...............................................................................................34

*Michel v. NYP Holdings, Inc.,*
816 F.3d 686 (11th Cir. 2016) .................................................................................34

*Mushikiwabo v. Barayagwiza,*
No. 94 Civ. 3627, 1996 WL 164496 (S.D.N.Y. April 8, 1996)............................................15

*Osorio v. State Farm Bank, F.S.B.,*
746 F.3d 1242 (11th Cir. 2014)..................................................................................30

*Owens v. Republic of Sudan,*
864 F.3d 751 (D.C. Cir. 2017) ...................................................................................12

*Riegel v. Medtronic, Inc.,*
552 U.S. 312 (2008) .................................................................................................39

*Strauss v. CBE Group, Inc.,*
173 F. Supp. 3d 1302, 1309 (S.D. Fla. 2016) ...................................................... 30, 31, 32

*Tachiona v. Mugabe,*
234 F. Supp. 2d 401 (S.D.N.Y. 2002), *rev'd on other grounds* 386 F.3d 205
(2d Cir. 2006)..........................................................................................................15

*Thuneibat v. Syrian Arab Republic,*
167 F. Supp. 3d 22, 35-36 (D.D.C. 2016) ....................................................................12

*Tolan v. Cotton,*
134 S. Ct. 1861 (2014) .............................................................................................10

*Velez v. Sanchez,*
693 F.3d 308 (2d Cir. 2012) ......................................................................................39

*Whetstone Candy Co. v. Kraft Foods, Inc.,*
351 F.3d 1067 (11th Cir. 2003)..................................................................................30

*William v. AES Corp.,*
No. 1:14CV343 ......................................................................................................39

*Xuncax v. Gramajo,*
886 F. Supp. 162 (D. Mass. 1995) ..............................................................................16

*In re Yamashita,*
327 U.S. 1 (1946) ....................................................................................................25

*Yousuf v. Samantar*,
No. 1:04-cv-1360, 2012 WL 3730617 (E.D. Va. Aug. 28, 2012) ................................... 25, 28

*Zschernig v. Miller*,
389 U.S. 429 (1968) ............................................................................................40

**Statutes**

28 U.S.C. § 1605A(h)(7) .............................................................................................12

Bolivian Law 3955 .............................................................................................. 37, 39

Bolivian Code of Civil Procedure ..................................................................................35

Bolivian Code of Criminal Procedure ......................................................................... 34, 35

Foreign Sovereign Immunities Act, 28 U.S.C. § 1605A ........................................................12

Torture Victim Protection Act, 28 U.S.C. § 1350 ............................................................*passim*

**Other Authorities**

Bolivian Constitution ....................................................................................... 36, 37

Fed. R. Civ. P. 56(a) ...............................................................................................10

H.R. Rep. No. 101-55 (1989) ......................................................................................11

Red Cross, Commentary on the Additional Protocols of 8 June 1977 to the
Geneva Conventions of 12 August 1949 (1987) ...............................................................25

Report on Human Rights Practices 2000, App. ..................................................................13

Report on Human Rights Practices 2010 ..........................................................................13

Restatement (Second) of Agency § 1 (1958) ....................................................................30

Restatement (Third) of Agency §4.01 cmt. ......................................................................32

Restatement (Third) of Foreign Relations Law of the United States § 702. ...............................13

S. Rep. No. 102-249 (1991) .................................................................................. 13, 15, 40

## INTRODUCTION

The record in this case contains ample evidence to support a finding that Defendants are liable for the extrajudicial killings of Plaintiffs' family members in Bolivia in September and October of 2003. As detailed below and in Plaintiffs' Counterstatement of Material Facts ("CSMF"), the record evidence is more than sufficient to raise genuine disputes as to all of the material facts.

Plaintiffs have presented evidence showing that, even before taking office in August 2002, Defendants Gonzalo Sánchez de Lozada and José Carlos Sánchez Berzaín agreed to use massive military force to quash public opposition to their programs, with the understanding that it would be necessary to kill as many as 3,000 people. This lethal plan was in sharp contrast to the Bolivian tradition of negotiation and political compromise whereby prior Bolivian governments had generally resolved protests. Defendants began to implement their plan as soon as they took office, altering the military legal framework to authorize the use of military force against civilian protesters.

Defendants put their plan into motion in September and October 2003. They oversaw military operations in which military officers under their command responded to civilian protests by repeatedly ordering troops to shoot at unarmed civilians, including numerous orders to "shoot at anything that moved" and to fire into houses, at individuals in windows, and into crowds of people. On different days, in different regions of Bolivia, without any lawful justification, the military implemented the Defendants' plan as soldiers intentionally took aim at unarmed civilians who were fleeing or hiding in fear for their lives, killing dozens of civilians and injuring hundreds more. One soldier was killed when he refused to fire at civilians, others were threatened with death when they hesitated to shoot, and others were withdrawn from duty and replaced with troops who would obey the order to shoot unarmed civilians.

1

Reports of military shootings of civilians were in the media and multiple people urged Defendants to engage in dialogue and stop the military violence.  However, Defendants refused to negotiate or change course and continued to deploy massive military force in civilian communities.  They failed to investigate civilian deaths, to punish those responsible, or to prevent future shootings that resulted in many more deaths.

Plaintiffs, the relatives of eight of the civilians killed as a result of Defendants' actions, have submitted evidence sufficient to overcome this motion for summary judgment.  The evidence indicates that none of the eight decedents had been involved in protests or posed a threat of any kind at the time of their deaths.  Four were killed inside their own homes.  Four were killed as they tried to hide from soldiers who were shooting at them.  None was armed or posed a threat to soldiers, and no threat justified the indiscriminate shooting at civilians.

Defendants' argument to the contrary contains two fundamental errors.  First, Defendants ignore Plaintiffs' evidence, including all of Plaintiffs' third-party fact witnesses, none of whom were deposed by Defendants.  Second, Defendants rely on a host of inadmissible evidence.  They offer not a single eyewitness to refute Plaintiffs' evidence of indiscriminate military shooting that caused dozens of civilian deaths.  Defendants' motion for summary judgment should be denied.

## I.       STATEMENT OF MATERIAL FACTS

Defendants came to power in 2002 with a pre-conceived plan to use military force to kill civilians in order to quash public opposition to their economic programs.  *See* CSMF ¶ 197.  In August 2002, shortly before taking office, they discussed the need to change the Bolivian government's historical practice of negotiating and compromising when faced with civilian protests against unpopular policies.  *See* CSMF ¶ 197; *see also id.* ¶¶ 198-199 (discussing Bolivian history of protest and negotiation).  Defendants explicitly agreed on an alternative to

negotiations and compromise: they would use massive military force against civilians, not to combat an armed insurgency, but rather as an unlawful means to deter civilian opposition to their policies. *See* CSMF ¶¶ 197, 200. They also agreed that they would need to kill as many as 3,000 people to achieve their goals. *See* CSMF ¶ 197.

Defendants' plan set the strategic objectives for the military—suppress popular protest by using lethal force against the civilian population—which were implemented through orders passed down the chain of command and translated into military operations on the ground in each location where decedents were killed. *See* CSMF ¶¶ 204, 207, 213-219, 230, 236-246, 249-256, 258, 260-261, 266-268, 271, 273-279, 281-285, 287-299, 301-302, 304-308, 311-322, 324-327, 333, 335. Defendants authorized the use of military force against civilian protests and called for the application of doctrines of armed conflict to civilian protesters. *See* CSMF ¶¶ 204, 206-207, 213-216, 236, 240-242, 270-271, 273-274, 276-278, 300-301, 318-319. They issued a plan (the "Republic Plan") that authorized the application of maximum combat force against civilian protests. *See* CSMF ¶¶ 204, 207. Through these military regulations, they designated civilian protests as subversion, labeled protesters the enemy, and authorized the military to attack civilians as if they were enemy combatants. *See* CSMF ¶¶ 204, 206-207.

In response to protests in January and February 2003, Defendants rejected peaceful resolutions. *See* CSMF ¶¶ 208-211. In the midst of the February confrontations between police and the military, after five people had been reported killed, the mayor of La Paz approached Sánchez Berzaín in an effort to avoid further deaths. *See* CSMF ¶ 209. Sánchez Berzaín responded to the mayor's concerns by saying, "Mayor, if there are five dead, then it doesn't matter if there are fifty more, as long as we solve the problem." CSMF ¶ 209.

In March 2003, Sánchez de Lozada was warned that the continued reliance on hardliners such as Sánchez Berzaín and the use of military force against protesters would lead to civilian deaths and a "massacre," and Sánchez de Lozada was urged to remove Sánchez Berzaín from any position of power within his administration. CSMF ¶ 211.  As they had discussed before taking office, *see* CSMF ¶¶ 197, 201, Defendants transferred troops from across the country who they thought would be more willing to kill civilians, *see* CSMF ¶ 333.

In early September 2003, in response to hunger strikes, marches, and other peaceful protests against Defendants' policies, the Armed Forces declared a "Red Alert" and implemented the "Republic Plan," which called for the deployment of "maximum combat power."  CSMF ¶¶ 207, 222-223, 225- 226.  As a result, multiple military units began to patrol the country, bearing weapons of war and prepared to use military force against civilian protesters and the communities in which the protests were occurring.  *See* CSMF ¶ 227.  At that time, and throughout the period of the killings that followed, Defendants falsely labeled peaceful civilian protesters as armed insurgents as a pretext to use military force against them.  *See* CSMF ¶¶ 224, 240, 258, 278, 331.

Widespread civilian protests continued in September 2003.  *See* CSMF ¶ 222.  A large group of peasant leaders began a hunger strike in El Alto while protesters blocked roads.  *See* CSMF ¶¶ 222-223.  On September 11, the mayor of La Paz arranged a meeting between two government ministers and the peasant leaders, at which the peasant leaders agreed to begin a formal dialogue with the government aimed at resolving the ongoing disputes.  *See* CSMF ¶ 225. That night, however, Sánchez de Lozada rejected the offer and refused to authorize the dialogue. *See* CSMF ¶ 225.

On September 20, 2003, the first killing at issue in this lawsuit occurred.  Speaking with Sánchez de Lozada by telephone throughout the day, Sánchez Berzaín commanded and oversaw a military excursion to the town of Sorata, a tourist site.  *See* CSMF ¶¶ 228, 232, 237.  The road to La Paz was blocked by protestors.  *See* CSMF ¶ 229.  Although Defendants insist that tourists in Sorata were in danger and needed to be rescued, *see* Def. Mem. 5, multiple eyewitnesses report that food and other supplies were available, the atmosphere was calm, people were able to leave by walking around the roadblocks, and, prior to the arrival of the military, local leaders had negotiated an agreement to allow those who wanted to leave to do so.  *See* CSMF ¶¶ 229-230, 234.

On September 20, over the objections of the Commander in Chief of the military, Sánchez Berzaín demanded that a military helicopter transport him to Sorata.  *See* CSMF ¶ 233. When he arrived, he was told that local community leaders had made arrangements to permit tourists in Sorata to travel safely through the roadblocks so that they could return to La Paz.  *See* CSMF ¶ 233.  Sánchez Berzaín angrily rejected the plan, saying that his orders from the government were to proceed with the military convoy.  *See* CSMF ¶ 233.  When a community leader pressed him to consider other options, Sánchez Berzaín said, "Fucking Indians, I'm going to shoot you. Leave me to do my work."  CSMF ¶ 235.  Sánchez de Lozada rejected consideration of a plan to send the convoy to La Paz via an alternate route, saying "the state will never back down."  CSMF ¶ 237.

A convoy of buses and military vehicles left Sorata.  *See* CSMF ¶ 238.  Shortly afterwards, soldiers in the helicopter, with Sánchez Berzaín aboard, were seen shooting at civilians on the ground.  *See* CSMF ¶ 244.  Although the convoy was not under attack, *see*

CSMF ¶ 245, the military shot at unarmed civilians in the hills above the road, *see* CSMF ¶¶ 243-246.

A soldier was killed by unknown assailants in Warisata, a small town on the road between Sorata and La Paz.  *See* CSMF ¶ 256.[1]  After speaking to Sánchez Berzaín, Sánchez de Lozada gave an order to take Warisata.  *See* CSMF ¶ 240.  Although Defendants had no evidence that a guerilla group was operating in Bolivia, *see* CSMF ¶ 331, they claimed falsely that a "guerrilla group" had attacked security forces, *see* CSMF ¶ 240.  In Warisata, officers ordered soldiers to shoot indiscriminately at civilians, "to shoot at anything that moves," and to shoot at civilians standing at windows, and said, "If you see a fly, shoot!"  CSMF ¶¶ 250, 254.  Officers and soldiers, including Special Forces, shot at houses and into windows.  *See* CSMF ¶ 254.  Shortly afterward, and as part of the Defendants' military operation, eight-year-old Marlene Nancy Rojas Ramos was killed by a soldier as she moved in front of a window in her home, far from the site of any protests.  *See* CSMF ¶ 255.

Sánchez de Lozada took full responsibility for the military's actions that day and falsely blamed the violence on "guerillas."  CSMF ¶¶ 240, 299, 333.  The military killings of civilians were widely reported in the Bolivian media.  *See* CSMF ¶ 318.  In response, Defendants did not order a change in their plans, an investigation of the killings, or instruct the military to protect civilian lives in future operations.  *See* CSMF ¶¶ 258-259, 265-266, 269-271, 273-278.

Over the next few weeks, Defendants rebuffed repeated efforts by colleagues and community leaders who sought a peaceful resolution and expressed concern about civilian bloodshed.  *See* CSMF ¶¶ 265, 269-270.  Instead, Defendants expanded military operations

---

[1] Although Defendants insist that armed civilians shot at the police and soldiers, they offer no admissible evidence to support those assertions, and Plaintiffs' witnesses state that they saw no armed civilians in Warisata that day.  *See* CSMF ¶ 328.

against civilians and authorized the use of counter-insurgency tactics.  *See* CSMF ¶¶ 258, 266-268, 271, 273-278.  In the weeks following September 20, new soldiers and weapons arrived at the barracks in El Alto, and soldiers were ordered to provide security at the Senkata gas plant. *See* CSMF ¶¶ 260-261.  Beginning in early October, military personnel patrolled the streets of El Alto, and planes flew low over the city.  *See* CSMF ¶ 266.  On October 10, the military was put in charge of security in El Alto and the police were withdrawn.  *See* CSMF ¶ 271.  On October 11, Sánchez de Lozada declared a national state of emergency and placed Defendant Sánchez Berzaín in charge of the operation to transport gas out of El Alto.  *See* CSMF ¶ 274.

On the evening of October 11, representatives of the Catholic Church and several civil society organizations met with Sánchez de Lozada to urge him to end the killings and use dialogue, not military force, to respond to political protests.  *See* CSMF ¶ 269.  Sánchez de Lozada refused to reconsider his violent approach, and reaffirmed his commitment to employ military force, and threatened to "shoot all the violent people of El Alto."  CSMF ¶ 272.

On October 12, dozens of civilians were killed in El Alto when the military, operating under Defendants' orders, shot indiscriminately at unarmed civilians and snipers targeted civilians in residential neighborhoods, including those who were hiding and fleeing.  *See* CSMF ¶¶ 281-285, 287-289, 291-294, 296-298.  On that day, Defendants mounted a military operation to escort gas tankers to La Paz, *see* CSMF ¶¶ 273, 277, 281, despite warnings that transporting the gas would be dangerous and that the amount the tankers could carry would make no impact on the fuel shortages in La Paz, *see* CSMF ¶¶ 272, 276. The Ministry of Defense, headed by Sánchez Berzaín, was placed in charge of the operation.  *See* CSMF ¶ 277.  Military commanders under Defendants' control authorized counter-insurgency operations against the

civilian population.  *See* CSMF ¶ 278.  None of these orders contained any instruction to minimize civilian casualties or protect civilian lives.  *See* CSMF ¶¶ 278, 319.

Throughout the day, without any justification, soldiers shot into houses and into crowds of fleeing civilians in multiple locations in El Alto.  *See* CSMF ¶¶ 282, 284, 288-289, 291, 293, 296-297.  More than twenty injured individuals were transported from a single for treatment on October 12, and by October 14, sixteen dead bodies were in the chapel.  *See* CSMF ¶ 292.  One soldier who refused to shoot at unarmed civilians was himself shot and killed by an officer, and others shot at civilians only after they were threatened with death.  *See* CSMF ¶ 294.  Soldiers who refused to shoot at unarmed civilians were removed and replaced by soldiers who agreed to follow the deadly orders.  *See* CSMF ¶ 285.  Multiple eyewitnesses at the scenes of the deaths saw no civilians with firearms.  *See* CSMF ¶ 329.

Four of Plaintiffs' relatives were killed by the military on that day, none of whom was involved in demonstrations or posed any threat to the military.  As a group of officers chased fleeing, unarmed civilians and targeted them "the way sharpshooters target people," CSMF ¶ 284, Lucio Santos Gandarillas Ayala was shot and killed when he peeked out from behind a kiosk where he had been hiding, *id.*  Teodosia Morales Mamani was shot through a wall in an apartment, after soldiers in the street below had threatened to shoot her and her relatives when they looked out the window.  *See* CSMF ¶¶ 289-290.  As soldiers marched down the street brandishing their weapons, they shot into home of Marcelino Carvajal Lucero, killing him.  *See* CSMF ¶ 296.  Roxana Apaza Cutipa was shot in the head as she peeked over a wall on the roof of her home, as soldiers drove and marched through the streets shooting at unarmed civilians.  *See* CSMF ¶¶ 297-298.

Despite the bloody events of October 12, Defendants remained committed to their plan to use military force to overcome and deter protests.  *See* CSMF ¶¶ 300-301.  On October 13, military units south of La Paz, who were ostensibly tasked with clearing roadblocks, shot at fleeing and hiding civilians in multiple locations.  *See* CSMF ¶¶ 302, 304-306, 308, 310-312, 313-314.  As on prior days, officers ordered soldiers to shoot at civilians who were fleeing and hiding, including orders to shoot at "[w]hatever head you see" and to ignore injured civilians.  CSMF ¶¶ 304, 306-307.  Soldiers stood in the open and shot, indicating that they were not under fire or otherwise endangered by the civilians they were attacking.  *See* CSMF ¶ 305.  Multiple eyewitnesses at the scenes of the deaths saw no civilians with firearms.  *See* CSMF ¶ 330.

Three of Plaintiffs' relatives were among the civilians killed by the military on that day. Jacinto Bernabé Roque was killed on a hilltop as he tried to hide behind tall straw plants.  *See* CSMF ¶¶ 308, 310, 312.  Arturo Mamani Mamani was shot and killed on an adjacent hill as he also attempted to hide from the gunfire.  *See* CSMF ¶¶ 308, 311.  Raul Ramón Huanca Márquez was shot as he ran for cover and attempted to hide; eyewitnesses were unable to come to his aid because the soldiers continued to shoot.  *See* CSMF ¶ 314.

Top government officials again criticized the mounting civilian death toll.  *See* CSMF ¶ 334.  Top military officers stressed that the military, in accordance with the constitutional order, had complied with orders from Sánchez de Lozada.  *See* CSMF ¶ 335.

Tens of thousands of people joined peaceful marches in Bolivia to protest the killings and demand the resignation of Sánchez de Lozada.  *See* CSMF ¶ 334.  Prominent civil leaders and people from across the social strata started a hunger strike demanding that Sánchez de Lozada resign because of the civilian death toll.  *See* CSMF ¶ 334.

On October 17, Sánchez de Lozada resigned and the Defendants left the country.  *See* CSMF ¶ 334.

## II.     STANDARD OF REVIEW

Summary judgment is only warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  In making the determination, "all justifiable inferences are to be drawn in [the non-movant's] favor."  *Tolan v. Cotton*, 134 S. Ct. 1861, 1863 (2014) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)).  The movant may argue that "there is an absence of evidence to support the nonmoving party's case," *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986), but "it is never enough simply to state that the non-moving party cannot meet its burden at trial," *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991).  If the non-moving party provides more than a mere "scintilla of evidence" demonstrating that "the jury could reasonably find for the plaintiff," it will defeat the motion.  *Anderson*, 477 U.S. at 252.  This can be done by pointing out where the record "contains supporting evidence . . . which was 'overlooked or ignored' by the moving party."  *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1116 (11th Cir. 1993) (citing *Celotex*, 477 U.S. at 332 (Brennan, J., dissenting)).

## III.    ARGUMENT

Defendants have "overlooked or ignored" the ample evidence in the record from which a reasonable jury could find both that the killings of Plaintiffs' relatives constituted extrajudicial killings as defined by the TVPA and that the Defendants are legally liable for those killings.  The evidence also supports a finding that the killings constituted wrongful deaths under Bolivian law—the law that the Florida courts would apply to Plaintiffs' state law claims.  Defendants' additional arguments are equally without merit.

10

A.   **The record contains evidence sufficient to support a finding that decedents' deaths constituted extrajudicial killings under the Torture Victim Protection Act.**

The Torture Victim Protection Act of 1991 ("TVPA"), P.L. 102-256, 106 Stat. 73 (Jan. 3, 1992) (codified at at 28 U.S.C. § 1350 (note)) defines an extrajudicial killing as:

> a deliberated killing not authorized by a previous judgment pronounced by a regularly constituted court affording all the judicial guarantees which are recognized as indispensable by civilized peoples. Such term, however, does not include any such killing that, under international law, is lawfully carried out under the authority of a foreign nation.

The Eleventh Circuit has stated that a "deliberated" killing is one that is "undertaken with studied consideration and purpose." *Mamani v. Berzaín*, 654 F.3d 1148, 1155 (11th Cir. 2011).[2] The record evidence supports a finding that each of the deaths at issue here was deliberated, either by the Defendants who set the deadly plan in motion and/or by the individual soldiers who followed orders to shoot indiscriminately at civilians and fired the shots that killed the decedents.

1.   **The record evidence supports a finding that each of the deaths was a deliberated killing.**

Defendants deliberately conceived and implemented a plan to use military force to kill unarmed civilians in order to suppress civilian protests and deter opposition to their policies. The deliberated nature of the killings is evident when Defendants' actions are considered in their entirety: a prior plan with the explicit goal of killing civilians, *see* CSMF ¶ 197; changes in Bolivian law and military doctrine to define civilians as subversive enemies who could be targeted by military force, *see* CSMF ¶¶ 204-207; a decision to employ the military in civilian communities rather than the police, who were trained to respond to protests with nonlethal force,

---

[2] The House Report to an earlier version of the TVPA states that the word "deliberated" was included in the definition "to exclude killings that lack the requisite extrajudicial intent, such as those caused by a police officer's authorized use of deadly force."  TVPA House Report, H.R. Rep. No. 101-55, at 4 (1989).  By implication, a police officer's unauthorized use of deadly force would satisfy the "deliberated" requirement.

*see* CSMF ¶¶ 207, 216, 226-227, 241, 271; refusal to engage in negotiations and compromise, approaches commonly used by prior governments to resolve disputes with civilian protesters, *see* CSMF ¶¶ 198-201, 208, 209, 211, 223, 225, 231-235, 265, 269-270, 300; implementation of Defendants' plan by officers who deployed troops in civilian neighborhoods and ordered soldiers to shoot at anything that moved, into houses and at unarmed civilians trying to flee, *see* CSMF ¶¶ 243-246, 250, 252-254, 279-298, 301, 304-307, 311-317, 321-322; and Defendants' failure to investigate the killings, or to issue orders to military subordinates to take care to avoid civilian casualties, CSMF ¶¶ 249, 278, 319-320.

These facts support a finding that civilian deaths, including the deaths of Plaintiffs' relatives, were the expected, desired consequence of the plan put in motion by Defendants.  This evidence that the deaths of Plaintiffs' relatives resulted from implementation of Defendants' plan is sufficient to support a finding that the killings were deliberate; it is not necessary that the plan identify particular persons as the targets. *See Owens v. Republic of Sudan*, 864 F.3d 751, 762, 769-70 (D.C. Cir. 2017) (deaths resulting from truck bombings constituted extrajudicial killings,[3] even though perpetrators had not targeted specific people for death); *Flanagan v. Islamic Rep. of Iran*, 190 F. Supp. 3d 138, 163 (D.D.C. 2016) (terrorist bombing that did not target specific people constituted extrajudicial killing because "the coordination and planning required to carry them out indicate that they were 'deliberated'"); *Thuneibat v. Syrian Arab Republic*, 167 F. Supp. 3d 22, 35-36 (D.D.C. 2016) (suicide bombings that did not target particular victims constituted extrajudicial killings); *Jaramillo v. Naranjo*, No. 10-cv-21951, 2014 WL 4898210, at *13 (S.D. Fla. Sept. 30, 2014) (evidence that defendant's organization targeted members of a

---

[3] Some of the claims in *Owens, Flanagan* and *Thuneibat* were decided under the Foreign Sovereign Immunities Act, 28 U.S.C. § 1605A, which explicitly adopts the TVPA definition of extrajudicial killing, *see* 28 U.S.C. § 1605A(h)(7) ("Extrajudicial killing" has "the meaning given . . . in section 3 of the Torture Victim Protection Act of 1991.").

particular political group and that decedent was a member of that group sufficient to satisfy TVPA's "deliberated" requirement).

In addition, the international law definition of extrajudicial killing, which informs interpretation of the TVPA,[4] contains no requirement that the perpetrator identify a particular target[5] and includes indiscriminate attacks using lethal force.[6] Prohibited extrajudicial killings include those that occur when security forces fire on civilians, regardless of whether the forces targeted a particular person.[7] The U.S. government has recognized that killings of bystanders by security forces constitute extrajudicial killings under international law.[8]

---

[4] The legislative history of the TVPA states that the statute "incorporates into U.S. law the definition of extrajudicial killing found in customary international law." TVPA Senate Report, S. Rep. No. 102-249, at 6 (1991). The Eleventh Circuit has turned to international law to interpret the TVPA when the statute "implicitly or explicitly incorporate[s]" international law principles. *Doe v. Drummond Co.*, 782 F.3d 576, 606 (11th Cir. 2015); *Ford ex rel. Estate of Ford v. Garcia*, 289 F.3d 1283, 1289 (11th Cir. 2002).
The Circuit has frequently relied on the legislative history of the TVPA. *See, e.g.*, *Doe v. Drummond Co.*, 782 F.3d at 602, 606-07; *Baloco v. Drummond Co.*, 640 F.3d 1338, 1347, 1348-49 (11th Cir. 2011); *Jean v. Dorelien*, 431 F.3d 776, 781-82 (11th Cir. 2005).

[5] *See Restatement (Third) of Foreign Relations Law of the United States* § 702 cmt. f ("[I]t is a violation of international law for a state to kill an individual other than as lawful punishment pursuant to conviction in accordance with due process of law, or as necessary under exigent circumstances, for example by police officials in line of duty in defense of themselves or of other innocent persons, or to prevent serious crime.").

[6] *See* Nils Melzer, *Targeted Killing in International Law* 3-5 (2008); International Commission of Jurists, *Enforced Disappearance and Extrajudicial Execution: Investigation and Sanction* 66 (2015); U.N. High Commissioner for Human Rights, *Human Rights and Law Enforcement: A Trainer's Guide on Human Rights*, at 15, U.N. Doc. HR/P/PT/5/Add.2 (2002)).

[7] *See, e.g.*, *Umetaliev v. Kyrgyzstan*, Comm. No. 1275/2004, U.N. Doc. CCPR/C/94/D/1275/2004 (Oct. 30, 2008) (U.N. Human Rights Committee found Kyrgyzstan responsible for extrajudicial killing when government militia opened fire on civilians engaged in political demonstration, killing petitioner).

[8] *See, e.g.*, Bureau of Democracy, Human Rights and Labor, U.S. Dep't of State, *Country Report on Human Rights Practices* 2000, App. A (Feb. 23, 2001) (noting that extrajudicial killings are "killings committed by police or security forces in operations. . . that result[] in the death of persons without due process of law (for example . . . killing of bystanders)"); Bureau of Democracy, Human Rights and Labor, U.S. Dep't of State, *Country Report on Human Rights Practices* 2010, Peru at 2 (2011) (noting the unlawful killings of protesters).

Defendants argue that Plaintiffs cannot show that each of the killings was "deliberated" in the absence of evidence identifying the shooter and detailing his state of mind at the time of the killing. Def. Mem. 19.[9]  That is nonsense. Assessing liability for an extrajudicial killing when a person is shot and killed by soldiers aiming at unarmed civilians does not require identifying the specific shooter. As an initial matter, in denying Defendants' Motion to Dismiss, this Court held that Plaintiffs had stated a claim for extrajudicial killings without any allegations as to the identity of individual shooters. *Mamani*, 21 F. Supp. 3d 1375.  Other courts have agreed.  *See, e.g.*, *In re Chiquita Brands Int'l, Inc.*, 792 F. Supp. 2d 1301, 1354–55 (S.D. Fla. 2011) (allowing TVPA claims where paramilitary group killed civilians, without identifying killer). Superior officers have routinely been held liable under the TVPA for the acts of subordinates regardless of whether the subordinates can be identified. *Kadic v. Karadzic*, 70 F.3d 232 (2d Cir. 1995) (permitting TVPA claims without any allegations as to the identity of the specific perpetrators); *Tachiona v. Mugabe,* 234 F. Supp. 2d 401, 420-423 (S.D.N.Y. 2002), *rev'd on other grounds* 386 F.3d 205 (2d Cir. 2004) (holding that killing members of opposing political party to suppress opposition constituted extrajudicial killing, without identifying killers); *Mushikiwabo v. Barayagwiza*, No. 94-cv-3627, 1996 WL 164496 (S.D.N.Y. April 9, 1996) (finding defendant liable for violations committed according to plan adopted with his coconspirators, without identifying who actually committed acts). In those cases, as in this, the circumstances

---

[9] Defendants mistakenly suggest that Plaintiffs must affirmatively prove the state of mind of each shooter, based on the Eleventh Circuit's observation that some of the shooters may have had personal motivations. Def. Mem. 19, citing *Mamani*, 654 F.3d at 1155. The Eleventh Circuit decision, however, was based on an early version of the Complaint that did not plausibly allege that the killings were the intentional outcome of a prior plan formulated by the Defendants. This Court found that the now-operative Second Amended Complaint plausibly alleged that the killings were part of a plan, not based on personal vendettas. *Mamani v. Berzain*, 21 F. Supp. 3d 1353, 1374-75 (S.D. Fla. 2014). Plaintiffs now submit ample evidence to support that allegation. Personal animus of individual soldiers cannot explain the pattern of shootings.

surrounding killings committed by unidentified shooters are sufficient to support a finding of extrajudicial killing under the TVPA.

Moreover, the TVPA legislative history, which relies on *Forti v. Suarez-Mason* as a model for TVPA liability, makes clear that a superior can be held liable for acts of his unnamed subordinates. TVPA Senate Report, S. Rep. No. 102-249, at 9 (1991) (citing *Forti v. Suarez-Mason*, 672 F. Supp. 1531, 1537-38 (N.D. Cal. 1987)). In *Forti*, the plaintiffs alleged only that they had been abducted by military and police officials acting under the defendant's command. The plaintiffs did not identify by name the individual subordinates who detained or tortured them or killed their young relative. *Forti*, 672 F. Supp. at 1537-38.

Defendants suggest that Plaintiffs cannot show that members of the Bolivian Armed Forces committed the killings. Def. Mem. 18.  However, the evidence of military responsibility for the killings is plentiful. Eyewitness testimony about the facts surrounding each death and the behavior of the troops in the vicinity at the time of each death; evidence that officers ordered soldiers to shoot at civilians at the times and places of decedents' deaths and that soldiers followed these order; and testimony about the absence of firearms in the hands of anyone except the military, are sufficient to support a finding that each of the decedents was killed by a soldier.

As noted above, international law informs the interpretation of extrajudicial killing in the TVPA. Under international law, killings by government agents are regularly labeled as extrajudicial killings without any evidence as to which soldiers fired the lethal shots. Applying the international law definition, federal courts have repeatedly held superior officials liable for killings by unidentified members of their security forces. *See, e.g.*, *In re Estate of Marcos Human Rights Litig. (Hilao v. Marcos)*, 25 F.3d 1467 (9th Cir.  1996) (head of state liable for killings by Philippine security forces); *Xuncax v. Gramajo*, 886 F. Supp. 162, 172-73 (D. Mass.

15

1995) (Minister of Defense who directed "indiscriminate campaign of terror against civilians" liable for extrajudicial killings). International jurisprudence similarly holds that killings by unidentified security personnel violate customary international law. *See, e.g.*, *Gul v. Turkey*, App. No. 22676/93, Eur. Ct. H.R. (Dec. 14, 2000) (holding government liable when unnamed security forces shot through closed door and killed civilian); *see also Case of the "Caracazo" v. Venezuela*, Inter-Am. Ct. H.R. (ser. C) No. 58 (Nov. 11, 1999) (indiscriminate shootings of civilians constituted extrajudicial killings).

> **2.    The circumstances of each death show that each constituted an extrajudicial killing and was not the result of an accidental or negligent shooting.**

Eyewitness evidence about the decedents' deaths and the actions of troops in each location at the time of the deaths, including testimony of soldiers involved in the military operations who received orders to shoot at civilians, are sufficient to create a genuine dispute about whether each of the killings constituted an extrajudicial killing.[10]

> **a.    September 20**

As the military convoy made its way from Sorata to Warisata, the military shot indiscriminately at civilians along the route. *See* CMSF ¶¶ 243-246. Defendant Sánchez

---

[10] Defendants pull out of context their assertion that Plaintiffs' counsel conceded in oral argument in 2008 that Plaintiffs must show that there were "no armed protesters in the area of the decedents' deaths." Def. Mem. at 18. At oral argument, Judge Jordan pushed Plaintiffs' counsel to consider a hypothetical in which 100 people in a group of 400 protesters fired at soldiers, triggering "a hale of bullets coming from both sides" and the deaths of 25 of the non-violent protesters. *Mamani, et al., v. Sanchez Berzaín*, Case No. 08-21063-CV-AJ, Trans. of Hrg. on Mot. to Dismiss at 53:8-17 (S.D.Fla. Oct. 24, 2008). Plaintiffs' counsel then agreed that the 25 non-violent decedents would not have a viable claim. Counsel did not concede that the presence of a single armed protester would defeat Plaintiffs' claims.

Even if Defendants' characterization of the standard were correct, the record contains no admissible evidence that any protester shot at the soldiers in the areas of the decedents' deaths, that they were caught in cross-fire, or that there were any armed protesters at all in those areas. Plaintiffs offer testimony from multiple witnesses who said that civilians were not armed and that no one was shooting at the soldiers. That evidence would permit a reasonable jury to conclude that there were no armed protesters in the areas of decedents' deaths.

Berzaín was in a helicopter near the convoy while soldiers in the helicopter shot at civilians who were fleeing into the hills. *See* CMSF ¶ 244. Soldiers on the ground also shot at civilians in the hills who posed no threat to them or to the caravan. *See* CMSF ¶¶ 242-246.

Marlene Nancy Rojas Ramos: After receiving the order to assault Warisata, troops moved through the town shooting without legal justification at villagers and at houses, including through doors and windows. *See* CSMF ¶¶ 243, 250, 252, 254. Officers ordered soldiers to shoot at people, "to shoot at anything that moves," and to shoot at civilians in windows who posed no threat, saying, "If you see a fly, shoot!" CSMF ¶¶ 250, 254. No one was shooting at the soldiers during this time. *See* CSMF ¶¶ 253, 328. Special Forces armed with specialized guns who were "like Rambo" and "ready to kill" moved through town, shooting into houses. *See* CSMF ¶ 252. The troops approached the home of eight-year-old Marlene, who was upstairs in a bedroom with her mother and her newborn sister. *See* CSMF ¶ 255. When she moved to look out a window, Marlene was fatally struck by a single shot from a soldier. *Id.* She was hit by a 7.62 caliber bullet—a bullet used by the Bolivian military. *Id.* No other bullet hit her house that day. *Id.* At least two other civilians were killed by soldiers in Warisata during that military operation. *See* CSMF ¶ 256.

### b.    October 12

As unarmed protesters blocked highways and roads throughout El Alto, officers gave orders to troops to open fire without warning and troops chased and shot civilians who were trying to flee and hide. *See* CSMF ¶¶ 281-282, 284, 288, 291. One soldier was executed by an officer when he refused to comply with the order to shoot at unarmed civilians. *See* CSMF ¶ 294. Some soldiers shot at civilians only after officers threatened to kill them if they did not, and others were withdrawn and replaced with soldiers who were willing to comply with the order. *See* CSMF ¶¶ 285, 294. Soldiers threatened to kill civilians and shouted racial insults at the

17

indigenous population of El Alto.  *See* CSMF ¶¶ 293, 295.  Troops were operating in two areas –

Río Seco and Juan Pablo Avenue II.  The record contains no admissible evidence that civilians

were armed with firearms or that the soldiers faced any threat that might justify the use of lethal

force against unarmed civilians.

Lucio Santos Gandarillas Ayala left his home in the Río Seco area that morning to borrow

cooking oil.  *See* CSMF ¶ 284.  Later that day, Luis Alfredo Castaño Romero, an eyewitness to

Mr. Gandarillas' killing, saw civilians fleeing as multiple soldiers shot at them, including

machine gun bursts aimed at fleeing people.  *See id.*  He saw no civilians with firearms.  *See*

CSMF ¶¶ 284, 329.  Mr. Castaño saw soldiers line up in formation and aim their guns at civilians

"the way sharpshooters target people."  CSMF ¶ 284.  He saw a man look out from behind a

kiosk where he had been hiding, heard a single gunshot fired without any warning, and saw the

man hit by a bullet.  *See id.*  That man was Mr. Gandarillas.  *See id.*[11]  Others civilians pulled him

back behind the kiosk, but he died later that day.  *See id.*

Teodosia Morales Mamani, who was pregnant at the time, was inside an apartment with

relatives when hundreds of soldiers armed with machine guns and rifles marched past on Juan

Pablo II Avenue while civilians fled.  *See* CSMF ¶¶ 287-289.  The military fired at fleeing

civilians, with bursts of gunfire and single shots; the gunfire was intense at times.  *See* CSMF ¶

288.  Soldiers raised their weapons and pointed them at windows.  *See* CSMF ¶ 289.  When a

relative of Ms. Morales Mamani opened the window and looked outside, three soldiers pointed

their guns at him, threatened to shoot, while yelling threats at her.  *Id.*  Ms. Morales Mamani

tried to leave to return to her own home, but came back upstairs, very upset, and said that she had

seen a soldier shoot a civilian.  *See id.*  The family members moved away from the windows.

---

[11] Mr. Castaño himself was shot in the leg shortly after he saw Mr. Gandarillas shot and his leg
was later amputated.  *See* CSMF ¶ 315.

*See id.*  Moments later, a soldier fired a single shot through a wall near the windows, hitting Ms. Morales Mamani.  *See id.*  She and her unborn child died the next day.  *See* CSMF ¶ 290.

Marcelino Carvajal Lucero was shot by the Bolivian military in his home on Juan Pablo II Avenue that evening.  *See* CSMF ¶ 296.  Witnesses saw soldiers marching down Juan Pablo II Avenue and shooting at civilians, *see* CSMF ¶¶ 296, 110, and passing in trucks, shooting in all directions, *see* CSMF ¶ 296.  Shortly before he was shot, his wife, Plaintiff Juana Valencia de Carvajal, saw military vehicles on the street and soldiers pointing their guns at houses even though they were not under fire.  *See* CSMF ¶¶ 109, 111.  No witnesses saw armed civilians or any civilian acting in a violent fashion, and, at the time of the shooting, there were no protesters on the street.  *See* CSMF ¶ 296.  As Mr. Carvajal Lucero bent to close a window on the second floor of the building, he was shot by a soldier and hit by a bullet that passed through him and left a bullet hole in the wall.  *See id.*  Another bullet also came through the window, and left a second bullet hole very close to the first, suggesting that both shots were targeted.  *See* CSMF ¶ 298.

Roxana Apaza Cutipa went up to the rooftop terrace of her home with her younger brother and cousins after hearing sounds of firecrackers or gunshots nearby.  *See* CSMF ¶ 297.  She looked over the wall around the terrace toward Juan Pablo II Avenue to see what was happening.  *See id.*  She was the tallest of those on the roof and the only one whose entire head was visible over the wall.  *See* CSMF ¶ 297.  Her younger brother, Guzmán Apaza Cutipa, saw tanks and military trucks on Juan Pablo II Avenue, with soldiers on the trucks shooting to all sides.  *See id.*  Mr. Apaza Cutipa did not see any civilians with guns.  *See* CSMF ¶ 297.  As Ms. Apaza Cutipa peered over the terrace, with just her head above the wall, she was fatally struck with a bullet in the head and killed.  *See id.*  Two other bullets left holes close together on the terrace, and the close proximity of the shots suggest that they were fired by a sniper.  *See* CSMF

¶ 298.  Mr. Apaza Cutipa heard the sound of the shot come from Juan Pablo II Avenue.  *See* CSMF ¶ 297.

### c.     October 13

Despite the mounting number of civilian deaths, Defendants took no steps to protect civilians.  They issued no orders instructing the military of its obligation to protect civilian lives. Military units deployed in the Southern Zone of La Paz to break up roadblocks and prevent marchers from moving to La Paz received repeated orders to shoot indiscriminately at fleeing and hiding civilians, which they did, mirroring prior operations in Warisata and El Alto.  *See* CSMF ¶¶ 301, 304, 313.  Protestors at a roadblock at Lake Animas were confronted by soldiers who opened fire on civilians without warning or provocation.  *See* CSMF ¶¶ 302, 304-05.  The soldiers captured and tortured other civilians.  *See* CSMF ¶ 307.  Soldiers were ordered to "shoot anything that move[d]," regardless of whether their target posed any threat; told "[w]hatever head you see, you need to shoot"; and ordered to ignore wounded civilians in need of medical attention.  CSMF ¶¶ 304, 306-307.  A helicopter arrived and replenished the soldiers' stock of lethal ammunition.  *See* CSMF ¶ 306.  Civilians attempting to flee or hide from the soldiers— including all of the decedents—were unarmed and posed no threat to the soldiers.  *See* CSMF ¶¶ 302, 305, 308-312.  Soldiers stood in full view, firing at civilians, making clear that they were not under attack and were in no way threatened by the civilians they were targeting.  *See* CSMF ¶ 305.

Arturo Mamani Mamani left his home that morning to walk toward his family's farm in the mountains.  *See* CSMF ¶ 309.  As he climbed into the hills, military trucks and soldiers passed on the road below, with the soldiers firing their weapons indiscriminately.  *See* CSMF ¶¶ 302, 304-306, 312.  There were no blockades or protesters in the hills, and no armed civilians. *See* CSMF ¶¶ 304-306.  As described above, soldiers standing in full view fired up into the hills

where civilians had fled to escape the soldiers' gunfire.  Mr. Mamani Mamani's son, Plaintiff Gonzalo Mamani Aguilar, watched from another hilltop as the military shot his father while he was lying down, attempting to hide from the soldiers.  *See* CSMF ¶ 311.  Mr. Mamani Mamani died as his neighbors attempted to carry him to a clinic to receive medical care.  *See* CSMF ¶ 311.

Jacinto Bernabé Roque had also left his home that morning.  When the shooting started, he and Gonzalo Mamani Aguilar tried to hide behind tall straw plants, in an effort to protect themselves from the soldiers shooting at them and at other civilians in the hills.  *See* CSMF ¶ 310.  Every time they moved, the soldiers shot at them; they could see bullets landing around them.  *See* CSMF ¶ 312.  Mr. Mamani Aguilar saw soldiers firing in their direction from the Ánimas Valley and was splattered with blood when Mr. Bernabé Roque was shot in front of him. *See* CSMF ¶ 312.

Raúl Ramón Huanca Márquez left home that morning in Ovejuyo to go to a store.  *See* CSMF ¶ 314.  As soldiers left the Ánimas valley in military trucks, travelling through Ovejuyo to return to their barracks, officers repeatedly ordered them to shoot at civilians, including to shoot at those looking out windows.  *See* CSMF ¶ 313.  When soldiers started to shoot indiscriminately at unarmed civilians, Mr. Huanca Márquez tried to hide but was shot in the abdomen.  *See* CSMF ¶ 314.  An eyewitness to the shooting was unable to go to his assistance because the soldiers continued shooting at other civilians.  *See id.*  Neither Mr. Huanca Márquez nor the other civilians in his vicinity were armed or threatening the soldiers.  *See id.*

### 3. Defendants have offered no admissible evidence to support a claim that the killings were lawful

Defendants rely entirely on inadmissible documents and hearsay to support their claim that armed civilians were shooting at the Bolivian military, and draw from that assertion the

erroneous conclusion that the military was lawfully entitled to shoot back.  Defendants have no

evidence from eyewitnesses to any of the events that they recount.  In contrast, Plaintiffs offer

firsthand accounts from multiple witnesses who, at multiple times and in multiple places: (1) saw

no armed civilians, (2) saw soldiers shooting at unarmed civilians without taking cover,

indicating that they were not concerned about being shot at themselves, and (3) heard officers

ordering soldiers to shoot at unarmed civilians, without any lawful justification.

Moreover, even if Defendants could offer evidence to indicate that any civilian had shot

any soldier in September and October 2003, an isolated shot would not render lawful the

military's indiscriminate shooting of unarmed civilians at other times and places over multiple

weeks.  That is, even if, for example, Defendants had admissible evidence that the soldier who

was killed in Warisata was shot by a civilian (which they do not), that killing would not have

justified the intentional shooting of civilians throughout Warisata at later times and in different

places, including the shooting of Marlene Rojas Ramos.

Plaintiffs have raised a genuine dispute as to whether their family members' deaths

constitute extrajudicial killings.

**B.**   **The record contains evidence sufficient to support a finding that Defendants are liable for the deaths of Plaintiffs' family members.**

       **1.**   **The record supports a finding that Defendants are liable under the doctrine of command responsibility.**

Defendants acknowledge that the command responsibility doctrine applies to TVPA

claims.  Def. Mem. 25-26.  Command responsibility holds superiors liable for the actions of their

subordinates.  *Ford*, 289 F.3d at 1289.  This Court has identified the applicable elements of

command responsibility, relying on settled Eleventh Circuit doctrine:

> [A] commander [is] liable for acts of his subordinates, even where the commander
> did not order those acts, when certain elements are met.  Those elements are (1)
> the existence of a superior-subordinate relationship between the commander and

the perpetrator of the crime; (2) that the commander knew or should have known, owing to the circumstances at the time, that his subordinates had committed, were committing, or planned to commit acts violative of the law of war; and (3) that the commander failed to prevent the commission of the crimes, or failed to punish the subordinates after the commission of the crimes.

*Mamani*, 21 F. Supp. 3d at 1375-36 (internal quotation marks and citation omitted).

Defendants focus on the first element of command responsibility, arguing that there is no evidence of the required "superior-subordinate relationship.[12] Def. Mem. at 26. Defendants concede that Plaintiffs can satisfy that prong of the standard by proving that Defendants had "effective control" over the military,[13] including the ability to "prevent or punish criminal conduct" and to "control the guilty troops." *Id.* at 27 (quoting *Ford*, 289 F.3d at 1290, 1291). They err, however, in equating effective control with operational control on the ground and ignoring evidence of the *de facto* control assumed by Sánchez Berzaín. Defendants also ignore the evidence that, after Defendants had agreed to the basic plan to use military force to kill and intimidate civilians, the actions of the military—all the way down the chain of command to the field officers—closely followed their plan. The alignment between actions on the ground and Defendants' original plan supports an inference that they had "effective control" over their military forces. In total, this evidence is sufficient to defeat summary judgment on this issue.

---

[12] In a footnote, Defendants argue again that command responsibility is inapplicable to civilian leaders outside of armed conflict. Def. Mem at 26 n.6. This argument has been rejected by the Eleventh Circuit, *Doe v. Drummond*, 782 F.3d 576, 609-610 (11th Cir. 2015) (noting that the doctrine applied outside of "acts of military officials or the context of war."); *see also Mamani*, 21 F. Supp. 3d at 1376 (holding that command responsibility applies in peacetime as well as war, and applies to Defendants as the highest commanders of the Bolivian military).

[13] Defendants' reliance on the Eleventh Circuit's 2011 decision, with its rejection of "strict liability . . . for national leaders at the top of the long chain of command," is, once again, misplaced. Def. Mem. 26 (quoting *Mamani,* 654 F.3d at 1154). The facts before this Court, which support a finding of command responsibility and are supported by admissible evidence, were not even alleged in the complaint considered by the Circuit.

### a. The record supports a finding that Sánchez de Lozada is liable under the doctrine of command responsibility.

Defendants acknowledge, as they must, that Sánchez de Lozada, as President, was the Captain General of the Armed Forces, the highest legal title in the Bolivian military.  Def. Mem. 27.  This *de jure* authority over the military is prima facie evidence of "effective control."  *Ford*, 289 F.3d at 1291.  Defendants err in suggesting that the presence of an "operational" commander below Sánchez de Lozada, who issued "technical-operational" orders to the military forces, somehow demonstrates that Sánchez de Lozada lacked "effective control."  Def. Mem. 27-28.  A commander who has lawful authority to issue orders to intermediary officers who then implement (operationalize) those orders has effective control.  The legislative history of the TVPA confirms this intent to hold liable "anyone with higher authority who authorized, tolerated or knowingly ignored" unlawful executions.  S. Rep. No. 102-249, at 9 (1991).

Indeed, Defendants concede that Sánchez de Lozada had sufficient control to satisfy the command responsibility standard by stating that "the President provides general orders to the Commander in Chief, who then issues operational orders as the highest decision-making operational commander."  Def. Mem. 27.  The admitted ability to issue "general orders" to the military's highest-ranking operational officer, by itself, is sufficient evidence from which a reasonable jury could conclude that the President had effective control over the Armed Forces.

Prior cases confirm that whether a commander's orders are transmitted directly to the troops or via an intermediary is irrelevant to TVPA liability.  *See, e.g.*, *Chavez v. Carranza*, 559 F.3d 486, 499 (6th Cir. 2009) (upholding jury verdict against Vice-Minister of Defense because command responsibility applies to "anyone with higher authority," not just direct supervisors) (quoting TVPA Senate Report, S. Rep. No. 102-249, at 9 (1991)); *Jara v. Nunez*, No. 13-cv-1426, 2015 WL 8659954, at *3 (M.D. Fla. Dec. 14, 2015) (finding command responsibility

24

adequately pled when pleading alleged that soldiers implemented a high level plan of "imprisonment, torture and execution"); *Jaramillo*, 2014 WL 4898210, *13; *Yousuf v. Samantar*, No. 04-cv-1360, 2012 WL 3730617, at *12-*13 (E.D. Va. Aug. 28, 2012) (finding claim of command responsibility survived summary judgment where defendant was "higher ranking person" who gave orders to the commanders of unit that committing killings).

Defendants attempt to refute this conclusion by distorting the *Ford* test for effective control. Where *Ford* holds that effective control requires "<u>actual ability to control the guilty troops</u>," Defendants add an extra requirement, stating that *Ford* requires "'<u>actual ability to control the [alleged] guilty troops' *on the ground*</u>." Def. Mem. at 28 (emphasis added). *Ford* does not state that control must be implemented "*on the ground*." Such a requirement would eviscerate the command responsibility doctrine, which aims to hold responsible those at any level of the military command structure who authorize criminal acts or fail to prevent or punish them. *See In re Yamashita*, 327 U.S. 1 (1946) (affirming propriety of military commission to consider whether army general was liable for widespread torture and killings by soldiers); *see also* Int'l Comm. of the Red Cross, *Commentary on the Additional Protocols of 8 June 1977 to the Geneva Conventions of 12 August 1949* at 1022, ¶3561 (1987) ("*Every* commander *at every level* has a duty to react by initiating 'such steps as are necessary to prevent such violations.'") (emphasis added).

In addition to Sánchez de Lozada's position as the ultimate commander of the Bolivian Armed Forces and his admitted authority to issue "high-level general orders," the record contains ample evidence to support a finding that he had the practical ability to control his subordinates, including orders that were followed by the military, *see* CSMF ¶¶ 204-208, 213-219, 225-226, 232-233, 236-237, 239-242, 257-259, 265, 269-270, 272, 273-279, 299-300, 318-220, 324, 333,

25

336; statements affirming that the military were following the orders of the President, *see* CSMF ¶¶ 220, 230, 236-237, 240, 242, 271-272, 274-275, 299, 319, 333, 335; and confirmation from Defendants' military witnesses that the President was the ultimate authority and that the lawful lines of authority were in effect in 2003, *see* CSMF ¶¶ 204, 207, 213, 219, 220, 226, 242.  In addition, the totality of the evidence supports a finding that the Bolivian military was implementing the plan that Defendants had concocted before even taking office, strongly suggesting that the military was acting under Defendants' command.

Although the record contains evidence from which a reasonable jury could conclude that Sánchez de Lozada *ordered* the military to commit extrajudicial killings, including those that took the lives of Plaintiffs' relatives, Plaintiffs need not prove direct orders.  Rather, it would be sufficient to show that Sánchez de Lozada knew or should have known about the extrajudicial killings and, having the power to do so, failed to prevent or punish them.  The record contains sufficient evidence to support those findings: civilian killings by the military were widely reported in the media, *see* CSMF ¶ 318, multiple people inside and outside government discussed the killings with Sánchez de Lozada and urged him to change paths, *see* CSMF ¶¶ 211, 265, 269-270, 272, 300, 334, and he made no effort to investigate, punish, or stop the killings, *see* CSMF ¶¶ 219, 278, 300, 318-319.[14]  Of crucial significance, there is no evidence to suggest that Sánchez de Lozada at any point made any effort to instruct the forces under his command to avoid civilian casualties.  *See* CSMF ¶¶ 204, 207, 278, 319.  The evidence indicates the opposite

---

[14] Contrary to Defendant's claim that he had no power to order an investigation, he acknowledged at his 2015 deposition that he had the power to order investigations of civilian deaths.  *See* CSMF ¶¶ 184, 219.  Nothing in the sources cited by Defendants undercuts this admission or otherwise supports their statement that neither Defendant had the authority to order an investigation.  *Id.*

–that the August 2002 plan to suppress civilian opposition was carried out through the chain of command that Sánchez de Lozada ultimately controlled.

> **b.    Sánchez Berzaín is liable under the doctrine of command responsibility.**

Defendants' challenge to the command responsibility of Sánchez Berzaín is based solely on the claim that the Minister of Defense's *de jure* role in the military was only administrative. Def. Mem. at 29.  They ignore the military law that provides that the Minister of Defense has the *de jure* authority to "plan, organize, direct and supervise Civil Defense in the National Territory." CSMF ¶ 214.  Moreover, the record contains evidence that Sánchez Berzaín assumed operational control and had effective command of military operations.

On September 20, Sánchez Berzaín planned and personally supervised a military operation to remove tourists from Sorata, resulting in several deaths and injuries, including the death of Marlene Rojas Ramos.  *See* CSMF ¶¶ 230-241, 243-244.  Sánchez Berzaín rejected an agreement that would have enabled the tourists to leave without bloodshed and threatened to shoot those who argued for the non-military resolution, saying "Fucking Indians, I'm going to shoot you. Leave me to do my work."  CSMF ¶¶ 231-235.  He was in a helicopter flying near the convoy as soldiers in the helicopter shot at civilians on the ground.  *See* CSMF ¶ 244.  While on the phone with Sánchez de Lozada, they together drafted the order for the military to assault Warisata that led to the civilian deaths; the order included the knowingly false claim that the convoy had been attacked by a guerrilla group.  *See* CSMF ¶ 240.

Sánchez Berzaín had direct authority from Sánchez de Lozada to oversee the military operation in El Alto on October 12, including the military convoy that transported fuel from El Alto to La Paz, leading to dozens of deaths.  *See* CSMF ¶ 274.  He met with gas station owners and military leaders to plan the convoy, and, when told that the proposed convoy would be

dangerous and many could die, said "There will be deaths, but there will be gas."  CSMF ¶¶ 275-277.  The military decree authorizing the transport of fuel placed his ministry, the Ministry of Defense, in charge of its implementation.  *See* CSMF ¶ 274.  Four of the decedents in this case were killed in El Alto on that day.

As Defendants and case law have emphasized, it is not only title but a person's "*actual ability to control*" the subordinate which determines effective control.  Def. Memo at 27; *see Ford*, 289 F.3d at 1290-91 (collecting international decisions involving "a superior without *de jure* command [who] was accused of having *de facto* command over the guilty troops); *id.* at 1297–98 (Barkett, J., concurring) ("A *de facto* superior is an official who exercises powers of control over subordinates that are substantially similar to those exercised by *de jure* authorities." (internal quotations marks omitted)); *Yousuf*, 2012 WL 3730617 at *13 (finding liability via command responsibility because defendant was "functional head" of military); *Doe v. Qi*, 349 F. Supp. 2d 1258, 1331-32 (N.D. Cal. 2004) (superior-subordinate relationship was established where a defendant "played a major policy-making and supervisory role in the policies and practices that were carried out") (internal quotation marks omitted).

Viewed as a whole, these facts about Sánchez Berzaín's *de jure* and *de facto* military role are sufficient to raise a genuine issue as to whether he had the ability to control the troops who fired at unarmed civilians on September 20, October 12, and October 13, and, therefore, the ability to prevent or punish those crimes.

**2.    The record supports a finding that Defendants are liable as conspirators.**

Defendants do not dispute the application of conspiracy liability to the TVPA.  Def. Mem. at 31-32.[15]  Their defense rests on their refusal to acknowledge that an eyewitness heard them agree to kill civilians as part of a plan to deter protests.  *See* Def. Mem. 32 (stating that "there is no evidence of an agreement to commit the alleged wrongful acts."). This testimony is sufficient to raise a genuine dispute about the first two prongs of conspiracy liability: that Defendants agreed to commit a wrongful act and joined the conspiracy knowing of the goals of the conspiracy and intending to help accomplish it.  The third prong—wrongful acts committed by a conspirator and in furtherance of the conspiracy—is satisfied by evidence that Defendants took steps to implement their plan, by changing the rules governing military involvement in civilian protests and unleashing a campaign of military violence against civilians. Having entered into an agreement to use military force to kill civilians, each Defendant is liable for injuries caused by foreseeable acts taken pursuant to or in furtherance of the conspiracy. *Halberstam*, 705 F.2d at 481; *see Cabello*, 402 F.3d at 1159-60 (defendant held liable because killing of prisoner was foreseeable consequence of the conspirators' agreement); *In re Chiquita Brands Int'l, Inc.*, 190 F. Supp. 3d 1100, 1120 (S.D. Fla. 2016) (conspiracy liability pled when it was "foreseeable to these Defendants that civilians would be tortured and killed" as a result of their agreement).

Here, given the evidence that that the Defendants conspired to kill civilians as a means to deter opposition to their policies, took steps to further their conspiracy by issuing orders and sending the military to carry out their plan, praised the troops who had killed civilians, and made

---

[15] Conspiracy liability requires showing that "(1) two or more persons agreed to commit a wrongful act, (2) [the defendant] joined the conspiracy knowing of at least one of the goals of the conspiracy and intending to help accomplish it, and (3) one or more of the violations was committed by someone who was a member of the conspiracy and acted in furtherance of the conspiracy."  *Cabello v. Fernandez-Larios*, 402 F.3d 1148, 1159 (11th Cir. 2005) (citing *Halberstam v. Welch*, 705 F.2d 472, 481, 487 (D.C. Cir. 1983)).

no attempt to investigate or stop the killings, a reasonable jury could find[16] that Plaintiffs'

relatives were killed in furtherance of Defendants' conspiracy.

### 3. The record supports a finding that Defendants are liable as principals for the acts of their agents.

Defendants do not deny that agency liability is applicable to a claim under the TVPA.

*See Doe v. Drummond Co.*, 782 F.3d at 607 (11th Cir. 2015). Here, Defendants are liable for the

killings carried out by their agents—military actors who were under their formal and actual

command.[17] The first element of agency, consent, need not be explicit—it can be given "by

implication from the conduct of the parties." *Osorio v. State Farm Bank, F.S.B.*, 746 F.3d 1242,

1253 (11th Cir. 2014). The second element, control, may be met "where the principal exercised

'substantial control' over the agent's actions, ratified the agent's conduct, or made

representations that the agent acts with authority." *Strauss v. CBE Group, Inc.*, 173 F. Supp. 3d

1302, 1309 (S.D. Fla. 2016) (citation omitted).

Defendants' position in the military hierarchy demonstrates consent to an agency

relationship with the members of the military, who acted on their behalf in responding to civilian

protests with lethal force and consented to be subject to the control of the military hierarchy,

including the Defendants. Consent is determined by looking at "the record as a whole."

*CommoditiesFuture*, 575 F.3d at 1190. Taken as a whole, the roles of the soldiers and the

Defendants in the military hierarchy and the soldiers' participation in implementing Defendants'

pre-conceived plan together create a triable issue as to whether the Defendants, the officers who

---

[16] Defendants misstate Plaintiffs' burden. Def. Mem. 31. Plaintiffs must only present sufficient evidence so that a reasonable jury could find against the Defendants. *See* Part II, *supra*.

[17] Common law agency, "either implied or express, requires: (1) consent to the agency by both principal and agent; and (2) the control of the agent by the principal." *CommoditiesFuture Trading Comm'n v. Gibraltar Monetary Corp. Inc.* 575 F.3d 1180, 1189 (11th Cir. 2009); *Whetstone Candy Co. v. Kraft Foods, Inc.*, 351 F.3d 1067, 1077 (11th Cir. 2003); Restatement (Second) of Agency § 1 (1958).

ordered soldiers to shoot civilians, and the soldiers who shot the decedents consented to the agency relationship.[18]  Moreover, the same evidence that demonstrates "effective control" over the military also demonstrates the substantial control necessary for agency liability.  *See* Section III(B), *supra*.

An agency relationship also exists through ratification.  A principal can ratify the act of an agent by "manifesting assent that the act shall affect the person's legal relations."  *GDG Acquisitions LLC v. Gov't of Belize*, 849 F.3d 1299, 1308 (11th Cir. 2017) (quoting Restatement (Third) of Agency § 4.01); *Strauss*, 173 F. Supp. 3d at 1312 (agency found where principal "ratified the agent's conduct, or made representations that the agent acts with authority").  After the soldiers killed numerous civilians—including Plaintiffs' relatives—Defendants stated that they were responsible for the military's actions and commended the work the military was doing.  *See* CSMF ¶ 299.  *See* Restatement (Third) of Agency §4.01 comment d (stating that a principal "congratulating" an agent on activity which at the time was outside the scope of his authority would constitute ratification).

Given these literal textbook examples of ratifying behavior, Defendants shift tactics to argue that they did not have knowledge of material details, namely that soldiers were killing unarmed civilians, invalidating the ratification.  However, there is sufficient evidence to demonstrate knowledge.  The Eleventh Circuit has explicitly rejected the contention that plaintiffs are required "to produce direct evidence that [defendants were] aware" of the agent's conduct, instead allowing proof of knowledge to "be based upon circumstantial evidence."  *Cox v. Adm'r United States Steel & Carnegie*, 17 F.3d 1386, 1409 (11th Cir. 1994).  In *Cox*, the court

---

[18] Defendants err in claiming that Plaintiffs must demonstrate agency by "clear and unequivocal" evidence.  Def. Mem. 30 (quoting *Strauss*, 173 F. Supp. 3d at 1313).  *Strauss* involved a plaintiff's motion for summary judgment and, therefore, a significantly higher standard.

found that evidence that the principal had "been placed on notice" of an agent's unauthorized and unlawful behavior through "allegations of . . . violations" from multiple sources was sufficient to create a jury question of knowledge and in turn ratification. *Id.* Here, the civilian deaths were widely covered in the media, *see* CSMF ¶ 49, and multiple people urged the Defendants to halt the ongoing violence. *See* CSMF ¶¶ 211, 265, 269-270, 272, 300, 334. As in *Cox*, this evidence could lead a reasonable jury to find that Defendants knew that unarmed civilians had been killed.

**C.   The record contains evidence sufficient to support a finding that each of the killings constituted a wrongful death under Bolivian law, the law that the Florida courts would apply to Plaintiffs' state law claims.**

Defendants concede that, applying Florida choice-of-law rules, Bolivian law applies to Plaintiffs' state law wrongful death claims. Def. Mem. 32.[19] Bolivian law recognizes indirect liability and permits victims of crime and their heirs to file civil claims for the harms they have suffered.[20] Defendants' arguments to the contrary are based on pulling isolated provisions of Bolivian law out of context and ignoring the relevant Bolivian statutory and case law.

___

[19] This result is mandated by Florida choice-of-law principles, which apply the 'most significant relationship' test." *Michel v. NYP Holdings, Inc.*, 816 F.3d 686, 694 (11th Cir. 2016) (listing the relevant factors). In his 2009 order denying Defendants' motion to dismiss, Judge Jordan stated that, "[g]iven that Bolivian law applies to the statute of limitations issue, it may also provide the substantive law for the wrongful death claims." *Mamani v. Berzain*, Nos. 07-22459-CIV, *et al.*, 2009 WL 10664387, at *23 n.13 (S.D. Fla. Nov. 25, 2009), *rev'd in part*, 654 F.3d 1148 (11th Cir. 2011). Here, all the relevant factors point to Bolivian law: the injury occurred in Bolivia, the conduct causing the injury occurred in Bolivia, the Plaintiffs reside in Bolivia and the Defendants are Bolivian nationals.

[20] Defendants make the bizarre assertion that, since Plaintiffs' state law claims are based on the same factual allegations as the TVPA claim, the state law claims must fail if the claim for extrajudicial killing fails. Def. Mem. 32. However, the viability of the state law claim depends on whether the legal standard established by that law has been met, which is, of course, a different issue than whether the standard established by the TVPA has been satisfied. Under Bolivian law, proof of intentional wrongful death (willful homicide) requires a showing that "the subject has acted with knowledge of the concrete risk of producing the result." Ex. OOO (Verástegui Rpt. ¶76); *see also id.* at ¶¶ 44-46, 75-78 (defining willful misconduct and the elements necessary to prove it). Defendants do not address these elements.

### 1.      Bolivian law recognizes indirect liability.

Defendants admit that indirect liability exists under Bolivian criminal law, as specified in Article 20 of the Bolivian Criminal Code.  Def. Mem. 33.  Article 20 states that "[p]erpetrators are those who carry out the act on their own" or "by means of another. . . . A mediate perpetrator is one who willfully uses another as an instrument for carrying out the crime."  Def. Mem. 33 (quoting Bol. Crim. Code, art. 20).  Article 14 of the Bolivian Code of Criminal Procedure establishes that a civil action arises "from the commission of *every crime*."  Ex. AAA (Bol. Code Crim. P., art. 14 (emphasis added)); Ex. OOO (Verástegui Rpt. ¶¶ 23-25).  With regard to who can be held civilly liable for a crime, Article 36 of the Bolivian Code of Criminal Procedure establishes that a civil complaint for a criminal act may be brought against both the "perpetrator" and "participants" in a crime.[21]  Ex. AAA (Bol. Code Crim. P., art. 36).  These provisions of Bolivian law clearly recognize a civil claim for those injured by criminal conduct based on indirect liability.[22]

Defendants argue otherwise based on the unsubstantiated claim that "perpetrator" in the provisions of the Bolivian Criminal Code referring to civil liability applies only to "direct perpetrators."  Def. Mem. 33.  But they offer no support for this claim, which is clearly refuted by the very Bolivian law provision that they quote.[23]

### 2.      Bolivian law does not preclude civil claims in this case.

Under Bolivian law, civil cases arising from criminal acts may not move forward until a criminal sentence has been issued, except when "the criminal proceedings [are] suspended due to

---

[21] Civil liability is passed on to the heirs of the perpetrators.  Ex. OOO (Verástegui Rpt. ¶ 26).

[22] Indirect liability under Bolivian law includes those who act through organized hierarchical structures like the State.  *See* Ex. HHH (Sup. Jud. Ct. (Bolivia), Trib. of the Trial of Responsibilities, Judgment, 1128 (Oct. 4, 2011)).

[23] The same analysis applies to Article 273 of the Bolivian Criminal Code, *see* Def. Ex. 75, which uses the term "perpetrator" without qualification.  *See* Def. Mem. 33.

default." Def. Ex. 76 (Bol. Code Crim. P., art. 38).  Because Defendants have refused to face criminal charges in Bolivia for crimes committed in Bolivia, the criminal case against them was suspended in 2009.[24]  Def. Mem. 34.  Plaintiffs filed the Second Amended Complaint in this case on June 4, 2013.  Dkt. No. 156.  Defendants offer no support for the claim that the fact that a criminal case was pending against them in 2007 impacts Plaintiffs' ability today to pursue state law claims that are governed by Bolivian law.  As this Court stated in 2014, Defendants have not offered any evidence that civil suits in Bolivia "could result in enforceable judgments against anyone—much less these Defendants."  *Mamani*, 21 F. Supp. 3d at 1373.

**D.      None of the Plaintiffs' claims fail based on individual deficiencies.**

**1.      Plaintiff Sonia Espejo is a proper plaintiff with regard to all claims.**

Under Bolivian law, a civil action that arises from a criminal act may be brought by the victim, or, if the victim has died, by the victim's heirs.  *See* Ex. AAA (Bol. Code. Crim. Proc., art. 36).  The common law spouse of a victim who dies is defined as both an heir and a victim in her own right who may bring a civil action for the death of the deceased.  *See* Ex. OOO (Verástegui Rpt. ¶¶ 27, 30-31) (citing Bol. Crim. P., art. 76).  Sonia Espejo is thus a proper claimant as an heir[25] and as a victim, based on articles 36 and 76 of the Code of Criminal Procedure.  Because she is a proper claimant under Bolivian law, the TVPA requires that Ms. Espejo be allowed to proceed even if this Court were to find that she is not a proper wrongful death claimant under Florida law.  "[W]here state law would provide no remedy, a court may

---

[24] While Defendants argue that Plaintiffs would have had access to Bolivian civil court for their claims against Defendants starting in May 2009, they have not stated that they would accept service, a requirement before a civil claim can proceed.  *See* Ex. YY (Bol. Code Civ. P., art. 68) (default only possible against a "duly served party"); *see id.* (Bol. Code Civ. P., art. 123) (describing notice procedures for a defendant with no domicile in Bolivia).  Defendants present no evidence that a civil suit against Defendants in Bolivia could result in enforceable judgments against them.

[25] *See* Ex. OOO (Verástegui Rpt. ¶¶ 33, 37-40) (inheritance rights of common law spouses).

apply the foreign law that would recognize the plaintiff's claim." *Baloco ex rel. Tapia v. Drummond Co.*, 640 F.3d 1338, 1349 (11th Cir. 2011).[26]

With regard to Ms. Espejo's State-law claims, she is also a proper plaintiff because she has been properly appointed by the Florida Probate Court as Mr. Gandarilla's estate representative.  Defendants argue that she should not have been appointed because she and Mr. Gandarillas were not formally married.  Def. Mem. 38-39.  However, Florida law permits common law spouses to serve as representatives of their deceased partner's estate if the foreign jurisdiction recognizes the common law marriage.  *See Johnson v. Lincoln Square Props., Inc.*, 571 So. 2d 541, 542-43 (Fla. 2d DCA 1990).  Common law marriage is recognized under Bolivian law.  Under the Family Code in force in 2003 (Law 996), free conjugal unions (common law marriages) produced similar effects as marriage and "the norms that regulate the effects of marriage" applied to free conjugal unions.  Ex. OOO (Verástegui Rpt. ¶ 33).  The Constitution of 2009, which applies retroactively to the definition of marriage under Bolivian Constitutional Court precedent,[27] states: "Free or de facto unions … shall produce the same effects as a civil marriage."  Ex. WW (Bol. Const., art. 63.II (Feb. 7, 2009)).  This definition of marriage and free conjugal unions controls the analysis of Ms. Espejo's free conjugal union.[28]

---

[26] The Court in *Baloco* noted that under the TVPA, if the Court were to find that plaintiffs were not "personal representatives" and thus were "not proper wrongful death complainants under Alabama's internal law, … [the Plaintiffs] would find themselves with 'no remedy whatsoever' under Anglo–American law.  As instructed by the Senate Committee Report in footnote 10, we would then determine whether the [Plaintiffs] possessed a remedy under foreign law." *Baloco*, 1349 n.12, citing S. Rep. 102-249, 7 n.10.

[27] *See* Ex. FFF (Plurinational Constitutional Court (Bolivia), Constitutional Judgment 1731/2010-R (Oct. 25, 2010)) (holding that Constitution applies to pending cases and applying it to appeal pending since 2008).

[28] *See* Ex. GGG (Plurinational Constitutional Court (Bolivia), Constitutional Judgment 0216/205-S2 (Feb. 15, 2015), § III.2)) (noting that 2009 Constitution applied retroactively to govern legal implications of free conjugal union that ended with one partner's death in 2006).

Defendants' reliance on a parenthetical note in article 2 of Bolivian Law 3955 is unfounded.  Def. Mem. 39; *see* Ex. BBB (Law No. 3955).  That note does not alter the structure of Bolivian family and inheritance law, which recognizes cohabitants in free conjugal unions as the heirs of their partners.  Ex. OOO (Verástegui Rpt. ¶¶ 33, 37-40).  Defendants also seek support for their argument in Ms. Espejo's statement that she did not apply for benefits under Law 3955 in her own name because she did not have a marriage certificate.  Def. Mem. 39-40.  However, under Bolivian law she had no obligation to present a marriage certificate.[29]  In any event, her decision to obtain benefits in the name of her son has no relevance to the Florida Probate Court's recognition of her as a proper personal representative of Mr. Gandarillas' estate.  Ex. K (Espejo Decl. ¶ 6).[30]

### 2.   All Plaintiffs received the benefits intended for the heirs of deceased victims of the 2003 events and exhausted local remedies.

All of the Plaintiffs have exhausted their available remedies in Bolivia, as required by the TVPA, section 2(b).[31]

In 2008, Law 3955 offered monetary and educational assistance to the victims of the events in 2003 and their heirs.  The benefits included a lump sum payment to the heirs of each

---

[29] *See* Ex. EEE (Constitutional Court (Bolivia), Constitutional Judgment, 1521/2002-R (Dec. 16, 2002), § III.3 (holding that government cannot require a marriage certificate from persons in free unions, much less so when such request is used to deny them rights).

[30] Defendants' focus on the word "similar" in the Constitution in effect in 2003 is irrelevant, given that the 2009 Constitution controls.  It also fails to support the conclusion that common law marriages were not recognized in Bolivia.  Def. Mem. 39.  Bolivian law in force in 2003 treated common law marriages as having the same legal effect as civil marriages. *See, e.g.*, Ex. DDD (Constitutional Tribunal (Bolivia), Constitutional Judgment 1083/2003-R, § III.2 (Aug. 4, 2003)) (discussing the existence of a "free and de facto union *with the effects of marriage*.") (emphasis added)). *See also* Ex. OOO (Verástegui Rpt. ¶ 33).  Further, Defendants' reliance on a U.S. Embassy guide, which distinguishes religious marriage ceremonies from civil ones is inapposite to their argument.  Def. Mem. 39; *see* CSMF ¶ 196.

[31] Defendants make no claim that exhaustion of other remedies is a bar to civil claims under Bolivian law. Thus, even assuming that any Plaintiff failed to exhaust remedies, that would not be a bar to their Bolivian law claims.

deceased, *see* Ex. BBB (Bol. Law 3955, arts. 1, 3, 6), and looked to Bolivian inheritance laws to identify the heirs, *id.*, art. 7.a.  If two or more beneficiaries were listed, the lump sum was divided proportionally among them.  *See* Ex. CCC (Bol. Supreme Decree No. 29884, art. 2.II). Once the funds were disbursed, the law did not allow additional requests.  *Id.*, art. 2.IV.

Plaintiffs Hermógenes Bernabé, Gonzalo Mamani Aguilar and Sonia Espejo each received the benefits intended for them under Law 3955 and have exhausted the remedies available to them in Bolivia.

- Hermógenes Bernabé received a proportional share of the benefits due to his family.  *See* Ex. F (Bernabé Decl. ¶ 4); *see also* PPP (MAMANI0024481T) (Ministry of Justice letter).  He never conceded otherwise, as Defendants claim. Def. Mem. 40.

- Gonzalo Mamani Aguilar received the benefits due to his family through his mother.  *See* CSMF ¶ 10.  Mr. Mamani Aguilar did not concede that he did not receive his share of the benefits, as Defendants claim.  Def. Mem. 40.  Instead, he explained that his mother took the lead in processing the request for the payments and collected the money for the family.  *See* CSMF ¶ 10.  Once the money was disbursed to his mother, Mr. Mamani Aguilar received a share.  *See Id.*

- Ms. Espejo never stated that she did not receive the benefits.  Def. Mem. 40.  She received the benefits in the name of her minor son because she was told that would be simpler and because it made no difference in whose name her family received the benefits.  *See* CSMF ¶ 5; *see also* Ex. K (Espejo Decl. ¶ 6).

37

Each of the Plaintiffs has exhausted the remedies available to them in Bolivia. Exhaustion does not turn on whether they personally filed the requests for these family benefits or whether the benefits were received in their own names or those of their children or parents.[32]

**E.     Plaintiffs' common law claims are not preempted and are not barred by the foreign affairs doctrine.**

**1.     Congress has not demonstrated a "clear and manifest" intent to preempt wrongful death claims through the TVPA.**

In enacting the TVPA, Congress demonstrated no intent to displace state tort claims. Contrary to Defendants' claim, this is not an issue of first impression:  courts in several districts have rejected the claim that the TVPA preempts state claims.[33]  "Courts have long presumed that Congress does not cavalierly pre-empt state-law causes of action," *Riegel v. Medtronic, Inc.*, 552 U.S. 312, 334 (2008) (internal quotations and citations omitted), and will not divest the States of their power to regulate areas that "ha[ve] been traditionally occupied by the States . . . unless that was the clear and manifest purpose of Congress.'"  *Jones v. Rath Packing Co.*, 430 U.S. 519, 525 (1977) (internal quotation omitted).  Tort claims for transitory torts, wherever the conduct occurred, fall within an area traditionally regulated by the States.  *Cabello v. Fernandez-Larios*, 402 F.3d 1148, 1155 (11th Cir. 2005) ("[P]rior to the TVPA, this Court could have exercised extraterritorial jurisdiction to reach wrongful death actions involving defendants and locations outside the forum jurisdiction.").

---

[32] Moreover, once the benefits were disbursed, there were no more "available" remedies for any of the Plaintiffs.  Ex. CCC (Bol. Supreme Decree 29884, art. 2.IV).

[33] *See Velez v. Sanchez*, 693 F.3d 308, 332 (2d Cir. 2012) (remanding to permit district court to consider supplemental jurisdiction over state law claims); *Jovic v. L-3 Servs., Inc.*, 69 F. Supp. 3d 750, 762 (N.D. Ill. 2014) (rejecting argument that TVPA and ATS preempted "the field of human rights violations" and permitting plaintiffs to proceed with state law claims); *William v. AES Corp.*, 14-cv-343 JCC/TRJ, 28 F. Supp. 3d 553, 574-75 (E.D. Va. 2014) (exercising diversity jurisdiction to consider viability of state law civil conspiracy claims); *Arias v. Dynacorp*, 517 F. Supp. 2d 221, 228-29 (D.D.C. 2007) (state tort claims not preempted by TVPA and ATS claims).

Defendants have produced no evidence of a "clear and manifest" congressional intent to displace Plaintiffs' wrongful death claims.[34]  To the contrary, both the text and legislative history imply an intention that the state and federal causes of action work in tandem.  The text of the TVPA states that a defendant will "be liable for damages to the individual's legal representative, or to any person who may be a claimant in an action for wrongful death."  TVPA § 2(a)(2).  The legislative history advises courts to "look to state law for guidance as to which parties would be proper wrongful death claimants."  TVPA Senate Report, S. Rep. No. 102-249, at 4 (1991).

> **2.      Plaintiffs' wrongful death claims are not barred by the foreign affairs doctrine.**

The foreign affairs doctrine dictates that state law can be displaced only where "a 'significant conflict' exists between an identifiable 'federal policy or interest'" and state law. *Boyle v. United Techs. Corp.*, 487 U.S. 500, 507 (1988) (quoting *Wallis v. Pan American Petroleum Corp.*, 384 U.S. 63, 68 (1966)).  Courts will not invoke preemption when a state statute merely has "some incidental or indirect effect in foreign countries," *Clark v. Allen*, 331 U.S. 503, 517 (1947), or there is "is a remote possibility that any holding may disturb a foreign nation." *Zschernig v. Miller*, 389 U.S. 429, 433 (1968).

Defendants find the foreign policy implications of litigating a wrongful death claim governed by Bolivian law to be so "self-evident" that they need not actually state what those implications are.  Def. Mem. 37.  However, both the Bolivian and United States governments disagree.  The Bolivian government has informed the U.S. Department of State that "the fact that a Court of the United States of America is adjudicating a complaint against [the defendants] does not cause any disruption or change in the diplomatic relations between Bolivia and the United

---

[34] Defendants note that the TVPA legislative history states that the TVPA has a narrow scope. Def. Mem. 35-36.  However, congressional intent to enact a narrow federal remedy is irrelevant to the preemption argument and entirely consistent with the intent to leave other remedies intact.

States of America."  United States' Notice Concerning Immunity at 1 [D.E. 107], Ex. A.

Similarly, in a formal "Notice" filed with this Court, the U.S. Government stated that it took "no

position" on the litigation, *id.* at 2, noting only that it would "continue to monitor this litigation."

*Id.*[35]

The foreign affairs doctrine is also inapplicable because there is no state statute to

encroach upon federal interests, negating the entire purpose of the doctrine.  The foreign affairs

doctrine seeks to assure that *state laws* do not interfere with the "uniformity in this country's

dealings with foreign nations."  *Am. Ins. Ass'n v. Garamendi*, 539 U.S. 396, 413 (2003) (quoting

*Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 427 n.25 (1964)).  Here, under Florida's

choice of law rules, the wrongful death claim is governed by Bolivian law, not state law,

removing any conflict between state and federal law.  *See Doe v. Exxon Mobile Corp*, 654 F.3d

11, 70-71 (D.C. Cir. 2011), *vacated on other grounds*, 527 Fed. App'x 7 (D.C. Cir. 2013) (court

declined to consider foreign affairs doctrine where state law claims were governed by Indonesian

law).

## CONCLUSION

For the foregoing reasons, Defendants' Motion for Summary Judgment should be denied.

Dated: December 29, 2017                    Respectfully submitted,
       Miami, Florida

                                            By:    */s/ Ilana Tabacinic*
                                            Ilana Tabacinic (Florida Bar No. 57597)
                                            AKERMAN LLP
                                            Three Brickell City Centre

---

[35] This explicit statement of disinterest cannot be overcome by the inferences drawn from the denial of a *Touhy* request seeking the deposition of the former U.S. Ambassador to Bolivia.  Def. Ex. 19.  The first reason for the denial offered by the Department of State was that the request was "very burdensome."  *Id.* at 1.  The second reason was that the events took place in Bolivia and involved Bolivians.  *Id.*  The final reason, that the former Ambassador's testimony could be used to entangle the United States in controversial matters, *see id.* at 1-2, addresses only the propriety of permitting a deposition of the ex-Ambassador, not the foreign affairs implications of the entire lawsuit.

98 Southeast Seventh Street, Suite 1100
Miami, FL 33131
Tel: (305) 374-5600
Fax: (305) 374-5095
Email: ilana.tabacinic@akerman.com


*Counsel for Plaintiffs*

*Counsel for Plaintiffs*

| | |
|---|---|
| Ilana Tabacinic (Florida Bar No. 57597)<br>AKERMAN LLP<br>Three Brickell City Centre<br>98 Southeast Seventh Street, Suite 1100<br>Miami, FL 33131<br>Tel: (305) 374-5600<br>Fax: (305) 374-5095<br>Email: ilana.tabacinic@akerman.com | Steven H. Schulman (*pro hac vice*)<br>AKIN GUMP STRAUSS HAUER & FELD LLP<br>Robert S. Strauss Building<br>1333 New Hampshire Avenue NW<br>Washington, DC 20036<br>Tel:  (202) 887-4000<br>Fax: (202) 887-4288<br>E-mail: sschulman@akingump.com |
| Judith Brown Chomsky (*pro hac vice*)<br>CENTER FOR CONSTITUTIONAL RIGHTS<br>Post Office Box 29726<br>Elkins Park, PA  19027<br>Tel:  (215) 782-8367<br>Fax:  (215) 782-8368<br>E-mail: judithchomsky@icloud.com | Joseph L. Sorkin (*pro hac vice*)<br>Jennifer L. Woodson (*pro hac vice*)<br>Saurabh Sharad (*pro hac vice*)<br>Christine Doniak (*pro hac vice*)<br>Harley Raff (*pro hac vice*)<br>AKIN GUMP STRAUSS HAUER & FELD LLP<br>One Bryant Park<br>Bank of America Tower<br>New York, NY 10036-6745<br>Tel:  (212) 872-1000<br>Fax: (212) 872-1002<br>E-mail: jsorkin@akingump.com<br>E-mail: jwoodson@akingump.com<br>E-mail: ssharad@akingump.com<br>E-mail: cdoniak@akingump.com<br>E-mail: hraff@akingump.com |
| Beth Stephens (*pro hac vice*)<br>CENTER FOR CONSTITUTIONAL RIGHTS<br>666 Broadway<br>Seventh Floor<br>New York, NY 10012<br>Tel:   (212) 614-6431<br>Fax:  (212) 614-6499<br>E-mail: beth.stephens@rutgers.edu | Zak Franklin (*pro hac vice*)<br>Erica Abshez Moran (*pro hac vice*)<br>AKIN GUMP STRAUSS HAUER & FELD LLP<br>1999 Avenue of the Stars, Suite 600<br>Los Angeles, CA 90067<br>Tel:  (310) 229-1000<br>Fax: (310) 229-1001<br>E-mail: zfranklin@akingump.com<br>E-mail: emoran@akingump.com |
| David Rudovsky (*pro hac vice*)<br>KAIRYS, RUDOVSKY, MESSING &<br>FEINBERG LLP<br>718 Arch Street, Suite 501 South<br>Philadelphia, PA 19016<br>Tel: (215) 925-4400<br>Fax: (215) 925-5365<br>E-mail: drudovsk@law.upenn.edu | Rubén H. Muñoz (*pro hac vice*)<br>Jason Weil (*pro hac vice*)<br>AKIN GUMP STRAUSS HAUER & FELD LLP<br>Two Commerce Square<br>2001 Market Street, Suite 4100<br>Philadelphia, PA 19103<br>Tel:  (212) 965-1328<br>Fax: (215) 965-1210<br>E-mail: rmunoz@akingump.com<br>E-mail: jweil@akingump.com |

| | |
|---|---|
| Paul Hoffman (*pro hac vice*)<br>SCHONBRUN, SEPLOW,<br>HARRIS & HOFFMAN, LLP<br>723 Ocean Front Walk<br>Venice, CA 90201<br>Tel: (310) 396-0731<br>Fax: (310) 399-7040<br>E-mail: hoffpaul@aol.com | Tyler R. Giannini (*pro hac vice*)<br>Susan H. Farbstein (*pro hac vice*)<br>Thomas Becker (*pro hac vice*)<br>INTERNATIONAL HUMAN RIGHTS CLINIC,<br>Human Rights Program<br>Harvard Law School<br>Pound Hall 401, 1563 Massachusetts Avenue<br>Cambridge, MA 02138<br>Tel: (617) 495-9362<br>Fax: (617) 495-9393<br>E-mail: giannini@law.harvard.edu<br>E-mail: sfarbstein@law.harvard.edu<br>E-mail: thomasbainbecker@gmail.com |

## CERTIFICATE OF SERVICE

I hereby certify that on December 29, 2017, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.  I also certify that the foregoing document is being served this day on counsel of record on the attached Service List in the manner specified, either via transmission of Notice of Electronic Filing generated by CM/ECF or via e-mail.

_/s/ Ilana Tabacinic_
Ilana Tabacinic

## <u>SERVICE LIST</u>

Ana C. Reyes
Stephen D. Raber
James E. Gillenwater
Suzanne M. Salgado

**WILLIAMS & CONNOLLY LLP**

725 Twelfth Street, N.W.
Washington, DC  20005
(202) 434-5000
(202) 434-5029 (facsimile)
areyes@wc.com
sraber@wc.com
jgillenwater@wc.com
ssalgado@wc.com

Evan B. Berger

**BECKER & POLIAKOFF, P.A.**

1 East Broward Blvd., Suite 1800
Ft. Lauderdale, FL  33301
(954) 364-6055
(954) 985-4176 (facsimile)
eberger@bplegal.com