UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 07-22459-CIV-COHN/SELTZER
CASE NO. 08-21063-CIV-COHN/SELTZER

ELOY ROJAS MAMANI, et al.,

      Plaintiffs,

v.

JOSÉ CARLOS SÁNCHEZ BERZAÍN,

      Defendant in No. 07-22459,

GONZALO DANIEL SÁNCHEZ DE
LOZADA SÁNCHEZ BUSTAMANTE,

      Defendant in No. 08-21063.

_____/

## ORDER DENYING DEFENDANTS' JOINT MOTION FOR SUMMARY JUDGMENT

**THIS CAUSE** is before the Court upon Defendants' Joint Motion for Summary

Judgment [DE 342 in Case No. 07-22459; DE 321 in Case No. 08-21063] ("Motion").[1]

The Court has carefully considered the Motion, Plaintiffs' Response and Defendants'

Reply, the parties' related submissions, and the record in these cases, and is otherwise

advised in the premises. For the reasons set forth below, Defendants' Motion is denied.

### I.    INTRODUCTION

These cases concern the Bolivian government's alleged massacre of its own

civilians during a period of civil unrest in Bolivia in 2003. Plaintiffs—nine Bolivian

---

[1] Many of the filings in these cases are redacted versions that were also filed unredacted and under seal. The Court will cite to the redacted filings where possible for efficiency, consistency, and clarity. The Court has redacted references to certain materials filed under seal in connection with Defendants' Motion that were designated by the parties as confidential. The Court has simultaneously filed an unredacted version of this Order under seal, for viewing by the parties and the Court only. Additionally, all docket citations in this Order refer to Case No. 07-22459, which was consolidated with Case No. 08-21093 in May 2008. See DE 68.

residents and citizens—are the relatives of eight Bolivian civilians who, it is alleged, were deliberately killed by the Bolivian military.[2] The crux of Plaintiffs' claims is that two former high-ranking Bolivian government officials—the former President, Gonzalo Daniel Sánchez de Lozada Sánchez Bustamante ("Defendant Lozada"), and the former Minister of Defense, José Carlos Sánchez Berzaín ("Defendant Berzaín")— masterminded a violent military campaign that led to Plaintiffs' relatives' deaths, all in an effort to quell public opposition to their unpopular political agenda. Based on these allegations, Plaintiffs seek to hold Defendants personally liable for compensatory and punitive damages under the Torture Victim Protection Act of 1991 ("TVPA"), Pub. L. No. 102-256, 106 Stat. 73 (codified at 28 U.S.C. § 1350 note), and state law.

Defendants now move for summary judgment. First, Defendants argue that there is no evidence that any of Plaintiffs' relatives were intentionally killed by the Bolivian military. Second, Defendants contend that even if there were evidence that members of the Bolivian military intentionally targeted and killed the decedents, there is no evidence supporting Defendants' indirect liability for those deaths. Third, Defendants assert that Plaintiffs' state-law claims fail as a matter of law. Fourth and finally, Defendants say that the claims of two Plaintiffs cannot proceed due to individual deficiencies.

## II.   FACTS

The facts central to Defendants' summary judgment Motion, taken in the light most favorable to Plaintiffs, the nonmoving parties, are set out below.

---

[2] Plaintiffs Eloy Rojas Mamani and Etelvina Ramos Mamani sue on behalf of their daughter, Marlene Nancy Rojas Ramos. Plaintiff Sonia Espejo Villalobos sues on behalf of her common-law husband, Lucio Santos Gandarillas Ayala. Plaintiff Hernán Apaza Cutipa sues on behalf of his sister, Roxana Apaza Cutipa. Plaintiff Teófilo Baltazar Cerro sues on behalf of his wife, Teodosia Morales Mamani. Plaintiff Juana Valencia de Carvajal sues on behalf of her husband, Marcelino Carvajal Lucero. Plaintiff Hermógenes Bernabé Callizaya sues on behalf of his father, Jacinto Bernabé Roque. Plaintiff Gonzalo Mamani Aguilar sues on behalf of his father, Arturo Mamani Mamani. Plaintiff Felicidad Rosa Huanca Quispe sues on behalf of her father, Raúl Ramón Huanca Márquez.

A.    Background

Defendant Lozada served as the democratically-elected President of Bolivia from August 1993 to August 1997 and again from August 2002 to October 2003. Defendants' Statement of Material Facts ("SMF") [DE 341] ¶ 1.  Defendant Berzaín served as Minister of Defense during Defendant Lozada's second term as president, between early August 2003 and October 2003.  Id. ¶ 2.

In 2001, approximately a year and a half before Bolivia's 2002 presidential election, Defendants agreed to a plan whereby they would use military force to kill civilians in order to quash public opposition to their economic programs.  Plaintiffs' Ex. H (Canelas Decl. ¶¶ 4-7).[3, 4]  Specifically, Defendants sought to "avoid the problems that President Hugo Banzer Suarez faced during the 'Water War.'"  Id. ¶ 5.  During the "Water War" of 1999 and 2000, the Bolivian government was forced to abandon a plan to privatize the water system in Cochabamba, Bolivia in the face of massive protests. See Defendants' Ex. RR (Lozada Dep. Tr. 53:5-54:8).[5]  To avoid civilian opposition similarly derailing their policies and programs, Defendants planned to use trained troops

---

[3] Plaintiffs' Exhibits A to IIII are attached to the Declaration of Joseph L. Sorkin in Support of Plaintiffs' Opposition to Defendants' Motion for Summary Judgment.  See DE 375-2.

[4] Defendants argue that Mr. Canelas' declaration cannot be considered because (1) he does not state that he is willing to testify to the declaration's contents, and (2) his declaration is "suspect" because he is a member of the same political party as the current president of Bolivia, Evo Morales (who Defendants characterize as "[t]he man behind the violence" at issue in this case), and because a third party deponent has testified that Mr. Canelas threatened to take revenge on Defendant Lozada and is lying about the events described in his declaration.  See DE 404 at 16 n.9.  First, while declarations used to oppose motions for summary judgment must "set out facts that would be admissible in evidence," Fed. R. Civ. P. 56(c)(4), Mr. Canelas is willing and able to testify at the trial in this case, see DE 383, and it therefore appears that the contents of his declaration can be reduced to admissible form at trial.  Second, the Court does not make credibility determinations on summary judgment.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986) ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether he is ruling on a motion for summary judgment or for a directed verdict.").

[5] Defendants' Exhibits 1 to 83 are attached to the Declaration of Ana C. Reyes in Support of Defendants' Motion for Summary Judgment.  See DE 341-1.  Defendants' Exhibits 84 to 113 are attached to the Declaration of Ana C. Reyes in Support of Defendants' Reply in Support of Defendants' Motion for Summary Judgment.  See DE 384-1.

from eastern Bolivia, as opposed to conscripts, to confront protesters. Plaintiffs' Ex. H (Canelas Decl. ¶ 6). Defendant Berzaín stated that it would be necessary to "kill two or three thousand people." Id. Defendant Lozada indicated that he approved of what Defendant Berzaín said. Id. ¶ 7.

On August 8, 2002, two days after entering office, Defendant Lozada issued Presidential Decree 26757, designating members of the Armed Forces to form his Military High Command, including, *inter alia*, Commander Juan Veliz Herrera. Plaintiffs' Counterstatement of Material Facts ("CSMF") [DE 375-1] ¶ 205. Less than a week later, on August 14, Commander Herrera approved the "Manual on the Use of Force." Id. ¶ 206; Plaintiffs' Ex. BBBB (Resolution 11/02). Among other things, the "Manual on the Use of Force" characterized "roadblocks, marches, [and] demonstrations" as subversive acts and authorized the use of military force against "subversive elements trying to prevent Army Units from accomplishing their constitutional missions and the orders received." Plaintiffs' Ex. YYY (Manual on the Use of Force at 13-14). It specified, though, that "[t]he use of legal violence is only justified in situations of extreme necessity, and as a last resort when all appropriate methods of persuasion have failed." Id. at 14. Five months later, on January 12, 2003, Commander Herrera released the "Republic Plan." CSMF ¶ 207. Under this plan, the Bolivian National Army was to "apply the Principles of Mass and Shock" to, *inter alia*, remove roadblocks and control civil disturbances. Plaintiffs' Ex. ZZZ (Republic Plan at 1).[6]

---

[6] Defendants appear to suggest that the term "masa y sopresa" means something other than "Mass and Shock." See Defendants' Reply Statement of Material Facts in Support of Their Motion for Summary Judgment ("Reply SMF") [DE 384] ¶ 207 ███████████

███████████████████████████████████████████

One of Defendant Lozada's policy aims in his second term was to raise domestic revenue by exporting Bolivia's natural gas reserves.  <u>See, e.g.</u>, Plaintiffs' Ex. BB (Bedoya Dep. Tr. 75:22-78:10).  This plan had been initiated by the prior administration. Defendants' Ex. 48 (Berindoague Dep. Tr. 76:22-77:5).  The parties dispute whether a decision was ever finalized to export natural gas through Chile.  Nevertheless, Defendants concede that "some members of the public believed that Bolivia was going to sell gas through Chile, and, indeed, to Chile itself."  SMF ¶ 16.  The plan to export Bolivia's natural gas reserves, and a number of other issues, led to protests in Bolivia in 2003.  <u>See, e.g.</u>, Plaintiffs' Ex. L (del Granado Decl. ¶¶ 8, 11, 16-17).

Peaceful, negotiated solutions to these protests were unsuccessful.  Instead, Defendants employed military force on multiple occasions, leading to civilian deaths. For instance, in January 2003, Defendant Lozada participated in negotiations in Cochabamba aimed at addressing rising tensions between coca farmers in the Chapare region of Bolivia and the Bolivian military.  Plaintiffs' Ex. B (Albarracín Decl. ¶ 16).  The negotiations were initially successful and a tentative agreement was reached; however, after Defendant Berzaín entered the room and indicated his opposition to the tentative agreement, Defendant Lozada changed his position and the deal fell apart.  <u>Id.</u>  The Bolivian government ultimately employed military force in Chapare, resulting in four deaths and dozens of injuries.  <u>Id.</u>

In February 2003, the government again employed military force against protesters, this time in Bolivia's capital, La Paz, resulting in 33 deaths, including

---

█████████████████████████ In any event, Plaintiffs rely on a certified translation of the Republic Plan, and Defendants do not expressly dispute the accuracy of the translation.

civilians.  Id. ¶ 20; Plaintiffs' Ex. L (del Granado Decl. ¶¶ 8-9).[7]  When the mayor of La Paz called Defendant Berzaín to express concern about the violence and the need to pacify the city, Defendant Berzaín said: "Mayor, if there are 5 dead, it doesn't matter if there are 50 more, as long as we solve the problem."  Plaintiffs' Ex. L (del Granado Decl. ¶ 9).  Shortly after the events of February 2003, Defendant Berzaín left the government—though he maintains that his resignation was unconnected to the violence.  Plaintiffs' Ex. VV (Berzaín Dep. Tr. 106-108).

In March 2003, in response to the violence of February, the Permanent Assembly of Human Rights of Bolivia—a nongovernmental human rights organization—sought to address the rising tensions in Bolivia by inviting all of the country's political parties and social organizations to a meeting to discuss an agreement to promote national unity.  Plaintiffs' Ex. B (Albarracín Decl. ¶ 21).  The only political party that did not attend was Defendants' party, the National Revolutionary Movement, which had sent an observer without authority to participate.  Id.  The meeting failed to produce an agreement.  Id.

B.    The Events of September 2003 in Sorata and Warisata

The most significant protests began in September 2003, and by the second week of September, peasant leaders went on a hunger strike in El Alto, Bolivia and began a blockade of roads in the high plateau region (the "*altiplano*").  Plaintiffs' Ex. L (del Granado Decl. ¶ 11).  These roadblocks led to approximately 1,000 tourists in Sorata, Bolivia—there to celebrate a popular annual religious festival—becoming stranded in

---

[7] There is, however, evidence that armed rebel police units had fired at military personnel stationed in front of the Presidential Palace amid this confrontation.  Defendants' Ex. 7 (May 2003 OAS Rep. at 7).

the town.  See Defendants' Ex. 11 (Three Prosecutors' Rep. at 454);[8] Defendants' Ex.

61 (Ramirez Dep. Tr. 50:8-51:18, 129:18-23).  The parties dispute how dire the situation

in Sorata became as the blockade continued for over a week, but there is evidence that

food supplies were running low and that, while some tourists were able to leave, others

were unable.  See, e.g., Defendants' Ex. 61 (Ramirez Dep. Tr. 74:11-19); Defendants'

Ex. 98 (Ramirez Dep. Tr. 131:19-133:21); Plaintiffs' Ex. QQQ (Ramirez Dep. Tr. 37:2-5);

Plaintiffs' Ex. J (Davis Decl. ¶ 7).  There is also evidence that diplomatic

representatives, concerned for the safety and security of their citizens, demanded that

Bolivia's government intervene.  Defendants' Ex. 11 (Three Prosecutors' Rep. at 454).

Amidst these rising tensions, Defendant Berzaín had returned to the cabinet as

Minister of Defense sometime in August 2003.  Plaintiffs' Ex. VV (Berzaín Dep. Tr. 108).

Between September 10 and 12, 2003, the Republic Plan was put into effect by the

military.  Plaintiffs' Ex. NN (Transcript, Audio Recording of Trial of Responsibilities

Testimony of Juan Veliz Herrera at 2-4).[9]  Additionally, in September 2003, the

Commander in Chief of the Armed Forces issued a "Red Alert"—███████████████

████████████████████████████████████████████████████████████

██████████████████████████████████.

Community leaders from Sorata met with their counterparts in Warisata, Bolivia

on September 18 to negotiate how to get the tourists out of Sorata over the coming

---

[8] Plaintiffs assert that Defendants' Exhibit 11 is inadmissible hearsay.  But as discussed in Section V.A, infra, Exhibit 11 is admissible under the public records exception to the hearsay rule.

[9] Defendants moved in limine to exclude all material concerning the 2009 proceedings in Bolivia known as the "Trial of Responsibilities."  See DE 360.  The Court will rule on the admissibility of this material in a separate written order, and only materials that the Court has found admissible are considered in this Order.

days.  Plaintiffs' Ex. N (García Decl. ¶ 3).[10, 11]  Two days later, however, the Bolivian

government sent in a convoy of army and police forces to transport the tourists (and

ultimately some Sorata residents who decided to leave due to the situation) out of

Sorata.  Defendants' Ex. 11 (Three Prosecutors' Rep. at 455).  Defendant Berzaín also

arrived in Sorata on September 20—with Defendant Lozada's authorization—and local

community leaders spoke with Defendant Berzaín to discuss a plan to transport people

through the roadblocks, including those in Warisata, without military interference.

Plaintiffs' Ex. N (García Decl. ¶ 8); Plaintiffs' Ex. VV (Berzaín Dep. Tr. 121:15-122:14,

124:16-125:18).  Defendant Berzaín, who was in ongoing contact with Defendant

Lozada, rejected the non-military alternative, stating to the community leaders that there

---

[10] Defendants argue that García's declaration is a sham and cannot be considered because it is inconsistent with a sworn statement that he gave to Bolivian police investigators in June 2004.  Reply SMF ¶ 315 (citing Defendants' Ex. 106 (García Police Stmt.)).  "When a party has given clear answers to unambiguous questions which negate the existence of any genuine issue of material fact, that party cannot thereafter create such an issue with an affidavit that merely contradicts, without explanation, previously given clear testimony."  Van T. Junkins & Assocs., Inc. v. U.S. Indus., Inc., 736 F.2d 656, 657 (11th Cir. 1984).  The inconsistencies between García's declaration and his statement to the police, however, concern only his actions and observations after Defendant Berzaín and the fleet of buses carrying tourists departed Sorata on September 20, 2003.  In his statement to the police, García stated that he "returned home" after Defendant Berzaín and the tourists left Sorata.  Defendants' Ex. 106 (García Police Stmt. at 1).  In his declaration, he now states that after Defendant Berzaín and the tourists departed, he actually "left in a car with some of the other leaders in the community . . . towards the caravan to help escort the tourists through Warisata" and observed soldiers shooting at civilians.  Plaintiffs' Ex. N (García Decl. ¶¶ 20-28).  The Court agrees that these portions of García's declaration are inconsistent with his 2004 statement to the police, and will therefore disregard these portions of his declaration.  The Court will not, however, disregard the statements in García's declaration concerning the events leading up to the departure of Defendant Berzaín and the tourists from Sorata, as there is no inherent inconsistency between those statements and García's statement to the police—both statements describe Defendant Berzaín's disinterest with a peaceful resolution to the situation.

[11] Defendants also argue that García's declaration and several other of the declarations relied upon by Plaintiffs may not be considered because "Plaintiffs have not made the required showing that the Bolivian declarants will appear at trial."  DE 404 at 16.  While the Court directed Plaintiffs to address whether one of their declarants, Victor Canelas, would be available to testify at trial given the significance of his testimony, see DE 374, the Court rejects Defendants' unsupported argument that Plaintiffs must make a showing that each of their declarants will appear at trial in order for their declarations to be properly considered.  Further, the Court does not find the refusal of certain declarants to make themselves available voluntarily for deposition in Bolivia necessarily shows that it is unlikely that they will be willing to testify at trial, whether live or by video.  Also, the fact that other declarants have been denied visas does not rule out the possibility that they may be permitted to testify at trial by video.  In sum, the Court will consider the affidavits relied upon by Plaintiffs that satisfy the requirements of Federal Rule of Civil Procedure 56(c)(4), assuming there are no independent reasons for the Court to refuse to consider specific declarations or portions thereof.  See supra n.10.

were orders from the government to remove the tourists "the good way or the bad way" and that "if you oppose this, you will face consequences." Plaintiffs' Ex. N (García Decl. ¶¶ 9-10); Plaintiffs' Ex. RR (Lozada Dep. Tr. 216:7-18); Plaintiffs' Ex. VV (Berzaín Dep. Tr. 122:11-13). As he continued to be pressed by community leaders, Defendant Berzaín responded: "Fucking Indians, I'm going to shoot you. Leave me to do my work." Plaintiffs' Ex. N (García Decl. ¶ 14). Defendant Berzaín then ordered military officers to look for bus drivers to transport the tourists. Id. ¶ 15.

Also on September 20, a meeting took place in El Alto between government officials and community leaders in an effort to resolve the conflict peacefully. Defendants' Ex. 58 (Harb Dep. Tr. 30:11-33:3). These negotiations were ongoing and had yet to reach an impasse when they ended abruptly after the community leaders received phone calls about the military operation to escort the tourists out of Sorata. Id. at 33:12-33:25, 40:12-41:11.

Late in the morning on September 20, the military convoy accompanying the buses of tourists left Sorata for La Paz, by way of Warisata. See, e.g., Plaintiffs' Ex. S (Smith Decl. ¶ 14); Plaintiffs' Ex. N (García Decl. ¶ 17). Defendant Berzaín departed Sorata by helicopter. Plaintiffs' Ex. VV (Berzaín Dep. Tr. 126-27). ▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

On the way from Sorata to Warisata, people on the buses observed soldiers firing at unarmed civilians. Plaintiffs' Ex. J (Davis Decl. ¶ 13); Plaintiffs' Ex. S (Smith

Decl. ¶¶ 18-25).  There is some evidence that civilians threw rocks at the convoy, and even used dynamite.  See Defendants' Ex. 11 (Three Prosecutors' Rep. at 455); Plaintiffs' Ex. S (Smith Decl. ¶ 16).  There is also evidence, however, that at the times when soldiers fired upon civilians en route to Warisata, the civilians were not throwing rocks or otherwise posing a threat to the convoy.  Plaintiffs' Ex. S (Smith Decl. ¶ 20); Plaintiffs' Ex. J (Davis Decl. ¶¶ 13, 16).

By the afternoon of September 20, the buses reached Warisata but stopped for approximately two hours on the road before entering the town.  Plaintiffs' Ex. S (Smith Decl. ¶ 27).  ███████████████████████████████████████ ███████████████████████████████████████  Shortly afterwards, Defendant Lozada signed a written order directing General Gonzalo Rocabado, the acting Commander in Chief of the Armed Forces, to use "necessary force" to restore order.  Id. at 67:23-69:13; Defendants' Ex. 20 (Sept. 20, 2003 Pres. Decree); Plaintiffs' Ex. RR (Lozada Dep. Tr. 229:12-232:7).  General Rocabado then issued Directive 27/03, which created a Joint Task Force whose mission was to carry out "Internal Defense of Territory" ("DIT") operations "and restore public order and the Rule of Law." Defendants' Ex. 72 (Directive 27/03).

In addition to the convoy, other soldiers arrived in Warisata from the opposite direction at approximately 3:00 p.m. on September 20.  Plaintiffs' Ex. A (Vargas Decl. ¶ 15).  The army and police forces in Warisata were fired upon from the hills and some local homes, and soldiers and policemen were killed.  Defendants' Ex. 11 (Three Prosecutors' Rep. at 455).[12]  There is also evidence, however, that the military shot

---

[12] Defendants attempt to rely on other sources of evidence to describe the clash between armed protesters and the military convoy in Warisata in greater detail, specifically, U.S. State Department cables

indiscriminately at civilians when there were no armed civilians firing shooting at the soldiers.  See Plaintiffs' Ex. A (Vargas Decl. ¶¶ 17, 19-22); Plaintiffs' Ex. QQ (Rojas Mamani Dep. Tr. 75:12-77:3).  Soldiers were ordered to switch from non-lethal to lethal munitions and to "shoot anything that moves."  Plaintiffs' Ex. A (Vargas Decl. ¶¶ 17-18).[13]  They "were never, in any way, warned that [they] should try to avoid civilian casualties."  Id. ¶ 5.  Soldiers proceeded on foot down the main avenue of Warisata, while special forces with "ski masks, helmets, radios . . . and specialized guns" moved through the backside of town to "take the hill."  Id. ¶ 19.[14]  Soldiers were repeatedly ordered to shoot at anything that moved, with a superior at one point telling them that, "[i]f you see a fly, shoot."  Id. ¶ 20.  The military shot at civilians, into houses, and at windows despite not seeing any civilians shooting back.  Id. ¶¶ 20-22.

For three to four hours, the military advanced and reached the home of decedent Marlene Nancy Rojas Mamani ("Decedent Marlene Mamani") in Warisata.  Plaintiffs' Ex. QQ (Rojas Mamani Dep. Tr. 77:15-23); Plaintiffs' Ex. PP (Ramos Mamani Dep. Tr. 22:7-24:16).  Decedent Marlene Mamani, an eight-year-old girl, was fatally shot by a single bullet while standing at the window of her home.  Plaintiffs Ex. PP (Ramos Mamani Dep. Tr. 22:7-24:16).  After Decedent Marlene Mamani was shot, her mother looked out the window and the only people she saw were soldiers.  Id.  In addition to Decedent

---

and military and other Bolivian government reports.  Plaintiffs argue that these documents are inadmissible hearsay.  As discussed in Sections V.B-C, infra, the Bolivian government reports and the U.S. State Department cables are not admissible.

[13] Defendants argue that the statements in Mr. Aguilar Vargas' declaration as to what third parties told him are inadmissible hearsay.  But with respect to the orders given to him by his superiors, these out-of-court statements are not being offered as evidence that their contents are true.  See Fed. R. Evid. 801(c)(2).  The same is true with respect to the orders described in Plaintiffs' Exhibit M (Flores Limachi Decl.) and Plaintiffs' Exhibit P (Ortega Decl.), discussed infra.

[14] Also present was a counter-terrorist force known as the Chachapumas, which was only deployable via a direct order from Defendant Lozada. ████████████████
████████████████

Marlene Mamani, at least two other civilians were killed in Warisata on September 20, and several more were injured.  Defendants' Ex. 11 (Three Prosecutors' Rep. at 455).

### C.   The Events of October 12, 2003 in El Alto

In response to reports of the military's use of force against civilians, opponents of the Lozada government began significant campaigns of civil disobedience in and around La Paz.  These campaigns took the form of protests, marches, roadblocks, general strikes, and demonstrations.  Their central focal point was the city of El Alto, which is located on a high plateau that stands above La Paz and contains one of the main roads going in and out of the capital.   See Defendants' Ex. 43 (Bedoya Dep. Tr. 199:15-200:20); Defendants' Ex. 46 (Bedoya Dep. Tr. 199:15-200:20); Plaintiffs' Ex. N (García Decl. ¶¶ 28-30); Plaintiffs Ex. T (Soria Decl. ¶ 4); Plaintiffs' Ex. U (Zabala Decl. ¶¶ 4-5, 8-9).  The parties dispute the extent to which these protests impacted La Paz. At a minimum, however, it is undisputed that at times the city was brought to a standstill, public transportation was light (if not nonexistent), and stores, restaurants, and other businesses were mostly closed.  See, e.g., Plaintiffs Ex. T (Soria Decl. ¶ 6); Plaintiffs' Ex. U (Zabala Decl. ¶ 11); Defendants' Ex. 48 (Berindoague Dep. Tr. 62:11-12); Defendants' Ex. 55 (Meruvia Dep. Tr. 18:13-19:10).

At the same time, the Lozada government continued its mobilization of the Armed Forces.  Following the violence in Warisata on September 20, new soldiers, rations, and weapons arrived at the Ingavi barracks in El Alto.  Plaintiffs' Ex. A (Aguilar Vargas Decl. ¶¶ 26, 28).[15]  Among the new units were Green Berets, tank crews, military police, and artillery regiments.  Id. ¶ 26.  Conscripts were directed to change

---

[15] Later, additional regiments would arrive from Santa Cruz, in eastern Bolivia.  Plaintiffs' Ex. A (Aguilar Vargas Decl. ¶ 42).

from FAL rifles to M-16 automatic rifles, and were shown "how to load the guns and switch from single shot to machine gun burst." Id. ¶ 25. Beginning in early October, the military was seen El Alto, especially along Avenue Juan Pablo II; low-flying planes were seen as well. See Plaintiffs' Ex. E (Aramayo Decl. ¶ 8); Plaintiffs' Ex. T (Soria Decl. ¶ 7); Plaintiffs' Ex. U (Zabala Decl. ¶ 11). On October 8, the military detained civilians who were out on the street and brought them to the Ingavi barracks, where they were threatened and beaten. Plaintiffs' Ex. E (Aramayo Decl. ¶¶ 32, 40). In at least one instance, a detainee was taunted with racial slurs as officers pointed weapons at him and threatened to shoot. Id. ¶¶ 34-37, 41.

Events reached a tipping point starting on October 10. Late that evening, Defendant Berzaín held a meeting at the Ministry of Defense with top military officers, as well as leaders from the La Paz Gas Stations Association. Plaintiffs' Ex. O (Loza Decl. ¶¶ 12-13, 15-16). There, Defendant Berzaín emphasized the need to alleviate gas shortages by transporting gas to La Paz from the Senkata gas plant in El Alto. Id. ¶ 17. When told that a plan to use the military to transport gas would be risky, he became angry on more than one occasion and threatened to penalize gas station owners who did not cooperate. Id. ¶¶ 17-21. And when warned that a military operation could result in a fatal explosion, Defendant Berzaín responded: "There will be deaths, but there will also be gasoline." Id. ¶ 21.[16] Defendant Berzaín nodded after a general proposed that the military be used to transport gasoline in La Paz, and the operation was planned during the meeting. Id. ¶ 22.

---

[16] Defendants do not dispute that Defendant Berzaín stated that "[t]here will be deaths, but there will also be gasoline." According to Defendants, Defendant Berzaín made this comment "in response to a comment that a tanker 'could cause an explosion at a gas station,' not in response to any concerns that deaths could be caused by the military." Reply SMF ¶ 276 (quoting Plaintiffs' Ex. O (Loza Decl. ¶ 21)).

Meanwhile, the Lozada government rejected efforts by civil society groups to negotiate a peaceful end to the tensions.  On the evening of October 11, representatives from the Catholic Church and the Permanent Assembly of Human Rights of Bolivia met with Defendant Lozada and his ministers.  Plaintiffs' Ex. B (Albarracín Decl. ¶¶ 32-33).  In order to show that the government was more responsive and less reliant on force, the representatives suggested that Defendant Lozada replace Defendant Berzaín and one other minister.  Id. ¶ 34.  When concerns were raised about civilian deaths, Defendant Lozada responded that force was necessary to restore order, saying: "If they want to dialogue about the gas, then we'll have dialogue; but if they want war over the gas, then they'll have war, and we'll shoot all the violent people in El Alto." Id. ¶ 35.

Also on October 11, Defendant Lozada issued, with the signed approval of his cabinet, Decree 27209.  Defendants' Ex. 6 (Supreme Decree No. 27209).  An order to the Commander in Chief of the Armed Forces, the decree declared a national emergency throughout Bolivia "in order to ensure a regular supply of liquid fuel to the people by protecting storage facilities and ensuring fuel shipments." Id. at 71.  It ordered the Armed Forces to "assume control of shipments in tanker trucks and other vehicles and to secure storage facilities, pipelines, service stations, and all types of infrastructure needed to ensure regular distribution and supply of liquid fuels to the people of the Department of La Paz." Id.  The Ministry of Defense was directed to "establish the mechanisms necessary" for the Armed Forces to execute its mission. Id. Finally, the decree provided that "[t]he Bolivian State guarantees compensation for any

damage to property and persons that might occur as a result of compliance with the terms hereof." Id.

On October 12, the Commander in Chief of the Armed Forces, General Roberto Claros Flores, issued Directives 33/03 and 34/03. Both directives cited Supreme Decree No. 27209 for authority. See Defendants' Ex. 73 (Directive 33/03); Defendants' Ex. 74 (Directive 34/03). Directive 33/03 created a Joint Task Force comprised of all three branches of the Armed Forces—the army, air force, and navy—to "perform [DIT] operations as of [the date of the order], throughout the entire national territory to restore public order and the rule of law with the purpose of ensuring that the population is able to carry out its normal activities." Defendants' Ex. 73 (Directive 33/03 at 262-63). Directive 33/03 ordered that the Joint Task Force be established in six areas of the country, id. at 263, and Directive 34/03 ordered a Joint Task Force specifically for El Alto. Defendants' Ex. 74 (Directive 34/03).

Also on October 12, protesters amassed on roads in El Alto and La Paz. Two locations hold particular relevance to this case. The first is the area near the Senkata gas plant, in the south of El Alto; the second is the Río Seco area, in the north of El Alto. Eyewitness reports indicate that members of the Bolivian military indiscriminately shot at unarmed civilians in both locations.

Senkata. — Protesters in Senkata gathered outside the local gas plant on the morning of October 12. Plaintiffs' Ex. I (Castaño Decl. ¶¶ 12-14). There is evidence that "the mobilized civilian population . . . armed with Mauser rifles and dynamite" carried out "attacks in the Senkata area of El Alto on the tanker trucks transporting gasoline to the city of La Paz." Defendants' Ex. 11 (Three Prosecutors' Report at

479).[17]  There is also evidence, however, that after military tanks and trucks exited the

gas plant, an officer began shooting at unarmed civilians without warning as the civilians

fled in different directions.  Plaintiffs' Ex. I (Castaño Decl. ¶¶ 16-17).  Specifically, near

*Colegio Jose Manuel Pando*, one officer fired a machine gun down an alley at civilians,

including children, who were fleeing and trying to hide.  Id. ¶ 17.  On the other side of

the street, soldiers lined up in formation, pointed their guns "in the calculated way

sharpshooters target people" and opened fire on civilians.  Id. ¶ 18; see also id. ¶¶ 21-

23.  In another area of Senkata, near the Bolivia Bridge, soldiers were ordered to shoot

at unarmed civilians.  Plaintiffs' Ex. A (Aguilar Vargas Decl. ¶ 34).[18]  These soldiers

"were using machine guns and sho[oting] like crazy at campesinos and women."  Id. ¶

38.

Decedent Lucio Santos Gandarillas Ayala ("Decedent Ayala") was shot and killed

in the Senkata area on October 12.  SMF ¶ 86; CSMF ¶¶ 86, 284.  According to Plaintiff

Sonia Espejo Villalobos, Decedent Ayala was traveling through Senkata to obtain

cooking gas from his brother's house.  Plaintiffs' Ex. K (Espejo Decl. ¶ 4); Plaintiffs' Ex.

HH (Espejo Dep. Tr. 31:3-13, 33:2-34:24).  Decedent Ayala was wearing a red cap and

a colorful yellow, red, and green jacket that day.  Plaintiffs' Ex. K (Espejo Decl. ¶ 4);

---

[17] The same paragraph of the Three Prosecutors' Report that Defendants cite also states that the military's response to these attacks was "disproportional[] . . . , leading to deaths and injuries that could have been avoided." Defendants' Ex. 11 (Three Prosecutors' Rep. at 480).  Nevertheless, the Court's role is not to judge the proportionality of the military's response to armed protesters, but to determine if there is an issue of material fact as to whether the Plaintiffs' relatives in this case were intentionally killed by the military.  The evidence that the military was responding to an armed attack at one point in time does not create a dispute that, at other times, the military shot unarmed civilians indiscriminately.

[18] Defendants note that, according to Mr. Aguilar Vargas, he received an order to shoot based on an officer's belief that "campesinos . . . were shooting, throwing grenades at [the military] and taking [their] munitions." Reply SMF ¶ 281 (alterations in original) (quoting Plaintiffs' Ex. A (Aguilar Vargas Decl. ¶ 34)).  Mr. Aguilar Vargas, however, did not see any armed protesters and none of his fellow soldiers were injured or killed that day.  Plaintiffs' Ex. A (Aguilar Vargas Decl. ¶¶ 34, 39).

Plaintiffs' Ex. HH (Espejo Dep. Tr. 34:4-7).[19]  A witness to the military's targeting of civilians in Senkata saw a man wearing a yellow and green jacket get hit by a single gunshot in the vicinity of approximately a half dozen soldiers.  Plaintiffs' Ex. I (Castaño Decl. ¶¶ 18-19).

Río Seco. — Protesters gathered in two areas of Río Seco: the Ex Tranca and Río Seco Bridge.  See Plaintiffs' Ex. D (Apaza Morales Decl. ¶ 5); Plaintiffs' Ex. U (Zabala Decl. ¶¶ 10, 14).  Flanked by trucks and tanks, two columns of armed soldiers advanced down Avenue Juan Pablo II toward the Río Seco Bridge.  Plaintiffs' Ex. D (Apaza Morales Decl. ¶ 5); Plaintiffs' Ex. U (Zabala Decl. ¶¶ 10, 14).  Soldiers were ordered to shoot at civilians in this area.  Plaintiffs' Ex. P (Ortega Decl. ¶¶ 25-27).  When a younger soldier refused to fire at civilians, he was shot by an officer in front of other soldiers.  Id. ¶¶ 25-27.  After the young soldier was shot, other soldiers began shooting at civilians in the area.  Id. ¶¶ 27-28.[20]

---

[19] Defendants note that Ms. Espejo has given varying descriptions of Decedent Ayala's jacket. See Reply SMF ¶ 284.  In her December 2017 declaration, Ms. Espejo stated that Decedent Ayala was "wearing a colorful yellow, red, and green jacket and a red cap." Plaintiffs' Ex. K (Espejo Decl. ¶ 4).  She previously testified in her July 2017 deposition that Decedent Ayala was wearing "a red hat and a jacket, a colorful jacket." Plaintiffs' Ex. HH (Espejo Dep. Tr. 34:4-7).  And in her testimony at the Trial of Responsibilities, Ms. Espejo gave no description of what Decedent Ayala was wearing the day he was shot.  See Defendants' Ex. 104 (Transcript, Audio Recording of Testimony of Sonia Espejo Villalobos, Trial of Responsibilities).  These minor differences and omissions are certainly no reason for the Court to disregard Ms. Espejo's declaration.

[20] Defendants contend that Ela Trinidad Ortega's declaration is a sham.  See Reply SMF ¶ 291. In her testimony at the Trial of Responsibilities and her 2003 police report, Ms. Ortega did not mention anything about hearing an order to shoot civilians, seeing the military shoot civilians, or seeing an officer kill a soldier who refused to fire on civilians.  Specifically, when asked at the Trial of Responsibilities whether she "s[aw] anything on the Río Seco [Bridge]," Ms. Ortega responded only that "there were military, the military were already stationed." Defendants' Ex. 105 (Transcript at 10, Audio Recording of Testimony of Ela Trinidad Ortega, Trial of Responsibilities).  Ms. Ortega now states that, at the Trial of Responsibilities, she "was only asked about [a single event when she was beaten by soldiers] and did not have an opportunity to further elaborate on what she saw." Plaintiffs' Ex. P (Ortega Decl. ¶ 46).

As noted above, see supra n.10, the rule permitting district courts to disregard sham affidavits at the summary judgment stage applies when a declarant "has given clear answers to unambiguous questions which negate the existence of any genuine issue of material fact," Van T. Junkins, 736 F.2d at 657.  The rule "should be applied sparingly because of the harsh effect it may have on a party's case." Furcron v. Mail Ctrs. Plus, LLC, 843 F.3d 1295, 1307 (11th Cir. 2016) (internal quotation marks omitted).

Three decedents in this case died in Río Seco on October 12: Teodosia Teodosia Morales Mamani ("Decedent Teodosia Mamani"), Marcelino Carvajal Lucero ("Decedent Lucero"), and Roxana Apaza Cutipa ("Decedent Cutipa").

On Avenue Juan Pablo II near both the *Ex Tranca* and Río Seco Bridge, a bullet came through the wall of the house where Decedent Teodosia Mamani, who was pregnant at the time, was sitting. SMF ¶¶ 101-02; CSMF ¶¶ 101-02, 289. She and her unborn child died two days later. SMF ¶ 102; CSMF ¶ 102. The military was seen firing at fleeing civilians in the area, and was outside of Decedent Teodosia Mamani's home when she was shot. See Plaintiffs Ex. D (Apaza Morales Decl. ¶¶ 9-22). Indeed, shortly before a bullet struck her, soldiers were pointing their guns at windows, including the windows of Decedent Teodosia Mamani's home. Id. ¶¶ 16, 18.

Decedent Lucero lived at 93 Avenue Juan Pablo II. SMF ¶ 108; CSMF ¶ 108. He was shot and killed on October 12 when a bullet came through the window of his second story home. SMF ¶¶ 107-08; CSMF ¶¶ 107-08, 296. Soldiers were seen marching and shooting along Avenue Juan Pablo II the afternoon Decedent Lucero was shot. Plaintiffs' Ex. C (Apaza Cutipa Decl. ¶¶ 13-15).

On the evening of October 12, Decedent Cutipa was shot and killed on the rooftop terrace of her home. SMF ¶ 92; CSMF ¶¶ 92, 297. Curious about the sounds they heard outside, Decedent Cutipa, her younger brother Guzmán Apaza Cutipa, and

---

It operates only "in a limited manner to exclude unexplained discrepancies and inconsistencies, as opposed to those 'which create an issue of credibility or go to the weight of the evidence.'" Id. at 1306 (11th Cir. 2016) (quoting Tippens v. Celotex Corp., 805 F.3d 949, 954 (11th Cir. 1986)). Stated differently, "an opposing party's affidavit should be considered although it differs from or varies from his evidence as given by deposition or another affidavit and the two in conjunction may disclose an issue of credibility." Id. at 1307 (brackets omitted) (quoting Tippens, 805 F.3d at 953).

The Court concludes that Ms. Ortega was never unambiguously asked about seeing the incidents she now described in her declaration. The more detailed account of the Río Seco events contained in that declaration therefore presents a credibility issue and cannot be disregarded as a sham.

18

their cousin's three children went up to the rooftop terrace.  Plaintiffs' Ex. C (Apaza Cutipa Decl. ¶¶ 9-10).  Only Decedent Cutipa was tall enough to see over the roof's terrace without standing on anything.  Id. ¶ 11.  Mr. Apaza Cutipa and the others stood on bricks and boxes.  Id.  He saw tanks and military trucks pass by, with soldiers on top of them shooting in all directions.  Id. ¶¶ 12-13.  After a few minutes passed, Decedent Cutipa was shot in the head while peering over the terrace.  Id. ¶ 18.  At the time his sister was shot, Mr. Apaza Cutipa heard a shot come from where he had seen soldiers below on Avenue Juan Pablo II.  Id.

> D.    The Events of October 13, 2003 in La Paz

There is some evidence that after the events of October 12, Defendant Lozada sought a dialogue with certain of El Alto's community leaders.  See Defendants' Ex. 55 (Meruvia Dep. Tr. 68:12-69:18); Defendants' Exs. 12-14 (letters from Defendant Lozada to community leaders explaining that no decision to export natural gas had been finalized and calling for dialogue).  Nevertheless, the violence persisted into the next day in a manner consistent with the violence of September 20 and October 12.  Specifically, there is evidence that on October 13, military regiments shot indiscriminately at unarmed civilians in the Southern Zone of La Paz, in both the Ánimas Valley and Ovejuyo areas.

On October 13, there was a roadblock on the Ánimas Valley road.  Defendants' Ex. 50 (Huanca Quispe Dep. Tr. 32:6-33:9).  This road is the only road from Palca[21] to La Paz.  Defendants' Ex. 47 (Mamani Aguilar Dr. Tr. 32:5-6).  Leading up to October 13, soldiers had been positioned to guard the road in Uni, in the Southern Zone of La Paz,

---

[21] Palca is an important rural region from which agricultural goods are transported to La Paz. Defendants' Ex. 60 (Antezana Dep. Tr. 139:10-14).

so that nobody could block the road and protesters could not reach La Paz.  Plaintiffs'
Ex. M (Flores Limachi Decl. ¶¶ 4-6).[22]  On the morning of October 13, however, soldiers
were ordered to move towards Chasquipampa—closer to La Paz on the Ánimas Valley
road—because they were told that a large crowd of protesters had gathered there.  Id.
¶¶ 7-8.  As the soldiers made their way from Uni to Chasquipampa, protesters threw
bottles, rocks, and firecrackers at them.  Id. ¶ 8.  After there was an explosion near the
soldiers' trucks, they got out of their trucks and confronted the protesters, aiming their
guns at the protesters to scare them.  Id. ¶¶ 8-9.  A soldier was then shot and killed by
an unknown shooter.  Id. ¶¶ 10-12.[23]

   The soldiers were ordered to change from non-lethal to lethal ammunition and
"shoot anything that moves."  Id. at ¶ 13.  At this point, however, there is evidence that
the soldiers were no longer in danger and that the civilians they were shooting at—who
were in the hills above the road—were unarmed, hiding, and fleeing.  See Plaintiffs' Ex.
M (Flores Limachi Decl. ¶¶ 14, 39); Plaintiffs' Ex. R (Sirpa Decl. ¶¶ 8, 14, 45).  The
soldiers shot at civilians for approximately 45 minutes.  See Plaintiffs' Ex. M (Flores
Limachi Decl. ¶ 15).  The soldiers were not being attacked and did not assume a
defensive position, but shot at the civilians from the road, in the open.  Plaintiffs' Ex. R
(Sirpa Decl. ¶¶ 12-14).

---

[22] Other regiments were also present in Uni, primarily regiments from Santa Cruz.  Plaintiffs' Ex.
M (Flores Limachi Decl.¶ 5).

[23] Defendants rely on a host of inadmissible evidence in an effort to show that the soldiers were
faced with not just one shooter, but an "ambush" in which "a mob of people" with firearms and dynamite
shot at and attacked the soldiers.  See SMF ¶¶ 119-122.  This evidence includes military and other
Bolivian government reports, discussed in Sections V.B-C, infra, as well as the testimony of General
Marcelo Eulogio Antezana Ruiz.  General Antezana, however, lacks personal knowledge of the events of
October 13 in the Southern Zone of La Paz, as all of his information regarding these events is based on
what he was told by Captain Dieter Belmonte.  See Plaintiffs' Ex. Z (Antezana Dep. Tr. 78:6-18, 79:7-11).
General Antezana's testimony is therefore inadmissible hearsay, and to the extent Defendants seek to
offer it for the non-hearsay purpose of the information's effect on General Antezana and his orders to
Captain Belmonte, see Reply SMF ¶ 112, it is irrelevant to the Court's resolution of Defendants' Motion.

As they ran low on ammunition, the soldiers retreated, continuing to shoot while they did so. Plaintiffs' Ex. M (Flores Limachi Decl. ¶ 15).  After a helicopter arrived to replenish their ammunition, the soldiers were ordered to climb into the hills and continue shooting civilians, with their superiors instructing them: "whatever head you see, you need to shoot." Id. ¶¶ 16-20.  There is evidence that, as with earlier in the day, civilians were not shooting at the military at this time either. Id. ¶ 18; Plaintiffs' Ex. R (Sirpa Decl. ¶¶ 18, 45).

Two of Plaintiffs' relatives were killed on October 13 in the Ánimas Valley area at approximately the same time as the shooting described above: decedents Arturo Mamani Mamani ("Decedent Arturo Mamani") and Jacinto Bernabé Roque ("Decedent Roque"). See SMF ¶¶ 125, 133.  Plaintiff Gonzalo Mamani Aguilar, Decedent Arturo Mamani's son, was present at the location where his father and Decedent Roque were shot. Plaintiffs' Ex. MM (Mamani Aguilar Dep. Tr. 90:20-91:3, 102:10-25).  Mr. Mamani Aguilar had left his home on the morning of October 13 to tend to his family's land and, while on his way, he witnessed the military moving through the area. Id. at 62-64.  Mr. Mamani Aguilar was unable to make it to his family's land before the military began shooting "in different directions." Id. at 65:3-16, 91:17-22.  He saw Decedent Roque attempting to hide from the military behind some tall straw on the hilltop they were both on (Huaichichuni), and crawled behind him, lying down behind the straw. Id. at 72:23-73:21, 82:23-85:21.  Every time Mr. Mamani Aguilar or Decedent Roque attempted to move, the military fired towards them. Id. at 91:21-22.  Decedent Roque was shot while Mr. Mamani Aguilar was still hiding behind him, and when Decedent Roque was shot, Mr. Mamani Aguilar was close enough that the blood splattered on his face. Id. at

90:20-91:16.  Additionally, while hiding, Mr. Mamani Aguilar saw his father on the hilltop directly across from his position (Huaichichuro), and heard him cry out and slip after being shot.  Id. at 74:15-75:2,102:10-11, 115:8-24.

As the soldiers left the Ánimas Valley in military trucks on October 13, they proceeded back to their barracks, through the locality of Ovejuyo.  Plaintiffs' Ex. M (Flores Limachi Decl. ¶¶ 25-26).  They had orders to shoot as they passed through Ovejuyo, including at civilians who were throwing rocks and bottles at the soldiers.  Id. ¶¶ 26-28.  An officer in a military truck shot at fleeing civilians with a machine gun.  Id. ¶ 29.  That same afternoon in Ovejuyo, decedent Raúl Ramón Huanca Márquez ("Decedent Márquez") was shot and killed.  CSMF ¶ 314; Plaintiffs' Ex. Q (Pari Decl. ¶¶ 8-13); Defendants' Ex. 50 (Huanca Quispe Dep. Tr. 39:2-10, 45:13-23).

Decedent Márquez had left his home after lunch on October 13 to buy a Coca-Cola.  Defendants' Ex. 50 (Huanca Quispe Dep. Tr. 38:21-25).  Although Decedent Márquez and his daughter, Plaintiff Felicidad Rosa Huanca Quispe, heard gunfire earlier and although the stores on the main road in Ovejuyo were closed, Decedent Márquez went to try to buy a Coca-Cola from the store because "[h]e would always like to drink a cold one after lunch" and he believed the store's owner would sell him the beverage.  Id. at 39:5-20.  Decedent Márquez was later seen near a store, hiding behind a wooden light pole nearby approximately fifteen soldiers.  Plaintiffs' Ex. Q (Pari Decl. ¶¶ 8-9, 12).[24]  He was unarmed.  Id. ¶ 10.  Decedent Márquez moved and an eyewitness, Juan Carlos Pari, heard "what sounded . . . like a rifle shot" and saw

_____

[24] The soldiers were lighter skinned and taller than people from the indigenous communities in the altiplano, and spoke with an accent of people from the eastern part of Bolivia.  Plaintiffs' Ex. Q (Pari Decl. ¶ 15).

Decedent Márquez grab the pole and fall backwards.  Id. ¶ 13.[25]  The soldiers continued

shooting "in all directions."  Id.  After the soldiers had passed through town, Ms. Huanca

Quispe found her father's body on the street near the store.  Defendants' Ex. 50

(Huanca Quispe Dep. Tr. 49:20-23).

After the above described events of September and October 2003, Defendant

Lozada resigned under protest on October 17, 2003, and his cabinet, which included

Defendant Berzaín, was dissolved.  SMF ¶ 21.  Following the Bolivian Congress'

acceptance of Defendant Lozada's resignation, he and Defendant Berzaín left Bolivia

for the United States.  Id.

### E.    Military Structure and Authority

Defendant Lozada, as the President of Bolivia, was the Captain General of the

Armed Forces.  SMF ¶ 154.  The Bolivian Constitution in effect in 2003 provided: "The

Armed Forces are subordinate to the President of the Republic and receive their orders

administratively through the Minister of Defense, and in technical matters, from the

Commander in Chief."  Defendants' Ex. 10 (Bol. Const. art. 210).  The Organic Law of

the Armed Forces ("Organic Law") in effect in Bolivia in 2003 provides: "The

Commander in Chief of the National Armed Force is the highest Command and

Decision-making body of a technical/operating nature, for the permanent coordination

and direction of the Armed Forces."  Defendants' Ex. 36 (Organic Law art. 36).  Plaintiffs

assert that this decision-making body is referred to as the "Command in Chief."  CSMF

¶ 159.  Regardless of the terminology, the Organic Law is clear that this entity is

---

[25] Defendants appear to argue that the Court may not consider Mr. Pari's declaration because he does not provide a basis for how he knew the man he observed was Decedent Márquez.  Reply SMF ¶ 314.  Mr. Pari states that he lived in Ovejuyo in 2003, that he could clearly see the store (which Decedent Márquez evidently frequented) from his home, and that his declaration is based upon personal knowledge.  The Court finds no basis for disregarding Mr. Pari's declaration.

composed of the Commander in Chief, the Office of the Chief of the General Staff, the Inspectorate General, the General Staff, and the Office of the Commander in Chief. Defendants' Ex. 36 (Organic Law art. 37). It is also undisputed that the Commander in Chief takes orders from the President. Id. art. 29.

## III.  **PROCEDURAL BACKGROUND**

This litigation began a decade ago and has a lengthy procedural history. Plaintiffs originally filed two separate suits on the same day in September 2007. Defendant Berzaín was sued in this Court, while Defendant Lozada was sued in the District of Maryland. The District of Maryland eventually transferred Defendant Lozada's case to this Court, where it was consolidated with Defendant Berzaín's case. Thereafter, Plaintiffs filed an amended complaint against both Defendants stating claims under the TVPA, the Alien Tort Statute ("ATS"), and state law. See DE 77.

Defendants moved for dismissal, and this Court disposed of that motion by way of two separate orders. The first order dismissed Plaintiffs' TVPA claims without prejudice for failure to exhaust their available Bolivian remedies. Mamani v. Berzaín, 636 F. Supp. 2d 1326 (S.D. Fla. 2009) ("Mamani I"). The Court explained that Plaintiffs could not move forward on their TVPA claims until they obtained benefits under Bolivian Law No. 3955, which was enacted in November 2008 to provide additional monetary compensation to the heirs of those killed during the events of 2003. Id. at 1329-33. The Court's second order held that Plaintiffs stated plausible claims for extrajudicial killings and crimes against humanity under the ATS, but dismissed the balance of Plaintiffs' complaint. Mamani v. Berzaín, 2009 WL 10664387 (S.D. Fla. Nov. 25, 2009) ("Mamani II").

This Court then granted Defendants' motion to certify Plaintiffs' ATS claims for interlocutory review by the Eleventh Circuit and stayed all proceedings pending the completion of that appeal.  The Eleventh Circuit reversed with instructions to dismiss, reasoning that Plaintiffs had failed to state claims for extrajudicial killings and crimes against humanity under the ATS.  Mamani v. Berzaín, 654 F.3d 1148 (11th Cir. 2011) ("Mamani III").

On remand, this Court lifted its stay and Plaintiffs filed a second amended complaint.  See DE 174.  That complaint raises claims for extrajudicial killings under ATS and the TVPA, crimes against humanity under the ATS, and wrongful death under state law.  Defendants again moved to dismiss, and this Court granted that motion in part and denied it in part.  Mamani v. Berzaín, 21 F. Supp. 3d 1353 (S.D. Fla. 2014) ("Mamani IV").  Applying the Supreme Court's decision in Kiobel v. Royal Dutch Petroleum Co., 569 U.S. 108 (2013), holding that the presumption against extraterritoriality applies to claims under the ATS, this Court determined that Plaintiffs' ATS claims do not touch and concern the United States with sufficient force to displace that presumption.  Mamani IV, 21 F. Supp. 3d at 1364-69.  The Court consequently dismissed those claims for lack of subject-matter jurisdiction.  Id. at 1369.  Turning to Plaintiffs' TVPA claims, the Court reached two conclusions.  First, Plaintiffs' prior recoveries from the Bolivian government did not preclude their TVPA claims against Defendants from moving forward.  Id. at 1369-73.[26]  And second, Plaintiffs not only stated plausible claims for extrajudicial killings under the TVPA, but also sufficiently alleged that Defendants could be held secondarily liable under the doctrine of command

---

[26] While Defendants' interlocutory appeal of this Court's Mamani III order was pending, Plaintiffs applied for and obtained compensation under Bolivian Law No. 3955.

responsibility. Id. at 1373-78.  Finally, the Court declined to relinquish its supplemental jurisdiction over Plaintiffs' state-law claims for wrongful death on the ground that they involve novel or complex issues of Bolivian law.  Id. at 1378-79.

This Court granted Defendants' motion to certify its TVPA exhaustion and command responsibility rulings for interlocutory appeal and once again stayed all proceedings.  The Eleventh Circuit affirmed.  Mamani v. Berzaín, 825 F.3d 1304 (11th Cir. 2016) ("Mamani V").  It agreed with this Court's exhaustion determination, but declined to address command responsibility.  Id. at 1311-14.  Defendants' petition for certiorari was denied by the Supreme Court.  Lozada v. Mamani, 137 S. Ct. 1579 (2017).

Following the Eleventh Circuit's decision in Mamani V, this Court lifted its stay and set the case for trial.  The discovery period has now closed, and Defendants seek summary judgment.

## IV.    STANDARD

The Court will grant summary judgment if the pleadings, the discovery and disclosure materials on file, and any affidavits show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The movant "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact."  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  To discharge this burden, the movant must demonstrate a lack of evidence supporting the nonmoving party's case.  Id. at 325.

After the movant has met its burden under Rule 56, the burden of production shifts to the nonmoving party who "must do more than simply show that there is some

26

metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). The nonmoving party may not rely merely on allegations or denials in its own pleading, but instead must come forward with specific facts showing a genuine issue for trial. Id. at 587.

As long as the nonmoving party has had ample opportunity to conduct discovery, it must come forward with affirmative evidence to support its claim. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 257 (1986). "A mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party." Walker v. Darby, 911 F.2d 1573, 1577 (11th Cir. 1990). If the evidence advanced by the nonmoving party is merely colorable, or is not significantly probative, summary judgment may be granted. Anderson, 477 U.S. at 249–50.

## V.   EVIDENTIARY DISPUTES

As noted throughout Section II, supra, the parties argue that certain documents or categories of documents cited to support or dispute a fact are inadmissible in evidence. The Court will consider these objections in turn. With respect to each document, the burden is of course on the proponent "to show that the material is admissible as presented or to explain the admissible form that is anticipated." 2010 Advisory Committee Notes on Fed. R. Civ. P. 56, 28 U.S.C. App., p. 922.

### A.   Three Prosecutors' Report

Defendants rely extensively on an investigatory report prepared by three Bolivian prosecutors who were appointed by Bolivia's Chief Prosecutor to investigate the events of September and October 2003. See Defendants' Ex. 11 (Three Prosecutors' Rep.). The Three Prosecutors' Report was issued in late July 2004 after a ten-month

investigation.  See Defendants' Ex. 102 (Ltr. from Three Pros. to Inter-American

Commission on Human Rights at 523).  Plaintiffs argue that the Three Prosecutors'

Report is inadmissible hearsay because: (1) it is only a preliminary report that the

Bolivian government ultimately declined to adopt; and (2) there is no "specific

evidentiary basis for [the Report's] findings or the extent of its investigative efforts."

CSMF ¶ 27.  Defendants assert that the Three Prosecutors' Report is admissible under

the public records exception to the hearsay rule.  See Defendants' Reply Statement of

Material Facts in Support of Their Motion for Summary Judgment ("Reply SMF") [DE

384] ¶ 27 (citing Fed. R. Evid. 803(8)(A)(ii)-(iii)).  The Court agrees.

The public records exception to the rule against hearsay provides that "[a] record

or statement of a public office" is not excluded as hearsay:

> (A) if it sets out:
>
>> (i) the office's activities;
>>
>> (ii) a matter observed while under a legal duty to report, but not
>> including, in a criminal case, a matter observed by law-enforcement
>> personnel; or
>>
>> (iii) in a civil case or against the government in a criminal case,
>> factual findings from a legally authorized investigation; and
>
> (B) the opponent does not show that the source of information or other
> circumstances indicate a lack of trustworthiness.

Fed. R. Evid. 803(8).

Plaintiffs do not dispute that the Three Prosecutors' Report is a record of a public

office that was prepared in conjunction with an authorized investigation.  And while

Plaintiffs are correct that Rule 803 "makes no exception for tentative or interim reports

subject to revision and review," CSMF ¶ 27 (quoting Toole v. McClintock, 999 F.2d

1430, 1434-35 (11th Cir. 1993)), the Three Prosecutors Report was presented to the magistrate judge as the prosecutors' "final report," and sent to the Chief Prosecutor and the Committees of the House of Representatives, see Defendants' Ex. 102 (Ltr. from Three Pros. to Inter-American Commission on Human Rights at 523-24).  Thus, the Three Prosecutors' Report is unlike the FDA report that was excluded in Toole, as that FDA report contained only "'proposed' findings" and specifically "invited public comment and forecasted the issuance of a 'final' document after more study."  999 F.2d at 1434.

Additionally, the fact that the Three Prosecutors' Report was subsequently disregarded by different prosecutors who were appointed—seemingly for political reasons—to replace its authors, see Plaintiffs' Ex. SSS (Resolution No. 091/04, Revocation of Rejection Resolution 16/04), is no reason to find that the Report falls outside the Rule 803(8)(A)(iii) exception.  Plaintiffs offer no support for the proposition that a final investigatory report is outside of this exception merely because subsequent litigation occurs.  In any event, the Court does not accord great weight to the Bolivian government's decision to disregard the Three Prosecutors' Report, as that decision appears to have been politically motivated to support the popular view that members of Defendant Lozada's Military High Command should be tried for their role in the events of September and October 2003, despite the recommendation to the contrary contained in the Three Prosecutors' Report.  See Defendants' Ex. 102 (Ltr. from Three Pros. to Inter-American Commission on Human Rights at 524-25).

Lastly, Plaintiffs are simply incorrect that the Three Prosecutors' Report fails to explain the evidentiary basis for its conclusions or the investigative efforts involved in the production of the Report.  The Report describes how its conclusions are the product

of, *inter alia*, field work performed at over 17 locations, witness interviews, the collection of physical evidence and written statements, and ballistics analyses. Defendants' Ex. 11 (Three Prosecutors' Rep. at 468-473). In sum, the Court finds that the Three Prosecutors' Report falls under the Rule 803(8)(A)(iii) exception and that Plaintiffs have failed to meet their burden of showing that it is not trustworthy. Not only do Plaintiffs fail to offer any valid reasons as to why the Three Prosecutors' Report is untrustworthy, but the fact that the prosecutors affirmed their findings, even after they were subject to "all manner of intimidation, threats, insults, and attacks on [their] dignity and [their] lives" for "fail[ing] to present the conclusions that would have been politically expedient for the government," suggests that the Report is the product of an impartial investigation and sufficiently trustworthy. Defendants' Ex. 102 (Ltr. from Three Pros. to Inter-American Commission on Human Rights at 252-256).

### B.    Military and other Bolivian Government Reports

Defendants also rely extensively on military and other Bolivian government reports. <u>See</u> Defendants' Ex. 15 (Police Intelligence Rep.); Defendants' Ex. 32 (Social Conflict Field Diary); Defendants' Ex. 33 (Military Intelligence Rep.); Defendants' Ex. 35 (Police Rep.). Plaintiffs argue that these documents are hearsay and may not be considered. CSMF ¶ 45. Defendants assert that the documents are admissible under either the Rule 803(6) business records exception, the Rule 803(8) public records exception, or the Rule 807 residual exception. Reply SMF ¶¶ 45, 83, 120. As discussed below, the Court finds that these military and police reports are hearsay and are not admissible under the exceptions listed in either Rule 803 or 807.

First, Defendants half-hearted argument that the military reports—Defendants'
Exhibits 32 and 33—are admissible under the Rule 803(6) business records exception
warrants little discussion.  Rule 803(6) permits the introduction of certain business
records if kept in the course of a regularly conducted business activity and if it was the
regular practice of that business activity to make the record.  Fed. R. Evid. 803(6).  But
Rule 803(6) requires that a proper foundation be laid for the admission of business
records.  See Fed. R. Evid. 803(6)(D); United States v. Garnett, 122 F.3d 1016, 1018-
19 (11th Cir. 1997) (per curiam) ("Fed. R. Evid. 803(6) requires the testimony of a
custodian or other qualified witness who can explain the record-keeping procedure
utilized.").  Defendants have not submitted the affidavit of "a custodian or other qualified
witness" and there is no indication they can offer any such testimony at trial.[27]  Thus,
the military and police reports are admissible, if at all, only under the Rule 803(8) public
records exceptions[28] or the Rule 807 residual exception.

As noted above, under Rule 803(8), a record or statement of a public office is not
excluded as hearsay if it sets out either "a matter observed while under a legal duty to
report" or "factual findings from a legally authorized investigation" and the opponent
does not show that the record or statement, or other circumstances, indicate a lack of
trustworthiness.  In contrast with the Three Prosecutors' Report discussed above, none
of the military and police reports relied upon by Defendants appear to set out "factual

---

[27] Even assuming a proper foundation had been laid, the military and other Bolivian government
reports would still be inadmissible under the business records exception because, as discussed below,
Plaintiffs have shown that the reports are not trustworthy.  See Fed. R. Evid. 803(6)(E).

[28] The Rule 803(8) public records exception does not require foundational testimony as a
predicate for admission.  See United States v. Loyola-Dominguez, 125 F.3d 1315, 1318 (9th Cir. 1997)
("[T]he public records exception is one of the few hearsay exceptions that does not require a foundation.
Instead, documents that fall under the public records exception are presumed trustworthy, placing the
burden of establishing untrustworthiness on the opponent of the evidence." (internal quotation marks
omitted)).

findings from a legally authorized investigation" as required for admissibility under Rule 803(8)(A)(iii).  Defendants argue, however, that the authors of these reports were legally bound to report the matters described therein, and that the reports are therefore admissible under Rule 803(8)(A)(ii).  But even assuming the existence of a legal duty to report, to fall under Rule 803(8), the matters observed while under that legal duty must be "'based upon the knowledge or observations of the preparer of the report,' as opposed to a mere collection of statements from a witness." United Techs. Corp. v. Mazer, 556 F.3d 1260, 1278 (11th Cir. 2009) (quoting Miller v. Field, 35 F.3d 1088, 1091 (6th Cir. 1994)). "In other words, placing otherwise inadmissible hearsay statements by third-parties into a government report does not make the statements admissible." Id. (brackets and internal quotation marks omitted).  Notably, even if the military and police reports do not "explicitly paraphrase the words of others," they can be hearsay if "the only conceivable explanation" for how the information was obtained was by "listening to the statements of others." United States v. Ransfer, 749 F.3d 914, 925 (11th Cir. 2014) (quoting United States v. Baker, 432 F.3d 1189, 1206 (11th Cir. 2005)).

The military and police reports offered by Defendants do not fall under the Rule 803(8) public records exception because there is no indication that the events described in these reports are based on the personal observations of the preparers of the reports, rather, "the only conceivable explanation" for how the information was obtained was by listening to the hearsay statements of third-parties. See id. Starting with the Police Intelligence Report (Defendants' Ex. 15), the events described in this report are military encounters with civilians on October 12, 2003, and there is no indication that the police,

much less the preparer of the report, were present to personally observe the encounters. Rather, the report repeatedly and expressly conveys what has been reported by third-parties. See Defendants' Ex. 15 (Police Intelligence Rep. at 797) ("[R]ight now, clashes are being reported."); id. at 806 (stating that after soldiers intervened in an incident, "[o]ne person was reported injured as a result"); id. at 807 (Stating that a military contingent "continue[s] to be attacked with dynamite and gunfire, allegedly from Mauser rifles."); id. at 821 (Stating that "[t]here are reportedly four people . . . who have been wounded as a result of all the clashes.").

The other police report relied upon by Defendants (Defendants' Ex. 35) fares no better. Like the Police Intelligence Report, it is clearly based not on the preparer's personal observations, but on the hearsay statements of others. It also describes an encounter between the military—not the police—and civilians, and is expressly based upon the statements of third-party witnesses. See Defendants' Ex. 35 (Police Rep. at 9747) (noting that the report is based in part on "a statement made by Mr. Agustín Sirpa Ortiz, (witness)," that "it was reported that . . . Captain Belmonte declared . . .," and noting the existence of statements from five additional witnesses).

Finally, the military reports—Defendants' Exhibit 32 (Social Conflict Field Diary) and Defendants' Exhibit 33 (Military Intelligence Rep.)—do not fall under the Rule 803(8) public records exception either. The "Social Conflict Field Diary" describes in detail—over the course of approximately forty pages—military operations from September 11, 2003 to October 21, 2003 in a multitude of different locations in Bolivia, yet it is only signed by one person: Brigadier General Miguel Angel Vidaurre Noriega. See Defendants' Ex. 32 (Social Conflict Field Diary at 5354). It is unclear whether

Brigadier General Noriega is the sole preparer of the Social Conflict Field Diary, but regardless, the observations contained therein could not conceivably have been obtained without the statements of third-parties who were actually on the ground in the numerous encounters described.  Similarly, the Military Intelligence Report (Defendants' Ex. 33) is only signed by one person and describes a number of clashes in different areas of Bolivia in October 2003.  There is no attribution as to the source of any of the information described in the Military Intelligence Report, but again, it is safe to say that the this information is not based on the knowledge or observations of the preparer of the report.

As indicated above, Defendants argue that if the Court refuses to admit the military and police reports under Rules 803(6) or 803(8), the Court should admit these exhibits under the Rule 807 residual exception.  Rule 807 provides that, even if a statement fails to fall under an exception in Rule 803 or 804, it is not excluded by the rule against hearsay if:

> (1) the statement has equivalent circumstantial guarantees of trustworthiness;
>
> (2) it is offered as evidence of a material fact;
>
> (3) it is more probative on the point for which it is offered than any other evidence that the proponent can obtain through reasonable efforts; and
>
> (4) admitting it will best serve the purposes of these rules and the interests of justice.

Fed. R. Evid. 807(a).  "Congress intended the residual hearsay exception to be used very rarely, and only in exceptional circumstances, and it applies only when certain exceptional guarantees of trustworthiness exist and when high degrees of probativeness and necessity are present."  United Techs., 556 F.3d at 1279 (brackets,

citations, and internal quotation marks omitted).  The Court cannot find that "equivalent circumstantial guarantees of trustworthiness" exist with respect to the military and police reports.  Defendants argue that the military reports bear "reliability indicia" because they "are signed by their authors and bear the seal of the Bolivian military."  Reply SMF ¶ 45.  But that is far from enough for the Court to find that "exceptional guarantees of trustworthiness exist" with respect to reports prepared by the military concerning highly controversial and highly publicized clashes between the military and civilians that resulted in numerous civilian deaths and led to criminal charges in Bolivia against many former military officers.  The same is true with respect to the police reports.  While Defendants argue that "the police officers had no incentive to provide false information," id. ¶ 83, the fact remains that the police reports concern an exceptionally fraught time in Bolivia with respect to relations between the government and its citizens in general.  Moreover, much of the information in the police reports appears to have originated from the military.

Finally, Defendants argue that if the Court refuses to admit the military and police records under a hearsay exception, it should consider these reports for the non-hearsay purpose of the effect they had on Defendant Lozada and his decision to order military involvement in September and October 2003.  Reply SMF ¶ 45.  The Court agrees that this is a potentially proper non-hearsay purpose for admission of the military and police reports.  But at least at the summary judgment stage, the Court cannot consider the military and police reports for this purpose because there is no evidence in the record showing that Defendant Lozada specifically relied upon any of the military and police

reports being offered by Defendants prior to making any of the decisions at issue in these cases.

### C.   U.S. State Department Cables

Plaintiffs object to Defendants' reliance on five U.S. State Department cables (Defendants' Exs. 1-5) and argue that the cables are hearsay. CSMF ¶ 38. Defendants counter that the cables are admissible under either the Rule 803(6) business records exception, the Rule 803(8) public records exception, or the Rule 807 residual exception. Reply SMF ¶ 38. For many of the same reasons discussed above in connection with the Bolivian military and police reports, the Court finds that the State Department cables are hearsay and are not admissible under the exceptions listed in Rules 803 or 807.

Starting with the business records exception, Defendants have failed to lay a foundation for admission of the State Department cables under Rule 803(6). See Section V.B., supra. The cables also do not fall under the Rule 803(8) public records exception because, like the police and military reports, they are clearly based not on the preparer's personal observations, but on the statements of others. For instance, with respect to the shootings in Warisata in September 2003, the cables do not appear to relay what an embassy official actually observed on the ground, but they simply report the Bolivian military's position—that the military convoy was ambushed—and then note that the "Campesino version is that the security forces fire[d] first at Ilabaya, outside Warisata . . . ." Defendants Ex. 1 (State Department Cable at 27). Many of the cables are also based on media reports, which are obviously themselves hearsay. See, e.g., Defendants Ex. 2 (State Department Cable at 32-34). While the Court does not rule out the possibility that some portions of the State Department cables are based on the

observations of the (unidentified) preparer,[29] these statements are immaterial to the

Court's analysis and are substantially duplicative of other evidence that the Court has

considered, including, *inter alia*, the Three Prosecutors' Report.

Finally, the statements contained in the State Department cables may not be

admitted under the Rule 807 residual exception, albeit for a different reason than the

Bolivian military and police records fail to qualify for admission under Rule 807.

Specifically, the Court finds that while the cables do bear exceptional guarantees of

trustworthiness, they still may not be admitted under the residual exception because

they are not "more probative on the point for which [they are] offered than any other

evidence that the [Defendants] can obtain through reasonable efforts." Fed. R. Evid.

807(a)(3). With respect to trustworthiness, the Court finds it sufficient that the cables

are signed by the then-U.S. Ambassador to Bolivia and identified as Department of

State materials, as the Court agrees with Defendants that the State Department had no

incentive to do anything but report the situation in Bolivia fairly and accurately.

However, as noted above, Rule 807 still requires that, in addition to a showing of

trustworthiness, the proponent show that the document offered is more probative than

any other evidence on the point for which it is offered than the proponent can obtain

through reasonable efforts. Defendants only argue that this is true with respect to the

State Department cables "because the U.S. government denied Defendants' request to

depose the Ambassador." Reply SMF ¶ 38. But Defendants' inability to depose the

Ambassador does not preclude Defendants from attempting to obtain other evidence

concerning the events described in the State Department cables, and indeed,

---

[29] Such as, for instance, information regarding the impact on La Paz of the October 2003
protests.

Defendants have done so in many cases.  Moreover, Defendants have failed to show an inability to reasonably obtain other evidence with respect to any specific point for which they offer a State Department cable, though the Court does not rule out the possibility that Defendants may be able to make such a showing at trial.

              D.     Hayden's Report

       The Court briefly notes that Defendants have moved to exclude the testimony of a number of Plaintiffs' experts, including, most relevant to the instant Motion, Phillip P. Hayden.  See DE 337.  Mr. Hayden reviewed ballistics evidence of the shootings at issue in these cases, conducted witness interviews and site visits, and opines that the decedents in these cases were intentionally shot and killed by members of the Bolivian military.  See DE 337-4 (Report of Phillip P. Hayden).  Defendants contend that Mr. Hayden's testimony is inadmissible, and even if it were admissible, it "cannot alone defeat summary judgment."  DE 342-1 at 23.  The Court will address Defendants' motion to exclude Mr. Hayden's testimony in a separate order, because as explained below, Plaintiffs have put forth sufficient evidence to raise genuine disputes of material fact even without consideration of Mr. Hayden's testimony.

## VI.      DISCUSSION

       The Court will now address the merits of Defendants' summary judgment Motion. As noted above, Defendants make four main challenges to Plaintiffs' claims.  First, Defendants assert that, based on the evidence in the record, a reasonable jury could not conclude that any of the eight decedents' deaths meet the TVPA's definition of an extrajudicial killing.  Second, Defendants say that there is no evidence by which they could be held indirectly liable for decedents' deaths.  Third, Defendants raise an assortment of challenges to the legal viability of Plaintiffs' wrongful death claims.  And

fourth, Defendants assert that the claims of Plaintiffs Sonia Espejo Villalobos and Gonzalo Mamani Aguilar contain various deficiencies.  The Court will consider each point in turn.

### A.   Extrajudicial Killings

#### 1.  Legal Principals

The TVPA provides:

> An individual who, under actual or apparent authority, or color of foreign nation . . . subjects an individual to extrajudicial killing shall, in a civil action, be liable for damages to the individual's legal representative, or to any person who may be a claimant in an action for wrongful death.

TVPA § 2(a)(2).  The statute goes on to define the term "extrajudicial killing" to mean "a deliberated killing not authorized by a previous judgment pronounced by a regularly constituted court affording all the judicial guarantees which are recognized as indispensable by civilized peoples."  Id. § 3(a).  Excluded from the statute's coverage is "any such killing that, under international law, is lawfully carried out under the authority of a foreign nation."  Id.

A deliberated killing, the Eleventh Circuit explained in Mamani III, is one that is "undertaken with studied consideration and purpose."  654 F.3d at 1155.[30]  Liability does not attach, however, if the deaths "could plausibly have been the result of precipitate shootings during an ongoing civil uprising."  Id.  Nor does liability exist if the deaths "are compatible with accidental or negligent shooting (including mistakenly

---

[30] Although the Eleventh Circuit in Mamani III was considering Plaintiffs' extrajudicial killing claims under the ATS, the court looked to the TVPA definition for guidance.  654 F.3d 1148, 1154 (11th Cir 2011).  While extrajudicial killings "are actionable under the TVPA if the killing falls within the statutory definition, and under the ATS if committed in violation of the law of nations," the Eleventh Circuit "assume[d]" for purposes of its decision "that an extrajudicial killing falling within the statutory definition of the TVPA would also likely violate established international law."  Id. at 1154 n.7 (internal quotation marks omitted).  The court noted, though, that "this may not be true under all circumstances."  Id.

identifying a target as a person who did pose a threat to others), individual motivations (personal reasons) not linked to defendants, and so on." Id.

### 2. Application

With the principles set out above in view, the Court now considers whether a reasonable jury could conclude that decedents were victims of extrajudicial killings, as that term is defined by the TVPA. Defendants argue that the record evidence does not support a finding that each of the deaths at issue here were deliberated because there is no evidence of the specific individual who shot each decedent, much less evidence concerning the shooter's intent. Defendants also contend that TVPA liability does not attach because each shooting is compatible with an accidental or negligent shooting. Plaintiffs dispute that evidence identifying the shooter and his state of mind is required, and assert that the deliberated nature of each killing is shown by the evidence that the deaths at issue resulted from implementation of Defendants' plan to use military force to kill civilians. Plaintiffs also say that the circumstances of each death at least raise a genuine dispute about whether each killing was intentional, as opposed to accidental or negligent.

The Court concludes that Plaintiffs have presented sufficient evidence to raise a jury question as to whether decedents' deaths were extrajudicial killings under the TVPA. First, a reasonable jury, considering the evidence of Defendants' plan to kill civilians to quash public opposition to their policies, could find that decedents' deaths were deliberated because they were the expected and desired outcome of this plan. Given the totality of the evidence in this case, this is not, as Defendants contend, a speculative inference. Rather, it is a reasonable inference that can be drawn from the

evidence of: (1) changes in Bolivian military doctrine during Defendant Lozada's administration to define protesters as subversives who could be targeted with military force; (2) a pattern of soldiers being ordered to shoot unarmed civilians in multiple different locations, including each location where decedents were killed, on multiple different dates; (3) a pattern of soldiers shooting indiscriminately at civilians at times when witnesses saw no armed protesters or anything indicating that the soldiers were firing defensively; (4) Defendants' repeated refusal to seriously commit to achieving peaceful, negotiated solutions to protests; and (5) consistent with Defendants' plan, the utilization of troops from eastern Bolivia. From this evidence, the Court must, at the summary judgment stage, draw all reasonable inferences in the light most favorable to Plaintiffs. And in so doing, the Court finds that there is a genuine dispute as to whether the deaths at issue here resulted from the implementation of Defendants' plan.

The Court is satisfied that a showing that decedents' deaths resulted from implementation of Defendants' plan is sufficient to show that these were deliberated killings under the TVPA. Plaintiffs need not, as Defendants argue, identify the specific soldier who fired each lethal shot and introduce evidence regarding what that soldier was "doing, seeing, hearing, . . . processing," or thinking at the time of the shooting. See DE 342-1 at 18. As Plaintiffs note, superior officers are consistently held liable under the TVPA for the acts of their subordinates, whether the subordinates can be identified or not. See, e.g., Hilao v. Estate of Marcos, 103 F.3d 767, 776-79 (9th Cir. 1996); Tachiona v. Mugabe, 234 F. Supp. 2d 401, 420-23 (S.D.N.Y. 2002), aff'd in part & rev'd in part on other grounds sub nom. Tachiona v. United States, 386 F.3d 205 (2d

Cir. 2004); <u>Mushikiwabo v. Barayagwiza</u>, 1996 WL 164496 (S.D.N.Y. Apr. 9, 1996);
<u>Xuncax v. Gramajo</u>, 886 F. Supp. 162, 172-73 (D. Mass. 1995).

To be sure, Plaintiffs must show that decedents were intentionally killed by the
Bolivian military.  But that intent need not necessarily be shown with evidence regarding
each individual shooter's state of mind.  Rather, it can be inferred by proof that
decedents' deaths resulted from the implementation of Defendants' plan to use military
force to kill unarmed civilians.  This approach is consistent with cases recognizing that
individualized targeting is not required to make out a claim under the TVPA's definition
of extrajudicial killing.  <u>See, e.g.</u>, <u>Owens v. Republic of Sudan</u>, 864 F.3d 751, 770 (D.C.
Cir. 2017) (holding that state-sponsored terrorist bombings "were deliberated in that
they involved substantial preparation, meticulous timing, and coordination across
multiples countries"); <u>Flanagan v. Islamic Republic of Iran</u>, 190 F. Supp. 3d 138, 163
(D.D.C. 2016) (state-sponsored terrorist bombings were deliberated due to the
"coordination and planning required to carry them out"); <u>Jaramillo v. Naranjo</u>, 2014 WL
4898210, at \*13 (S.D. Fla. Sept. 14, 2014) (evidence that defendant's paramilitary group
targeted members of a particular political group sufficient so long as decedent was a
member of that group).[31]

Having found the existence of a genuine dispute regarding whether the deaths at
issue here were deliberated, the Court turns next to whether Plaintiffs have presented
sufficient evidence to raise jury questions as to: (1) whether decedents were killed by a
member of the Bolivian military; and (2) whether the killings were incompatible with

---

[31] <u>Owens v. Republic of Sudan</u>, 864 F.3d 751 (D.C. Cir. 2017), and <u>Flanagan v. Islamic Republic
of Iran</u>, 190 F. Supp. 3d 138 (D.D.C. 2016), were decided under the Foreign Sovereign Immunities Act
(FSIA), which waives a foreign states' immunity from suit in cases seeking money damages "against a
foreign state for personal injury or death that was caused by" <u>inter alia</u> "extrajudicial killing."  28 U.S.C. §
1605A(a)(1).  The FSIA utilizes the TVPA's definitions of extrajudicial killing.  <u>See id.</u> § 1605A(h)(7).

accidental or negligent shootings, "precipitate shootings during an ongoing civil uprising," and shootings based on "individual motivations . . . not linked to defendants." Mamani III, 654 F.3d at 1155. The Court finds that Plaintiffs' evidence concerning the circumstances of decedents' deaths and the actions of troops in each location at the time of the deaths is sufficient to create a genuine dispute on these issues.

As an initial matter, the Court rejects Defendants' contention that "Plaintiffs' inability to produce sufficient evidence to show that only military in the area [where decedents were killed] were shooting should end the inquiry." DE 342-1 at 18. In order for Plaintiffs to show that decedents were intentionally killed by the military, Plaintiffs need not necessarily show that only the military was shooting in the areas where decedents were killed. Even though there is evidence in this case that, in certain of the areas where decedents were killed, there was an isolated shot at the military or, in other locations, a more substantial clash between the military and armed protesters, this does not foreclose a jury from reasonably finding that decedents were intentionally killed by the military—as opposed to by an armed protester, a member of the military who believed he was shooting at an armed protester, or a member of the military who was shooting at an armed protester but accidentally or negligently struck one of the decedents. A jury could reasonably make this determination by weighing the evidence of, on the one hand, the proximity of decedents' deaths to any armed conflict and the nature of same and, on the other hand, the evidence of the location and actions of troops in relation to where decedents were shot. For instance, a jury could reasonably find, by a preponderance of the evidence, that a decedent was intentionally killed by the military—notwithstanding evidence showing an isolated shot at the military a significant

43

distance away from the killing and at an earlier point in time—because of evidence that troops were ordered to shoot, and did shoot, indiscriminately at civilians in the immediate vicinity of the decedent at the time of his or her death and an absence of evidence of armed protesters in the area.

Sufficient evidence to make such a finding exists with respect to each decedent. For instance, while there is evidence that the military convoy in Warisata was fired upon from the hills on September 20, 2003, there is also evidence that troops indiscriminately shot at civilians, into houses, and at windows in this area when they were no longer facing any armed opposition.  A jury could certainly consider this evidence, the evidence of the distance between Decedent Marlene Mamani's home and the location of the earlier clash between the military and armed protesters, and the evidence of troop movement outside of Decedent Marlene Mamani's home at the time of her death, and reasonably conclude that she was intentionally killed by the Bolivian military while looking out the window of her home.

Similarly, with respect to the decedents killed in El Alto on October 12, 2003, while there is some evidence of violent acts committed by protesters on this day, there is also evidence that troops indiscriminately shot at unarmed civilians—and were not being fired upon by armed protesters when doing so—in the locations where Decedent Ayala, Decedent Teodosia Mamani, Decedent Lucero, and Decedent Cutipa were killed. Additionally, for Decedent Ayala, a jury could also find that he was intentionally killed by the military based on the evidence that a witness saw a man dressed similar to Decedent Ayala shot near several soldiers.[32]  And although Decedent Teodosia

---

[32] Any discrepancies in appearance between Decedent Ayala and the man who was witnessed being shot may impact how the jury weighs this evidence, but do not impact the Court's determination

Mamani was shot through the wall of her home, a jury could still find that this was not an accidental or negligent shooting because it resulted from the implementation of Defendants' plan to kill civilians.  There is evidence that this plan was implemented by soldiers shooting indiscriminately in areas with high concentrations of civilians, and a jury could reasonably find that the death of a civilian due to a shot fired through the wall of a home was the expected and desired outcome of this plan.

Finally, there is also sufficient evidence that the decedents killed on October 13, 2003 in the Southern Zone of La Paz—Decedent Arturo Mamani, Decedent Roque, and Decedent Márquez—were intentionally killed by the Bolivian military.  Plaintiff Gonzalo Mamani Aguilar was present at the location where his father, Decedent Arturo Mamani, and Decedent Roque were shot.  Mr. Mamani Aguilar testified that the military was firing towards him and shooting in different directions when Decedent Arturo Mamani and Decedent Roque were shot and killed.  While Defendants have submitted evidence that a soldier was shot on October 13 in a different location, there is no evidence that there were armed protesters in the location where Decedent Arturo Mamani and Decedent Roque were at the time they were shot.  The same is true with respect to the shooting of Decedent Márquez in Ovejuyo on October 13.  Defendants' evidence of violence in other locations on this day does not create a genuine dispute that soldiers were indiscriminately shooting at unarmed civilians in Ovejuyo.  Moreover, an eyewitness places several soldiers—shooting "in all directions" —in the immediate vicinity of Decedent Márquez when he was shot, and Defendants have introduced no evidence of armed protesters in Ovejuyo at this time.

---

that Plaintiffs have shown the existence of a genuine dispute.  See Anderson, 477 U.S. at 249 ("[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.").

In sum, based on the evidence regarding the facts and circumstances of each shooting, a jury could reasonably conclude that each decedent was killed by a member of the Bolivian military and that the shootings were not accidental or negligent, "precipitate shootings during an ongoing civil uprising," or shootings based on "individual motivations . . . not linked to defendants." Mamani III, 654 F.3d at 1155.

### B.   Defendants' Secondary Liability

It is firmly established that the TVPA "contemplates liability against officers who do not personally execute the torture or extrajudicial killing." Mohamad v. Palestinian Auth., 566 U.S. 449, 458 (2012); see also Doe v. Drummond Co., 782 F.3d 576, 607 (11th Cir. 2015) ("[S]ince domestic law sets the standards for the TVPA, secondary or indirect theories of liability recognized by U.S. law are available for claims brought under the TVPA."), cert. denied, 136 S. Ct. 1168 (2016).   Plaintiffs seek to hold Defendants indirectly liable for decedents' deaths on three grounds.   Plaintiffs focus, first and foremost, on the doctrine of command responsibility.   Plaintiffs also invoke, but place minimal reliance on, theories of agency and conspiracy.

### 1.   Command Responsibility

The TVPA permits suits "against commanders under the international law doctrine of command responsibility." Ford ex rel. Estate of Ford v. Garcia, 289 F.3d 1283, 1286 (11th Cir. 2002).   That doctrine "makes a commander liable for acts of his subordinates, even where the commander did not order those acts, when certain elements are met." Id.   There are three essential elements of command responsibility liability:

> (1) the existence of a superior-subordinate relationship between the commander and the perpetrator of the crime; (2) that the commander

knew or should have known, owing to the circumstances at the time, that his subordinates had committed, were committing, or planned to commit acts violative of the law of war; and (3) that the commander failed to prevent the commission of the crimes, or failed to punish the subordinates after the commission of the crimes.

Id. at 1288.[33]  Defendants' motion for summary judgment focuses only on the first element.[34]

To establish a superior-subordinate relationship, Plaintiffs must demonstrate "that Defendants had 'effective control' over the Bolivian soldiers" who killed decedents. Mamani IV, 21 F. Supp. 3d at 1376 (quoting Ford, 289 F.3d at 1291).  The Eleventh Circuit has explained that "[t]he concept of effective *control* over a subordinate [is] the sense of a material ability to prevent or punish criminal conduct, however that control is

---

[33] The Eleventh Circuit has yet to address whether the command responsibility doctrine includes an element of proximate causation.  See Ford ex rel. Estate of Ford v. Garcia, 289 F.3d 1283, 1293-94 (11th Cir. 2002).  At least two courts of appeals and one judge of the Eleventh Circuit have concluded that a showing of proximate causation is not required.  See id. at 1298-99 (Barkett, J., concurring); Chavez v. Carranza, 559 F.3d 486, 499 (6th Cir. 2009); Hilao v. Estate of Marcos, 103 F.2d 767, 774, 776-79 (9th Cir. 1996).  Defendants did not raise the issue in their motion for summary judgment, and so the Court need not address it at this juncture.

[34] Defendants also briefly raise two general objections to application of the command responsibility doctrine.  Both lack merit.

*First*, Defendants assert that the command responsibility doctrine does not apply to civilian leaders outside of an armed conflict as defined by international law.  See DE 342-1 at 26 n.6 (citing Guénaël Mettraux, The Law of Command Responsibility 97 (2009) ("Mettraux")).  The Eleventh Circuit has rejected this argument.  See Doe v. Drummond Co., 782 F.3d 576, 610 (11th Cir. 2015) (holding, in the context of a non-wartime case, that "a civilian superior—including a civilian corporate officer—could *feasibly* be held liable" under the command responsibility doctrine), cert. denied, 136 S. Ct. 1168 (2016); see also Mamani IV, 21 F. Supp. 3d 1353, 1376 (S.D. Fla. 2014) (Concluding that the command responsibility doctrine "applies not only in 'wartime,' but also in 'peacetime.'" (quoting Hilao, 103 F.3d at 777)); Doe I v. Qi, 349 F. Supp. 2d 1258, 1330-31 (N.D. Cal. 2004) (Observing that the TVPA's text "does not limit its applicability to acts of military officials or the context of war," and its legislative history "implicitly endorsed the application of command responsibility to acts of torture and extrajudicial killings whether committed by military or civilian forces.").

*Second*, Defendants say that the command responsibility doctrine recognizes a more stringent knowledge requirement for military commanders than it does for their civilian counterparts.  It is indeed so that the Rome Statute of the International Criminal Court, July 17, 1998, 2187 U.N.T.S. 90, requires proof that a military commander "knew or, owing to the circumstances at the time, should have known" about his subordinates' crimes, but only allows liability for civilian commanders who "knew, or consciously disregarded information which clearly indicated" that their subordinates were committing crimes.  Id. art. 28(a)(1), (b)(1).  The Eleventh Circuit's decision in Doe recognized command responsibility liability for civilians without holding that a separate knowledge standard should exist for civilian commanders.  See 782 F.3d at 609-10.  Defendants do not attempt to distinguish Doe.

exercised." Ford, 289 F.3d at 1290 (quoting Prosecutor v. Delalic (Appeals Chamber
ICTY, Feb. 20, 2001) ¶ 256).  "[A] showing of the defendant's actual ability to control the
guilty troops is required as part of the plaintiff's burden under the superior-subordinate
prong of command responsibility, whether the plaintiff attempts to assert liability under a
theory of *de facto* or *de jure* authority."  Id. at 1291.[35]  A defendant's "*de jure* authority . .
. over the troops who perpetrated the underlying crime is *prima facie* evidence of
effective control."  Id.

Applying these principles, the Court concludes that a reasonable jury could find
that Defendants had both *de jure* and *de facto* authority to effectively control the troops
that are alleged to have shot and killed Plaintiffs' decedents.

a.      Defendant Lozada

As President, Defendant Lozada was Captain General of the Armed Forces.  The
Bolivian Constitution in effect in 2003 provided that "[t]he Armed Forces are subordinate
to the President of the Republic and receive their orders administratively through the
Minister of Defense, and in technical matters, from the Commander in Chief."
Defendants' Ex. 10 (Bol. Const. art. 210)).  The Organic Law vested in the President the

---

[35] A *de jure* superior-subordinate relationship exists for purposes of the command responsibility
doctrine when "the superior has been appointed, elected or otherwise assigned to a position of authority
*for the purpose of commanding or leading* other persons who are thereby to be legally considered his
subordinates."  Mettraux 139.  A formal title or position of authority is insufficient to establish a superior-
subordinate relationship; rather, "any inference concerning the relationship of subordination" must be
"accompanied by the powers and authority normally attached to such a role."  Id. at 141.  A defendant in a
position of *de jure* authority exercises effective control over his subordinates when he "was effectively
able to enforce his legal authority through the exercise of his legal powers over the perpetrators."  Id. at
174.
        A *de facto* superior-subordinate relationship exists under the command responsibility doctrine
when "one party—the superior—has acquired over one or more people enough authority to prevent them
from committing crimes or to punish them when they have done so."  Id. at 142-43.  A *de facto* superior
must be (1) "cognizant of his position vis-à-vis other persons whose conduct he is responsible for," and
(2) "aware of the duties which his relationship with another person, or group of persons, implied for him
(in particular, a duty to prevent and punish crimes) and must have accepted this role and responsibility,
albeit implicitly."  Id. at 145.

power to address domestic unrest.  See Defendants' Ex. 36 (Organic Law art. 8).
Operational coordination of the military was accomplished by the Commander in Chief,
an entity defined by the Organic Law as "the highest Command and Decision-making
body of a technical/operating nature, for the permanent coordination and direction of the
Armed Forces."  Id. art 36.  One member of that body—also given the title Commander
in Chief—received his orders directly from the President.  Id. art 39.

          According to Defendants, the Bolivian Constitution and the Organic Law's textual
commitments of power to the President were all form but little substance.  The
President, Defendants say, could only issue general orders.  Because the
operationalization of the President's orders could only be achieved by the Commander
in Chief, it follows (as Defendants would have it) that the President lacked effective
control over the soldiers on the ground during the events at issue in these cases.

          The Court disagrees.  A reasonable jury could conclude, based on Defendant
Lozada's legal powers as President and the manner in which he exercised those
powers, that he had effective control over the Armed Forces.  As detailed above, the
orders issued by Defendant Lozada to the Commander in Chief—namely, the
September 20, 2003 decree directing the military into Warisata and Supreme Decree
27209 issued on September 11, 2003—led directly to orders by the Commander in
Chief—specifically, Directive 27/03 on September 20 and Directives 33/03 and 34/03 on
October 12—that in turn produced the military action resulting in the alleged
extrajudicial killings of Plaintiffs' decedents.  This action aligned closely with
Defendants' previously-formulated plan to violently suppress opposition to their political
agenda.  Thus, especially when considered in connection with the other evidence in this

case suggesting that Defendants deliberately put their plan in motion once in power, including, *inter alia*, the changes in military policy relating to civil disobedience (*i.e.*, the "Manual on Use of Force" and the Republic Plan), a reasonable inference can be drawn that Defendant Lozada used his authority as President to direct the Armed Forces to implement the military operations that led to decedents' deaths. And because such an inference can made with regard to Defendant Lozada's orders, it follows that he could have taken similar actions to prevent the alleged criminal conduct.

While Defendant Lozada's ability to prevent the military's criminal conduct is enough on its own to establish a superior-subordinate relationship,[36] the Court is of the view that Plaintiffs have also created a genuine dispute of material fact as to whether Defendant Lozada had the ability to punish guilty troops. Defendants insist that "any investigation or prosecution of guilty troops would have occurred through the military justice process, or in civilian courts, at the request of the Office of the Chief Prosecutor, *i.e.*, the Attorney General, which is independent from the executive branch." DE 342-1 at 28. But Defendants cite no Bolivian legal sources for this proposition. Instead, they point to a May 2003 report by the Organization of American States and a 2003 U.S. State Department report on human rights practices in Bolivia. See SMF ¶ 184 (citing Defendants' Ex. 7 (OAS Rep. at 90) and Defendants' Ex. 16 (U.S. State Dep't Rep. on Human Rights Practices—2003 at 3432, 3425). Neither report says anything about the President's independence from the Office of the Chief Prosecutor. Plaintiffs, on the other hand, note that Defendant Lozada testified in his deposition that, on several

---

[36] The Court notes in this regard that the Eleventh Circuit's articulation of the effective control standard is phrased in the disjunctive—effective control refers to "the sense of a material ability to prevent *or* punish criminal conduct." Ford, 289 F.3d at 1290 (emphasis added).

occasions in September and October 2003, he appointed special prosecutors to investigate reports of unarmed civilians being shot by the military.[37]

        b.       Defendant Berzaín

As noted above, under the Bolivian Constitution in force in 2003, the Armed Forces "receive[d] their orders administratively through the Minister of Defense." Defendants' Ex. 10 (Bol. Const. art. 210). Additionally, the Organic Law vested the Minister of Defense with authority to "plan, organize, direct and supervise Civil Defense in the National Territory." Defendants' Ex. 36 (Organic Law, Article 22). Defendants describe the Minister of Defense as little more than an administrative figurehead, lacking any meaningful authority—legal or otherwise—to control military operations.

The record evidence tells a different story. As detailed above, Defendant Berzaín played a hands-on role in the planning and implementation of the events of September 20, 2003 and October 12 and 13, 2003. With regard to the September 20 events, it was Defendant Berzaín who—having traveled to Sorata with Defendant Lozada's authorization—rejected a compromise with community leaders in favor of a military alternative, saying that he would remove the tourists from Sorata "the good way or the bad way." Plaintiffs' Ex. N (García Decl. ¶¶ 9-10); Plaintiffs' Ex. RR (Lozada Dep. Tr. 216:7-18); Plaintiffs' Ex. VV (Berzaín Dep. Tr. 122:11-13). Defendant Berzaín then ordered military officers to look for bus drivers to transport the tourists. Id. ¶ 15. Later, as the military convoy escorted the tourists from Sorata to La Paz, by way of Warisata,

---

[37] See Plaintiffs' Ex. RR (Lozada Dep. Tr. 265:7-14) ("[Q.] Did you talk at that meeting at all about the death of unarmed civilians?  A. . . . [W]hat we were informed is that I had ordered that there be special prosecutors outside of the special prosecutors that accompany the armed forces and the police."); id. at 285:1-13 ("[Q. W]hile you were President of Bolivia . . . did you receive any reports of unarmed civilians shot by the Bolivian military?  A. I received reports of civilians killed . . . . [W]hile I was President there was three—at my request, three special prosecutors appointed to look at all these circumstances . . . . ").

51

Defendant Berzaín spoke on the phone with Defendant Lozada just before Defendant Lozada issued an order to the acting Commander in Chief of the Armed Forces directing the use of "necessary force" to restore order in Warisata.  See ▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮

And with regard to the events of October 12 and 13, Defendant Berzaín played a key role in organizing the operation to use the military to transport gas from the Senkata gas plant to La Paz.  On the evening of October 10, Defendant Berzaín held a meeting at the Ministry of Defense with top military officers and leaders from the La Paz Gas Stations Association.  Plaintiffs' Ex. O (Loza Decl. ¶¶ 12-13, 15-16).  It was at that meeting that Defendant Berzaín not only nodded in response to—and, a jury could reasonably conclude, approved—a general's proposal to use the military to transport gasoline, but also was present as the operation was planned.  Id. ¶ 22.  And the following day, Supreme Decree 27209 directed Defendant Berzaín to "establish the mechanisms necessary" for the Armed Forces to execute its mission to transport gas from Senkata to La Paz.  Defendants' Ex. 6 (Supreme Decree No. 27209 at 71).

Although Defendant Berzaín's actions are open to some interpretation, Plaintiffs have adduced sufficient evidence by which a reasonable jury could conclude that Defendant Berzaín exercised such control over the Bolivian Armed Forces that he was complicit in the extrajudicial killings of decedents.  Defendant Berzaín's role in planning and executing the operations of September 20 and October 12 and 13 indicate that he could have prevented the actions of any guilty troops.[38]

---

[38] There is also the potential that a reasonable jury could find that Defendant Berzaín had the ability to punish guilty troops.  As Minister of Defense, he was one of the six Bolivian authorities involved in the "final investigatory phase" of military justice matters.  Defendants' Ex. 38 (Organic Law art. 28).

\*          \*          \*

That a reasonably jury could hold Defendants liable under the doctrine of command responsibility will not result in "strict liability akin to respondeat superior for national leaders at the top of the long chain of command in a case like this one." Mamani III, 654 F.3d at 1154.  For one thing, the Eleventh Circuit made that observation in the course of dismissing Plaintiffs' *prior* complaint as insufficiently pleaded.  That complaint presented no plausible allegations tying Defendants (or anyone, for that matter) to decedents' deaths.  See id. at 1155 ("Plaintiffs have not pleaded facts sufficient to show that anyone—especially *these defendants*, in their capacity as high-level officials—committed extrajudicial killings within the meaning of established international law.").   Now, after a new round of pleading and nearly a year of discovery, Plaintiffs have adduced evidence showing that—even before taking office—Defendants formulated a plan to use lethal force to kill civilians in an effort to quell opposition to their political agenda.  Based on the alignment of Defendants' plan with the events of September 20, 2003 and October 12 and 13, 2003—together with other evidence detailed above—a reasonable jury could conclude the Bolivian military committed extrajudicial killings under the TVPA and that Defendants, having a superior relationship to the soldiers who committed those killings, should be held liable under the doctrine of command responsibility.  Finding Defendants liable on the present record would therefore not amount to the form of strict liability turned away by the Eleventh Circuit in Mamani III.[39]

---

[39] Contrary to Defendants' suggestion, see DE 384 at 26, these cases are not like Belhas v. Ya'alon, 515 F.3d 1279 (D.C. Cir. 2008).  In Belhas, the D.C. Circuit held that a complaint brought against a retired general of the Israeli Defense Forces was properly dismissed for failing to meet the jurisdictional prerequisites contained in the FSIA.  In reaching that conclusion, Belhas held that the FSIA does not

2.  Conspiracy

Defendants can be held indirectly liable by means of conspiracy if Plaintiffs

establish the following three elements:

> (1) two or more persons agreed to commit a wrongful act, (2) [Defendants] joined
> the conspiracy knowing of at least one of the goals of the conspiracy and
> intending to help accomplish it, and (3) one or more of the violations was
> committed by someone who was a member of the conspiracy and acted in
> furtherance of the conspiracy.

Cabello v. Fernández-Larios, 402 F.3d 1148, 1159 (11th Cir. 2005) (per curiam) (citing

Halberstam v. Welch, 705 F.2d 472, 481, 487 (D.C. Cir. 1983)).  The record evidence

compels the conclusion that a reasonable jury could find Defendants indirectly liable

under a theory of conspiracy.  A genuine dispute of material fact exists as to whether

Defendants entered into an agreement to kill civilians in order to further their political

---

recognize a *jus cogens* exception to a foreign state's immunity from the jurisdiction of American courts.
Id. at 1286-88.  A *jus cogens* norm "is a norm accepted and recognized by the international community of
states as a whole as a norm from which no derogation is permitted and which can be modified only by a
subsequent norm of general international law having the same character."  Id. at 1286 (quoting Siderman
de Blake v. Republic of Argentina, 965 F.3d 699, 714 (9th Cir. 1992)).
     In a concurring opinion, Judge Williams explained that, aside from the question of whether the
FSIA carves out an exception for violations of *jus cogens* norms, the allegations contained in plaintiffs'
complaint did not amount to such a violation.  See id. at 1293 (Williams, J., concurring).  "While plaintiffs
characterize this conduct as violating both international and Israeli law," Judge Williams noted, "they point
to no case where similar high-level decisions on military tactics and strategy during a modern military
operation have been held to constitute torture or extrajudicial killing under international law or under the
Torture Victim Protection Act."  Id. (citations omitted).  In Mamani III, the Eleventh Circuit quoted part of
this sentence from Judge Williams' concurrence.  See 654 F.3d at 1293 ("[Plaintiffs] point to no case
where similar high-level decisions on military tactics and strategy during a modern military operation have
been held to constitute . . . extrajudicial killing under international law." (alterations in original) (quoting
Belhas, 515 F.3d at 1155 (Williams, J., concurring))).
     Defendants invoke Judge Williams' concurrence in an attempt to defeat command responsibility
liability.  See DE 384 at 22.  But Belhas and Mamani III dealt not with liability but with a predicate
question, namely, whether or not the conduct alleged amounted to an extrajudicial killing under
international law.  Here, by contrast, the Court has concluded that a reasonable jury could find that
Plaintiffs' decedents were victims of extrajudicial killings.  Extrajudicial killings are clear violations of both
the TVPA and *jus cogens* norms.  See TVPA § 3(a); Restatement (Third) of Foreign Relations Law of the
United States § 702 cmt. f (1987) ("[I]t is a violation of international law for a state to kill an individual
other than as lawful punishment pursuant to conviction in accordance with due process of law, or as
necessary under exigent circumstances, . . . or to prevent serious crime."); see also, e.g., Yousuf v.
Samantar, 699 F.3d 763, 778 (4th Cir. 2012) ("this case involves acts that violated *jus cogens norms*,
including . . . extrajudicial killings"); Alejandre v. Republic of Cuba, 996 F. Supp. 1239, 1252 (S.D. Fla.
1997) ("The ban on extrajudicial killing thus rises to the level of *jus cogens*, a norm of international law so
fundamental that it is binding on all members of the world community.").

agenda. See Plaintiffs' Ex. H (Canelas Decl. ¶¶ 4-7). This evidence satisfies the first

two elements of conspiracy liability for summary judgment purposes. And the third

element is met based on the steps Defendants took to implement their plan, including

their deployment of the military on September 20, 2003 and October 12 and 13, 2003.

A reasonable jury could conclude that decedents' extrajudicial killings were a

foreseeable result of Defendants' acts. See Cabello, 402 F.3d at 1159-60 (TVPA

defendant properly held liable for torture and extrajudicial killing that was a foreseeable

result of conspirators' agreement); Halberstam, 705 F.2d at 481 ("As to the extent of

liability, once the conspiracy has been formed, all its members are liable for injuries

caused by acts pursuant to or in furtherance of the conspiracy. A conspirator need not

participate actively in or benefit from the wrongful action in order to be found liable. He

need not even have planned or known about the injurious action, . . . so long as the

purpose of the tortious action was to advance the overall object of the conspiracy.").

### 3. Agency

Agency law is recognized as an available theory of indirect liability in TVPA

cases. See Doe, 782 F.3d at 607; Chowdhury v. Worldtel Bangladesh Holding, Ltd.,

746 F.3d 42, 52 (2d Cir. 2015). Whether express or implied, common law agency

requires (1) consent to the agency by both the principal and the agent, and (2) the

control of the agent by the principal. Commodity Futures Trading Comm'n v. Gibraltar

Monetary Corp., 575 F.3d 1180, 1189 (11th Cir. 2009) (per curiam).

A reasonable jury could find that, based on Defendants' positions at the top of

the Bolivian military hierarchy, Defendants' longstanding plan to kill civilians, and the

orders given by Bolivian military officers to kill civilians, decedents' deaths at the hands

of the Bolivian military were committed by soldiers who had consented to an agency relationship with Defendants.  Defendants respond that consent was lacking because the identity of the perpetrators of decedents' deaths remains a mystery.  But as the Court explained above, a reasonable jury could conclude that decedents were deliberately killed by members of the Bolivian military who were implementing Defendants' plan.

The Court further holds that the record contains sufficient evidence of control.  This conclusion follows *a fortiori* from the Court's effective control analysis under the command responsibility doctrine.  Because a reasonable jury could find that Defendants possessed effective control under that doctrine, a similar finding of substantial control for purposes of common-law agency could also be made.[40]  Defendants concede as much in their briefing.  See DE 342-1 at 30; DE 384 at 22.

### C.    State-Law Claims

Florida resolves conflict-of-laws questions according to the "most significant relationship" test outlined in the Restatement (Second) of Conflict of Laws.  See Michel v. NYP Holdings, Inc., 816 F.3d 686, 694 (11th Cir. 2016); Mamani II, 2009 WL 10664387, at *23.  In determining the most significant relationship, courts are to consider "(a) the place where the injury occurred, (b) the place where the conduct causing the injury occurred, (c) the domicil, residence, nationality, place of incorporation

---

[40] Plaintiffs also assert that an agency relationship could also exist through ratification.  See GDC Acquisitions LLC v. Gov't of Belize, 849 F.3d 1299, 1308 (11th Cir. 2017) ("While only interactions that are within the scope of an agency relationship affect the principal's legal position, the principal may also ratify his agent's *unauthorized* actions, thus becoming bound by their legal consequences." (brackets, citation, and internal quotation marks omitted)).  The only evidence Plaintiffs cite to support ratification is testimony of General Roberto Claros Flores at the Trial of Responsibilities explaining that Defendant Lozada took responsibility for the events of September and October 2003.  See DE 342 at 31 (citing CSMF ¶ 299).  For the reasons explained in a separately filed order, the Court concludes that General Flores' Trial of Responsibilities testimony is inadmissible.  Plaintiffs' ratification argument must accordingly be rejected.

and place of business of the parties, and (d) the place where the relationship, if any,

between the parties is centered." Bishop v. Florida Specialty Paint Co., 389 So. 2d 999,

1001 (Fla. 1980) (quoting Restatement (Second) of Conflict of Laws § 145(2) (1971)).

All four of these factors lean heavily toward applying Bolivian law, as the parties

concede.  The decedents were Bolivian citizens killed in Bolivia, allegedly by the

Bolivian Armed Forces; and Plaintiffs are all Bolivian citizens, as were Defendants at the

time of the events at issue in this case.  The Court therefore holds that Bolivian law

provides the substantive law for Plaintiffs' wrongful death claims.

Defendants assert that a number of legal barriers foreclose Plaintiffs' wrongful

death claims.  First, Defendants say that Plaintiffs' claims are preempted by the TVPA.

Second, Defendants assert that Bolivian law does not recognize indirect liability in this

context.  And third, Defendants argue that even if Plaintiffs' wrongful death claims were

otherwise viable, they are precluded due to the criminal charges pending in Bolivia at

the time of the inception of this action.

1.  Preemption

a.      Field Preemption

The Constitution's Supremacy Clause provides that federal law "shall be the

supreme Law of the Land; and the Judges in every State shall be bound thereby, any

Thing in the Constitution or Laws of any State to the Contrary notwithstanding."  U.S.

Const. art VI, cl. 2.  This fundamental principle permits Congress to preempt state law.

See Crosby v. Nat'l Foreign Trade Council, 530 U.S. 363, 372 (2000).  State action

must give way to federal law in at least three circumstances: (1) "by express language

in a congressional enactment," (2) "by implication from the depth and breadth of a

congressional scheme that occupies the legislative field," or (3) "by implication because of a conflict with a congressional enactment." Graham v. R.J. Reynolds Tobacco Co., 857 F.3d 1169, 1186 (11th Cir. 2017) (en banc) (quoting Lorillard Tobacco Co. v. Reilly, 533 U.S. 525, 541 (2001)), cert. denied, 583 U.S. ___, 2018 WL 311345 (Jan. 8, 2018). It is the second form of preemption—commonly known as field preemption—that is at issue in these cases.

Field preemption reflects a congressional judgment "to foreclose any state regulation in the area, irrespective of whether state law is consistent or inconsistent with federal standards." Oneok, Inc. v. Learjet, Inc., 135 S. Ct. 1591, 1595 (2015) (internal quotation marks omitted). It precludes States "from regulating conduct in a field that Congress, acting within its proper authority, has determined must be regulated by its exclusive governance." Arizona v. United States, 567 U.S. 387, 399 (2012). "The intent to displace state law altogether can be inferred from a framework of regulation 'so pervasive . . . that Congress left no room for the States to supplement it' or where there is a 'federal interest . . . so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject.'" Id. (ellipses in original) (quoting Rice v. Santa Fe Elevator Corp., 331 U.S. 218, 230 (1947)). In conducting preemption analysis, courts are to "assume that 'the historic police powers of the States' are not superseded 'unless that was the clear and manifest purpose of Congress.'" Id. at 400 (quoting Rice, 331 U.S at 230). And because the States are "independent sovereigns in our federal system," courts have long presumed that "Congress does not cavalierly pre-empt state-law causes of action." Medtronic, Inc. v. Lohr, 518 U.S. 470, 485 (1996).

Defendants contend that, in passing the TVPA, Congress sought to occupy the field of civil remedies for foreign state-sponsored torture and extrajudicial killings.  Of course, "Congress appeared well aware of the limited nature of the cause of action it established in the [TVPA]."  Mohamad, 566 U.S. at 460.  And while Defendants place great emphasis on the restraint exercised by Congress when it enacted the TVPA, they point to no evidence of a clear and manifest purpose to displace the traditional common-law doctrine permitting State courts to exercise jurisdiction over transitory torts, including torts committed abroad.  See Dennick v. Railroad Co., 103 U.S. 11, 18 (1881) ("Wherever, by either the common law or the statute law of a State, a right of action has become fixed and a legal liability incurred, that liability may be enforced and the right of action pursued in any court which has jurisdiction of such matters and can obtain jurisdiction of the parties."); Cabello, 402 F.3d at 1154 ("[P]rior to the TVPA, this Court could have exercised extraterritorial jurisdiction to reach wrongful death actions involving defendants and locations outside the forum jurisdiction.").  The Court therefore concludes that Plaintiffs' wrongful death claims are not preempted by the TVPA.

b.      Foreign Affairs Doctrine

The foreign affairs doctrine is based on the premise that "at some point an exercise of state power that touches on foreign relations must yield to the National Government's policy, given the 'concern for uniformity in this country's dealings with foreign nations' that animated the Constitution's allocation of the foreign relations power to the National Government in the first place."  American Ins. Ass'n v. Garamendi, 539 U.S. 396, 413 (2003) (quoting Banco Nacional de Cuba v. Sabbatino, 376 U.S. 398, 427, n.25 (1964)).  Where a State acts in an area of its "'traditional competence,'" courts

must consider "the strength of the state interest, judged by standards of traditional practice, when deciding how serious a conflict must be shown before declaring the state law preempted." Id. at 420 (quoting Zschernig v. Miller, 389 U.S. 429, 459 (1968) (Harlan, J., concurring in the result)).

As an initial matter, application of the foreign affairs doctrine is entirely inapt in these cases, as the Court is applying Bolivian law, not Florida law, to Plaintiffs' wrongful death claims. See Doe v. Exxon Mobile Corp., 654 F.3d 11, 70-71 (D.C. Cir. 2011) ("Because Indonesian law applies under District of Columbia choice of law rules, the court need not address Exxon's federal preemption argument regarding District of Columbia and Delaware law."), vacated on other grounds, 527 F. App'x 7 (D.C. Cir 2013).[41] There is simply no state law to be preempted here.

Even if a conflict could exist—even if Florida's interest in entertaining a transitory tort under Bolivian law could somehow implicate foreign policy concerns—the conflict with U.S. foreign policy interests would not be strong enough for Plaintiffs' wrongful death claims to be preempted. Early in this litigation, the Court invited the Departments of Justice and State to file briefs expressing the views of the United States on "the interpretation and application of the Alien Tort Statute and the Torture Victim Protection Act, and the possible foreign policy repercussions" of these cases. DE 60. On October

---

[41] Although the D.C. Circuit later vacated its judgment in Doe v. Exxon Mobile Corp., 654 F.3d 11 (D.C. Cir. 2011), due to intervening changes in governing law, it explicitly reinstated the portion of its prior opinion addressing foreign affairs preemption, see Doe v. Exxon Mobile Corp., 527 F. App'x 7, 7 (D.C. Cir. 2013) (Ordering, "in accordance with this court's opinion issued July 8, 2011, that the judgment of the District Court . . . be reversed as to the dismissal of appellants' non-federal tort claims."). Indeed, on remand the district court followed the D.C. Circuit's holding and rejected Exxon's argument that the Indonesian law claims against it must be dismissed on the basis of the foreign affairs preemption doctrine. See Doe v. Exxon Mobil Corp., 69 F. Supp. 3d 75, 93 (D.D.C. 2014) (Holding that the "foreign affairs preemption doctrine does not apply in this context because the Court is not considering a U.S. state law, making irrelevant the doctrine's concerns about maintaining the proper constitutional balance between state and federal authority.").

21, 2008, the United States filed a Notice informing the Court that it took "no position on those issues at this time," but that it would "continue to monitor this litigation."  DE 107 ¶¶ 3-4.  Attached to the Notice was a letter from the Bolivian Ministry of Foreign Affairs and Culture notifying the Secretary of State that "the fact that a Court of the United States of America is adjudicating a complaint against [Defendant Lozada and Defendant Berzaín] does not cause any disruption or change in the diplomatic relations between Bolivia and the United States of America."  DE 107-1 at 4.  The United States and the Bolivian government have not, to date, indicated any change in their respective positions on this litigation.  Given those positions, even assuming the foreign affairs doctrine applied here, the Court concludes that Plaintiffs' wrongful death suits are not preempted.[42]

### 2.  Indirect Liability Under Bolivian Law

Defendants argue that Plaintiffs' wrongful death claims fail because Bolivian law does not recognize a civil claim for those injured by criminal conduct based on indirect liability.  Specifically, Defendants assert that, while the Bolivian Penal Code imposes criminal liability upon "mediate perpetrators"—"person[s] who use[] another as an instrument, *i.e.*, a person who uses an agent to commit an aspect of the crime"—mediate perpetrator liability is not available for Bolivian civil liability.  DE 342-1 at 33.

This argument warrants little discussion.  It is based solely on the fact that one article of the Bolivian Penal Code uses the term "perpetrator" but does not also

---

[42] The Department of State's August 14, 2017 denial of Defendants' Touhy request to depose David Greenlee, the former U.S. Ambassador to Bolivia, see Defendants' Ex. 19, does not alter this conclusion.  While one of the reasons the Department of State gave for denying Defendants' request was that permitting former Ambassador Greenlee to testify would "entangle the United States in the controversial matters addressed in the case, with substantial detrimental impact on U.S. foreign policy interests," id. at 1-2, the Court does not view the Department of State's Touhy denial as signaling a change in the position taken by the United States early in this litigation.

specifically mention "mediate perpetrators" as well.  See Defendants' Ex. 75 (Bol. Penal

Code art. 273) ("A person who, with the intent of causing bodily damage or damage to

health, causes the death of a person unintended by the perpetrator but which could

have been foreseen shall be punished by imprisonment of from THREE to EIGHT

years.").  But Defendants concede that, under Bolivian law, the criminal code informs

civil liability.  And Article 14 of the Bolivian Code of Criminal Procedure establishes that

a civil action arises "from the commission of every crime."  Plaintiffs' Ex. AAA (Bol. Code

Crim. P. art. 14 (emphasis added)); see also Defendants' Ex. 75 (Bol. Penal Code art.

87) ("Any person criminally liable is also civilly liable and is obligated to pay reparations

for the material and non-material damages caused by the crime.").  Moreover, the

Bolivian Code of Criminal Procedure specifies that a civil action "for the reparations or

compensation for damages and injuries caused by [a] crime, may be initiated by the

injured party, against the perpetrator and the participants of the crime."  Plaintiffs' Ex.

AAA (Bol. Code Crim. P. art. 36 (emphasis added)).  Based on this authority, the Court

concludes that Defendants have failed to show that Bolivian law does not recognize a

civil claim based on indirect liability.

### 3.  Preclusion Based on Pendency of Criminal Charges

Defendants also assert that Plaintiffs' wrongful death claims are precluded

because when Defendants brought these claims in 2007, a criminal case—the Trial of

Responsibilities—was pending against Defendants in Bolivia.[43]  In support, Defendants

cite to Article 37 of Bolivia's Code of Criminal Procedure, which provides that "[a] civil

action can be pursued in the criminal proceedings under special rules or may be filed

---

[43] The Bolivian criminal proceedings against Defendants were ultimately suspended, but not until May 2009.

with the civil courts, but cannot be pursued simultaneously in both jurisdictions."

Defendants' Ex. 76 (Bol. Code Crim. P. art. 37).  Defendants further note that Bolivian

law prohibits the resolution of civil cases based on criminal conduct "while the pending

criminal proceedings have not been resolved," except in certain enumerated

circumstances, including when "the criminal proceedings have been ordered suspended

due to default."  Id. art. 38.  The Court does not find that, based on these principles of

Bolivian law, Plaintiffs' wrongful death claims are barred because of the pendency of

Bolivian criminal charges against Defendants when Plaintiffs brought the instant

wrongful death claims in 2007.

First, Article 37 of the Bolivian Code of Criminal Procedure appears to solely

prohibit litigants from pursuing civil claims simultaneously "in the criminal proceeding

under special rules" and in the civil courts.  Id. art. 37.  While this rule would seem to

have prohibited Plaintiffs from, for example, simultaneously pursuing their civil claims

"under special rules" as part of the Trial of Responsibilities and in a separate civil case,

that is irrelevant because there is no indication that Plaintiffs have pursued their civil

claims anywhere but in this Court.  Article 38 of the Bolivian Code of Criminal Procedure

does not support Defendants' argument either.  While it is somewhat ambiguous, the

rule seems to only preclude a court from finally disposing of a civil case prior to the

resolution of the pending criminal proceedings—it does not seem to bar the assertion of

a civil claim prior to the resolution of the criminal proceeding, so long as the criminal

proceeding is resolved first.  See id. art. 38) ("When the action for reparations is initiated

in the civil courts, a sentence cannot be handed down in this jurisdiction while the

pending criminal proceedings have not been resolved . . . .").[44]  In sum, Defendants

have failed to show that Plaintiffs' wrongful death claims are barred because of the fact

that, when they were initially asserted in 2007, the criminal proceedings against

Defendants were still pending.

D.    Individual Deficiencies

Defendants take the position that various individual deficiencies preclude the

claims of Plaintiffs Sonia Espejo Villalobos and Gonzalo Mamani Aguilar.

1.  Sonia Espejo Villalobos

Defendants contend that Plaintiff Sonia Espejo Villalobos is not a proper plaintiff

with respect to either her TVPA or wrongful death claims.  In order to obtain relief for an

extrajudicial killing pursuant to the TVPA, a plaintiff must be: (1) a legal representative

or any person who may be a claimant in an action for wrongful death (2) of a victim of

an extrajudicial killing (3) that was committed by an individual acting under actual or

apparent authority, or color of law, of any foreign nation.  Baloco ex rel. Tapia v.

Drummond Co., 640 F.3d 1338, 1346 (11th Cir. 2011).  State law governs the

determination of whether a plaintiff may be a claimant in an action for wrongful death.

Id. at 1349.

Defendants argue that Ms. Espejo is not a proper representative of Mr.

Gandarilla because they were not formally married at the time of Mr. Gandarilla's death,

but had a common-law union.  Under Florida law, the only ground upon which Ms.

Espejo could serve as the representative of Mr. Gandarilla is as his spouse.  See Fla.

Stat. § 733.304.   While common-law marriages are not generally recognized in Florida,

---

[44] If anything, this rule may have been grounds to stay the adjudication of Plaintiffs' wrongful death claims while the Bolivian criminal proceedings against Defendants were pending, but as the criminal proceedings have been suspended, this is a moot point.

see Fla. Stat. § 741.211, that limitation does not apply to marriages entered into outside of Florida, see Johnson v. Lincoln Square Props., Inc., 571 So. 2d 541, 542-43 (Fla. 2d DCA 1990).  Moreover, if a foreign state acknowledges a common-law marriage as a marriage under its law, then it may be recognized under Florida law as well.  See Cohen v. Shushan, 212 So. 3d 1113, 1118-19 (Fla. 2d DCA 2017); American Airlines, Inc. v. Mejia, 766 So. 2d 305, 306 (Fla. 4th DCA 2000).

At the time of Decedent Gandarilla's death in 2003, the Bolivian Family Code recognized that "free conjugal or de facto unions that are stable and singular produce effects similar to marriage, as much in the personal relationships as in the hereditary relationships of cohabiting partners."  Plaintiffs' Ex. OOO (Verástegiu Rpt. ¶ 33 (quoting Law 996 art. 159)).  The Bolivian Constitution of 2009 likewise provides: "Free or de facto unions between a woman and a man which meet the requirements of stability and singularity and for which there is no legal impediment shall produce the same legal effects as civil marriage . . . ."  Plaintiffs' Ex. WW (Bol. Const. art 63).  Plaintiffs point to decisions of Bolivia's highest court, the Plurinational Constitutional Tribunal, that appear to retroactively apply the 2009 Bolivian Constitution's definition of marriage.  See DE 375 at 42 & nn.27-28.

The Court need not definitively resolve the status of Ms. Espejo's common-law marriage to Decedent Gandarilla in order to find that she is a proper plaintiff in these cases.  The Bolivian Code of Criminal Procedure considers a cohabitating partner as both an heir and a victim in her own right who may bring a civil action for the death of a decedent.  See Plaintiffs' Ex. OOO (Verástegiu Rpt. ¶¶ 27, 30-31 (citing Bol. Code Crim. Proc. arts. 76, 92)); id. at ¶¶ 33, 37-40 (discussing the inheritance rights of cohabiting

partners).  Eleventh Circuit precedent instructs that, "where state law would provide no

remedy [to a TVPA plaintiff], a court may apply the foreign law that would recognize the

plaintiff's claim."  Baloco, 640 F.3d at 1349.  Thus, even assuming that Ms. Espejo's

common-law marriage to Decedent Gandarilla would not be recognized under Florida

law, because she would be a proper representative for Decedent Gandarilla in a civil

action brought under Bolivian law, she may serve as a TVPA plaintiff here.  It follows

from this conclusion that, due to the Court's application to Bolivian law to Plaintiffs'

wrongful death claims, Ms. Espejo is a proper plaintiff for those claims as well.

2.  Exhaustion

Section 2(a) of the TVPA provides that "[a] court shall decline to hear a [TVPA]

claim . . . if the claimant has not exhausted adequate and available remedies in the

place in which the conduct giving rise to the claim occurred."  The statute's exhaustion

requirement is an affirmative defense that Defendants bear a "substantial" burden to

prove.  Jean v. Dorelien, 431 F.3d 776, 781 (11th Cir. 2005).  Defendants assert that

Ms. Espejo and Plaintiff Gonzalo Mamani Aguilar have not exhausted their Bolivian

remedies because they did not personally apply for benefits under Bolivian Law No.

3955.[45]

As relevant here, Bolivian Law No. 3955 awarded a lump sum benefit "to the

heirs who are relatives up to the first degree of consanguinity (children, spouse and

parents) of those who died as a consequence of the events of February, September and

October of 2003."  Plaintiffs' Ex. BBB (Law No. 3955 art. 2.I.).  The law further looked to

Bolivian inheritance law to identify a decedent's heirs.  See id. art. 7.a.  Pursuant to

---

[45] Defendants initially challenged Plaintiff Hermógenes Bernabé Callizaya's exhaustion of
remedies, see SMF ¶ 9; DE 342 at 40, but later withdrew that objection, see Reply SMF ¶ 9.

Supreme Decree 29884, promulgated two months after Law No. 3955's enactment, if two or more beneficiaries were eligible, the lump sum would be distributed proportionally amongst them. Plaintiffs' Ex. CCC (Supreme Decree No. 29884 art. 2.I).

Plaintiffs appear to concede that both Ms. Espejo and Mr. Mamani Aguilar did not personally apply for benefits under Law No. 3955. See CSMF ¶ 5 ("Because of the limited time in which [Ms. Espejo] had to apply for benefits and the time it would have taken to obtain official paperwork showing her common-law marriage status, she instead chose to apply for the benefits for her family under her minor son Aldair's name because she had his birth certificate."); id. ¶ 10 ("Mr. Mamani Aguilar's mother handled applying for the benefits for the entire family and he did not ask her about the details."). Plaintiffs insist, however, that Ms. Espejo and Mr. Mamani Aguilar nonetheless received benefits through other family members who were beneficiaries under Law No. 3955.

To be sure, this Court held in Mamani I that Plaintiffs "are required to seek compensation in Bolivia under Law No. 3955 before they can assert their TVPA claims." 636 F. Supp. 2d at 1326. But nothing in Mamani I suggests that Plaintiffs could not satisfy the TVPA exhaustion requirement by having other eligible family members seek relief under Law No. 3955. And that is what has happened here. There are no more remedies available for Ms. Espejo and Mr. Mamani Aguilar to exhaust. After all, Supreme Decree 29884 provides that "[o]nce the benefit of the lump sum [under Law No. 3955] is awarded, it shall not be subject to any subsequent reconsideration or increase." Plaintiffs' Ex. CCC (Supreme Decree No. 29884 art. 2.IV). The available lump sums have been awarded to survivors of all decedents in these cases. Thus,

Defendants have not met their substantial burden of proving that Plaintiffs have failed to exhaust their "adequate and available remedies" in Bolivia.  TVPA § 2(a).

**VII.        CONCLUSION**

Having addressed all issues raised by Defendants in their Joint Motion, it is thereupon **ORDERED and ADJUDGED** that Defendants' Joint Motion for Summary Judgment [DE 342 in Case No. 07-22459; DE 321 in Case No. 08-21063] is **DENIED**.

**DONE AND ORDERED** in Chambers at Fort Lauderdale, Broward County, Florida, this 14th day of February, 2018.

JAMES I. COHN
United States District Judge

Copies provided to counsel of record via CM/ECF