**EXPERT REBUTTAL REPORT OF PROFESSOR JULIAN KU**

I have been asked by Williams & Connolly, attorneys for Defendants José Carlos Sánchez Berzaín and Gonzalo Daniel Sánchez de Lozada Sánchez Bustamante, to provide an expert opinion on certain international legal issues raised in this action brought by Plaintiffs Eloy Rojas Mamani, *et. al.*, in rebuttal to the expert reports of William J. Aceves (Sept. 11, 2017) and Albert Borrelli (Sept. 13, 2017).

**BACKGROUND AND QUALIFICATIONS**

The opinions I offer herein reflect the expertise I have developed as a legal scholar focused on issues of public international law and its use in the U.S. legal system. The conclusions I express reflect my considered opinion as to the proper interpretation of international law as it is relevant to the application of the Torture Victim Protection Act and are given within a reasonable degree of professional certainty.

I am currently the Senior Associate Dean for Academic Affairs, Maurice A. Deane Distinguished Professor of Constitutional Law, and Faculty Director of International Programs at the Maurice A. Deane School of Law at Hofstra University in New York. I am a nationally recognized expert on the relationship between international law and the American legal system. In 2012, I co-authored *Taming Globalization: International Law, the U.S. Constitution, and the New World Order* (Oxford University Press), which analyzes the treatment of international law in the U.S. legal system, including international laws used in claims similar to the ones that are the focus of this Report. I am also the author of more than forty articles, essays, and book chapters, several of which are also focused on legal issues related to lawsuits brought against individuals and corporations invoking and applying public international law. My work on this subject has appeared in leading peer-reviewed academic journals including the *American Journal of International Law*, *Supreme Court Review*, and *Constitutional Commentary*. I have presented academic papers on this subject at leading academic conferences including the Annual Meeting of the American Society of International Law. I am also a member of the American Law Institute, which is a select group of lawyers and scholars charged with developing authoritative principles and "restatements" of different areas of American law. In this capacity, I have been participating in the preparation of a "Fourth Restatement of U.S. Foreign Relations Law," some of which is related to the subject of this opinions expressed herein.[1]

I am a graduate of the Yale University School of Law where I hold a Juris Doctor degree. I am also a graduate of Yale College where I hold a Bachelor of the Arts degree in Ethics, Politics, and Economics.

---

[1] A detailed list of my publications and presentations is set forth in my curriculum vitae, which is being provided along with this Report as Appendix A. I have not previously testified as an expert at trial or by deposition. A list of materials that I have reviewed in preparing this Report are attached as Appendix B. I am being compensated for my work on this matter at the rate of $650 per hour.

## SUMMARY OF OPINION

Both the Expert Report of William J. Aceves (the "Aceves Report") and the Expert Report of Albert Borrelli (the "Borrelli Report") use international law to interpret and apply the Torture Victim Protection Act (TVPA).  While I agree that the text and legislative history of the TVPA calls for the use of international law in the interpretation and application of certain provisions of the statute, I disagree with both reports' descriptions of the content of relevant international law doctrines and views on how those doctrines should be applied through the TVPA as set forth below.  In this Report, I explain and elaborate on these disagreements about (1) how international law affects the definition of "extrajudicial killing" in the TVPA and (2) how international law defines the scope of the doctrine of command responsibility.

With respect to "extrajudicial killings," I disagree with the Aceves Report's claim that the definition of extrajudicial killing in the TVPA should be understood as "an extension of the right to life norm" in international human rights treaties.  Instead, the TVPA's text offers a distinct definition of "extrajudicial killing" based in part upon Common Article III of the Geneva Conventions,[2] but without reference to other international law sources.  For this reason, there is nothing in the text or legislative history supporting the Aceves Report's wholesale incorporation of other international law instruments to give substantive content to the TVPA's statutory definition of extrajudicial killing.

Rather than conflating a prohibition on extrajudicial killing with the "right to life," international law should be used, in accordance with the TVPA's text, solely to determine when lethal force by state agents is "lawfully carried out" outside of the judicial process.  My review confirms that international law authorizes many uses of lethal force by state agents outside of the judicial process.  For instance, international law sources have consistently recognized that state agents do not act unlawfully when they use lethal force in response to exigent circumstances such as armed conflict, civil unrest threatening the health and safety of their populations, and self-defense.  Importantly, decisions applying international law have found that mistaken killings may not be unlawful if that mistake was made in response to exigent or emergency circumstances.

Finally, international legal authorities have required substantial evidence showing that state agents are in fact responsible for killings before holding such agents liable for those killings.  The European Court of Human Rights, for instance, demands evidence establishing "beyond a reasonable doubt" that state agents actually committed the unlawful killings.[3]

---

[2] These are the Geneva Convention for the Amelioration of the Condition of the Wounded and Sick in Armed Forces in the Field, Geneva Convention for the Amelioration of the Condition of Wounded, Sick and Shipwrecked Members of Armed Forces at Sea, Geneva Convention Relative to the Treatment of Prisoners of War, and Geneva Convention Relative to the Protection of Civilian Persons in Time of War.

[3] *See infra* Section I.C.

The TVPA's legislative history also permits courts to hold TVPA defendants liable for their subordinates' actions under the international law doctrine of command responsibility. But the Borrelli Report, in my opinion, improperly imports non-legal concepts such as "command and control" and "non-delegation of responsibility" into the command responsibility doctrine's legal requirements and ignores the legal difference between civilian and military leaders recognized by international legal authorities.

Recognized international law authorities confirm that an individual can be held liable for the actions of his subordinates only if his subordinates have actually committed a crime falling within the authority of that court. Thus, a court must first conclude that the alleged killings satisfy the definition of extrajudicial killings and that there is sufficient evidence to attribute the alleged killings to a defendant's subordinates before it can consider the command responsibility doctrine.

Moreover, because the command responsibility doctrine originated in the law of war context, international authorities have been careful to constrain and limit its application to a military commander or civilian leader commanding troops during an armed conflict. To date, no international authorities have applied the doctrine of command responsibility to civilian leaders acting outside the context of an armed conflict.

For this reason, and in contrast to the Borrelli Report, it is my opinion that the international law doctrine of command responsibility should not be applied at all outside the context of an armed conflict. In times of armed conflict, military commanders have distinct responsibilities for their troops and their troops are expected to engage in dangerous and necessarily lethal activities. Imposing a strict command responsibility on a commander during an armed conflict makes sense in a way that imposing that same doctrine on a civilian outside armed conflict does not. Because both Defendants are civilian leaders and not military commanders, and because all of their alleged unlawful actions took place outside of an armed conflict, it is my opinion that the command responsibility doctrine should not be applied to either of them.

But even if this Court concludes that the command responsibility doctrine should be applied in this case, the doctrine should be carefully constrained to account for the civilian character of the Defendants in ways that the Borrelli Report ignored or misstated. International law provides the appropriate guidance. Thereunder, a defendant can be held liable for the acts of their subordinates only if: 1) there is substantial evidence that their subordinates committed the particular crimes or acts against the plaintiff(s); 2) the defendant possessed "effective control" over the activities of the alleged perpetrators to the same degree as a military commander would have control over his or her troops; 3) the defendant knew or had reason to know information that would have led to knowledge that the alleged extrajudicial killings were about to be committed; and 4) the defendant failed to take "necessary and reasonable" measures to prevent the alleged extrajudicial killings or to punish the alleged perpetrators. While the Borrelli Report purported to apply these standards, it is my opinion that the facts alleged by the Plaintiffs (supplemented by new facts introduced in the Borrelli Report) do not amount to "effective control" by the Defendants under international law.

Finally, I discuss the international law doctrine of aiding and abetting liability, which the TVPA's legislative history suggests could also provide a mechanism for secondary liability. Under that doctrine, the Plaintiffs would have to show that the Defendants gave substantial assistance to the alleged extrajudicial killings and that this assistance was provided for the purpose of facilitating the alleged extrajudicial killings, or with the specific directive to assist in the alleged extrajudicial killings.

## I.  EXTRAJUDICIAL KILLING

This section reviews the definition of extrajudicial killing in the TVPA and explains how international law affects the interpretation and application of this definition. While the TVPA's definition of "extrajudicial killing" draws upon certain specific sources of international law, it is my opinion that the Aceves Report incorrectly equates the TVPA's definition with the evolving international law concept of a "right to life."

### A.  The Role of International Law and the TVPA's Definition of Extrajudicial Killing

In defining "extrajudicial killing," both the text and legislative history of the TVPA instruct courts to look to specific sources of international law to interpret the scope and meaning of the term. Thus, as the legislative history notes, the definition of extrajudicial killing was drafted to be consistent with Common Article 3 of the Geneva Conventions.[4] But neither the text nor the legislative history supports the Aceves Report's broad conclusion that the TVPA's definition of extrajudicial killing is an "extension of the right to life norm" recognized in many international human rights treaties.[5][6] While the TVPA's statutory definition of extrajudicial killing draws upon the law of armed conflict's specific limitations on the use of deadly force, the TVPA offers its own distinct textual definition and does not wholesale incorporate any and all sources of international law.

The statutory definition of the term extrajudicial killing specifically excludes killings that are lawfully carried out under international law.[7] It is only in this context that international law sources other than Common Article 3 may be used to determine whether an alleged killing falls with the TVPA's definition. Where non-judicially-authorized killings by state agents are found lawful under international law, such killings are not "extrajudicial killings" under the TVPA. Thus, my analysis draws upon international law sources, but it does not simply assume (as the Aceves Report does) that extrajudicial killings under the TVPA can be equated with the right to life protected by international human rights treaties.

For this reason, I disagree with the Aceves Report's attempt to import a "procedural" component of the right to life into the TVPA's prohibition on extrajudicial killing. While the

---

[4] H.R. Rep. No. 102-367, at 5 (1991), *reprinted in* 1992 U.S.C.C.A.N. 84, 87.
[5] *See* Aceves Report at 6.
[6] Aceves Report at 3.
[7] 28 U.S.C. § 1350 (note).

substantive component of the right to life might be relevant in determining whether a killing is lawful under international law, the procedural component is concerned solely with the duties of superiors to prevent or investigate such killings.  The TVPA's legislative history clearly points courts to the command responsibility doctrine when assessing any superior responsibility.[8]  It does not mention, much less incorporate, a "procedural" right to life.

This makes sense because to the extent international authorities have recognized a "procedural" component to the right to life, they have done so solely in the context of determining governmental as opposed to individual responsibility.  Every single authority cited by the Aceves Report applying a "procedural" component did so in the context of determining a government's responsibility for an extrajudicial killing rather than that of an individual government official or military commander.[9]  As such, these authorities do not provide guidance, for instance, on the level of knowledge or *mens reas* that individuals must have in order to incur personal liability for failing to fulfill the "procedural" component.  Thus, these authorities do not provide any legal support for the proposition that any court should apply the "procedural" component to individual defendants, much less that this Court should do so under the Torture Victim Protection Act ("TVPA").

International law's role should be *complementary* to the text of the TVPA.  A specific international law source should be considered if and only if the TVPA's text or legislative history calls for such sources.  This approach avoids the Aceves Report's mistake of mixing international caselaw applying the right to life against governmental entities with a domestic statutory framework applying only to natural persons.

###   B.   The TVPA's Definition of Extrajudicial Killing

To meet the definition of extrajudicial killing in the TVPA, Plaintiffs must prove Defendants' subordinates committed a "deliberated killing not authorized by a previous judgment pronounced by a regularly constituted court affording all the judicial guarantees which are recognized as indispensable by civilized peoples."[10]  The TVPA goes on to note that that term "does not include any such killing that, under international law, is lawfully carried out under the authority of a foreign nation."[11]  Thus, under the TVPA, there are three elements required to establish an extrajudicial killing: 1) it must be a "deliberated killing"; 2) it must lack the authority of a judicial judgment; and 3) it must be an unlawful killing under international law.

---

[8] By its terms, the Acevez Report does not address the issue of command responsibility.  Acevez Report at 22 n.15.
[9] *See* Florentina Olmedo v. Paraguay, Comm. No. 1828/2008, U.N. Doc. CCPR/C/104/D/1828/2008 (2012) (assessing Paraguay's possible violation of the ICCPR); Mocanu v. Romania, App. Nos. 10865/09, 45886/07, and 32431/08, ¶ 316, Eur. Ct. H.R. (Sept. 17, 2014) (assessing Romania's responsibility); Montero-Aranguren v. Venezuela, Inter-Am. Ct. H.R. (ser. C) No. 150, ¶ 79 (July 5, 2006) (determining Venezuela's responsibility); *see also* Nadege Dorzema v. Dominican Republic, Inter-Am. Ct. H.R. (ser. C) No. 251, ¶ 101, (Oct. 24, 2012) (determining the Dominican Republic's responsibility); Myrna Mack Chang v. Guatemala, Inter-Am. Ct. H.R. (ser. C) No. 101, ¶ 157 (Nov. 25, 2003) (assessing Guatemala's responsibility).
[10] Torture Victim Protection Act of 1991, Pub. L. No. 102-256, § 3(a), 106 Stat. 73, 73 (codified as amended at 28 U.S.C. § 1350 note (2006)).
[11] *Id.*

### 1. "[D]eliberated killing"

The Aceves Report does not comprehensively analyze the use of the phrase "deliberated killing" in the TVPA's definition of extrajudicial killing.[12]  This omission may be explained by the fact that the phrase "deliberated killing" does not appear in international instruments protecting the right to life and is unique to the TVPA.  But the absence of the term from international law jurisprudence is not a reason simply to ignore it.  As the Eleventh Circuit explained in an earlier decision in this case, a "deliberated killing" occurs if the killing was "'deliberate' in the sense of being undertaken with studied consideration and purpose."[13]  Other U.S. courts interpreting the phrase have cited Black's Law Dictionary to define "deliberate" as "[c]arried on coolly and steadily, especially according to a preconceived design."[14] Thus, U.S. courts interpreting the phrase "deliberated killing" in the TVPA and the identical term in the context of Foreign Sovereign Immunities Act litigation have found pre-conceived killings such as assassinations, suicide bombings, and the downing of an unarmed civilian plane to satisfy the "deliberated killing" element.[15]

The Eleventh Circuit in this case further held that the phrase "deliberated killing" excludes an "accidental or negligent shooting (including mistakenly identifying a target as a person who did pose a threat to others), [or] individual motivations (personal reasons) not linked to defendants."[16]

Although they do not use the same phrase, this concept of no liability for mistaken killings is shared by international authorities.  For instance, the European Court of Human Rights found that the mistaken killing of civilians wrongly suspected of planning a terrorist attack did not violate the international law right to life because the use of deadly force was authorized in such circumstances.  In *McCann and Others v. the United Kingdom*, the ECHR held that the use of deadly force may be justified "where it is based on an honest belief which is perceived, for good reasons, to be valid at the time but which subsequently turns out to be mistaken."[17]  Thus,

---

[12] The only discussion of the phrase is found in footnote 13 of the Aceves Report.  Acevez Report at 16 n.13.

[13] Mamani v. Berzain, 654 F.3d 1148, 1155 (11th Cir. 2011).

[14] Flatow v. Islamic Republic of Iran, 999 F. Supp. 1, 17 (D.D.C. 1998).

[15] *See, e.g.*, Murphy v. Islamic Republic of Iran, 740 F. Supp. 2d 51, 71 (D.D.C. 2010) (bombing of U.S. Marine barracks in Lebanon); Peterson v. Islamic Republic of Iran, 264 F. Supp. 2d 46 (D.D.C. 2003) (same); Dammarell v. Islamic Rep. of Iran, 281 F. Supp. 2d 105 (D.D.C. 2003) (same); Kerr v. Islamic Republic of Iran, 245 F. Supp. 2d 59, 63 n.10 (D.D.C. 2003) ("deliberate and premeditated" killing of university president in Lebanon); Weinstein v. Islamic Republic of Iran, 184 F. Supp. 2d 13 (D.D.C. 2002) (bombing of passenger bus); Stethem v. Islamic Republic of Iran, 201 F. Supp. 2d 78, 82 (D.D.C. 2002) (hijacking and killing of naval officer); Wagner v. Islamic Republic of Iran, 172 F. Supp. 2d 128, 133 (D.D.C. 2001) (car bomb at US embassy was a "deliberate and premeditated" attack); Eisenfeld v. Islamic Republic of Iran, 172 F. Supp. 2d 1 (D.D.C. 2000) (bombing of bus); Elahi v. Islamic Republic of Iran, 124 F. Supp. 2d 97 (D.D.C. 2000) (assassination); Flatow v. Islamic Republic of Iran, 999 F. Supp. 1 (D.D.C. 1998) (suicide bombing on tourist bus); Alejandre v. Republic of Cuba, 996 F. Supp. 1239, 1248 (S.D. Fla. 1997) ("unprovoked firing of deadly rockets," without warning, to down civilian unarmed airplane).

[16] Mamani, 654 F.3d at 1155.

[17] McCann v. United Kingdom, ¶ 200, 324 Eur. Ct. H.R. (ser. A) (1995) (finding violation of right to life on other grounds).

soldiers who killed civilians at close range in the mistaken belief they were preventing a terrorist attack did not violate the European Convention's protection of the right to life.  As the ECHR observed, "[t]o hold otherwise would be to impose an unrealistic burden on the State and its law-enforcement personnel in the execution of their duty, perhaps to the detriment of their lives and those of others."[18]

Finally, the legislative history of the TVPA explains that "[t]he inclusion of the word 'deliberated' is sufficient also to [ex]clude killings that lack the requisite extrajudicial intent, such as those caused by a police officer's authorized use of deadly force."[19]  Thus, Congress recognized that even some killings that lack judicial authority, such as a police officer's use of deadly force, would still not qualify as "extrajudicial killings."  As I will discuss below, international law has long recognized the legality of non-judicially sanctioned killings arising from exigent circumstances such as restoring civil order or protecting other civilians.

## 2.  Not Authorized by Judgment of a "regularly constituted court affording all judicial guarantees"

The TVPA also defines an extrajudicial killing as lacking the authority of a "regularly constituted court affording all judicial guarantees."  It is this part of the TVPA's definition that draws most directly upon international law.  As the legislative history confirms, this language "is derived from article 3 common to the four Geneva Conventions of 1949."[20]  That provision applies to the treatment of civilians and noncombatants during an armed conflict not of an international character.  It is worth noting that Common Article 3 of the Geneva Conventions is a source of international law distinct from the international human rights law sources discussed by the Aceves report.[21] Common Article 3 is intended to codify customary international law rules applicable during times of armed conflict.[22]  While the Aceves Report assumes that the TVPA's definition of extrajudicial killing is an "extension of the right to life norm," only the Geneva Convention is specifically referenced in the TVPA's legislative history with respect to the definition of extrajudicial killing.

---

[18] *Id.*

[19] H.R. Rep. No. 102-367, at 5 (1991), *reprinted in* 1992 U.S.C.C.A.N. 84, 87.  The legislative history appears to have a typo.  While the word "include" is used, it is clear from the context that the authors intended to use the word "exclude."

[20] *See id.*;  *see also* Geneva Convention for the Amelioration of the Wounded and Sick in Armed Forces in the Field, Aug. 12, 1949, art. 3, 6 U.S.T. 3114, T.I.A.S. No. 3362, 75 U.N.T.S. 31 ("To this end, the following acts are and shall remain prohibited at any time and in any place whatsoever . . . (d) the passing of sentences and the carrying out of executions without previous judgment pronounced by a regularly constituted court, affording all the judicial guarantees which are recognized as indispensable by civilized peoples.").

[21] *See* Aceves Report at 5-6.

[22] For a discussion of the original distinct origins and purposes of the law of armed conflict and internal human rights law, see Robert Kolb, *The Relationship between International Humanitarian Law and Human Rights Law: A Brief History of the 1948 Universal Declaration of Human Rights and the 1949 Geneva Convention*, 324 INT'L REV. RED CROSS 409 (1998).

This distinction is important because Common Article 3 is not a categorical ban on all killing by agents of a state.  Rather, Common Article 3 protects only "[p]ersons taking no active part in the hostilities" from violence and executions.  It does not constrain killings of active combatants from the protections of Common Article 3.  As one study of the drafting of Common Article 3 has concluded, the countries negotiating Common Article 3 wanted its protections to apply broadly, "except [for] combatants at the time engaged in fighting."[23]  Moreover, because a state's armed forces is authorized to use deadly force during an armed conflict, the law of armed conflict does not treat actions causing accidental noncombatant deaths as illegal.[24]

Because the definition of extrajudicial killing in the TVPA is drawn from Common Article 3 and the law of armed conflict (and not from international human rights law), the TVPA's definition of extrajudicial killing should not include the killings of armed individuals, including civilians, engaged in violence against government security forces or even unarmed civilians who were accidentally or unintentionally killed.

> **3.  Except for a "killing that, under international law, is lawfully carried out under the authority of a foreign nation."**

The TVPA's definition of extrajudicial killing also excludes killings that might otherwise be deliberate, but which are "lawfully carried" out by a foreign nation "under international law." In other words, those killings by state agents that are consistent with international law will not fall within the TVPA's definition of extrajudicial killing.

The TVPA's legislative history indicates that this language excludes killings such as by "armed forces during declared wars which do not violate the Geneva Convention and killings necessary to effect a lawful arrest or prevent the escape of a person lawfully detained."[25]  But it does not purport to define all killings that fall within this exclusion.  As the statutory text indicates, the scope of this exclusion is determined by international law.

The TVPA's text instructs courts to look to international law for the limited purposes of determining when state killings are lawful.  In this context, international law has consistently recognized that the protection of the "right to life" does not prohibit a state's use of deadly force in certain "exigent circumstances."[26]  International law sources such as the European Convention on Human Rights, for instance, recognize that a state may lawfully use deadly force in at least three circumstances where "absolutely necessary":

---

[23] *See* David A. Elder, *The Historical Background of Common Article 3 of the Geneva Convention of 1949*, 11 CASE W. RES. J. INT'L L. 37, 58 (1979) (emphasis omitted).

[24] *See* MICHAEL BOTHE, KARL JOSEF PARTSCH & WALDEMAR A. SOLF, NEW RULES FOR VICTIMS OF ARMED CONFLICTS: COMMENTARY ON THE TWO 1977 PROTOCOLS ADDITIONAL TO THE GENEVA CONVENTIONS OF 1949 (2d ed. 2013) ("The accidental killing or wounding of [captured combatants] due to their presence among, or in proximity to, combatants actually engaged, by fire directed against the latter, gives no just cause for complaint . . . .")

[25] S. Rep. No. 102-249, at 6 (1991).

[26] RESTATEMENT (THIRD) OF FOREIGN RELATIONS § 702 cmt. f (1987).

(a) in defence of any person from unlawful violence;
(b) in order to effect a lawful arrest or to prevent the escape of a person lawfully detained;
(c) in action lawfully taken for the purpose of quelling a riot or insurrection.[27]

The idea that a state may lawfully use deadly force in such exigent circumstances is also supported by other international sources.  The Inter-American Commission on Human Rights (IACHR), for instance, has recognized that "in situations where a state's population is threatened by violence, the state has the right and obligation to protect the population against such threats."[28]  Thus, the IACHR has noted that states may use lethal force "where strictly unavoidable to protect themselves or other persons from imminent threat of death or serious injury."[29]  Hence, the amount of force used must be justified by the circumstances for "purpose of, for example, self-defense or neutralizing or disarming the individuals involved in a violent confrontation."[30]

The Aceves Report describes several international law authorities that similarly find the use of lethal force legally authorized.  It argues, however, that such authorizations under international law require any killings to satisfy "necessity, proportionality, and precaution" elements to be legal.[31]  I agree with the Aceves Report that international law authorities have often cited such elements to determine the lawfulness of a state killing.  But I disagree with the Aceves Report's further claim that state practice applying such requirements can change or override the statutory requirements of the TVPA.

For instance, the Aceves Report uses state practice requiring a showing of necessity or proportionality to mean that "the intentional targeting of victims is but one form of extrajudicial killing" and that "indiscriminate attacks using lethal force and excessive use of lethal force" would also qualify.[32]  Recognizing that this reading of the TVPA is in tension with the TVPA's use of the phrase "deliberated killing," the Aceves Report argues that the TVPA's legislative history implicitly endorsed this approach by excluding legally authorized use of

[27] European Convention for the Protection of Human Rights and Fundamental Freedoms, art. 2(2), Nov. 4, 1950, Eur. TS No. 5, 213 U.N.T.S. 221.
[28] Inter-Am. Comm'n H.R., Report on Terrorism and Human Rights OEA/Ser.L/V/II.116,  Doc. 5 rev. 1 corr.87. Doc. 5 rev. 1 corr. (Oct. 22, 2002) [hereinafter IACHR Report on Terrorism]; *see also* Neira-Alegría v. Peru, Merits, Judgment, Inter-Am. Ct. H.R. (ser. C) No. 20, ¶ 74 (Jan. 19, 1995) ("But, in the present case, the analysis that must be made has to do with the right of the State to use force, even if this implies depriving people of their lives to maintain law and order, an issue that currently is not under discussion."); Velásquez Rodríguez Case, Judgment, Inter-Am. Ct. H.R. (ser. C)  No. 4, ¶ 154 (July 29, 1988); Godínez Cruz Case, Judgment, Inter-Am. Ct. H.R. (ser. C) No. 5, ¶ 162 (Jan. 20, 1989); *see also* Case 11.291, Report No. 34/00, Carandiru (Brazil), Annual Report of the IACHR 2000, ¶ 62.
[29] *See* IACHR Report on Terrorism ¶ 87.
[30] *Id.* ¶ 92.
[31] Aceves Report at 14.
[32] *See id.* at 16-17.

deadly force by police officers.[33]  By allowing legally authorized use of deadly force, the Aceves Report argues, the TVPA must necessarily impose liability for unauthorized uses of deadly force.

This analysis confuses the role of international law in interpreting this part of the TVPA.  As the Eleventh Circuit recognized, the TVPA's use of the phrase "deliberated killing" requires that an extrajudicial killing under the TVPA be "undertaken with studied consideration and purpose."  State practice interpreting the right to life cannot change this statutory language.  Rather, international law concepts such as "necessity, proportionality, and precaution" should be used to determine whether a killing that is otherwise "deliberate[]" and not judicially authorized nonetheless falls outside the TVPA's definition.  If a killing that is otherwise deliberate also satisfies international law standards such as necessity, then such a killing would not give rise to an action under the TVPA.  If a killing is not deliberate, then the question of whether the shooting itself was the result of necessity, proportionality, and precaution is inapposite to assessing liability.  In other words, without the deliberate shot, one does not reach the question of necessity, proportionality, and precaution.  In this way, the Aceves Report wrongly substitutes international law for the textual requirements of the TVPA.

This flawed approach undermines the Aceves Report's application of the law to the "facts" of this case.  By ignoring the "deliberated killing" requirement, the Aceves Report incorrectly concluded that the Defendants are liable solely on the basis of *allegations* about indiscriminate, disproportionate shooting at unarmed protesters without citing any evidence of deliberate targeting of the Plaintiffs' decedents.[34]  The Aceves Report simply erased the TVPA's textual requirement that the killing must be "deliberate[]", and relied solely on international standards. This use of international law is not supported by the text or legislative history of the TVPA.

### C.  Attribution of Killings to State Agents

The text of the TVPA allows a court to impose liability on "[a]n individual who, under actual or apparent authority, or color of law, of any foreign nation – subjects an individual to extrajudicial killing."  A successful cause of action must show that an actual individual person acting on behalf of a state is responsible for the extrajudicial killing.[35]  Merely showing that an individual was killed by unknown assailants is not enough to satisfy this language.  For this reason, courts awarding judgments for under the TVPA (or under the parallel Foreign Sovereign Immunities

---

[33] *See id.* at 16 n.13.

[34] In addition, the Acevez Report improperly opines on Defendants' liability—seemingly on the basis of command responsibility—without applying any legal standard for such secondary liability, and despite the concession that the Report "does not address command responsibility."  *See id.* at 22-25 & n.15.

[35] The Aceves Report also incorrectly implies that the TVPA "effectively encompasses "wrongful death" actions. *See id.* at 4.  In fact, the TVPA simply allows plaintiffs who would have had standing to bring wrongful death actions under common law to do so, but it does not import common law elements for wrongful death into the TVPA.

Act definition) for extrajudicial killing have generally relied on evidence (or undisputed allegations) identifying the killers as state agents.[36]

The TVPA's requirement that legal liability for extrajudicial killing requires evidence identifying the killer and linking that killer to a state is also supported by international authorities. Such requirements have included evidence demonstrating that the killer was a state agent. In *Case of Babat and Others v. Turkey*, the European Court of Human Rights refused to attribute liability to a state for Babat's killing when "there is no cogent evidence before the Court concerning the supposed identity of the gunman who shot and killed Önder Babat."[37] Additionally, the ECHR found that aside from evidence that the bullet was not a ricochet, "there is also no evidence to conclude with certainty that Önder Babat was the ultimate target or that his killing was politically motivated."[38] The authorities finding illegal state killings in the Aceves Report do not contradict this approach since they involved cases where the responsibility of the state's agents for the illegal killings were not disputed.[39]

In this way, international law, like the TVPA, does not recognize liability where a plaintiff can provide no specific evidence identifying the killer and linking that killer to the state. This approach is consistent with the general aim of both the TVPA and international law to provide a mechanism of relief for proven extrajudicial killings, but not to provide such expansive theories of liability as to encroach on the rights and prerogative of States to conduct necessary policing and military activities. Permitting liability against state agents where the actual shooter cannot be identified would allow the imposition of liability on states and their agents for acts committed by unrelated third parties and thereby expand liability far beyond what is authorized by the TVPA or international law.

### D. Conclusion

While international law has an important role to play in interpreting the TVPA, the Aceves Report wrongly equates the statutory definition of extrajudicial killing with a wide-ranging and diverse international jurisprudence protecting the right to life. The Aceves Report's expansive interpretations of how the "right to life" contains a "procedural" component should not be adopted in the interpretation of the TVPA.

Instead, the definition of extrajudicial killings in the TVPA is drawn from specific sources of international law and explicitly excludes from its scope those killings lawful under international

---

[36] *See, e.g.*, Doe v. Rafael Saravia, 348 F. Supp. 2d 1112, 1144 (E.D. Cal. 2004) (default judgment accepting as true Plaintiffs' allegations that killers were members of paramilitary.); Xuncax v. Gramajo, 886 F. Supp. 162, 169 (D. Mass. 1995) (default judgment accepting as true allegations that soldiers committed extrajudicial killings).

[37] Babat and Others v. Turkey, No. 44936/04, ¶ 36 (Jan. 12, 2010).

[38] *Id.*

[39] The fact that state agents were responsible for the alleged illegal killings was not disputed in these authorities cited by the Aceves Report at pages 22-23. *See* Gul v. Turkey, App. No. 22676/93, Eur. Ct. H.R. (2000); Neira Alegria v. Peru, Inter-Am. H.R. (ser. C) No. 20 (Jan. 19, 1995); Case of the "Caracazo" v. Venezuela, Inter-Am. H.R. (ser. C) No. 58 (Nov. 11, 1999).

law.  To qualify as an extrajudicial killing, the Plaintiffs must prove that the Defendants' subordinates "deliberately" killed the Plaintiffs' relatives, which requires showing some kind of preconceived plan to carry out the killings.  Further, the killing cannot have been the result of a mistake.  Keeping in mind the TVPA's exclusion for killings authorized by international law, this Court should satisfy itself that the alleged killings were not justified by exigent circumstances, such as in defense of other civilians or in self-defense.  Finally, both the TVPA and international law require the Plaintiffs to provide evidence that would attribute the killings to individual state agents.  Unlike other TVPA cases where courts relied on undisputed allegations, the Plaintiffs in this case must provide substantial evidence of the identity of the alleged killers to satisfy these requirements.

## II.  COMMAND RESPONSIBILITY

The Borrelli Report "examines the command responsibility" of the Defendants and concludes that both should be held liable under this legal doctrine.  Although not styled as a expert report on the law, the Borrelli Report purports to apply legal standards associated with the command responsibility doctrine.  This section reviews the definition of the doctrine of command responsibility under international law and explains how the Borrelli Report misunderstands and misstates the applicable legal standard.  It also reviews international legal standards for finding the Defendants secondarily liable, under a theory of conspiracy or as principals responsible for their agents' actions.

### A.  The International Law Doctrine of Command Responsibility and the TVPA

The text of the TVPA does not mention or refer to the doctrine of command responsibility, a theory of secondary liability. The idea that plaintiffs suing under the TVPA can invoke the doctrine of command responsibility is solely based on the TVPA's legislative history, which contains a Senate Report stating that "under international law," liability for extrajudicial killings and torture in the statute extends to "anyone with higher authority who authorized, tolerated or knowingly ignored those acts."[40]

The Senate Report then points to two U.S. cases applying the doctrine of international law of command responsibility and cites, in a footnote, two international treaties prohibiting torture. These sources confirm that drafters of the TVPA sought to incorporate the international law doctrine of command responsibility into the TVPA, but analysis of the sources also reveals some limitation as to the nature and scope of the TVPA's incorporation of this international law doctrine.

The two U.S. judicial authorities cited by the Senate Report—*In re Yamashita*[41] and *Forti v. Suarez-Mason*[42]—apply command responsibility as a doctrine for holding military commanders liable for the crimes of their subordinates during an armed conflict. In *Yamashita*, the U.S. Supreme Court upheld a military commission's conviction of a Japanese military commander for a "pervasive pattern of war crimes committed by his officers."[43]  In *Forti*, the court held that a military commander could be held liable for torture and summary execution committed by subordinates "acting pursuant to . . . policy, pattern and practice."[44]  Both cases involved military commanders and their military subordinates, which reflects the command responsibility doctrine's origins in the law of war and military justice.[45] Neither case addressed whether this law of war doctrine could be applied to civilian leaders, and there were no

---

[40] S. Rep. No. 102-249, at 9.
[41] 327 U.S. 1 (1946).
[42] 672 F. Supp. 1531 (N.D. Cal. 1987).
[43] S. Rep. No. 102-249, at 9.
[44] 672 F. Supp. at 1537.
[45] S. Rep. No. 102-249, at 9.

international legal authorities extending the doctrine to civilian leaders at the time the TVPA was enacted in 1991.

Thus, while it is clear that the legislative history supports interpreting the TVPA to incorporate the doctrine of command responsibility as understood under international law, the nature and scope of that doctrine does not necessarily include liability for civilan leaders under the circumstances of this case. The authorities cited by the legislative history refer to the doctrine in its classic context of military command during an armed conflict and do not clarify how and whether it should be applied outside of that context, especially against civilian leaders.

### B.  Scope and Applicability Outside Times of Armed Conflict

The doctrine of command responsibility originated in principles of "responsible command" developed in the context of military command and hierarchy. This principle was recognized in the Fourth Hague Convention of 1907, but it did not serve at that time as a binding rule for holding commanders liable.[46]  Rather, the modern legal doctrine of command responsibility originated in the post-World War II military commission trial of Japanese general Tomoyuki Yamashita. General Yamashita, the military commander of the Japanese occupation of the Philippines, was charged and convicted of having "unlawfully disregarded and failed to discharge his duty as a commander to control the operations of members of his command, permitting them to commit brutal atrocities and other high crimes . . . and thereby violated the law of war."[47]

As this history illustrates, the command responsibility doctrine originated as a doctrine of the law of war applicable to military commanders during times of armed conflicts.  It is thus not surprising that nearly all judicial applications of the command responsibility doctrine have applied it during armed conflicts, either of an international (World War II) or non-international (Former Yugoslavia and Rwanda) character.[48] While a U.S. district court did apply the command responsibility doctrine in a TVPA case outside of an armed conflict situation it appears to be the sole judicial example and it did not cite any international authorities. The possibility of applications of the command responsibility outside armed conflict was raised during negotiations of the Rome Statute of the ICC, but no resolution or decision was reached.[49] This confirms that there is no international consensus supporting the application of the command responsibility doctrine outside of armed conflicts.

---

[46] *See* Chantal Meloni, Command Responsibility in International Criminal Law 35 (2010); *see also* Beatrice I. Bonafé, *Finding a Proper Role for Command Responsibility*, 5 J. Int'l Crim. Just. 599, 601-02 (2007) (discussing origins of command responsibility doctrine in military context).

[47] *Id.* at 43 (citing United States v. Yamashita, Military Commission, Manila, Oct. 8-Dec. 7, 1945).

[48] *See* Guenael Mettraux, The Law of Command Responsibility 97 (2012) (stating that it is an "unresolved question whether the doctrine of superior responsibility could also apply in peacetime").

[49] *See id.* (citing Working Paper on Article 25, Responsibility of commanders and superiors, Committee of the Whole, Working Group on General Principles of Criminal Law, United Nations Diplomatic Conference of Plenipotentiaries on the Establishment of an International Criminal Court. A/CoNF.183/C/1/WGGP/L.7, 22 June 1998, n.3).

The restriction of the command responsibility doctrine to times of armed conflict is significant for this case because there is no doubt that the violence in Bolivia described in the Plaintiffs' complaint did not constitute an armed conflict under international law.  As the ICTY held in an early influential decision, "[a]n armed conflict exists whenever there is a resort to armed violence between States or protracted armed violence between governmental authorities and organized armed groups or between such groups within a State."[50]  Such violence must be "protracted" and between "organized armed groups."  On the other hand, as other authorities note, the law of armed conflict does not apply to "situations of internal disturbances and tensions, such as riots, isolated and sporadic acts of violence and other acts of a similar nature, as not being armed conflicts".[51]  Indeed, the Aceves Report concedes this point, noting "there is no evidence of an armed conflict in this case."[52]

The Borrelli Report neither acknowledges these distinctions, nor does it apply the standards developed for civilian superiors to its analysis of the case.  But this dearth of international authority confirms my opinion that the international law does not allow the application of the doctrine of command responsibility outside the context of an armed conflict. The doctrine originated as a legal mechanism to hold responsible military commanders engaged in armed conflicts. Almost all of the civilian leaders charged under the command responsibility doctrine were actually convicted for their direct responsibility in abetting the crimes rather than simply holding command over the perpetrators.[53] Most civilian leaders charged in the ICTY and ICTR were acquitted of command responsibility, and the ones who were convicted often did so via a guilty plea.[54]  This suggests that international tribunals have had difficulty adapting the command responsibility jurisprudence to civilians even while they were acting during times of armed conflict. The ICTY usually limited its indictments to civilians who were acting in a military capacity during the Yugoslavia conflict such as serving as military prison commanders or a civilian leading military forces carrying out military operations.[55] Other civilian leaders charged

---

[50] Prosecutor v. Tadić, No. IT_94-1-AR2, Decision on the Defense Motion for Interlocutory Appeal on Jurisdiction (Int'l Crim. Trib. for the Former Yugoslavia Oct. 2, 1995).

[51] Protocol II of the Geneva Protocols of 1977, Article 1(2); *see also* Leslie C. Green, The Contemporary Law of Armed Conflict 56 (2d ed. 2000) (acts of violence committed by private individuals or groups which are regarded as acts of terrorism, brigandage, or riots which are of a purely sporadic character are outside the scope of [the laws of armed conflict]).

[52] Aceves Report at 23 n.14.  Evidence adduced by Defendants that there were armed civilians, and even organized groups, firing on police and military supports that there were exigent circumstances to which police and soldier responded.  But such clashes with civilians, no matter how violent, do not meet the definition of an "armed conflict," which has a very specific meaning under international law.

[53] *See* Yaël Ronen, *Superior Responsibility of Civilians for International Crimes Committed in Civilian Settings*, 43 Vand. J. Transnat'l L. 313, 323 (2010) (noting that post-WWII tribunals do not clearly establish applying doctrine of command responsibility to civilians).

[54] *See* Maria L. Nybondas, Command Responsibilty and its Applicability to Civilians 123 (2010) ("[M]ost cases against civilian superiors have ended in an 'acquittal.").

[55] *See* Prosecutor v. Kordić, Case No. IT-95-14/2-T, Judgment, ¶ 5 (Int'l Crim. Trib. for the Former Yugoslavia Feb. 26, 2001) (leader of militia forces); Prosecutor v. Delalić, Case No. IT-96-21, Indictment, ¶¶ 2-3 (Int'l Crim. Trib. for the Former Yugoslavia Mar. 21, 1996) (prison camp commander); Prosecutor v. Aleksovski, Case No. IT-95-14, Indictment, ¶ 26 (Int'l Crim. Trib. for the Former Yugoslavia Nov. 10, 1995) (prison camp commander).

in the ICTY with wartime activities were actually acquitted.[56] The ICTR's convictions of civilian leaders under the command responsibility doctrine were all concurrent with convictions of those leaders for direct participation in the genocide suggesting that holding a civilian liable under the command responsibility alone remains disfavored.[57] As noted previously, the drafters of the ICC Statute considered but decided not to address this issue.[58] Applying such a doctrine to the very different factual context of activities outside armed conflict, especially to civilian leaders who almost always have a different level of control over their subordinates compared to their military counterparts, is highly inappropriate and not supported by international precedents.

For these reasons, it is my opinion that the command responsibility doctrine should be limited to armed conflicts and should not apply to the Defendants here because, as the Aceves Report acknowledges, despite the violence and exigent circumstances that existed, this case does not meet the specific definition of an armed conflict under international law.

### C.   The Definition of Command Responsibility

If the command responsibility doctrine does apply, this Court has held that a defendant can be held liable under the doctrine if the plaintiffs can show

> (1) the existence of a superior-subordinate relationship between the commander and the perpetrator of the crime; (2) that the commander knew or should have known, owing to the circumstances at the time, that his subordinates had committed, were committing, or planned to commit acts violative of the law of war; and (3) that the commander failed to prevent the commission of the crimes, or failed to punish the subordinates after the commission of the crimes.[59]

As I discuss below, because the TVPA's command responsibility standard is drawn from international law, the "should have known" formulation adopted by some US courts can and should be interpreted to conform with the "had reason to know" standard developed by states during negotiations of Additional Protocol I of the Geneva Conventions[60] and applied by

---

[56] Prosecutor v. Milutinović, Case No. ICTY-05-87-T, Judgement, vol. 3, at ¶¶ 106, 160, 1207 (Int'l Crim. Trib. for the Former Yugoslavia Feb. 26, 2009); Prosecutor v. Boškoskii, Case No. ICTY-04-82-T, Judgement, ¶ 514 (Int'l Crim. Trib. for the Former Yugoslavia July 10, 2008).

[57] Ronen, *supra* note 53, at 329 ("At the same time, all seven superior responsibility indictments of civilians prior to Nahimana were concurrent with and secondary to indictments under" provision punishing genocide.)

[58] METTRAUX, *supra* note 48, at 97 ("The possibility of the doctrine applying in times of peace was also raised, but not resolved, during the negotiation of Article 28 of the ICC Statute.").

[59] Mamani v. Berzain, 21 F. Supp. 3d 1353, 1376 (S.D. Fla. 2014) (quoting Ford ex rel. Estate of Ford v. Garcia, 289 F.3d 1283, 1288 (11th Cir. 2002).

[60] *See* Greg R. Vetter, *Command Responsibility of Non-Military Superiors in the ICC*, 25 YALE J. INT'L L. 89, 109 (2000) (after rejecting various drafts containing a "commander should have known" standard, the delegations agreed on a standard imposing responsibility on military commanders "if they knew, or had information which should have enabled them to conclude in the circumstances at the time, that he was committing or was going to commit such a breach").

subsequent international courts such as the United Nations International Criminal Tribunal for the Former Yugoslavia (ICTY)[61] and the United Nations International Criminal Tribunal for Rwanda.[62]

Additionally, international law has also developed a distinct and more demanding formulation of command responsibility in cases, such as this one, involving a civilian leader.  As I will explain below, states negotiating the Rome Statute for the International Criminal Court agreed to apply more stringent requirements for knowledge and effective control before imposing command responsibility on civilian leaders.  Because the TVPA calls on courts to look to international law as the source of the command responsibility doctrine, these contemporary developments should be used to further refine and clarify the definition of command responsibility that applies to this case.

### 1. The Commission of a crime by the defendant's subordinates

In order to apply the doctrine of command responsibility under international law, the party alleging command responsibility must first establish that the defendant's subordinates committed a "principal crime" as a distinct element of the doctrine of command responsibility. As one trial chamber of the ICTY put it, "[u]ntil recently, both the requirement of a principal crime (committed by others than the accused) and its performance in any of the modes of liability provided for in Art. 7(1) appeared so obvious as to hardly need to be explicitly stated."[63] However, the element has distinct consequences because the lack of such a finding is basis for dismissal of charges.[64]

Because the TVPA incorporates the international law of command responsiblity, a plaintiff must first establish that the defendant's subordinates committed extrajudicial killings in order to attempt to hold the defendant secondarily liable.[65]

### 2. The existence of a superior-subordinate relationship between the commander and the perpetrator of the crime

In order to demonstrate command responsibility, a plaintiff must show that there was a superior-subordinate relationship between the defendants and the subordinates who allegedly committed extrajudicial killings.  This element requires a plaintiff to establish that the defendant had "effective control" over the alleged perpetrators.  Effective control requires proof "that the superior has effective control over the persons committing the violations of

---

[61] Statute of the International Criminal Tribunal for the Former Yugoslavia art. 7(3).

[62] Statute of the International Criminal Tribunal for Rwanda art. 6(3).

[63] Prosecutor v. Orić, Case No. IT-03-68, Judgment ¶¶ 294-295 (Int'l Crim. Trib. for the Former Yugoslavia June 30, 2006).

[64] Prosecutor v. Orić, Case No. IT-03-68-A, Judgment ¶¶ 48 & 61 (Int'l Crim. Trib. for the Former Yugoslavia July 3, 2008).

[65] *See*, *supra*, Part I (discussing extrajudicial killing).

international humanitarian law in question, that is, has the material ability to prevent the crimes and to punish the perpetrators thereof."[66]

The Borrelli Report endorses this general standard, but then improperly amends it by importing the phrase "command and control" from a U.S. Department of Defense dictionary of military terms.[67] This dictionary, however, does not purport to offer a legal definition of "command" for purposes of the command responsibility doctrine. Rather, the purpose of the dictionary is to "improve communication and mutual understanding within DOD with other US Government departments and agencies and among the United States and its allies."[68] It is not intended, nor should it be used, to define the legal standard applicable for determining command responsibility under international law. Yet the Borrelli Report repeatedly uses this term as a synonym for requirements under international law for establishing "effective control."

The Borrelli Report makes the further error of importing the non-legal principle of "non delegation of responsibility" into the command responsibility doctrine.[69] This term refers to the principle of military operation wherein a commander should be responsible for the operational failures of his subordinates, even if he is not in control of them. As an expert on military leadership explained in an article published in a military journal, this principle makes sense "organizationally" but it is not meant to be used to impose liability on commanders for their subordinates' criminal activity.[70] This distinction between organizational theory and criminal liability makes sense because if the non-delegation of responsibility doctrine was truly incorporated into the command responsibility doctrine, commanders would always be responsible for their subordinates' criminal actions, regardless of whether they had effective control or any kind of knowledge of their actions, contrary to elements of command responsibility. Like its reference to "command and control," the Borrelli Report's attempt to blend this non-legal term with technical international law terms like command responsibility has no legal basis.

a.   De jure authority and effective control

This Court held that the Defendants' alleged de jure authority over the subordinates who allegedly committed extrajudicial killings is prima facie evidence of the Defendants' effective control.[71] In doing so, it relied upon the Eleventh Circuit's decision in *Ford ex rel. Estate of Ford*

---

[66]  Prosecutor v. Blaskic, Case No. IT-95-14-T, Judgment, ¶¶ 295 & 302 (Int'l Crim. Trib. for the Former Yugoslavia March 3, 2000) (quoted in Ford ex rel. Estate of Ford v. Garcia, 289 F.3d 1283, 1291 (11th Cir. 2002)).

[67] Borelli Report ¶ 36.

[68] Def. Technical Info. Ctr., DOD Dictionary of Military and Associated Terms i (Aug. 2017), http://www.dtic.mil/doctrine/new_pubs/dictionary.pdf

[69] Borelli Report ¶ 37.

[70] Lt. Col. Joseph Doty & Capt. Chuck Doty, *Command Responsibility and Accountability*, MILITARY REVIEW 36 (Jan.-Feb. 2012) http://usacac.army.mil/CAC2/MilitaryReview/Archives/English/MilitaryReview_20120229_art009.pdf. ("Organizationally, yes, though I do not agree that a commander should be responsible for criminal activity by subordinates unless he was aware and ignored or clearly set the conditions to enable it.").

[71] Mamani, 21 F. Supp. 3d at 1376 (accepting as true Plaintiffs' allegations regarding Defendants' alleged de jure authority).

*v. Garcia*, which itself cited a 2001 *Prosecutor v. Delalic* decision from the ICTY as authority. Delalic confirms that a plaintiff must still establish a defendant had effective control for liability to be imposed, regardless of whether the plaintiff asserts liability under a theory of *de facto* or *de jure* authority.  The Eleventh Circuit cited with approval the *Delalic* court's statement that "a court *may* presume that possession of such power prima facie results in effective control unless proof to the contrary is produced."[72]  In doing so, the ICTY was referring to the trial chamber's discretionary authority rather than defining a rule of law.  As the ICTY explained in a subsequent decision, "The possession of de jure authority, without more, provides only some evidence of such effective control.  Before the International Tribunal there is *no such presumption to the detriment of an accused*."[73]  In other words, proof of de jure authority *may* provide prima facie evidence of effective control, but is not alone sufficient to establish it.  As the Eleventh Circuit recognized in *Ford*, "*Delalic* provides a strong suggestion that it is the plaintiff who must establish, in all command responsibility cases, that the defendant had effective control over his troops."[74]

Consistent with this international legal principle, the Eleventh Circuit has also rejected attempts by TVPA plaintiffs to impose a burden on defendants with de jure authority to disprove effective control.[75]  The Eleventh Circuit has required plaintiffs to carry the burden of persuasion to establish effective control, regardless of whether de jure authority constitutes prima facie evidence thereof.  In other words, de jure authority should be treated as part of the overall factual record when determining the existence of effective control.  As the ICTY noted, "[t]he doctrine of command responsibility is ultimately predicated upon the power of the superior to control the acts of his subordinates."[76]  The question should be whether there is evidence that the Defendants had the degree of control over the alleged perpetrators "which is similar to that of military commanders."[77]

This view that de jure authority may not by itself establish effective control is well-settled in the ICTY's jurisprudence.[78]  As the ICTY Trial Chambers stated in *Kordić*, "Whether de jure or de facto, military or civilian, the existence of a position of authority will have to be based upon an

---

[72] Prosecutor v. Delalic, Case No. IT-96-21-A, Judgement, ¶ 197 (Int'l Crim. Trib. for the Former Yugoslavia Feb. 20, 2001) (emphasis added).  This case is often referred to as the Celebici case.

[73] Prosecutor v. Orić, Case No. IT-03-68-A, Judgment ¶¶ 91-92 (Int'l Crim. Trib. for the Former Yugoslavia July 3, 2008) (emphasis added).

[74] Ford ex rel. Estate of Ford v. Garcia, 289 F.3d 1283, 1292 (11th Cir. 2002).  The Eleventh Circuit's discussion of de jure authority as potential prima facie evidence of effective control is consistent with its reliance on the statement in *Delalic* that a court *may* decide whether evidence of de jure authority provides prima facie evidence of effective control.

[75] *Id.* ("In the end, then, there is ample authority contrary to Appellants' argument that Defendants bore the burden of persuasion on effective control.")

[76] *Delalic*, Case No. IT-96-21-A, ¶ 197.

[77] *Id.*

[78] *See* Prosecutor v. Hadžihasanović, Case No. IT-01-47-A, Judgement, ¶¶ 20-21 (Int'l Crim. Trib. for the Former Yugoslavia Apr. 22, 2008); Prosecutor v. Blagojević, Case No. IT-02-60-A, Judgement, ¶ 302 (Int'l Crim. Trib. for the Former Yugoslavia May 9, 2007).

assessment of the reality of the authority of the accused."[79]  De jure authority is merely evidence that a court should consider in deciding whether effective control exists.  It is not dispositive.

For this reason, it is my opinion that international law requires that the Plaintiffs provide evidence of effective control over the alleged perpetrators to the same degree as that would be enjoyed by a military commander over soldiers under his command.  This is true even if the Defendants held de jure authority over the alleged perpetrators.

Thus, the fact that Defendant Sánchez Lozada held the position of "Captain-General of the Armed Forces" under Article 210(1) of the Bolivian Constitution does not, by itself, establish effective control or even a presumption of effective control over the alleged perpetrators.  A court applying the command responsibility doctrine would have to look for actual evidence of control beyond merely the legal formalities.

As to Defendant Berzaín, the Borrelli Report concedes there is no basis for alleging de jure authority since Minister of Defense's authority was constitutionally limited to administrative support of the Armed Forces, leaving "technical matters" to the Commander in Chief.[80]  The question, therefore, is whether there is evidence of actual behavior that establishes de facto effective control.

> b.   Civilian superiors and effective control

The Borrelli Report wrongly assumes that the command responsibility doctrine applies in exactly the same way to civilian leaders as it does to a military commander.  Because command responsibility arose as a doctrine to hold military commanders responsible for their subordinates' crimes during armed conflicts, it has only recently begun to develop principles applicable to civilian leaders such as the Defendants.  As I noted previously, I have found no international authorities that have applied the command responsibility doctrine outside of an armed conflict, and they have only rarely applied the doctrine to civilian leaders even in times of armed conflict.

Whereas military commanders may be presumed to have operational command over their soldiers through the structure of a military hierarchy, civilian leaders do not usually enjoy the same level of operational control.  Thus, in other cases finding civilian leaders responsible under the command responsibility doctrine, international tribunals have required a finding that the evidence proved the subordinates acted "in accordance with the dictates of" the civilian leaders as opposed to merely being under military command.[81]  A mere hierarchical relationship, which

---

[79] Prosecutor v. Kordić, Case No. IT-95-14/2, Judgement, ¶ 418 (Int'l Crim. Trib. for the Former Yugoslavia Feb. 26, 2001).

[80] Borrelli Report ¶¶ 47, 85.

[81] *See* Prosecutor v. Nahimana, Case No. ICTR-99-52-T, Judgement and Sentence, ¶ 976 (Dec. 3, 2003).

might suffice in a military context to provide evidence of effective control, does not necessarily do so in the civilian context.

For this and other reasons, international authorities have recognized that civilian superiors present a different factual scenario for a doctrine that was originally applied exclusively to military commanders during wartime.[82]  Thus, the states that drafted and then acceded to the Rome Statute creating the International Criminal Court agreed to create a distinct legal framework for determining whether a civilian can be held responsible for his subordinates. While a military commander under the Rome Statute is liable for crimes committed by "forces under his or her effective command and control," the Rome Statute creates a different standard for when a civilian superior is charged.  Article 28(b)(ii) of the Rome Statute requires proving that the alleged illegal "activities" were within the civilian superior's "effective responsibility and control."

By focusing on a superior's effective control over "activities" rather than a military commander's control over his "forces," the nations who agreed to the Rome Statute acknowledged that a civilian superior does not necessarily have the presumptive level of control over his subordinates in the way a military commander does over his soldiers.  For instance, whereas a military commander has command of his troops twenty-four hours a day, a civilian leader rarely, if ever, holds such authority.  A civilian leader's scope of authority is limited to those subordinate activities related to his position, whereas a military commander can be assumed to have authority over every military subordinate's act during wartime.  This assumption is also reflected in the ICTY's acknowledgement that civilians may only be held liable under this doctrine when they "exercise a degree of control over their subordinates which is similar to that of military commanders."[83]

Many commentators believe this standard makes it "more difficult to establish the criminal responsibility of the civilian superiors of those who commit war crimes . . . . [T]his provision obviously raises a high bar to the successful prosecution of civilian leaders."[84]  Others predicted that the ICC's approach "would likely allow some civilian authorities to escape conviction where the court could reach and punish military commanders."[85]  But this different standard for holding civilian leaders liable under command responsibility received the assent of 118 states and provides strong evidence of those states' views on the development of international law.

---

[82] *See, e.g.*, M. CHERIF BASSIOUNI & PETER MANIKAS, THE LAW OF THE INTERNATIONAL CRIMINAL TRIBUNAL FOR THE FORMER YUGOSLAVIA 347-48 (1996) ("Some argue that the command responsibility doctrine should have a different standard when applied to civilians."); *see also* Prosecutor v. Akayesu, No. ICTR-96-4-T, Judgement, ¶ 491 (Sept. 2, 1998) ("The Chamber therefore finds that in the case of civilians, the application of the principle of individual criminal responsibility, enshrined in Article 6 (3) [allowing command responsibility], to civilians remains contentious.").
[83] Prosecutor v. Delalic, Case No. IT-96-21-A, Judgment, ¶ 197 (Int'l Crim. Trib. for the Former Yugoslavia Feb. 20, 2001) (emphasis added).
[84] *See* Vetter, *supra* note 60, at 95 n.44 (quoting advocates for the creation of the ICC as stating "[t]he Rome Statute also departs from the [ICTY Statute] by making it more difficult to establish the criminal responsibility of the civilian superiors of those who commit war crimes . . . . [T]his provision obviously raises a high bar to the successful prosecution of civilian leaders").
[85] *Id.* at 95.

To apply this standard for civilian commanders, a court would have to look for evidence that the defendants had effective control over the illegal "activities" of the alleged perpetrators. Unlike a military commander who is assumed due to military hierarchy to have control over any activities of his "forces," the Plaintiffs will have to establish a direct link between the Defendants' de jure and de facto control and the alleged killings.  As the ICTY observed in a decision refusing to find a civilian leader liable under command responsibility, determining whether civilian leaders have effective control is more difficult:

> While in the case of military commanders, the evidence of external observers such as international monitoring or humanitarian personnel may be relied upon, in the case of civilian leaders evidence of perceived authority may not be sufficient, as it may be indicative of mere powers of influence in the absence of a subordinate structure.[86]

The focus should thus shift away from the de jure control Defendants may have held over the subordinates, and toward whether or not the Defendants were in a position effectively to control the perpetrators's activities (e.g. illegal killings) in this case.

        c.   The Borrelli Report offers insufficient evidence for its conclusion that the Defendants had effective control under international law.

Because de jure control does not by itself establish the existence of effective control, the Plaintiffs must provide evidence of actual control over their subordinates' allegedly illegal activities.  But instead of citing such evidence, the Borrelli Report's conclusion that defendant Sánchez de Lozada held effective control over the alleged perpetrators rests almost entirely on the fact that Sánchez Lozada gave two general, high-level orders to the Bolivian Commander in Chief to have the military mobilize to restore public order.  But both the ICTY and the ICTR have repeatedly held that evidence a superior gave orders that were obeyed does not by itself establish effective control.  For instance, the ICTY acquitted Brđanin, a civilian political leader, on charges of command responsibility despite also finding that the police and army executed orders given by his staff that resulted in illegal killings.  The ICTY Trial Chamber held that "the Accused's de facto authority to direct the action of the police is not indicative of his alleged material ability to prevent or punish the commission of crimes by members of the police."[87] Similarly, the ICTR dismissed an indictment against a Rwandan civilian minister for command responsibility even though they found that the attackers had "followed the orders of the Accused."  No de jure or de facto control existed, the Trial Chambers held, because there "'was no evidence that [the subordinates]' did so in a superior-subordinate hierarchy, or that the Accused had the ability to prevent or punish them for crimes committed."[88]  The ICTR also

---

[86] Prosecutor v. Kordić, Case No. IT-95-14/2, Judgement, ¶ 424 (Int'l Crim. Trib. for the Former Yugoslavia Feb. 26, 2001).

[87] Prosecutor v. Brđanin, Case No. IT-99-36, Judgement, ¶ 374 (Int'l Crim. Trib. for the Former Yugoslavia Sept. 1, 2004).

[88] Prosecutor v. Niyitegeka, Case No. ICTR-96-14-T, Judgement and Sentence, ¶ 477 (May 16, 2003).

acquitted defendant Kamuhanda, a minister in the Rwandan government, of liability under command responsibility even though it convicted him of responsibility for "ordering" an attack. Such considerations for direct versus command responsibility are distinct, the ICTR held.[89]

Moreover, when orders have been used in command responsibility cases to support a finding of effective control in the ICTR, those courts found the illegal attacks were "orchestrated" by the defendant and "only executed upon his direction."[90]  In contrast, the Borrelli Report's evidence of his effective control only indicates that Sánchez de Lozada had the ability to give general orders to the Commander in Chief, the head of the Command in Chief, which is the the highest organ of command and decision making, or operational control, of the Armed Forces.[91]  None of the orders cited by the Borrelli Report authorized extrajudicial killings, nor did they direct the military to conduct particular kinds of lethal operations.  Instead, the orders simply authorized and ordered that operations be conducted to achieve the lawful objectives of restoring law and orderMoreover, the statements that the Borrelli Report claims were made by Sánchez de Lozada generally taking responsibility for what happened in September and October 2003 do not establish effective control without evidence that he had actual control of the operations.[92]  None of the facts relied upon by the Borrelli Report demonstrates that Sánchez de Lozada specifically directed or controlled the operations of the alleged perpetrators, or had the material ability to prevent or punish such perpetrators.  As noted above, the mere existence of orders from a superior does not by itself establish effective control under international law.

Similarly, the Borrelli Report mistakenly concludes that Sánchez Berzaín had effective control.  As the Borrelli Report concedes, Sánchez Berzaín's role as Minister of Defense was legally limited to administrative responsibilities for the Armed Forces.  Even assuming the truth of the Borrelli Report's evidence of Sánchez Berzaín's involvement in military operations, such evidence does not demonstrate effective control under international law.  The Borrelli Report focuses mostly on Sánchez Berzaín's presence and supposed involvement in operations involving Sorata on September 20, 2003.  The Campaign Diary that the Borrelli Report references, however, simply states that the Minister of Defense (among others) arrived in Ayacucho that morning to review the situation, and then flew towards Sorata to observe the operation shortly thereafter. Nowhere does the Campaign Diary suggest, as the Borrelli Report implies, that Sánchez Berzaín made any operational decisions or had effective control over troops on the ground.  According to other evidence introduced by the Borrelli Report, Sánchez Berzaín observed the helicopter along with the Commander in Chief Juan Veliz Herrera, who commanded the operation in Sorata, and Sánchez Berzaín spoke regularly to Sánchez de Lozada by phone throughout the day, updating him on the situation and requesting that an order be given.  According to the Borrelli Report, the request allegedly resulted in Sánchez de Lozada issuing Presidential Directive on September 20, which became the basis of Directive 27/03 issued by the office of the Commander in Chief of the Armed Forces, consistent with the established chain of command.  Again, nowhere

---

[89] Prosecutor v. Kamuhanda, Case No. ICTR-95-54A-T, Judgement, ¶ 611 (Jan. 22, 2004).
[90] Prosecutor v. Kayishema, Case No. ICtR-95-1-T, Judgement ¶ 504 (May 21, 1999).
[91] Borrelli Report ¶ 55.
[92] *Id.* ¶¶ 69, 76, 80.

does the evidence suggest that Sánchez Berzaín made any operational decisions, gave any orders to the Armed Forces, or took any acts suggesting he exercised effective control over troops on the ground.  Similarly, despite the Borrelli Report's conclusory statements as to Sánchez Berzaín's alleged effective control in October 2003, the disputed facts that the Borrelli Report cites does nothing more than confirm that Sánchez Berzaín was involved in support of operations by the Armed Forces, and at best, was engaged with them.

But as numerous international authorities confirm, even a civilian leader exercising substantial influence does not satisfy the effective control requirement**.**  For instance, the ICTY dismissed command responsibility charges against Kordić, a regional political leaders in Central Bosnia on the grounds that even having "tremendous influence and power"[93] is no indication of effective control.[94]  The ICTY reached a similar conclusion in *Delalic* when it dismissed command responsibility charges against a "well-placed influential individual" who nonetheless lacked "political or military authority."[95]

All of this jurisprudence confirms that there is no legal basis for the Borrelli Report's conclusion that the Defendants had effective control for purposes of the command responsibility doctrine.

### 3. That the commander knew or should have known, owing to the circumstances at the time, that his subordinates had committed, were committing, or planned to commit acts violative of the law of war.

According to this Court's earlier ruling in this matter, the doctrine of command responsibility requires the Plaintiffs to demonstrate that the Defendants "knew or should have known, owing to the circumstances at the time," that their subordinates "had committed, were committing, or planned to commit" extrajudicial killings.[96]  This *mens rea* standard is phrased differently than the mens rea standard that is applied under international law to civilians.

In the formulation of the international tribunals, defendant-commanders must have "known, or *had reason to know* that a subordinate was about to commit" a violation in order to incur liability.[97]  The leading international judicial sources that developed the command responsibility doctrine have thus applied the "had reason to know" standard without exception.  Under the

---

[93] Prosecutor v. Kordić, Case No. IT-95-14/2, Judgement, ¶ 839 (Int'l Crim. Trib. for the Former Yugoslavia Feb. 26, 2001).

[94] *See id.* ¶¶ 838-841.

[95] Prosecutor v. Delalic, Case No. IT-96-21-T, Judgement, ¶ 658 (Int'l Crim. Trib. for the Former Yugoslavia Nov. 16, 1998).

[96] Mamani v. Berzain, 21 F. Supp. 3d 1353, 1376 (S.D. Fla. 2014) (quoting Ford v. Garcia, 289 F.3d 1283, 1286 (11th Cir. 2002)).

[97] *See* Prosecutor v. Delalic, Case No. IT-96-21-A, Judgement, ¶¶ 223-226 (Int'l Crim. Trib. for the Former Yugoslavia Feb. 20, 2001) (emphasis added); Prosecutor v. Bagilishema, ICTR-95-1A, Judgement, ¶¶ 26-38 (June 7, 2001); Special Court for Sierra Leone Statute, art. 6; UNTAET Regulation for the East Timor Special Panels for Serious Crimes, § 16; Law on the Establishment of the Extraordinary Chambers in the Courts of Cambodia, art. 29.

"had reason to know" formulation, the Defendants would have knowledge only if information was provided or available that would have given notice of the alleged killings.[98]

When nations agreed to a standard for civilian leaders in the Rome Statute, they adopted another formulation requiring a court to find a civilian leader "consciously disregarded information which clearly indicated" information that would have led to knowledge of their subordinates' crimes but imposing liability on military commanders if they "should have known."

U.S. courts have rarely applied  the "should have known" prong of the knowledge element because almost all U.S. courts have found that defendants had actual knowledge of torture or extrajudicial killings under the TVPA.  For instance, in two of the cases cited by this Court in support of its finding on knowledge, the defendants had actual knowledge of the illegal acts by their subordinates.[99]  The third case "inferred" knowledge from the pattern of abuses, but also relied upon the defendants in that case "actively encouraging" the crackdown.[100] As noted, no international courts have ever applied the "should have known" standard, making it difficult to determine if it is meaningfully different from the "had reason to know" or "consciously disregarded information" formulations recognized in international law.

Because the overwhelming weight of international authority follows the "knew or had reason to know" standard—and because the TVPA's command responsibility is based entirely on international law – it is my opinion that the "should have known" formulation should be interpreted to conform to the "had reason to know" standard (i.e., that the two are not meaningfully different as applied, at a minimum, to civilians). This seems especially important in a case involving civilian defendants because international law has recognized that the requirements for holding civilian superiors liable under this doctrine should be different than for military commanders. As civilian leaders, the Defendants must be shown to have either actual knowledge that the alleged killings were about to be committed or had information presented to them that would have given them knowledge of the imminent alleged killings, or consciously disregarded such information. Under international law, if the "should have known" standard is distinct from the "had reason to know" standard, it should be restricted to determining the *mens reas* of military commanders only as set forth in the ICC Statute.

The Borrelli Report does not specify whether it is stating that the Defendants had actual knowledge of the alleged killings, or whether they failed the "should have known" prong.  It

---

[98] METTRAUX, *supra* note 48, at 195 (arguing that "consciously disregarded" does not diverge from "had reason to know" in any significant way).

[99] *See, e.g.*, Lizarbe v. Rondon, 642 F. Supp. 2d 473, 491 (D. Md. 2009) (defendant oversaw firing on villagers and burning of homes and set up blockade of escape routes); Xuncax v. Gramajo, 886 F. Supp. 162, 173 (D. Mass. 1995) (defendant was aware of and supported widespread acts of brutality committed by personnel under his command) (cited in Mamani v. Berzain, 21 F. Supp. 3d 1353, 1377–78 (S.D. Fla. 2014)).

[100] Doe I v. Lui Qi, 349 F. Supp. 2d 1258, 1332–33 (N.D. Cal. 2004) (defendants had requisite knowledge of their subordinates' alleged human rights violations where "repression and abuse were widespread, pervasive, and widely reported," and both defendants "actively encouraged and incited the crackdown" on victims).

does make three factual claims to support its conclusion that the Defendants knew or should have known: (1) that the Defendants intended to order their soldiers to commit illegal killings; (2) evidence that the Defendants ordered a "massive use of force" against civilians; and (3) that the Defendants altered the rules of engagement to enable their subordinates to kill indiscriminately. All of these essentially allege the Defendants planned and intended to commit crimes against civilians. But none of these factual claims, even if true, would satisfy the definition of "knew or had reason to know" under international law.

As the ICTY held in the *Halilović* decision, knowledge of a possibility that offenses might occur is not enough to satisfy this requirement.  Thus, "[i]t is not sufficient that the information known to the commander at the time of the offense would have indicated the possibility that such offenses might occur, but it is required that the information indicated that such crimes would occur."[101] When the Borrelli Report focuses on the alleged intent of the Defendants, the key inquiry is actually whether they possessed knowledge that the orders to use military force would result in illegal killings. The focus should be on what knowledge the Defendants possessed when the alleged illegal killings were about to occur, and not on their intent months or even years before the alleged illegal killings allegedly occurred.  Thus, the ICTR has acquitted a civilian prefect whose subordinates committed genocidal attacks because the prefect was neither present nor had advance warning of a certain attack until after the attack's completion.[102] Notably, the Borrelli Report does not cite any actual order, given by either Defendant, that innocent civilians should be killed or cite to any piece of evidence that they were told innocent killings were about to occur.

For these reasons, it is my opinion that the Borrelli Report does not provide a sufficient factual basis for its conclusion that the Defendants had sufficient mens rea (as understood under international law) to incur liability under the command responsibility doctrine.

### 4. That the commander failed to prevent the commission of the crimes, or failed to punish the subordinates after the commission of the crimes

The final element of the command responsibility doctrine requires the Plaintiffs to establish that the Defendants failed to prevent their subordinates from committing the alleged extrajudicial killings, or failed to punish their subordinates afterwards for those same alleged crimes. International authorities have elaborated on this element of the doctrine by clarifying that a commander's obligation is to prevent or punish requires that he or she take "necessary and reasonable measures" to prevent his or her subordinates from committing crimes.[103] As the International Committee on the Red Cross Commentary has explained, "the rationale behind the [duty] is the nature of the position of military commanders on the field: ... military

---

[101] Prosecutor v. Halilović, Case No. IT-01-48-T, Judgement, ¶ 68 (Int'l Crim. Trib. for the Former Yugoslavia Nov. 16, 2005).

[102] Prosecutor v. Bagambiki, Case No. ICTR-99-46-T, Judgement and Sentence, ¶ 649 (Feb. 25, 2004).

[103] *See* Prosecutor v. Delalic, Case No. IT-96-21-A, Judgement, ¶ 226 (Int'l Crim. Trib. for the Former Yugoslavia Feb. 20, 2001).

commanders […] are on the spot and able to exercise control over the troops and the weapons which they use."[104]

Drawing on these and other international authorities, U.S. courts applying the TVPA have incorporated this "necessary and reasonable measures" language in jury instructions or other legally binding formulations of this element.[105] Thus, the ICC Statute's formulation in Article 28(b)(iii) reflects both the practice of the ICTY and U.S. courts by stating a civilian superior is responsible for his or her subordinates' crimes where "[t]he superior failed to take all necessary and reasonable measures within his or her power to prevent or repress their commission or to submit the matter to the competent authorities for investigation and prosecution."[106]

   a. Necessary

The ICTY has summarized the definition of the phrase "necessary" as "measures appropriate for the superior to discharge his obligation (showing that he genuinely tried to prevent and punish)."[107] The phrase "necessary" also limits the scope of a commander's duty to prevent to those actions over which he has a legal competence and responsibility. Thus, in the High Command case, a defendant was acquitted of charges for killings of civilianswhere it was established that defendant had no responsibility over the subordinates who committed the killings.[108]

The "necessary" requirement is also meant to avoid applying the duty to prevent too broadly by requiring a civilian leader to take any steps a subsequent court might imagine that would be helpful.  Rather, as the ICTY held in *Kordić*, "To prove a failure to prevent, it would be necessary to show that the superior failed to take any meaningful steps to prevent the commission of the subordinate crime."[109]

For instance, the Borrelli Report alleges that the Defendants breached this duty by failing to issue orders reminding soldiers of their duties to abide by human rights obligations.[110]  This is a good example of a measure that could have been taken, but is not "necessary."  While the Borrelli Report would seem to find a breach of this duty unless all possible steps are taken, the "necessary" requirement limits the duty to taking some (but not all) "meaningful steps" to prevent the illegal acts.

---

[104] ICRC Commentary (Additional Protocol I), ¶ 3560.

[105] Ford ex rel. Estate of Ford v. Garcia, 289 F.3d 1283, 1290 (11th Cir. 2002).

[106] Rome Statute of the International Criminal Court art. 28(b)(iii), July 17, 1998, 2187 U.N.T.S. 90.

[107] *See* Prosecutor v. Halilović, Case No. IT-01-48-A, Judgement, ¶ 63 (Int'l Crim. Trib. for the Former Yugoslavia Oct. 16, 2007).

[108] The United States of America vs. Wilhelm von Leeb et al. US Military Tribunal Nuremberg, Judgment of 27 October 1948, 561 ("High Command" case) (acquitting Field Marshal von Leeb because no evidence he "had knowledge of the murder of civilians within his area by" subordinate in area of his command).

[109] Prosecutor v. Kordić, Case No. IT-95-14/2, Judgement, ¶ 444 (Int'l Crim. Trib. for the Former Yugoslavia Feb. 26, 2001).

[110] Borrelli Report ¶ 150.

b.  Reasonable

International authorities have used the "reasonableness" standard to give flexibility to the measures a commander must take to prevent or punish crimes.  Based on a number of ICTY decisions, the "reasonableness" standard requires a commander to take measures that, in light of the information at his disposal at the time and in view of all relevant factual circumstances, were legal, feasible, proportionate, and timely.[111]  While a court might have adopted different measures, the reasonableness standard asks courts to consider whether the measures taken were reasonable to the commander at that time and given the information that was available. The duty is limited to "feasible" measures since it is not always possible to prevent a breach.  As the ICTY observed in the *Krnojelac* Trial Judgement, the superior "is not obliged to perform the impossible."[112]  Taking disciplinary measures according to applicable law against subordinates, for instance, satisfied this requirement in the *Bagambiki* ICTR decision.[113]

This Court held that the Complaint properly alleged that Defendants failed to prevent the death of the Plaintiffs' relatives because they "direct[ed] the violent military campaign" that led to their deaths but also "repeatedly ignored pleas to find peaceful solutions to the protests."[114]  In my opinion, this analysis does not fully account for the "necessary and reasonable measures" language that is part of international law and which has also been adopted by U.S. courts in interpreting the TVPA.

First, allegedly directing a "violent military campaign" does not preclude the Defendants from having fulfilled their duty to take necessary and reasonable measures to prevent the alleged crimes and punish perpetrators.  Thus, a court could view the Defendants' insistence on issuing a Law of War Manual and directing troops to comply with it as a "necessary and reasonable" measure to prevent crimes.  Second, a court could view the Defendants' appointment of special prosecutors to accompany, investigate, and prosecute possible crimes by their troops could satisfy the "duty to punish" requirement.  At the very least, there is no international precedent for the view that a failure to find a "peaceful solution" breaches the duty to prevent and punish the alleged perpetrators since the military campaign could go on while punishments for alleged extrajudicial killings are being handed out.  The actions to prevent illegal killings, and the punishment of the alleged illegal killings, in other words, are what matters for determining the Defendants' responsibility as commanders. Their failure to reach a peace agreement is irrelevant for this legal purpose.

---

[111] *See* Prosecutor v. Todović, Case No. IT-97-25/1, ¶ 158 (Int'l Crim. Trib. for the Former Yugoslavia Mar. 21, 2006); *Halilović*, Case No. IT-01-48-A, ¶ 63.

[112] Prosecutor v. Krnojelac, Case No. IT-97-25-T, Judgement, ¶ 95 (Int'l Crim. Trib. for the Former Yugoslavia Mar. 15, 2002).

[113] Prosecutor v. Bagambiki, Case No. ICTR-99-46-T, Judgement and Sentence, ¶ 650 (Feb. 25, 2004).

[114] Mamani, 21 F. Supp. 3d at 1378.

5.  Conclusion

In summary, if this Court decides that the international law of command responsibility should apply to civilian leaders outside of an armed conflict, that doctrine requires the Plaintiffs to satisfy four elements.  First, the Plaintiffs must establish that the Defendants' subordinates committed extrajudicial killings as defined by the TVPA for any command responsibility theory of liability to apply.  Second, the Plaintiffs must prove that the Defendants had effective control over the subordinates who committed the alleged extrajudicial killings.  Third, the Plaintiffs must show that the Defendants had actual knowledge, or had been provided information that would have given them actual knowledge, that their subordinates were about to commit the alleged killings.  Finally, the Plaintiffs must demonstrate that the Defendants failed to take any necessary or reasonable measures to prevent the alleged killings from taking place, or to punish those responsible for the alleged killings.

## III.    OTHER THEORIES OF SECONDARY LIABILITY

In addition to alleging that the Defendants are liable for the alleged extrajudicial killings under a theory of command responsibility, the Plaintiffs also allege that Defendants are liable for "because members of the Bolivian Armed Forces who killed Plaintiffs' Decedents were the agents of the Defendants."[115] Separately, the Plaintiffs also allege that the Defendants are liable "as part of a conspiracy" for the alleged extrajudicial killings in this case.[116] This section reviews international legal authorities defining and applying secondary liability under the TVPA.

As it did in the case of command responsibility, the legislative history of the TVPA points to two international sources to guide the application of secondary liability doctrines under the TVPA. The Senate Report cites Article 4(1) of the Convention against Torture, which requires states to criminalize "an act by any person which constitutes complicity or participation in torture."[117]  It also cites Article 3 of the Inter-American Convention to Prevent and Punish Torture, which requires states to punish a "public servant" who "orders, instigates or induces the use of torture, or directly commits it or who, being able to prevent it, fails to do so."[118]

Both of these sources offer international legal theories of liability that are distinct from the command responsibility doctrine.  Both require a finding that the Defendants had actually participated or actively assisted in the alleged extrajudicial killings.  As the Eleventh Circuit observed, the citation of these two treaties show that the TVPA's drafters sought to reach persons who "order[ed], abet[ted], or assist[ed] in the violation."[119]  In contrast, the command responsibility doctrine requires effective control and a failure to prevent or punish a violation, but not active assistance or participation.

---

[115] Second Am. Consolidated Compl. ¶ 189.

[116] *Id.* ¶ 197.

[117] S. Rep. No. 102-249, at 9 n.16.

[118] *Id.*

[119] Cabello v. Fernandez-Larios, 402 F.3d 1148, 1157–58 (11th Cir. 2005) (per curiam).

In order to apply international law standards of secondary liability to the Defendants, the ICC Statute would require this Court to find that the Defendants provided substantial assistance "[f]or the purpose of facilitating the commission" of the alleged extrajudicial killings."[120]  Other authorities, including the ICTY, have required only a showing of "knowledge" that substantial assistance would facilitate the relevant crimes.[121]  Still, this "knowledge" standard for aiding and abetting liability also has been interpreted by the ICTY to require proof that the defendant's substantial assistance was "specifically directed" at aiding the commission of the offense.[122]  This suggests the "purpose" and "knowledge" standards may be closer than many have believed.

For this reason, to establish secondary liability under international law for international crimes like extrajudicial killings, this Court would have to find that the Defendants provided substantial assistance to their subordinates either (1) for the purpose of facilitating the extrajudicial killings; or (2) that was specifically directed at aiding the extrajudicial killings.  Put another way, substantial assistance to the Bolivian military to carry out military operations to safeguard civilians does not satisfy either standard.  Rather, Plaintiffs would have to show that the Defendants provided the substantial assistance for the purpose of aiding the alleged extrajudicial killings or specifically directed their assistance toward committing those alleged extrajudicial killings.  This would require a very different evidentiary showing than that required in order to satisfy the command responsibility doctrine.

---

[120] Rome Statute art. 25(c).

[121] Prosecutor v. Vasiljević, Case No. IT-98-32-A, Judgement, ¶¶ 102(i)-(ii) (Int'l Crim. Trib. for the Former Yugoslavia Feb. 25, 2004); *see also* Prosecutor v. Furundžija, Case No. IT-95-17/1-T, Judgement, ¶¶ 249, 275 (Int'l Crim. Trib. for the Former Yugoslavia Dec. 10, 1998); Prosecutor v. Tadić, Case No. IT-94-1-T, Judgement, ¶¶ 689–692, 730, 735, 738 (Int'l Crim. Trib. for the Former Yugoslavia May 7, 1997).

[122] Prosecutor v. Perišić, Case No. IT-04-81, ¶¶ 28 n.70, 29, 32 (Int'l Crim. Trib. for the Former Yugoslavia Feb. 28, 2013); Prosecutor v. Tadić, Case No. IT-94-1-A, Judgement, ¶ 229 (Int'l Crim. Trib. for the Former Yugoslavia July 15, 1999).

**CONCLUSION**

I summarize my opinion as follows:

*Extrajudicial Killings*

Before any question of command responsibility or other theory of secondary liability, the Plaintiffs must first satisfy the TVPA's definition of extrajudicial killing.  While that statutory definition directs courts to use international law to its meaning and applicability, it does not, as the Aceves Report claims, simply result in an "extension of the right to life norm" under international law.  Based on my review of international law authorities, it is my opinion that the Plaintiffs must offer evidence to establish three key factual findings:

1) That the alleged extrajudicial killings of the Plaintiffs' relatives can be attributed to the Defendants' subordinates based on reliable evidence such as eyewitness observations of state agents in the act of killing the Plaintiffs' relatives;
2) That the alleged extrajudicial killings satisfy the definition of "deliberated" in that the alleged killings were intentional and not the result of an accident or a mistake; and
3) That the alleged extrajudicial killings were not a result of the Defendants' subordinates actions to defend the lives of other civilians, to quell a riot or insurrection, or in their own self-defense.

Under the TVPA as it is interpreted under international law, the absence of any one of these factual findings would make it impossible for the Plaintiffs to satisfy the definition of "extrajudicial killings."

*Command Responsibility and Secondary Liability*

If the Plaintiffs are able to establish that the Defendants' subordinates committed extrajudicial killings within the definition set forth in the TVPA, the Plaintiffs must provide further evidence to establish the Defendants' liability for those alleged killings.  The TVPA has been interpreted to allow the imposition of liability on commanders if Plaintiffs can satisfy the international law doctrine of command responsibility.  Moreover, the TVPA's legislative history also allows secondary liability under the international law doctrine of "aiding and abetting."

As an initial matter, it is my opinion that, under international law, the command responsibility doctrine does not apply to civilian leaders' actions outside armed conflict.  There is no international legal precedent for divorcing the command responsibility doctrine completely from its origins in the laws of war governing armed conflicts.

But if this Court does apply the command responsibility doctrine to the Defendants, the Plaintiffs must establish three key factual findings:

1) That the Defendants had "effective control" over the alleged perpetrators' activities in the same manner and to the same degree as a military commander over his or her forces;

2) That the Defendants had actual knowledge, or had been provided with actual information that would have given them knowledge that their subordinates were about to commit extrajudicial killings; and

3) That the Defendants failed to take necessary and reasonable measures to prevent the alleged extrajudicial killings or to punish the alleged perpetrators.

The failure of the Plaintiffs to establish any of these three factual findings would mean that this Court could not find the Defendants responsible for the alleged extrajudicial killings under a command responsibility theory.

The Borrelli Report improperly imports non-legal terms and concepts such as "command and control" and "non-delegation of responsibility" from military dictionaries into the command responsibility doctrine. There is no legal basis for using the concepts to determine liability under the command responsibility doctrine. The Borrelli Report also ignores the well-accepted international law distinction between civilian leaders and military commanders under this doctrine. Finally, in addition to its misunderstanding of the legal standard, the Borrelli Report makes a number of legal conclusions at odds with international law precedents applying the command responsibility doctrine.

Finally, the TVPA may allow the Plaintiffs to impose secondary liability on the Defendants under the international law of aiding and abetting if they can establish the following two factual findings:

1) That the Defendants gave substantial assistance to their subordinates; and

2) That the Defendants gave such assistance for the purpose of facilitating the alleged extrajudicial killings or with the knowledge that the assistance was specifically directed at the alleged extrajudicial killings.

The failure of the Plaintiffs to establish either of these factual findings would preclude this Court from holding Defendants' liable under an aiding and abetting liability theory.

I declare under penalty of perjury that the foregoing is true and correct.

SIGNED:

_____

Julian Ku
Maurice A. Deane Distinguished Professor of Constitutional Law
Hofstra University, New York
October 11, 2017

**APPENDIX A**

## JULIAN G. KU

Maurice A. Deane School of Law
Hofstra University
Hempstead, NY 11549 U.S.A.
(516) 463-4237
Julian.G.Ku@hofstra.edu

**EDUCATION**

J.D. 1998              Yale Law School, New Haven, CT

B.A. 1994              Yale University, New Haven, CT

**PROFESSIONAL EXPERIENCE**

9/17-Present      *Senior Associate Dean for Academic Affairs, Maurice A. Deane Distinguished
                  Professor of Constitutional Law &
                  Faculty Director of International Programs*
                  Maurice A. Deane School of Law, Hofstra University,
                  Hempstead, NY

                  Classes Taught:
                  - Business Organizations
                  - China and International Law
                  - Contracts
                  - Constitutional Law
                  - Foreign Affairs and the U.S. Constitution
                  - International Business Transactions
                  - International Commercial Arbitration
                  - Introduction to the U.S. Legal System
                  - Law of International Trade
                  - Transnational Law (first year)
                  Committees
                  - Tenure Committee (Chair)
                  - Strategic Planning Committee
                  - Faculty Appointments Committee (Chair in 2009-10, 2011-
                    12).
                  - Diversity Committee
                  - Dean's Search Committee (2012)
                  International Programs
                  - Oversee recruitment, admission, and curriculum for
                    American Legal Studies LL.M students

- Oversee programs in Italy, Curacao, and Cuba.
- Manage and supervise Law School's relationships with foreign universities and institutions, including exchange student programs.

9/14 – 8/17        *Maurice A. Deane Distinguished Professor of Constitutional Law & Faculty Director of International Programs*
Maurice A. Deane School of Law, Hofstra University, Hempstead, NY

5/17-6/17          *Visiting Professor of Law*
National Taiwan University, Taipei, Taiwan, R.O.C..

5/14-8/14          *Visiting Scholar and Taiwan Fellowship Grantee*,
National Taiwan University, Taipei, Taiwan, R.O.C.

9/10 – 8/14        *Professor of Law*
Maurice A. Deane School of Law, Hofstra University, Hempstead, NY

1/11-7/11          *Fulbright Distinguished Lecturer in Law and Grantee*
East China University of Law and Politics, Shanghai, China

9/08-9/10          *Professor of Law & Associate Dean for Faculty Development*
Hofstra University School of Law, Hempstead, NY

8/02-8/08          *Associate Professor of Law*
Hofstra University School of Law, Hempstead, NY

8/06-1/07          *Visiting Assistant Professor of Law*
College of William and Mary Marshall-Wythe School of Law, Williamsburg, VA

10/00- 8/02        *Associate*, International Disputes Resolution Group, Debevoise & Plimpton, New York, NY
- Practice areas include general commercial law, mergers and acquisitions law, securities law, and international commercial arbitration, and public international law

9/99-8/00          *Lecturer in Law and Olin Fellow*
University of Virginia School of Law, Charlottesville, VA

9/98-9/99          *Judicial Clerk*, The Hon. Jerry E. Smith,
U.S. Court of Appeals, Fifth Circuit, Houston, TX

**MEMBERSHIPS**

U.S. Commission on Civil Rights, New York State Advisory Committee
Member (2016)
American Law Institute (2014)
New York Bar (2001)

**PUBLICATIONS**

*Monograph*:    CHINA, THE UNITED STATES, AND THE LIMITS OF INTERNATIONAL LAW (in progress).

TAMING GLOBALIZATION: INTERNATIONAL LAW, THE U.S. CONSTITUTION, AND THE NEW WORLD ORDER (with John Yoo) (Oxford University Press, 2012).

*Law Reviews:*    *Perceptions and Reality: The Enforcement of Foreign Arbitral Awards in China*, 33 UCLA PACIFIC BASIN LAW JOURNAL 1 (2016).

*Why Ratification of the U.N. Convention on the Law of the Sea May Violate Article III of the U.S. Constitution*, 25 MINN. J. INTL. L. 1 (Winter 2016).

*Bond, the Treaty Power, and the Overlooked Value of Non-Self-Executing Treaties*, 90 NOTRE DAME L. REV. 1607(2015) (with John Yoo).

*Striking the Right Balance Between Sovereign Debt Impunity and Market Chaos: Argentina and the Foreign Sovereign Immunities Act*, 36 U. PA. J. INT'L L. 433 (2014)

*Kiobel and the Surprising Death of Universal Jurisdiction Under the Alien Tort Statute*, 107 AM. J. INT'L L. 835 (2013).

*The Enforcement of ICSID Awards in the People's Republic of China,* 6 CONTEMPORARY ASIA ARBITRATION JOURNAL 31 (Spring 2013).

*Globalization and Sovereignty*, 31 BERKELEY JOURNAL OF INT'L L. 210 (2013) (with John Yoo).

*China and the Future of International Adjudication*, 25 MARYLAND J. INT'L L.  154 (2012).

*Rethinking the Direction of the Alien Tort Statute,* 100 GEO. L. J. 2217 (2012).

*The Limits of Corporate Rights Under International Law,* 12 CHI. J. INT'L L. 729 (2012).

*Globalization and Structure*, 53 WM. & MARY L. REV. 431 (2011) (with

John Yoo).

The *Curious Case of Corporate Liability Under the Alien Tort Statute*, 51 VA. J. INT'L L. 353 (2010).

"The Future of Presidential Power Will Resemble the Past," WHITE HOUSE STUDIES (2010).

*Unitary Executive Theory and Exclusive Presidential Powers,* 12 U. PENN. J. CONST. L. 615 (2010) (symposium essay).

*How System Criminality Could Exacerbate the Weaknesses of International Criminal Law*, 8 SANTA CLARA J. OF INT'L L. 365 (2010) (symposium essay).

*The Wrongheaded and Dangerous Campaign to Criminalize Good Faith Legal Advice,* 42 CASE W. RES. J. INT'L L. 449 (2009) (symposium essay).

*The Prospects for the Peaceful Co-existence of Constitutional and International Law*, 119 YALE L. J. ONLINE 15 (2009)

Medellin's *Clear Statement Rule: A Solution for International Delegations,* 77 FORDHAM L. REV. 609 (2008) (symposium essay)

*The Crucial Role of the States and Private International Law Treaties: A Model for Accommodating Globalization,* 73 MO. L. REV. 1063 (2008) (symposium essay)

Sanchez- Llamas v. Oregon*: Stepping Back from the New World Court Order*, 11 LEWIS & CLARK L. REV. 17 (2007) (symposium essay)

*Do International Criminal Tribunals Deter or Exacerbate Humanitarian Atrocities*?, 84 WASH. U. L. REV. 777 (2006) (with Jide Nzilebe)

*A No Decision:* Sosa v. Alvarez-Machain *and the Debate Over the Domestic Status of Customary International Law*, 101 AM. SOC'Y INT'L L. PROC. 267 (2007)

Hamdan v. Rumsfeld*: The Functional Case for Foreign Affairs Deference to the Executive Branch,* 23 CONST. COMMENT. 179 (Summer 2006) (Faculty Edited) (with John Yoo)

*Gubernatorial Foreign Policy*, 115 YALE L. J. 2380 (2006) (symposium article)

*Ali v. Rumsfeld: Challenging the President's Power to Interpret Customary International Law*, 38 CASE WESTERN INT'L L. J. 371 (2006) (symposium essay)

*Is There an Exclusive Commander-in-Chief Power?*, 115 YALE L. J. POCKET

PART 84 (March 1, 2006)

*International Delegations and the New World Court Order,* 81 WASH. L. REV. 1 (2006)

*Structural Conflicts in Judicial Interpretations of Customary International Law*,   45 SANTA CLARA L. REV. 857 (2005) (symposium essay)

*The Third Wave: the Alien Tort Statute and the War on Terrorism*, 19 EMORY INT'L L. REV. 205 (2005) (symposium essay)

*Beyond Formalism in Foreign Affairs: A Functional Approach to the Alien Tort Statute*, 2005 SUP. CT. REV. 153 (with John Yoo). (Faculty Edited)

*Treaties as Laws: A Defense of the Last in Time Rule for Treaties and Federal Statutes*, 80 IND. L. J. 319 (2005)

*The State of New York Does Exist: How States Control Compliance with International Law*, 82 N.C. L. REV. 457 (2004)

*Customary International Law in State Courts*, 42 VA. J. INT'L L. 265 (2001)

*The Delegation of Federal Power to International Organizations: New Problems with Old Solutions*, 85 MINN. L. REV. 71 (2000)

| | |
|---|---|
| *Book Chapters:* | "The Benefits of Avoiding Conflicts Between the Constitution and International Law," in William Dodge, David Sloss, and Michael Ramsey, eds., THE SUPREME COURT AND INTERNATIONAL LAW: CONTINUITY OR CHANGE? (Oxford University Press 2011). |
| | "The Unsatisfactory Condition of Customary International Law in the United States", in Rebecca A. Bratspies and Russell A. Miller, eds., PROGRESS IN INTERNATIONAL LAW (Martinus Nijhoff Press 2008). |
| *Other Publications:* | "Trump's Syria strike clearly broke international law — and no one seems to care**,**" *Vox.com* (April 19, 2017). https://www.vox.com/the-big-idea/2017/4/19/15345686/syria-un-strike-illegal-un-humanitarian-law |
| | "Trump Might Be Stuck with NAFTA," Los Angeles Times (November 29, 2016) (with John Yoo). http://www.latimes.com/opinion/op-ed/la-oe-yoo-ku-trump-nafta-20161129-story.html (Republished in the Chicago Tribune, the Cleveland Plain Dealer, the Houston Chronicle, and the St. Paul Pioneer Press) |

"It is Beijing's fault that China lost big in the South China Sea ruling," Quartz (July 17, 2016).
http://qz.com/733012/it-is-beijings-fault-that-china-lost-big-in-the-south-china-sea-ruling/

"While the Courts Have Ruled, China Is Not Leaving the South China Sea," *The National Interest* (July 15, 2016).
http://nationalinterest.org/blog/the-buzz/while-the-courts-have-ruled-china-not-leaving-the-south-16980

"China's Legal Scholars Are Less Credible After South China Sea Ruling" *Foreign Policy* (July 14, 2016).
http://foreignpolicy.com/2016/07/14/south-china-sea-lawyers-unclos-beijing-legal-tribunal/

China's Ridiculously Weak Legal Argument for Not Complying with the South China Sea Arbitration, *Financial Times* (Chinese edition) (July 1, 2016) (中国抵制南海仲裁的理由成立□?).
http://www.ftchinese.com/story/001068274

"Differing interpretations of international law could spark major naval conflict between the US and China," *Quartz* (October 20, 2015)
http://qz.com/527865/differing-interpretations-of-international-law-could-spark-major-naval-conflict-between-the-us-and-china/

"The U.S. Isn't Challenging China's Claims in the South China Sea, Yet", *Defenseone* (May 29, 2015)
http://www.defenseone.com/threats/2015/05/us-isnt-challenging-chinas-claims-south-china-sea-yet/114043/

"The Philippines' Massive Lawfare Blunder in the South China Sea," *The National Interest Online* (December 11, 2014).
http://nationalinterest.org/feature/the-philippines-massive-lawfare-blunder-the-south-china-sea-11837

"The Supreme Court Misses Its Chance to Limit the Treaty Power," *Forbes.com* (June 12, 2014).
http://www.forbes.com/sites/realspin/2014/06/12/the-supreme-court-misses-its-chance-to-limit-the-treaty-power/

"When Corporate Defendants Play Offense," *The Wall Street Journal* A11 (Friday, July 5, 2013) (with George T. Conway III).
http://www.wsj.com/articles/SB10001424127887324328204578572592476276824

"The Supreme Court Unanimously Rejects Universal Jurisdiction" (April 21, 2013), *Forbes.com*, (with John Yoo)
http://www.forbes.com/sites/realspin/2013/04/21/the-supreme-court-unanimously-rejects-universal-jurisdiction/

"A Bigger Concern is the Law of the Sea Treaty" (December 7, 2012), *NYTimes.com*.
http://www.nytimes.com/roomfordebate/2012/12/06/have-treaties-gone-out-of-style/the-senators-are-right-to-worry-about-vague-language-in-treaties

"Don't Cry for Argentina: The World's Worst Sovereign Deadbeat" (November 30, 2012), *Forbes.Com*.
http://www.forbes.com/sites/realspin/2012/11/30/dont-cry-for-argentina-the-worlds-worst-sovereign-deadbeat/

"Online *Kiobel* symposium: The Alien Tort Statute as a species of extraterritorial U.S. law" (July 16, 2013), *SCOTUSBlog.com*.
http://www.scotusblog.com/2012/07/online-kiobel-symposium-the-alien-tort-statute-as-a-species-of-extraterritorial-u-s-law/

"Treaties shouldn't trump law," *Houston Chronicle* (March 11, 2006),
http://www.chron.com/disp/story.mpl/editorial/outlook/3716391

"Treaties shouldn't trump U.S. law," *Los Angeles Times* B13 (March 8, 2006)
http://www.latimes.com/news/opinion/commentary/la-oe-ku8mar08,1,5129382.story

"Choosing Between Constitutional and International Law: Why the U.S. Had Good Reason to Ignore the Recent World Court Order," *Writ,* FINDLAW.COM,  February 11, 2003,
http://writ.news.findlaw.com/scripts/printer_friendly.pl?page=/commentary/20030211_ku.html

*Weblogs:*          *Opiniojuris.org,* Co-Founder and Permanent Contributor
Contributions can be found at
http://opiniojuris.org/author/julianku/

*Lawfare*, Contributing Editor.
Contributions can be found at
https://www.lawfareblog.com/contributors/jkuguest

*Twitter:*           @julianku

## PRESENTATIONS

10/17    The Supreme Court, the Alien Tort Statute, and Jesner v. Arab Bank, George Washington University School of Law, Washington D.C.

4/17    China and the South China Sea Arbitration, Harvard University School of Law, Cambridge, MA

3/17    How China's View of the Law of Jus ad Bellum Could Shape Its Legal Views on Cyber-Warfare, Hoover Institution, Palo Alto, CA

1/17    Track II Dialogue, Maritime Disputes in the South China Sea, National Committee for U.S.-China Relations, Hainan, China

12/14    "The South China Sea Arbitration and International Law," New York City Bar Association, Admiralty Committee, New York, NY

11/16    Commentator, Timothy Gelatt Dialogue, New York University, New York, NY

9/16    The South China Sea Arbitration Award and China, Habibie Center, Jakarta, Indonesia.

8/16    The South China Sea Arbitration Award, U.S. State Department International Visitors' Program, New York, NY.

6/16    Co-Presenter, Compliance with the South China Sea Arbitration Award, Council on Foreign Relations, New York, NY.

5/16    Asian Island Disputes, University of California at Berkeley, Corsica, France.

4/16    China, Sovereignty, and the Future of International Law, University of Minnesota Law School, Minneapolis, Minnesota

2/16    China and Sovereign Immunity, St. Johns University School of Law, New York, NY

2/16    Maritime Disputes in the East China Sea, U.S. Naval War College, Newport, Rhode Island

2/16    Asian Island Disputes, The Heritage Foundation, Washington D.C.

11/15    "The Paris Climate Change Talks and the U.S. Constitution's Requirements for International Agreements," Testimony before the U.S. Senate Committee on the Environment and Public Works, Washington DC

11/15    The Significance of China's View on the Jus Cogens Exception to Foreign Sovereign Immunity, Duke University School of Law, Durham, NC

| | |
|---|---|
| 11/15 | "The Case Against Investor-State Dispute Settlement", Columbia University Center for Sustainable Investment, New York, NY (commenter, with Simon Lester). |
| 4/15 | War Powers and the Obama Administration, New York City Bar Association, New York, NY |
| 4/15 | State Governments, Treaties, and Foreign Affairs, Midwest Regional Meeting, National Association of Attorneys General, Indianapolis, Indiana |
| 3/15 | The Bush Administration and National Security, George W. Bush Presidential Conference, Hofstra University, Hempstead, NY (moderator) |
| 3/15 | The Constitutional Case Against U.S. Ratification of the UN Convention on the Law of the Sea, The Federalist Society and George Washington University, Washington D.C. |
| 3/15 | What the Rise of China Means for International Dispute Settlement: The Philippines-China South China Sea Arbitration as a Case Study, New York City Bar Association, New York, NY |
| 2/15 | What the Rise of China Means for International Dispute Settlement: The Philippines-China South China Sea Arbitration as a Case Study, University of California at Berkeley, Berkeley, California |
| 11/14 | Bond and the Overlooked Value of Non-Self-Executing Treaties, Notre Dame School of Law, South Bend, Indiana |
| 10/14 | Post-*Kiobel* Litigation and Prospects, Pepperdine University School of Law, Malibu, California |
| 8/14 | What the Rise of China Means for International Dispute Settlement: The Philippines-China South China Sea Arbitration as a Case Study, Vanderbilt University School of Law |
| 8/14 | What the Rise of China Means for International Dispute Settlement: The Philippines-China South China Sea Arbitration as a Case Study: National Sun-Yat Sen University, Kaohsiung, Taiwan. |
| 6/14 | The Philippines-China South China Sea Arbitration, National Institute for South China Sea Studies, Haikou, Hainan, China. |
| 6/14 | "Taming Globalization", National Chengchi University, Taipei, Taiwan. |
| 3/14 | The Fourth Amendment and Section 702 of the Foreign Intelligence Surveillance |

Act, Privacy and Civil Liberties Oversight Board, Washington D.C.

12/13      Argentina and U.S. Law Governing Foreign Sovereign Immunity, Cato Institute, Washington D.C.

11/13      Does the Rise of China Mean the End of International Dispute Resolution Under the UN Convention on the Law of the Sea, Asian Society of International Law Biennial Conference, New Delhi, India

11/13      International Law and the U.S. Government' Decisions to Use Military Force, OP Global Jindal Law School, India

10/13      Argentina's Sovereign Debt Litigation and the U.S. Supreme Court, Emerging Markets Trade Association Panel, London, U.K.

5/13      China and International Law, American Society of International Law Annual Meeting, Washington DC

11/12      National Security v. International Law, Federalist Society National Lawyer's Convention, Washington D.C.

10/12      Taming Globalization, International Law Weekend, American Branch of the International Law Association, New York, NY

9/12      China and the Enforcement of ICSID Awards, Chinese Arbitration Association, Taipei, Taiwan ROC

7/12      Taming Globalization, Bryant Park, New York

6/12      Taming Globalization and the Future of Global Governance, American Enterprise Institute, Washington D.C.

3/12      "Transnational Human Rights Litigation in State Courts and Under State Law, University of California at Irvine School of Law, Irvine, CA

3/12      The Foreign Corrupt Practices Act at 35 and its Impact on Global Business, Ohio State University, Columbus, OH

11/11      Corporations and International Law: A Response to Alan Sykes, Georgetown Law Journal's 100th Anniversary, Washington D.C.

10/11      China and the Future of International Adjudication, China, Taiwan, and International Law: Essays in Honor of Professor Hungdah Chiu, University of Maryland School of Law, Baltimore, MD

9/11      International Law in Crisis, Cox Center, Case Western Reserve University School

of Law, Cleveland, OH

6/11     The Implementation of International Economic Law in the United States, Guangxi University, Nanning, China

6/11     The False Promise of the Direct Effect of Treaties, International Law Association Asia-Pacific Regional Branch, Taipei, Taiwan, Republic of China.

5/11     The Implementation of International Economic Law in the United States, Northwest University, Xi'an, China

5/11     The Implementation of International Economic Law in the United States, Wuhan University, Wuhan, China

5/11     The Implementation of International Economic Law in the United States, Zhongnan University of Finance and Law, Wuhan, China

5/11     History and the Study of International Law, American Society for International Law, Teaching International Law Interest Group, Pace University, New York, NY.

4/11     The Debate Over Judicial Review, Chinese University of Political Scicnce and Law, Beijing, China.

4/11     Legal Aspects of the United States War on Terrorism, Chinese University of Political Scicnce and Law, Beijing, China.

4/11     Globalization and the U.S. Constitution, Chinese University of Hong Kong, Hong Kong, SAR, China.

4/11     Globalization and the U.S. Constitution, City University of Hong Kong, Hong Kong, SAR, China.

3/11     Globalization and the U.S. Constitution, Fudan University, Shanghai, China.

11/10     The Case Against Corporate Rights Under International Law, American Society of International Law International Economic Law Interest Group, University of Minnesota, Minneapolis, MN

10/10     The Responsibility to Protect and Sovereign Dignity, American Branch of the International Law Association, International Law Weekend, New York, NY.

6/10     The Enforcement of Foreign Judgments and Transnational Litigation, U.S. Chamber of Commerce Panel, The Manhattan Institute, New York, NY

5/10     "Kosovo, Palestine, and Declarations of Independence," Northwestern University Law School, Chicago, IL

4/10      "The Curious Case of Corporate Liability Under the Alien Tort Statute,"
          University of Georgia Colloquium on International Law, Athens, GA

3/10      "Corporate Liability Under the Alien Tort Statute," Annual Meeting of the
          American Society of International Law, Washington D.C.

2/10      "The Constitution, International Humanitarian Law, and the War on Terrorism,"
          Justice Action Center, New York Law School, New York, NY

2/10      "The Obama Administration and the United Nations," John Bassett Moore
          Society Annual Symposium, University of Virginia School of Law, Charlottesville,
          VA

1/10      "The Constitution and U.S. Interrogation Policy," U.S. Marine Corps Command
          and Staff College, Quantico, VA

1/10      "The Future of U.S. Interrogation Policy and the Obama Administration,"
          American Association of Law Schools Annual Meeting, New Orleans, LA

12/09     "The Curious Case of Corporate Liability Under the Alien Tort Statute," American
          Society of International Law, International Law in Domestic Courts Interest
          Group, University of California Hastings College of Law, San Francisco, CA

10/09     "The Future of Presidential Power", Peter S. Kalikow Center for the Study of the
          Presidency, Hofstra University, Hempstead, NY

10/09     "Transnational Norms and U.S. Sovereignty," Meeting of the American Branch of
          the International Law Association,  New York, NY

10/09     Roundtable on "Does the Constitution Follow the Flag? The Evolution of
          Territoriality in American Law), Temple University Beasley School of Law,
          Philadelphia, PA

9/09      "Signing Statements and Challenges to Executive Power," Meeting of the
          International Association of Law Schools, Washington DC

9/09      Accountability for the Torture Memos, Symposium on "After Guantanamo", Case
          Western Reserve University School of Law, Cleveland, OH

3/09      "Deterrence and System Criminality," Symposium on the Future of International
          Criminal Law, Santa Clara University Law School, Santa Clara, CA

2/09      "The Unitary Executive and Exclusive Executive Power", Symposium on the
          Unitary Executive, University of Pennsylvania, Philadelphia, PA

4/08      "The Difficulties of Constitutional Rights for Extraterritorial Conduct," Annual Meeting of American Society of International Law, Washington D.C.

3/08      "The Dangers of Extraterritorial Constitutionalism," Symposium on the Constitution and National Security, St. Johns Law School, Queens, NY

2/08      Private International Law Treaties and the Constitution, Symposium on Missouri v. Holland, University of Missouri- Columbia Law School, Columbia, MO

2/08      "The Case Against Corporate Liability for International Crimes," Symposium on Grave Breaches of International Law, Brooklyn Law School, Brooklyn, NY

10/07     "Delegations and International Institutions," Symposium on International Law and the Constitution: Terms of Engagement, Fordham Law School, New York, NY

10/07     "Corporate Liability for International Crimes," American Branch of the International Law Association, New York, NY

3/07      "Customary International Law in the United States", Annual Meeting of the American Society of International Law, Washington D.C.

1/07      "Globalization and the U.S. Constitution", Globalization Comes Home Conference, University of California at Berkeley, Berkeley, CA

11/06     "The Bush Administration and the War on Terrorism",  American Civil Liberties Union, Virginia Chapter, Virginia Beach, VA

8/06      "Roundtable on International Tribunals,"  American Political Science  Association Annual Meeting, Philadelphia, PA

3/06      "Gubernatorial Foreign Policy," Symposium on Executive Power,  Yale Law School, New Haven, CT

2/06       "Gubernatorial Foreign Policy," Lewis & Clark Law School, Portland, OR

2/06       "The President and the Interpretation of Customary International Law,"  Outsourcing of American Law, American Enterprise Institute, Washington  D.C.

1/06      "International Human Rights Treaties and Constitutional Interpretation,"  Barnes Symposium on Western and Non Western Views of Human Rights, University of South Carolina Law School, Columbia, SC

11/05     "The President's Power to Interpret Customary International Law and the Alien Tort Statute", Symposium on the 20th Anniversary of *Filartiga v. Pena-Irala*, Rutgers-Camden School of Law, Camden, NJ

| | |
|---|---|
| 10/05 | "Torture and the War on Terror," Symposium on the War on Terrorism, Case Western Reserve University School of Law, Cleveland, OH |
| 9/05 | "International Delegations," University of San Diego School of Law,  San Diego, CA |
| 1/05 | "Structural Tensions in Judicial Interpretation of Customary International Law," Santa Clara University School of Law, Santa Clara, CA |
| 1/05 | "Delegation and the New World Court Order," International Legal Studies Conference, University of California at Berkeley, Boalt Hall, Berkeley CA |
| 10/04 | "The Third Wave," Alien Tort Claims after *Sosa v. Alvarez Machain*, Emory University School of Law, Atlanta, GA |
| 5/04 | Supreme Court in American Politics, "International Human Rights Law in American Courts," Program in Law and Public Affairs, Princeton University, Princeton, NJ |
| 12/03 | "Treaties as Laws," American Society of International Law Section, International Law in Domestic Courts Workshop, University of Maryland School of Law, Baltimore, MD |
| 12/02 | "The State of New York Does Exist," American Society of International Law Section, International Law in Domestic Courts Workshop, Fordham University, New York, NY |

**APPENDIX B**

**LIST OF FACTUAL SOURCES**

Defendants' counsel has made available to me the following documents which I have reviewed in formulating my opinions set forth herein.

1. Petition for Certiorari (December 2016).
2. Order Granting in Part and Denying in Part Defendants' Joint Motion to Dismiss (May 20, 2014).
3. Second Amended Consolidated Complaint (June 24, 2013).
4. Order Granting in Part and Denying in Part Defendants' Joint Motion to Dismiss (November 11, 2009).