UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 07-22459-CIV-COHN/SELTZER
CASE NO. 08-21063-CIV-COHN/SELTZER

ELOY ROJAS MAMANI, et al.,

      Plaintiffs,

v.

JOSÉ CARLOS SÁNCHEZ BERZAÍN,

      Defendant in No. 07-22459.

GONZALO DANIEL SÁNCHEZ DE
LOZADA SÁNCHEZ BUSTAMANTE,

      Defendant in No. 08-21063.

_____/

## ORDER GRANTING DEFENDANTS' RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW[1]

**THIS CAUSE** is before the Court upon Defendants' Renewed Motion for

Judgment as a Matter of Law [DE 501 in Case No. 07-22459; DE 475 in Case No. 08-

21063] ("Motion").[2] The Court has carefully considered the Motion, Plaintiffs' Response

and Defendants' Reply, the arguments of counsel on March 19 and 23, 2018, and the

record in these cases, and is otherwise advised in the premises. For the reasons set

forth below, Defendants' Motion is granted.

---

[1] Although styled as a supplement to their original Federal Rule of Civil Procedure 50(a) motion made at the close of Plaintiffs' case, Defendants' Motion is properly considered a "renewed motion" under Rule 50(b) because the Court declined to grant Defendants' original motion. See Ortiz v. Jordan, 562 U.S. 180, 189 (2011) ("Federal Rule of Civil Procedure 50(b) . . . permits the entry, postverdict, of judgment for the verdict loser if the court finds that the evidence was legally insufficient to sustain the verdict."). Regardless, it is of no consequence whether the Motion is labeled a "supplement" or "renewal" because the Motion advances the same grounds as Defendants' preverdict Rule 50(a) motion.

[2] All docket citations in this Order refer to Case No. 07-22459, which was consolidated with Case No. 08-21093 in May 2008. See DE 68.

## I.   **INTRODUCTION**

These cases concern the Bolivian government's alleged massacre of its own civilians during a period of civil unrest in Bolivia in 2003. Plaintiffs—nine Bolivian residents and citizens—are the relatives of eight Bolivian civilians allegedly killed deliberately by the Bolivian military.[3] The crux of Plaintiffs' claims is that two former high-ranking Bolivian government officials—the former President, Gonzalo Daniel Sánchez de Lozada Sánchez Bustamante ("Defendant Lozada"), and the former Minister of Defense, José Carlos Sánchez Berzaín ("Defendant Berzaín")—masterminded a violent military campaign that led to Plaintiffs' relatives' deaths, all in an effort to quell public opposition to their unpopular political agenda. Based on these allegations, Plaintiffs brought claims against Defendants for extrajudicial killings under the Torture Victim Protection Act of 1991 ("TVPA"), Pub. L. No. 102-256, 106 Stat. 73 (codified at 28 U.S.C. § 1350 note), and for intentional wrongful death under state law.

On April 3, 2018, after a three-week-long jury trial, the jury rendered a verdict for Plaintiffs on their TVPA claims. DE 474.[4] The jury awarded Plaintiffs a total of $10 million dollars in compensatory damages, but declined to award any punitive damages.

---

[3] Plaintiffs Eloy Rojas Mamani and Etelvina Ramos Mamani sue on behalf of their daughter, Marlene Nancy Rojas Ramos. Plaintiff Sonia Espejo Villalobos sues on behalf of her common-law husband, Lucio Santos Gandarillas Ayala. Plaintiff Hernán Apaza Cutipa sues on behalf of his sister, Roxana Apaza Cutipa. Plaintiff Teófilo Baltazar Cerro sues on behalf of his wife, Teodosia Morales Mamani. Plaintiff Juana Valencia de Carvajal sues on behalf of her husband, Marcelino Carvajal Lucero. Plaintiff Hermógenes Bernabé Callizaya sues on behalf of his father, Jacinto Bernabé Roque. Plaintiff Gonzalo Mamani Aguilar sues on behalf of his father, Arturo Mamani Mamani. Plaintiff Felicidad Rosa Huanca Quispe sues on behalf of her father, Raúl Ramón Huanca Márquez.

[4] The jury found that Defendants were not liable under Bolivian wrongful death law. See DE 474. While Defendants argue that this renders the jury's verdict inconsistent, the jury's finding of no liability under Bolivian law is not at issue here. The Court has already held that the jury's verdict is not irreconcilably inconsistent. DE 494 at 18:19-22 (4/3/18 Trial Tr.). And Defendants concede that even if the Court were to reconsider this ruling, an inconsistent verdict would not itself be an independent basis for granting the instant Motion. DE 501 at 18 n.5.

2

Id. Defendants now argue that Plaintiffs failed to present a legally sufficient evidentiary basis for the jury's verdict, and therefore seek judgment as a matter of law.

## II.    BACKGROUND

### A.    Pleadings

This litigation has a lengthy procedural history, which is detailed in the Court's Order Denying Defendants' Joint Motion for Summary Judgment, Mamani v. Berzaín, ___ F. Supp. 3d ___, 2018 WL 2013600, at *11-12 (S.D. Fla. Feb. 14, 2018), and need not be repeated in full here. One aspect of the history of this litigation, however, is worth highlighting given its significance to the issues raised in Defendants' Motion. That is, the evolution of Plaintiffs' claims from their 2008 Amended Complaint [DE 77]—which the Eleventh Circuit held "allege[d] no facts showing that the deaths in this case met the minimal requirement for extrajudicial killing," Mamani v. Berzaín, 654 F.3d 1148, 1155 (11th Cir. 2011)[5]—to their 2013 Second Amended Complaint [DE 174], which this Court held "alleged facts plausibly suggesting that [Plaintiffs'] relatives' deaths were extrajudicial killings" under the TVPA. Mamani v. Berzaín, 21 F. Supp. 3d 1353, 1374 (S.D. Fla. 2014).

In Plaintiffs' 2008 Amended Complaint, they alleged that in response to protests in Bolivia in 2003, Defendants "order[ed] Bolivian security forces, including military sharpshooters armed with high-powered rifles and soldiers and police wielding machine guns, to attack and kill scores of unarmed civilians." DE 77 ¶ 1. Plaintiffs specifically alleged that in each part of the country where their relatives were killed, and on the days in September and October 2003 when they were killed, soldiers fired upon civilians

---

[5] While the Eleventh Circuit was specifically analyzing whether Plaintiffs had sufficiently pled a cause of action under the Alien Tort Statute ("ATS"), not the TVPA, the Eleventh Circuit relied "on the TVPA definition [of an extrajudicial killing] for guidance." Mamani, 654 F.3d at 1155.

3

without justification. See id. ¶¶ 38-39 (alleging that on September 20, 2003, the Bolivian military shot from a helicopter at villagers below in Warisata and attacked civilians there with sharpshooters and machine guns); id. ¶ 54 (alleging that on October 12, 2003 in El Alto, soldiers "took up firing positions . . . and began shooting directly at civilians in the road with rifles and machine guns"); id. ¶ 63 (alleging that on October 13, 2003 in La Paz, "[t]he military opened fire [at villagers] with rifles and machine guns, and the villagers fled in different directions," with "[t]he military continu[ing] to fire on the fleeing villagers."). Plaintiffs described these acts as "part of a pattern and practice of systemic and widespread attacks and human rights violations committed against the civilian population in Bolivia from September to October 2003, for which Defendants bear responsibility." Id. ¶ 78. As noted above, the Eleventh Circuit held that these allegations were insufficient to make out a plausible claim for extrajudicial killings. Mamani, 654 F.3d at 1155.

The Eleventh Circuit explained that the TVPA defines an extrajudicial killing as a "deliberated killing." Id. at 1154 (citing TVPA § 3(a)). A deliberated killing is one that is "undertaken with studied consideration and purpose." Id. at 1155. The Eleventh Circuit reasoned that Plaintiffs alleged no facts showing that decedents' deaths were deliberated, and that "[o]n the contrary: even reading the well-pleaded allegations of fact in the [Amended] Complaint in plaintiffs' favor, each of the plaintiffs' decedents' deaths could plausibly have been the result of precipitate shootings during an ongoing civil uprising." Id. That is, given the fact that the decedents were killed during a time of "significant conflict" in Bolivia involving trapped travelers, thousands of protestors, and a blockade of major highways to the nation's capital, the Eleventh Circuit noted that

4

alternative explanations (other than extrajudicial killing) for the pertinent
seven deaths easily come to mind; for instance, the alleged deaths are
compatible with accidental or negligent shooting (including mistakenly
identifying a target as a person who did pose a threat to others), individual
motivations (personal reasons) not linked to defendants, and so on.

Id. Finally, the Eleventh Circuit went on to contrast the killings at issue in this litigation

with the killing at issue in Cabello v. Fernandez-Larios, 402 F.3d 1148 (11th Cir. 2005)

(per curiam), which involved a former military officer defendant personally commanding

a "killing squad" that killed civilian prisoners. The Eleventh Circuit held that "[t]he

specific targeting of the victim based on his political beliefs, direct involvement of the

defendant, and premeditated and deliberate circumstances of the victim's death

set Cabello apart from the facts alleged in this case." Mamani, 654 F.3d at 1155 n.9.

After the Eleventh Circuit instructed this Court to dismiss Plaintiffs' Amended

Complaint, Plaintiffs filed their Second Amended Complaint on June 24, 2013. DE 174.

Critically, Plaintiffs' Second Amended Complaint included for the first time the allegation

that Defendants entered office with a preconceived plan to deliberately kill civilians in

order to suppress opposition to their economic policies. Specifically, Plaintiffs alleged

that Defendants "took office . . . intending to impose controversial economic programs"

and that "[t]hey knew that these programs, particularly a plan to export gas through

Chile, would trigger political protests." Id. ¶ 2. Given their awareness "that, in the past,

political protests had successfully pressured past governments to change unpopular

policies," Defendants allegedly decided "to use unlawful, lethal military force against

Bolivian civilians to ensure that the anticipated protests would not derail their unpopular

plans." Id. ¶¶ 2-3. Plaintiffs further alleged that "Defendants made a conscious decision

that thousands of unlawful killings would be both necessary and acceptable to deter

5

protests," and that "in a meeting before the 2002 elections, Defendants agreed that they would have to kill 2,000 or 3,000 people in order to ensure that popular opposition would not block their proposals." Id. ¶ 4. Plaintiffs went on to describe how Defendants implemented their alleged plan, and how the deaths of decedents and approximately fifty others were the "intended result of Defendants' plan to use systematic unlawful killings to quash and deter opposition to their economic programs." Id. ¶¶ 5-7. In sum, Defendants' alleged plan to kill civilians was the centerpiece of Plaintiffs' Second Amended Complaint.

When Defendants moved to dismiss Plaintiffs' Second Amended Complaint, Plaintiffs argued in response that the Second Amended Complaint "contain[ed] copious new factual allegations directly showing that Defendants developed and executed an unlawful plan that led to the deaths of Plaintiffs' family members," and noted that these allegations "were not part of the [2008 Amended Complaint] and respond directly to the omissions identified by the Eleventh Circuit," DE 189 at 2. In fact, when discussing the differences between the Amended Complaint and the Second Amended Complaint, Plaintiffs stated that "[m]ost important, the [Second Amended Complaint] contains factual allegations that the two Defendants repeatedly discussed their plan to kill civilians . . . ." Id. at 27. Given these new allegations that decedents' deaths were the intended result of Defendants' alleged preconceived plan, the Court denied Defendants' motion to dismiss Plaintiffs' TVPA claims and held that Plaintiffs had sufficiently alleged that decedents' deaths were deliberated, and therefore extrajudicial killings. Mamani, 21 F. Supp. 3d at 1373-75. On appeal, the Eleventh Circuit exercised its discretion not to decide the issue of whether the Second Amended Complaint stated a claim for

6

extrajudicial killings under the TVPA. <u>Mamani v. Berzaín</u>, 825 F.3d 1304, 1312-13 (11th Cir. 2016).

Thereafter, on October 4, 2016, the Court set these cases for trial and permitted discovery to commence. DE 232.

### B. Summary Judgment

On November 28, 2017, after approximately a year of discovery, Defendants moved for summary judgment on all of Plaintiffs' claims. DE 342. Defendants argued, *inter alia*, that the summary judgment record contained no evidence that any of Plaintiffs' relatives were intentionally killed by the Bolivian military. <u>See</u> DE 342-1. Specifically, Defendants argued that no reasonable jury could conclude that the killings at issue were deliberated because Plaintiffs could not identify the specific individuals who shot each decedent, much less present any evidence concerning whether those unknown individuals shot the decedents intentionally. <u>Id.</u> at 18.

In response, Plaintiffs argued that they were not required to identify the specific individuals who shot each decedent because, even lacking such evidence, the summary judgment record still sufficiently supported a finding that the decedents were killed deliberately given evidence of Defendants' preconceived "plan to use military force to kill unarmed civilians in order to suppress civilian protests and deter opposition to their policies." DE 375 at 11, 14. Plaintiffs claimed that evidence suggesting that the decedents' deaths resulted from the implementation of Defendants' alleged plan—which had "the explicit goal of killing civilians"—was sufficient to support a finding that the killings were deliberate. <u>Id.</u> at 11-12.

7

Although Defendants' alleged plan to kill civilians was central to Plaintiffs' theory of the case, Plaintiffs' only evidence of the existence of this plan was the Declaration of Victor Hugo Canelas Zannier. DE 375-10 (Canelas Decl.).[6] In his declaration, Mr. Canelas stated that he was present at a meeting in 2001 at Defendant Lozada's home where Defendant Berzaín said that, when he and Defendant Lozada came into power, they would "avoid the problems that President Hugo Banzer Suarez faced during the 'Water War'"[7] by using trained troops from eastern Bolivia (as opposed to conscripts) to confront protesters, and that "it would be necessary to 'kill two or three thousand people.'" Id. ¶¶ 4-6. According to Mr. Canelas' declaration, Defendant Lozada "indicated that he approved of what [Defendant] Berzaín said." Id. ¶ 7.

Ultimately, the Court agreed with Plaintiffs that, at the summary judgment stage, this evidence of Defendants' alleged plan to kill civilians, together with circumstantial evidence that the decedents' deaths resulted from the implementation of this plan, was sufficient to raise a jury question as to whether decedents' deaths were extrajudicial killings. Mamani, ___ F. Supp. 3d ___, 2018 WL 2013600, at *18-20. Specifically, the Court held that "a reasonable jury, considering the evidence of Defendants' plan to kill civilians to quash public opposition to their policies, could find that decedents' deaths were deliberated because they were the expected and desired outcome of this plan." Id. at *18. The Court explained that, "given the totality of the [summary judgment] evidence"—from which the Court was required to draw all reasonable inferences in the

---

[6] To be clear, Plaintiff cited additional evidence that, if accepted by the jury, could permit the inference that the decedents' deaths resulted from the *implementation* of Defendants' alleged plan by the Bolivian military. See DE 375 at 11-12. But Plaintiffs did not present any other evidence, apart from Mr. Canelas' declaration, that could permit a reasonable inference of the *existence* of a plan to kill civilians.

[7] During the "Water War" of 1999 and 2000, the Bolivian government was forced to abandon a plan to privatize the water system in Cochabamba, Bolivia in the face of massive protests.

8

light most favorable to Plaintiffs—a jury could reasonably infer that decedents' deaths

resulted from the implementation of Defendants' plan to kill civilians based on five

pieces of evidence:

> (1) changes in Bolivian military doctrine during Defendant Lozada's administration to define protesters as subversives who could be targeted with military force; (2) a pattern of soldiers being ordered to shoot unarmed civilians in multiple different locations, including each location where decedents were killed, on multiple different dates; (3) a pattern of soldiers shooting indiscriminately at civilians at times when witnesses saw no armed protesters or anything indicating that the soldiers were firing defensively; (4) Defendants' repeated refusal to seriously commit to achieving peaceful, negotiated solutions to protests; and (5) consistent with Defendants' plan, the utilization of troops from Eastern Bolivia.

Id.

In sum, given Plaintiffs' evidence that (1) a plan to kill civilians existed and (2)

decedents' deaths resulted from the implementation of this plan by the Bolivian military,

the Court held that Plaintiffs could withstand summary judgment despite their inability to

present any witnesses who saw the individuals who shot each decedent.  Id.

### C.    Trial

The Court held a jury trial beginning on March 5, 2018.  DE 438.  During the

course of trial, Plaintiffs presented at least some circumstantial evidence in each of the

five categories that the Court, in its summary judgment Order, had held—if accepted by

the jury—could permit the reasonable inference that the decedents deaths' resulted

from the Bolivian military's *implementation* of a plan to kill civilians.  But critically,

Plaintiffs failed to present any evidence that such a plan actually *existed*.

At trial, like at summary judgment, Mr. Canelas was the only witness offered by

Plaintiffs to testify regarding a plan to kill civilians.  But Mr. Canelas did not testify at trial

according to his earlier summary judgment declaration.  While he testified about the

9

meeting at Defendant Lozada's home where Defendant Berzaín made a comment about using troops from eastern Bolivia to kill civilians, rather than offer admissible testimony that Defendant Lozada indicated his approval of this comment, Mr. Canelas only testified that Defendant Lozada responded "This is over" and then "just adjourned the meeting." DE 482 at 92:6-12 (3/14/18 Trial Tr.). Despite repeated prodding by Plaintiffs' counsel, Mr. Canelas did not offer any admissible testimony that Defendant Lozada approved of Defendant Berzaín's comment or otherwise indicated any agreement to a plan to kill civilians.[8] Mr. Canelas' trial testimony is set forth below in relevant part:

> A: . . . It was in [Defendant Lozada's] residence. It is a meeting where I approach, and I hear Carlos Sanchez Berzain. In Bolivia, in the year 2000, under the government of Banzer, what was known as the Water War, where the people of Cochabamba opposed the privatization of water, and Banzer uses force in the attempt to repress them. And I heard Carlos Sanchez Berzain say, "It's not going to happen to us as it happened to Banzer." Banzer used soldiers without what we call in Bolivia mostrencos. Mr. Sanchez Berzain continues, and he says, "What we're going to use are elite troops, troops from the Beni, and we will kill 50, a hundred, a thousand." Upon hearing that I said to the people that were gathered there, but I was addressing Sanchez Berzain, that if it were a matter of killing people, dictatorships would have lasted forever.
>
> BY MR. MUNOZ:
> Q: What happens after that?
>
> A: [Defendant Lozada] adjourns that meeting, because other people are now arriving. He says to everyone and he says to me, "This is over."
>
> Q: Did Mr. de Lozada have a response to the comment made by either Mr. Berzain or you?
>
> A: No specific commentary. He just adjourned the meeting and, from my point of view, with some sort of approval.

---

[8] The Court excluded as speculative Mr. Canelas' opinion that, when Defendant Lozada adjourned the meeting, he did so "from my point of view, with some sort of approval." Id. at 92:11-14; 93:4-9.

10

MS. REYES: Objection, Your Honor. Speculation.

THE COURT: Sustained as to the conclusion.

MS. REYES: Yes, Your Honor. Thank you.

BY MR. MUNOZ:
Q: I'm going to clarify a statement that he made regarding a distinction between military. You mentioned a distinction between the military proposed by Mr. Berzain versus other type that I think you called mostrencos. What is the distinction?

A: What Banzer had were untrained troops. These are troops that are in for a year. And Berzain was proposing elite troops, troops from the countryside, from the Beni.

Q: And what, if anything, did you see Mr. de Lozada do after Mr. Berzain's comment?

A: It's what I said a moment ago.

Q. Which is what?

A. From my point of view, a species or –

MS. REYES: Objection, Your Honor. Speculation. It has already been sustained.

THE COURT: Sustained. He can give his observations but not his conclusion or opinion.

3/14/18 Trial Tr. at 91:12-93:9.

At the close of Plaintiffs' case, Defendants moved for judgment as a matter of law

pursuant to Federal Rule of Civil Procedure 50(a). See DE 447-1; DE 484 at 5-33

(3/19/18 Trial Tr.). Defendants argued, *inter alia*, that because Plaintiffs offered no

evidence of a plan to kill civilians, "no reasonable jury could conclude that the

[decedents'] deaths were deliberate." DE 447-1 at 5. Although the Court expressed

reservations as to whether the jury could reasonably infer the existence of such a plan

from the evidence at the close of Plaintiffs' case, the Court reserved ruling on

11

Defendants' Motion. 3/19/18 Trial Tr. at 32:15-33:3. Defendants renewed their Motion at the close of evidence, and the Court again, despite expressing "serious reservations as to the sufficiency of the evidence relating to a plan to use lethal force against civilians," reserved ruling so that the Court could "hear what the jury has to say, and then, if need be, readdress th[e] motion." DE 488 at 169:7-20 (3/23/18 Trial. Tr.).[9]

The Court submitted the case to the jury on March 26, 2018. DE 454. The jury deliberated for six days, and on April 3, 2018, returned a verdict for Plaintiffs on their TVPA claims, finding that decedents' deaths were extrajudicial killings by Bolivian soldiers, and that Defendants were secondarily liable for those deaths because they had command responsibility over the Bolivian soldiers who committed the killings. DE 474.[10] The Court deferred entering judgment pending resolution of the instant Motion.

## III.    **STANDARD**

Defendants' Motion is governed by Federal Rule of Civil Procedure 50(b). Under Rule 50(b), the Court is called upon to review the sufficiency of the evidence and "should grant judgment as a matter of law when the plaintiff presents no legally sufficient evidentiary basis for a reasonable jury to find for him on a material element of his cause of action." Pickett v. Tyson Fresh Meats, Inc., 420 F.3d 1272, 1278 (11th Cir. 2005). Conversely, the court should deny the motion "if the plaintiff presents enough evidence to create a substantial conflict in the evidence on an essential element of the plaintiff's case." Id. "In other words, the evidence must be sufficient so that a jury will

---

[9] As explained in the Advisory Committee Notes to Federal Rule of Civil Procedure 50, "the court may often wisely decline to rule on a motion for judgment as a matter of law made at the close of the evidence" due to the fact that "a jury verdict for the moving party moots the issue and because a preverdict ruling gambles that a reversal may result in a new trial that might have been avoided." Advisory Committee Notes to 1991 Amendment to Rule 50.

[10] Because the Court holds that Plaintiffs have failed to present evidence supporting a reasonable inference that decedents' deaths were extrajudicial killings, it need not address Defendants' argument that there is no evidence to support command responsibility liability for the killings.

12

not ultimately rest its verdict on mere speculation and conjecture." Anthony v. Chevron USA, Inc., 284 F.3d 578, 583 (5th Cir. 2002).

The court must consider all of the evidence in the light most favorable to the nonmoving party and grant that party the benefit of all reasonable inferences. Cleveland v. Home Shopping Network, Inc., 369 F.3d 1189, 1192–93 (11th Cir. 2004). "Nonetheless, a non-movant must present more than a mere scintilla of evidence." U.S. Steel, LLC, v. Tieco, Inc., 261 F.3d 1275, 1288 (11th Cir. 2001). Additionally, a jury verdict is not entitled to "the benefit of unreasonable inferences, or those at war with the undisputed facts." United Fire & Cas. Ins. Co. v. Garvey, 419 F.3d 743, 746 (8th Cir. 2005) (internal quotation marks omitted); see also McGreevy v. Daktronics, Inc., 156 F.3d 837, 840-41 (8th Cir. 1998) ("A reasonable inference is one which may be drawn from the evidence without resort to speculation.") (internal quotation marks omitted).

Ultimately, judgment as a matter of law is appropriate if the "facts and inferences point so overwhelmingly in favor of the movant that reasonable people could not arrive at a contrary verdict." Bogle v. Orange Cty. Bd. of Cty. Comm'rs, 162 F.3d 653, 656 (11th Cir. 1998) (internal quotation marks omitted). "While the court affords due deference to the jury's findings, it is axiomatic that such findings are not automatically insulated from review by virtue of the jury's careful and conscientious deliberation." Ice Portal, Inc. v. VFM Leonardo, Inc., No. 09-60230-CIV, 2010 WL 2351463, at *5 (S.D. Fla. June 11, 2010). "Rule 50 'allows the trial court to remove cases or issues from the jury's consideration when the facts are sufficiently clear that the law requires a particular result.'" Weisgram v. Marley Co., 528 U.S. 440, 447 (2000) (internal quotation marks omitted).

## IV.    DISCUSSION

As noted above, Defendants argue that they are entitled to judgment as a matter of law principally because Plaintiffs presented no evidence from which a reasonable jury could conclude that decedents' deaths were deliberated, and therefore extrajudicial killings under the TVPA. Defendants assert that because Plaintiffs introduced no evidence regarding the identity of the individual shooters who killed the decedents, much less evidence regarding the state of mind of these unknown shooters, Plaintiffs needed to introduce evidence at trial of Defendants' alleged preconceived plan to kill civilians in order for the jury to reasonably conclude that the decedents' deaths were deliberated. And this, Defendants say, Plaintiffs failed to do. Defendants note that:

> Plaintiffs did not utter the word "plan," or otherwise refer to a plan, in their opening statement. Not a single witness has testified that President Sánchez de Lozada and Minister Berzaín planned or ordered innocent civilians to be killed in order to deter protests in 2003. Indeed, during the presentation of Plaintiffs' 29 witnesses, over eight trial days, the word "plan" was spoken zero times in connection with a plan to kill innocent civilians.

DE 447-1 at 3. Defendants contend that even Mr. Canelas did not testify about a plan, but only that he heard a single comment from Defendant Berzaín at a meeting more than three years before the events at issue. Id. at 3-4. Defendants point to the fact that Mr. Canelas did not offer any admissible testimony that Defendant Lozada approved of what Defendant Berzaín had said at this meeting or indicated any agreement to a plan to kill civilians. Id. at 7.[11]

_____

[11] Defendants also assert that "there is nothing in [Mr. Canelas'] testimony that Mr. Berzaín contemplated using troops to kill *unarmed protestors.*" DE 447-1 at 7. Defendants say that Mr. Canelas testified only that people in Cochabamba opposed privatization, not that those people were unarmed and protesting peaceful. Id.

14

Plaintiffs' response to this argument has evolved during the course of trial and briefing the instant Motion. First, at the close of their case, Plaintiffs argued that based on evidence that

> [m]ultiple officers in multiple places on multiple days ordered soldiers to shoot at unarmed civilians, without lawful justification, and [evidence that] soldiers responded by shooting indiscriminately at civilians . . . [t]he jury could infer from this pattern that these orders were part of the Defendants' plan to suppress popular protests with lethal military violence.

DE 448 at 12-13. Plaintiffs suggested that such an inference was supported by evidence of the implementation of military policies known as the Republic Plan and the Manual on the Use of Force after Defendants took office. Id. at 2-4; 3/19/18 Trial Tr. at 18:21-19:25. Plaintiffs also argued that further support for the inference that the shootings occurred as part of Defendants' alleged plan "can be drawn from the fact that Defendants have not produced any evidence suggesting that they took any steps to issue orders to protect civilians, to investigate civilian deaths, or to ensure that troops under their command did not shoot and kill unarmed civilians." DE 448 at 13.

The problem for Plaintiffs, of course, is that evidence suggesting that shootings occurred as part of a plan is not itself evidence that a plan existed in the first place. Perhaps recognizing this fundamental flaw in their argument, Plaintiffs changed tack during their closing argument to the jury and—instead of arguing that they had presented evidence that decedents' deaths resulted from the implementation of a plan to kill civilians—implied that the testimony of Jose Elias Harb was sufficient evidence of deliberateness. DE 489 at 178:17-179:2 (3/26/18 Trial Tr.). Mr. Harb was the Vice Minister of Government in Defendant Lozada's administration and testified regarding, *inter alia*, the debate within the administration as to whether to respond to the protests

15

engulfing the country "through the control of the State mechanisms" or negotiation. DE
500-7 at 164:11-20 (Harb Dep. Tr.). In his closing argument, Plaintiffs' counsel
referenced Mr. Harb's deposition testimony which had been played at trial and, after
reminding the jury that "[a] deliberated killing is one that is undertaken with studied
consideration and purpose," asked "[w]hat could be more studied, what could be greater
consideration than debate and dispute within the own government?" 3/26/18 Trial Tr. at
178:17-21.

Finally, in Plaintiffs' post-verdict response to the instant Motion, Plaintiffs theory
of deliberateness shifted yet again. See DE 510. This time, Plaintiffs argued that
evidence of a "widespread campaign against civilians" was alone sufficient to support
the jury's verdict. Id. at 16. Specifically, Plaintiffs argue that

> [t]he jury heard evidence of a widespread campaign against civilians—one
> that spanned weeks and many locations, involved a number of Bolivian
> troops, and resulted in over 50 deaths and hundreds wounded. Such
> evidence is sufficient to establish that each killing was deliberated as part
> of that campaign.

Id. In other words, Plaintiffs say that solely based on evidence that over fifty people
died in different locations on different days, it is reasonable to infer that all of those
people were killed deliberately.

Plaintiffs further argue that while this evidence of a "widespread campaign" is
"sufficient on its own," the jury could have also reasonably inferred that decedents'
deaths were deliberated because of evidence that Defendants "were warned that an
aggressive response to the protests would lead to a 'Bolivian tragedy' and 'generate
deaths.' Yet Defendants insisted on their hardline approach." Id. at 17. Plaintiffs say
that this evidence, coupled with evidence that Defendants "continued the military

16

operations despite actual knowledge of widespread civilian casualties . . . allows for the jury's reasonable inference that Defendants intended, supported, or at the very least, knew of the lethal military campaign against the civilian population and the inevitable civilian deaths." Id.

## A. The Absence of Evidence of a Plan to Kill Civilians Precludes TVPA Liability in These Cases

For the reasons set forth below, Plaintiffs' failure to adduce evidence at trial of Defendants' alleged preconceived plan to kill civilians—which had been central to their case theory for the past five years of this litigation and to this Court's Summary Judgment Order—compels the Court to grant Defendants' Motion. The evidence borne out at trial, even when viewed in the light most favorable to Plaintiffs, simply does not support a reasonable inference that the deaths in these cases meet the minimal requirement for extrajudicial killing.

The Court does not lightly set aside the jury's verdict in these cases where each Plaintiff has suffered a tragic loss and fought undeterred for justice—both in the United States and Bolivia—for almost fifteen years. But the Court is nevertheless bound to grant Defendants' Motion as it is not only clear that Plaintiffs have failed to present a legally sufficient evidentiary basis for TVPA liability, but the evidence that Plaintiffs did present at trial is strikingly similar to the allegations that the Eleventh Circuit previously found insufficient earlier in this litigation.

### 1. Evidence of Multiple Shootings Resulting in a Total of Fifty Deaths is Not Evidence of Extrajudicial Killings

As noted above, Plaintiffs have effectively abandoned their argument that the jury could reasonably infer from the evidence the existence of plan to kill civilians. Plaintiffs'

17

chief argument now is that evidence of a "widespread campaign" involving Bolivian soldiers being ordered to shoot and/or shooting indiscriminately at unarmed civilians on multiple days and in multiple locations while there were no armed civilians in the immediate vicinity, eventually resulting in over fifty deaths and hundreds wounded, is sufficient on its own to show that each of the deaths at issue here "was deliberated as part of that campaign." DE 510 at 16. To be certain, Plaintiffs did present evidence at trial of indiscriminate shootings by the Bolivian military in the locations where the decedents were killed. See, e.g., DE 500-1 at 26:20-21 (Aguilar Dep. Tr.) (troops ordered to "shoot at anything that moved" in Warisata on September 20, 2003); DE 500-4 at 29:23-32:14 (Castaño Dep. Tr.) (military witnessed shooting a "rain of bullets" at people running down an alleyway in El Alto on October 12, 2003); DE 480 at 37:17-38:4 (3/12/18 Trial Tr.) (soldiers seen "shooting in every direction" in the Southern Zone of La Paz on October 13, 2003).

There is also evidence, however, that on these days in September and October 2003, not only was the country of Bolivia in crisis, but there were specific crises at each of the locations where decedents were shot. For example, there is unrebutted evidence that there was: (1) an ambush in Warisata on the military convoy transporting trapped travelers on September 20, Aguilar Dep. Tr. at 68:24-69:13, Ex.1002.3; (2) crippling blockades in El Alto and La Paz in October, DE 478 at 86:5-87:11 (3/8/18 Trial Tr.), 3/12/18 Trial Tr. at 95:11-98:5; (3) attacks on October 12 in El Alto on tanker trucks transporting gasoline to La Paz by protestors armed with rifles and dynamite, Ex. 1002.27; and (4) and an attack on the military on October 13 in the Southern Zone of La Paz, 3/12/18 Trial Tr. at 130:12-131:10.

18

Thus, at minimum, the evidence establishes a plausible reason for the military's presence and its use of some degree of force in each shooting location, meaning that Plaintiffs' evidence of a "widespread campaign" is not evidence of a random campaign of violence from which no reasonable inference can be drawn other than deliberate killings. This is why Plaintiffs needed to present some evidence to the jury from which it could reasonably infer (not merely speculate) that the shootings were more than disproportionate reactions to civil unrest or attacks on the military, but were essentially premeditated, or deliberated, killings. And this was the critical gap filled by evidence at summary judgment of Defendants' preconceived plan to kill civilians. Plaintiffs' failure to adduce that evidence at trial effectively lands them back where they were seven years ago, when the Eleventh Circuit found legally insufficient their allegations of indiscriminate shootings in multiple locations—shootings which Plaintiffs then described, like they do now, as "part of a pattern and practice of systemic and widespread attacks" against civilians.

Not only did the Eleventh Circuit find Plaintiffs' allegations of a pattern of indiscriminate shootings, without more, insufficient to meet the minimal requirement for extrajudicial killing, it also rejected another argument similar to one that Plaintiffs make now: that the scale of the loss of life and injuries resulting from the events at issue supports an inference that the killings were deliberate. Plaintiffs expressly cite the "magnitude" of the attacks at issue as further support that an inference of deliberateness is reasonable. DE 510 at 16. But the Eleventh Circuit, albeit operating

19

under a different legal framework,[12] specifically held that while this toll—then alleged to be seventy deaths—"is sufficient to cause concern and distress," given the "mass demonstrations, as well as the threat to the capital city and to public safety," it is not sufficiently "widespread" or "systematic" to amount to "conduct that is carried out in an extensive, organized, and *deliberate* way, and that is plainly unjustified." Mamani, 654 F.3d at 1156 (emphasis added).

Even if the Court were forced to examine this issue without the benefit of the Eleventh Circuit's guidance, the Court would reach the same conclusion. Evidence that approximately fifty individuals were killed, without more, is not evidence that those individuals were killed deliberately. In support of their argument to the contrary, Plaintiffs first cite the Court's Summary Judgment Order. DE 510 at 16 ("intent to kill may be inferred from evidence that 'decedents' deaths resulted from the implementation of Defendants' plan to use military force'") (quoting Mamani, ___ F. Supp. 3d ___, 2018 WL 2013600, at *17). Critically, Plaintiffs omit the remainder of this sentence from the Court's Summary Judgment Order, which discusses Defendants' alleged plan "to use military force *to kill unarmed civilians*." Mamani, ___ F. Supp. 3d ___, 2018 WL 2013600, at *17 (emphasis added). While the evidence could of course support a reasonable inference that Defendants planned to use military force to, for example, restore order in Bolivia, it is not possible to infer—without resorting to speculation—that Defendants planned to use such force to kill unarmed civilians. And again, evidence that might suggest that civilians were killed according to an unlawful plan to kill civilians is not itself evidence that such a plan existed.

---

[12] The Eleventh Circuit was specifically examining whether Plaintiffs, in their 2008 Amended Complaint, "pleaded facts sufficient to state a claim [under the ATS] for a crime against humanity pursuant to established international law." Mamani, 654 F.3d at 1156.

Plaintiffs next rely on cases involving the 1998 United States embassy bombings in Tanzania and Kenya and the 2000 bombing of the U.S.S. Cole in Yemen. DE 510 at 16-17. In Owens v. Republic of Sudan, 864 F.3d 751, 770 (D.C. Cir. 2017), the D.C. Circuit held that the 1998 embassy bombings "were 'deliberated' in that they involved substantial preparation, meticulous timing, and coordination across multiple countries in the region." Similarly, in Flanagan v. Islamic Republic of Iran, 190 F. Supp. 3d 138, 163 (D.D.C. 2016), the district court held that the "coordination and planning" required to carry out the U.S.S. Cole bombing indicates that it was deliberated.[13] These cases are unhelpful to Plaintiffs for obvious reasons.

For one, neither of these cases involves a set of facts from which competing inferences could conceivably be drawn regarding intent. Unlike here, where the jury was tasked with deciding whether the evidence showed a democratically elected government's response to civil unrest or a deliberated campaign to kill unarmed civilians, in Owens and Flanagan, there was no possible inference to be drawn that the terrorist bombings at issue were intended to serve some legitimate purpose. And the "meticulous timing" and "coordination" that supported a finding of deliberateness in Owens was based on facts showing "the near-simultaneous bombings of American embassies in two different countries." 864 F.3d at 797. In contrast, it would be unreasonable in the instant cases to infer, merely from the locations and timing of the shootings—which the unrebutted evidence showed were dictated by external crises outside of Defendants' control—or the number of troops involved, that the shootings

---

[13] Owens and Flanagan were decided under the Foreign Sovereign Immunities Act (FSIA), which waives a foreign states' immunity from suit in cases seeking money damages "against a foreign state for personal injury or death that was caused by," inter alia, "extrajudicial killing." 28 U.S.C. § 1605A(a)(1). The FSIA utilizes the TVPA's definition of extrajudicial killing. See id. § 1605A(h)(7).

21

were the product of a similar degree of timing and coordination. Moreover, Plaintiffs'

argument that the killings at issue here must have involved substantial coordination and

planning presupposes the existence of a plan that required substantial coordination to

implement.

> 2. Evidence That Defendants Were Advised Against Using Military
> Force and Continued to Employ the Military After Civilians Were
> Killed is Not Evidence of Extrajudicial Killings

Plaintiffs next argue that evidence that (1) Defendants were warned against

employing the military but did so anyways and (2) "continued the military operations

despite actual knowledge of widespread civilian casualties" shows that decedents'

deaths were deliberated. DE 510 at 17-18. Specifically, Plaintiffs claim that this

evidence, when viewed in conjunction with Defendant Berzaín's comment in 2000 that,

once in power, Defendants would "kill [fifty], a hundred, a thousand," permits an

inference that "Defendants intended, supported, or at the very least, knew of the lethal

military campaign against the civilian population and the inevitable civilian deaths." Id.

at 17.

The first problem with this argument is that, as discussed above, there is no

evidence that the "military campaign" which Plaintiffs claim that Defendants "intended,

supported, or . . . knew of" was a campaign to intentionally kill unarmed civilians. Thus,

Defendants' intent to launch this "campaign," or their knowledge or support of it, is

irrelevant to whether Plaintiffs have presented sufficient evidence of extrajudicial

killings. Mr. Canelas' testimony regarding Defendant Berzaín's comment in 2000 does

not alter this conclusion.

Plaintiffs argue that because Defendant Lozada "did nothing to dispute or disavow [Defendant] Berzaín's unconscionable statement, the jury could have properly inferred that he adopted it as well." Id. at 17 n.5. But the only support Plaintiffs offer on this point is an unpublished decision wherein the Eleventh Circuit held that, based on evidence that the plaintiff "was asked several questions to which he did not respond," the trial court properly instructed the jury that it could consider whether plaintiff's "silence was an admission of the truth of the statement." Elzubier v. Sony Music Holdings, Inc., 564 Fed. Appx. 545, 549 (11th Cir. 2014) (per curiam). Here, as Defendants point out, there was no question put to Defendant Lozada, nor was he silent. He said "[t]his is over" and adjourned the meeting. It would be unreasonable to infer, as Plaintiffs suggest, that based on this response, Defendant Lozada "adopted" Defendant Berzaín's comment. It would be even more unreasonable to infer that, because Defendant Lozada did not do more to "dispute or disavow" the comment, the mobilization of the military three years later to respond to various crises was actually the implementation of a plan to kill up to a thousand civilians. See, e.g., Fenner v. Gen. Motors Corp., 657 F.2d 647, 650-51 (5th Cir. Unit B June 1981) ("[A] jury may properly reconstruct a series of events by drawing an inference upon an inference. The inference relied upon, however, must be reasonable.") (citation and internal quotation marks omitted)).[14]

Additionally, neither the evidence that there was debate within Defendant Lozada's administration about the proper response to the issues facing the country nor

---

[14] In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all decisions of the United States Court of Appeals for the Fifth Circuit, as that court existed on September 30, 1981, handed down by that court prior to close of business on that date.

the evidence that Defendants were warned not to employ the military is evidence from which a reasonable jury could infer that Defendants chose the path of military intervention out of a desire to intentionally kill unarmed civilians. To reach such a conclusion from the evidence presented at trial would be impossible without resort to speculation. And, as a general matter, it would be unprecedented to conclude that, because an elected official's decisions as to how to govern his or her country were made over the opposition of others within the government and ultimately resulted in the loss of civilian life, the loss of life was intentional. Likewise, Plaintiffs cite no authority supporting their argument that Defendants' decision not to abandon military operations after there had been civilian casualties supports an inference that those casualties, and all subsequent casualties, were intentional. See Mamani, 654 F.3d at 1155 ("'Plaintiffs point to no case where similar high-level decisions on military tactics and strategy during a modern military operation have been held to constitute extrajudicial killing under international law.'") (alterations omitted) (quoting Belhas v. Ya'alon, 515 F.3d 1279, 1293 (D.C. Cir. 2008) (Williams, J., concurring)).

### 3. The Totality of the Evidence Does Not Support a Reasonable Inference That Plaintiffs' Relatives Were Killed Deliberately

Finally, Plaintiffs argue that it is improper to "point to individual pieces of evidence and suggest that, in isolation, each piece cannot support the verdict." DE 510 at 2. Rather, Plaintiffs say that the totality of the evidence presented allows for the jury's reasonable inference that decedents' deaths were deliberated. But whether the evidence is considered individually or cumulatively, the Court cannot conclude that such an inference can reasonably be drawn.

At most, the evidence in these cases supports an inference that Defendants responded to civil unrest in their country with a heavy hand, and that some unidentified members of the Bolivian military fired upon civilians for unknown reasons. But that is insufficient to impose TVPA liability on these Defendants. See Mamani, 654 F.3d at 1155 (holding that shootings based on "individual motivations (personal reasons) not linked to defendants" and those "compatible with accidental or negligent shooting[s]" are not extrajudicial killings). Plaintiffs' failure to present any evidence supporting a reasonable inference that decedents' deaths were "undertaken with studied consideration and purpose" impels judgment as a matter of law in favor of Defendants. Id.

## V.    CONCLUSION

After Plaintiffs' claims were dismissed without prejudice seven years ago, they amended their pleadings and included a new allegation that their relatives were killed pursuant to a plan, conceived and implemented by Defendants, to deliberately kill civilians in order to suppress opposition to Defendants' policies. Plaintiffs stressed the importance of this new allegation in addressing deficiencies in their case previously identified by the Eleventh Circuit, and based on this allegation—and a sworn statement substantiating same—the Court held that Plaintiffs had put forth sufficient evidence to present their case to a jury. At trial, however, Plaintiffs failed to present any evidence supporting this critical allegation. And the evidence that Plaintiffs did present is legally insufficient to support the jury verdict rendered in their favor. Accordingly, it is

**ORDERED and ADJUDGED** that Defendants' Renewed Motion for Judgment as a Matter of Law [DE 501 in Case No. 07-22459; DE 475 in Case No. 08-21063] is

**GRANTED**.  The Court will enter a separate Final Judgment in favor of Defendants consistent with this Order.

**DONE AND ORDERED** in Chambers at Fort Lauderdale, Broward County, Florida, this 30th day of May, 2018.

James I. Cohn

JAMES I. COHN
UNITED STATES DISTRICT JUDGE

Copies provided to counsel of record via CM/ECF